LEXSEE 315 B.R. 226

**JOHN T. SHEEHAN, JR., EXECUTOR OF THE ESTATE OF JOHN T. O'BRIEN; and JAMES T. CONNELL, Appellants, v. ANDREW S. RICHARDSON, TRUSTEE of Newport Creamery, Inc., Appellee.**

**C.A. No. 03-395L**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

*315 B.R. 226*; *2004 U.S. Dist. LEXIS 19538*

**September 29, 2004, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *Sheehan v.*

*June 23, 2006)*

**DISPOSITION:** [**1] Bankruptcy Court's entry of judgment against appellants, jointly and severally, in amount of $ 150,000 for usury on Count I, and in amount of $ 450,000 for state RICO violations on Count IV, affirmed. Matter remanded to Bankruptcy Court for further proceedings.

**COUNSEL:** For JOHN T. SHEEHAN, as Executor of the Estate of John T. O'Brien, Jr., Appellant: Kevin D. Heitke, Harrisville, RI.

For ANDREW S. RICHARDSON, Appellee: John Paul Boyajian, Esq., Boyajian, Harrington & Richardson, Providence, RI.

For US TRUSTEE, Trustee: PRO SE, Providence, RI.

**JUDGES:** Ronald R. Lagueux, Senior Judge.

**OPINION BY:** Ronald R. Lagueux

**OPINION**

[*230] **DECISION AND ORDER**

**Ronald R. Lagueux, Senior United States District Judge**

This matter is before the Court as an appeal from a judgment entered by the Bankruptcy Court for the

was Executor of the Estate of John O'Brien, and James T. Connell, who was a residuary beneficiary of that Estate (hereinafter "Appellants"). Appellants seek a reversal of the Bankruptcy Court's decision granting summary judgment in this case on one count of usury (Count I), *see R.I. Gen. Laws § 6-26-2(a) (2000)*, and one count for violation of the Rhode Island Racketeering Influenced and Corrupt Organizations ("RICO") statute (Count IV), *R.I. Gen. Laws § 7-15-1(d)(1985)*; *§ 7-15-2(a) (1979)*, in favor of Appellee, Andrew Richardson, the Bankruptcy [**2] Trustee for Newport Creamery, Inc., [1] (hereinafter "the Trustee"). At the time of the hearing, the Bankruptcy Court also denied the Trustee's motion for summary judgment on Count III which alleged that there had been a fraudulent conveyance to the Appellants. [2] Roughly two months after these decisions were made, the Trustee filed a Motion for Entry of Separate and Final Judgment as to Counts I and IV (the usury and state RICO claims). The motion was granted and judgment was entered on those Counts and this appeal ensued. Counts II and III (both alleging a fraudulent conveyance) were not resolved, therefore, those Counts are not before this Court on this appeal.

1 Case No. BK 01-13196, U.S. Bankruptcy Court for the District of Rhode Island.

2 Count III of the Trustee's Complaint, entitled "Fraudulent Conveyance," alleges that Newport Creamery paid $ 150,000 to Appellants without receiving a reasonably equivalent value in exchange for the transfer, and (1) the debtor was

engaged in or about to engage in a business or a transaction for which remaining assets of the debtor were unreasonably small in relation to its business, and (2) the debtor intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. Complaint at PP20-22.

[**3] **BACKGROUND**

In the summary judgment context, a district court must consider the facts presented in the light most favorable to the non-moving party. *See Fed.R.Civ.P. 56(c)*; *Fed.R.Bankr.P. 7056*; *see also McConaghy v. Sequa Corp., 294 F. Supp.2d 151, 153 (D.R.I. 2003)*. Pursuant to that directive, the following are the undisputed facts, taken in the light most favorable to the non-moving party:

John T. Sheehan (hereinafter, "Sheehan") was appointed the Executor of the Estate of John T. O'Brien (hereinafter, "the Estate"). Mr. O'Brien passed away on January 20, 1999, and his will was [*231] probated in the Bristol, Rhode Island Probate Court, on February 2, 1999. The will provided that, after three bequests were paid, James T. Connell (hereinafter, "Connell") of Portsmouth, Rhode Island, would receive the residue of the Estate. [3]

3 The three bequests were made to Stan Novak of Barrington, Rhode Island, Larry Genovese of Queens, New York, and Saint Luke's Church of Barrington, Rhode Island.

[**4] Some time prior to March 8, 1999, Robert Swain (hereinafter, "Swain") approached Connell and requested a private loan. Connell agreed to grant him the loan in the amount of $ 100,000 and contacted Sheehan to have the money forwarded from his expected bequest. On March 5, 1999, a promissory note drafted by Sheehan, which is the focal point of this litigation, was executed by Swain, which provided: "Swain Development Corporation and Robert Swain, personally. . .promise to pay to John Sheehan, Executor of the Estate of John T. O'Brien. . .the sum of One Hundred Fifty Thousand ($ 150,000) Dollars." *See* Complaint, Exhibit A. In the note it is provided that $ 75,000 was to be payable in 14 days and $ 75,000 was to be payable in 90 days.

On March 8, 1999, three days after the execution of the note, Sheehan made a wire transfer in the amount of $ 100,000 from the Estate to Swain's account at Huntington National Bank in Clearwater, Florida. All exhibits, testimony, and memoranda submitted by the parties show that the amount transferred to Swain was $ 100,000, which is $ 50,000 less than the amount payable under the promissory note. Appellants do not contest these facts.

[**5] On or around March 12, 1999, Swain acquired The Newport Creamery, Inc. (hereinafter, "Newport Creamery") via his Florida-based, family-controlled, limited-liability corporation, Rocomi, LLC. Thereafter, he assumed the role of President of Newport Creamery. Acting in that capacity, Swain used funds of Newport Creamery to pay the full amount of the note. On September 27, 1999, approximately six months after Swain acquired Newport Creamery, Swain issued a $ 50,000 check from Newport Creamery to the Estate as a first installment on the loan. Seven months later, on April 20, 2000, Swain orchestrated the sale of property owned by Newport Creamery, located on Brown's Lane in Middletown, Rhode Island, to Rhumbline Partners, [4] a company partly owned by Sheehan and Connell and managed by Connell. The property was sold for the price of $ 300,000 with a credit in the amount of $ 100,000 given to the purchaser. This credit was deemed by the parties to have satisfied the balance due on the note.

4 Rhumbline Partners was an original party to this suit in the bankruptcy court; however, summary judgment was not granted against this entity, so it is not a party to this appeal.

[**6] No connection has been shown between the Estate and Rhumbline with regard to this credit. Also there is no direct evidence showing that the money was actually paid to the Estate by Rhumbline. However, bank records from the Estate indicate that two deposits were made to the Estate account. Combined, these deposits serve as the payment for the full balance due on the note. The first deposit was in the amount of $ 50,000, and it was immediately transferred to Larry Genovese to satisfy his bequest from the Estate. The second deposit was in the amount of $ 100,000, and it was divided with $ 25,000 going to Sheehan and $ 75,000 to Connell.

No other evidence has been presented to show that money was transferred to Swain, Swain Development Corporation, or Newport Creamery. All evidence and testimony [*232] establish the following factual sequence: (1) Connell verbally agreed to grant Swain a loan of $ 100,000; (2) Sheehan drafted and Swain

executed a promissory note in the amount of $ 150,000; (3) Swain received $ 100,000 from Estate funds; and (4) once Swain gained control of Newport Creamery, the repayment of the loan was satisfied with Newport Creamery funds in the amount of $ 150,000.

[**7] In a relatively short time, under Swain's stewardship, Newport Creamery became insolvent and filed for Chapter 11 bankruptcy in the Bankruptcy Court for the District of Rhode Island on June 25, 2001. The case was converted into a Chapter 7 proceeding on September 11, 2001, and Richardson was appointed the Trustee of Newport Creamery. *See In re Bowker, 245 B.R. 192, 195 (D.N.J. 2000)*; *see also 11 U.S.C. § 704(1)*. On April 4, 2002, in fulfillment of his obligations as Trustee, Richardson filed this Complaint in the United States Bankruptcy Court for the District of Rhode Island to recover money damages against Sheehan and Connell.

On April 24, 2003, as part of a separate settlement agreement of claims made by the Trustee against Swain, Swain made the following assignment to the Trustee:

> On his behalf and on behalf of Swain Development Corporation. . .any and all claims he and Swain Development might have against the Estate of John O'Brien *or any other party* arising out of a promissory note executed by Robert Swain and Swain Development Corporation in the face amount of $ 150,000, dated March 5, 1999.

[**8] Trustee's Brief, Exhibit J (emphasis added).

Both sides agree that for purposes of this appeal there are no disputed issues of material fact. However, Appellants dispute that the Trustee was entitled to judgment as a matter of law on Counts I and IV of the Complaint.

The judgment entered in pertinent part provides as follows:

> 1. The Trustee's Motion for Summary Judgment as to Count I of the Complaint is granted, and judgment is entered jointly and severally against defendants John T. Sheehan, Jr., Executor of the Estate of John T. O'Brien and James T. Connell in the amount of One Hundred Fifty Thousand ($ 150,000.00) Dollars plus interest and costs;
>
> 2. The Trustee's Motion for Summary Judgment as to Count III of the Complaint is denied;
>
> 3. The Trustee's Motion for Summary Judgment as to Count IV of the Complaint is granted, and judgment is entered jointly and severally against defendants John T. Sheehan, Jr., Executor of the Estate of John T. O'Brien and James T. Connell in the amount of Four Hundred Fifty Thousand ($ 450,000.00) Dollars plus interest, costs and reasonable attorney's fees to be determined by the Court.

[**9] **JURISDICTION AND STANDARD OF REVIEW**

Pursuant to *28 U.S.C. § 158* this Court has jurisdiction over the instant appeal. *Section 158(a)* states in pertinent part:

> (a) The district courts of the United States *shall* have jurisdiction to hear appeals
>
> (1) from *final judgments, orders, and decrees;*
>
> (2) from interlocutory orders and decrees issued under *section 1121(a) of title 11* increasing or reducing the time periods referred to in *Section 1121* of such title; and
>
> (3) *with leave of the court, from other interlocutory orders and decrees. . .*of [*233] bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under *section 157* of this title. . .

*28 U.S.C. § 158 (2004)* (emphasis added), *see also In re Ryan, 282 B.R. 742, 747 (D.R.I. 2002).*

It is clear that "on appeal from a decision of the Bankruptcy Court, this Court sits as an immediate

appellate Court." *In re Ryan, 282 B.R. at 747*. Such appeals are taken in the same manner as appeals in federal civil proceedings. *28 U.S.C. § 158(c)(2)*; [**10] *see also In re Mayhew, 223 B.R. 849, 854 (D.R.I. 1998)*. On appeal from the decision of a bankruptcy court, the district court is not bound to remain within the confines of the bankruptcy court's reasoning, but is free to affirm the decision on any ground supported by the record. *In re Ryan, 282 B.R. at 747*. (citing *In re Erin Food Services, Inc., 980 F.2d 792, 801 (1st Cir. 1992))*.

When reviewing a disposition of the bankruptcy court under *28 U.S.C. § 158(a)*, a district court may set aside factual findings only when they are clearly erroneous. *Fed.R.Bankr.P. 8013*; *see also In re Lopes, 211 B.R. 443, 445 (D.R.I. 1997)*; *In re Anderson, 128 B.R. 850, 852 (D.R.I. 1991)*. However, when questions of law are appealed, *de novo* review is the appropriate

of Bankruptcy Procedure state that *Fed.R.Civ.P. 56* applies to adversary proceedings. *See Fed.R.Bankr.P. 7056*. Pursuant to *Rule 56(c)*, summary [**11] judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*; *see also Darr v. Muratore, 8 F.3d 854, 859 (1st Cir. 1993)*. "A nonmovant, however, bears the burden of placing at least a single material fact into dispute after a moving party offers evidence of the absence of a genuine issue." *Darr, 8 F.3d at 859*. In this case, Appellants do not contest any of the facts that were educed in the Bankruptcy Court; therefore, this Court reviews the questions of law *de novo*, *In re Lopes, 211 B.R. at 445*.

While it is abundantly clear that this Court does have jurisdiction over the instant appeal, a close reading of the statute indicates that as a threshold matter, it must also be determined whether or not the order of the Bankruptcy Court is a final one and, in so doing, ascertain under which part of *§ 158* this appeal falls. While all parties, including the Bankruptcy [**12] Court itself have treated the order on appeal as a final judgment as to Counts I and IV, two issues remain outstanding which may call into question the order's finality. They are, (1) whether or not pre-judgment interest should be included in the judgment and, if so, in what amount, and; (2) whether or not attorneys' fees are payable to the Trustee and, if so, in what amount.

Despite these two as yet unresolved issues, this Court concludes that under *§ 158* the order is in fact final for purposes of appeal. Indeed, district courts, including many in this circuit have held that in bankruptcy proceedings, the finality of an order has a more flexible interpretation than in ordinary civil cases. *In re Murray, 116 B.R. 6, 1990 U.S. Dist. LEXIS 8085 (D. Mass. June 29, 1990)* (*citing to In re American Colonial Broadcasting Corp., 758 F.2d 794 (1st Cir. 1985))*; *In re Saco Local Development Corp., 711 F.2d 441, 444-46 (1st Cir. 1983)*. *See also In re Chateaugay Corp., 880 F.2d 1509, 1511 (2d Cir. 1989)*; *In re Johns-Manville Corp., 824 F.2d 176, 179 (2d Cir. 1987)*. The First Circuit, along with other courts, [**13] [*234] has held that in a bankruptcy proceeding, orders "may be immediately appealable if they finally dispose of discrete disputes within the larger case." *In re Saco, 711 F.2d at 444*. *See also In re Richmond, 105 B.R. 14, 15 (D. Tex.. 1989)* (Finding that order was final for purposes of appeal because it determined the substantive rights of the parties).

While case law does indicate that this order may be treated as final for purposes of appeal, it is worthy of note that were its finality to be challenged (it has not), jurisdiction is still present under *§ 158(a)(3)*. In fact, pursuant to *§ 158* this court may review *any* order of the bankruptcy court, including "with leave of the court. . .interlocutory orders and decrees. . ." *28 U.S.C. § 158(a)(3)*. Thus, under the broad jurisdictional discretion provided by *§ 158*, this Court may actually treat the notice of appeal, filed with the bankruptcy court, as an application for leave to appeal. *In re Johns-Manville Corp., 32 Bankr. 728, 731 (S.D.N.Y. 1983)*. The statute provides the Court with discretion in reviewing an interlocutory appeal whether or not it [**14] is considered final for purposes of appeal in other instances. *In re Richmond, 105 B.R. at 15*. Jurisdiction, thus, having been settled, this Court turns now to the substance of the appeal.

**DISCUSSION**

Rhode Island law declares that interest charged on a loan at a rate higher that twenty one (21%) percent per annum is usurious and void and a borrower can recover any amounts paid on the loan. *R.I. Gen. Laws § 6-26-2(a) (2000)*. In this case, the evidence establishes that a promissory note was executed for the amount of $ 150,000; however, only $ 100,000 was transferred to

Swain as a loan. The Bankruptcy Court correctly concluded that the difference of $ 50,000 was interest charged on the loan. According to the Trustee, the repayment schedule contemplated by the promissory note would have resulted in an interest rate on the loan of 406 percent. Trustee's Brief at 5; Transcript at 3. Using the repayment schedule utilized by Swain, the interest on the note was actually 49 percent. Trustee's Brief at 4; Transcript at 3.

It is clear under Rhode Island law that all loan contracts that violate state interest laws, *see R.I. Gen. Laws § 6-26-2(a) (2000)* [**15] , are usurious and void. *R.I. Gen. Laws § 6-26-4 (1995)*. Under Rhode Island law, if it is shown that Appellants acted in concert in (1) making the loan, (2) demanding payment on the loan, and (3) achieving receipt of funds in excess of the 21 percent maximum interest rate, a case of usury has been made out [illegible] *127, 133 (1980)*. In addition to the state usury statute, the Rhode Island RICO statute makes it illegal to collect "unlawful debt." *R.I. Gen. Laws § 7-15-1(d) (1985)*. The statute defines "unlawful debt" as debt incurred or contracted for which is unenforceable under state law in whole or part as to principal or interest because of the law relating to usury. *Id.* at *§ 7-15-1(d)*.

As previously noted, Appellants do not contest the facts on this appeal, nor do they contend that the Trustee has failed to prove all the elements of the usury claim or state RICO claim. Instead, they offer four separate arguments as to why the Bankruptcy Judge's decision granting summary judgment on Counts I and IV should be reversed.

First, Appellants assert [**16] that the Trustee's usury claim is barred by the state statute of repose because it was brought against the Estate after the Estate was distributed. *See R.I. Gen. Laws § 33-11-5 (1956)*. Second, Appellants argue that [*235] since the promissory note discussed above was signed by Swain, the Trustee cannot establish a debtor/creditor relationship between Newport Creamery and Appellants and thus, cannot recover against them. Third, Appellants argue that Swain's complicity in the usurious transaction undermines his ability to bring suit, and, as a result, prevents the Trustee from maintaining this cause of action in his stead. Finally, Appellants argue that the Bankruptcy Judge's reasoning in denying summary judgment as to Count III, on the Trustee's claim for fraudulent conveyance, applies with equal force to the Trustee's usury and state RICO claims, and thus should bar summary judgment on those Counts. This Court shall address each of these four assignments of error individually.

**I. The State Statute of Repose**

Appellants argue that the Bankruptcy Court erred in entering summary judgment against Sheehan because Sheehan is being sued in his representative [**17] capacity as Executor of the Estate. The Rhode Island statute of repose provides that all claims against an estate must be filed before that estate is distributed. *R.I. Gen. Laws § 33-11-5 (1956)*. In this case, the Estate was distributed on January 15, 2002, and, the Trustee did not file his Complaint until April, 2002. Further, Appellants argue that Sheehan's representative capacity was result, according to the Appellants, Sheehan was no longer the Executor of the Estate of John T. O'Brien, when the Complaint was filed. Therefore, Appellants argue that the Bankruptcy Court erred in granting summary judgment against Sheehan as Executor of the Estate.

The argument that Appellants make regarding the statute of repose can only succeed if the claim was brought against Sheehan in his representative capacity. If the Complaint was filed against Sheehan in his representative capacity (really against the Estate), Appellants are correct that the Trustee would not be able to maintain the suit because the Estate had been closed prior to the Trustee filing the case. However, if the Complaint was filed against [**18] Sheehan in his individual capacity, the state statute of repose would be inapplicable. In his brief, the Trustee argues that the instant claim is not brought against Sheehan in his representative capacity as Executor, but rather against Sheehan in his *individual capacity* for harm resulting from his actions *while serving as Executor of the Estate*. See Trustee's Brief at 8 ("The fact that an estate is closed does not prevent an entity harmed by the actions of its executor from suing the executor for those actions.") Therefore, this Court must determine in what capacity Sheehan was sued in this case.

In order to resolve this question, this Court must evaluate the Complaint as a whole. *Colorado Springs Cablevision, Inc. v. W.A. Lively, 579 F. Supp. 252, 255 (D.Colo. 1984)*; *see also Babb v. Paul Revere Life Ins.*

*Co., 102 F. Supp. 247, 251 (D. Mass. 1952)* (stating that a complaint should always be evaluated as a whole rather than piecemeal). Rhode Island courts apply the same standard. *Procaccianti v. Procaccianti, 76 R.I. 305, 312, 69 A.2d 635, 639 (1949)* (holding that under Rhode Island law courts must look to both the summons [**19] and the body of the complaint to determine the capacity in which the parties are sued). Thus, this writer must look at the Complaint as a whole in order to determine whether Sheehan was sued in his individual or representative capacity.

When reviewing the Complaint, this Court also recognizes that [*236] *Fed.R.Civ.P. 10(c)* applies to adversary bankruptcy proceedings. *Fed.R.Bankr.P. 7010. Rule 10(c) of the Federal Rules of Civil Procedure* provides that a copy of any written instrument which is attached as an exhibit to a pleading is incorporated as a part thereof for all purposes. *Fed.R.Civ.P. 10(c)*. The same rule applies under Rhode Island law. *See* R.I.Super.R.Civ.P. 10(c); *Bowen Court Associates v. Ernst & Young, LLP, 818 A.2d 721, 726 (R.I. 2003)*. In this case, the Trustee attached a copy of the promissory note to the Complaint, and referred to it specifically therein. *See* Complaint at P7; *see also* Exhibit A. Because the promissory note was attached to the Complaint, it was made part thereof, and this [**20] Court must consider it in determining this issue. [5] Taking these principles into consideration, this Court will analyze the various parts of the Complaint.

5 The Trustee also attached to his Complaint a copy of a check from Newport Creamery to the Estate in the amount of $ 50,000, representing the first payment on the loan. *See* Complaint at P11 and Exhibit C. Thus, this instrument is also incorporated into the Trustee's Complaint. The check is made out to the Estate alone, and does not name Sheehan in any capacity. *See* Complaint, Exhibit C. As a result, it does not assist the Court in determining in what capacity Sheehan was sued.

**A. Caption**

The caption of the Complaint names "JOHN T. SHEEHAN, Executor of the Estate of John O'Brien." The word "as" was not used. The wording of this caption was taken verbatim from the promissory note, which was executed by Swain under Rhode Island law. Standing alone, this caption merely recites that Sheehan was Executor of the Estate, and does not include [**21] language indicating that Sheehan was sued in his representative capacity. *See Stratton v. City of Boston, 731 F. Supp. 42, 45 (D. Mass. 1989)* (stating that a claim made against a defendant identified in the caption both by name and by an official title, set off only by commas, is ambiguous as to the capacity in which the defendant is sued). However, pursuant to *Fed.R.Civ.P. 9(a)*, which applies to adversary bankruptcy proceedings, *see Fed.R.Bankr.P. 7009*, representative capacity need not be specifically pleaded in the case caption for a party to be sued in his or her representative capacity. [6] When the caption is ambiguous as to the capacity in which a party is sued, the court must evaluate the body of the complaint and the claims asserted to determine capacity. *See Colorado Springs Cablevision, 579 F. Supp. at 255*; *see also Chute v. City of Cambridge, 201 F.R.D. 27, 32 (D. Mass. 2001)* (scrutinizing body of complaint in a case brought under *42 U.S.C. § 1983* to determine whether the defendants were sued in their individual or official [**22] capacities). As a result, this writer must consider the remainder of the Trustee's Complaint.

6 In federal courts, capacity need not be alleged by a party in a pleading unless it is relevant to the determination of jurisdiction. *Fed.R.Civ.P. 9(a)*; Wright & Miller, Federal Practice and Procedure: Civil 2d § 1292 (1990). While*9(a)* allows a party to omit from the caption, the capacity in which a person is sued, courts have held that if a plaintiff alleges a capacity, that averment must be correct. *Castleglen, Inc. v. Commonwealth Sav. Ass'n, 118 F.R.D. 515, 517 (D. Utah 1988)*.

**B. Body**

In its evaluation of the body of the Complaint, this Court recognizes that the Complaint's factual allegations make reference, in at least one place, to Sheehan's actions in his representative capacity as Executor of the Estate. Paragraph 7 of the Complaint states that Sheehan, in his capacity [*237] as Executor of the Estate, loaned $ 100,000 to Swain and Swain [**23] Development Corporation. Complaint at P7. However, this Court concludes that this factual allegation describes only where the money for the loan originated and not necessarily the capacity in which Sheehan is being sued. It is uncontested that Sheehan actually ordered the transfer of money from the Estate to Swain in his capacity as Executor. However, it is clear that Sheehan

was acting as Connell's agent in doing so. As the Trustee argues, the fact that Sheehan used Estate funds does not prevent the Trustee from suing Sheehan individually for damages for his wrongdoing. Although the Complaint alleges that Sheehan used his position as Executor to fund the loan to Swain, the Complaint also cites and attaches the promissory note, describing the note throughout the Complaint as the vehicle giving rise to the claims against Appellants. *See* Complaint at PP7, 9, 13, 15, and Exhibit A. Consequently, the Court must now focus on the promissory note because it is deemed to be part of the Complaint. *See Fed.R.Civ.P. 10(c)*.

**C. Exhibit A, the Promissory Note**

The promissory note was drafted by Sheehan. He is the architect of this fiasco. [**24] He structured this transaction as a usurious loan. Not only did he commit a

personally liable for violating the usury laws. He made the promissory note payable to "John Sheehan, Executor of the Estate of John T. O'Brien". He didn't use the word "as" so the Estate is not the payee of the note. The Rhode Island Supreme Court has held that an executor, who endorses a promissory note in his own name and adds to it the words "as executor", is to be held personally liable because he has no authority to bind the persons for whom or for whose benefit, or for whose estate, he is acting. *Roger Williams Nat. Bank v. Groton Mfg. Co., 16 R.I. 504, 506-07, 17 A. 170, 170-71 (1889)*; *see also Taylor v. Davis' Adm'x, 110 U.S. 330, 337, 28 L. Ed. 163, 4 S. Ct. 147 (1884)*. The mere use of his title in the note will not discharge him. *Id.* The Rhode Island Supreme Court has also held that if a note is payable to an individual with a description of his official character attached to his name, then the added words shall be regarded as *discriptio personae,* and the individual is the payee. *Nat'l Bank of Commerce v. McLaughlin, 50 R.I. 60, 62, 145 A. 16, 17 (1929)*. [**25] Thus, under Rhode Island law, Sheehan's failure to include the Estate as the payee of the note, whether intentional or otherwise, makes him the payee and personally liable for any wrongful conduct arising out of the transaction.

In short, the Trustee had no claim against the Estate. He surely had a claim against Sheehan personally and against Connell because Connell was Sheehan's principal and participated in and ratified this transaction.

Therefore, it is obvious to this Court that Sheehan was sued in his individual capacity and the statute of repose has no application to this case. Consequently, this Court concludes that Appellants' argument regarding the statute of repose is meritless.

**II. The Debtor/Creditor Relationship**

Here, Appellants argue that there is no debtor/creditor relationship between Newport Creamery and Appellants and, therefore, this suit cannot be maintained by the Trustee against them. When the promissory note was executed, Swain signed the note on his own behalf and on behalf of Swain Development Corporation. At that time, neither Swain, nor Swain Development Corporation, had an interest in Newport Creamery. Swain was merely [*238] in [**26] negotiations for the purchase. It is clear that Newport Creamery was not the recipient of the loan and was not liable on the promissory note. Therefore, Appellants

between Appellants and Newport Creamery, the Trustee could not maintain an action for usury, and without usury, the Trustee could not maintain an action for state RICO violations.

This argument has no merit because it ignores the assignment executed by Swain as a part of his settlement with the Trustee. That assignment establishes the basis for a suit by Newport Creamery and the Trustee since Newport Creamery funds were used to pay off the loan. When Swain assigned to the Trustee any and all claims that Swain or Swain Development Corporation had in order to settle the Trustee's claims against him for his wrongdoing, the right to sue became part of the bankruptcy estate of Newport Creamery. *See 11 U.S.C. § 541(a)*. Therefore, the Trustee had the right and the duty to pursue these usury and RICO claims against Sheehan and Connell as the perpetrators of this usurious transaction.

[**27]

Appellants rely on a U.S. Supreme Court case which holds that a trustee in bankruptcy cannot maintain an action against a third party that could not have been maintained by the debtor. *Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 432 n.22, 434, 32 L. Ed. 2d 195, 92 S. Ct. 1678 (1972)*. Appellants argue that Swain had no grounds to sue at the time the case was commenced because he never claimed that the loan was usurious. Appellants also assert that Swain waived his right to a claim of usury. Alternatively, as an added

argument made both in their brief and at the hearing before the Bankruptcy Court, Appellants content that the Trustee "conveniently but conversely" attempted to distance Newport Creamery from Swain for fear that Swain would be considered a co-conspirator, and furthermore, if Swain was a co-conspirator, then the liability of Appellants should be limited. *See* Appellants' Brief at 16; *see also Pate v. Hunt, 149 B.R. 96, 101 (N.D. Texas 1992)*. The Court will now address these contentions.

**A. Grounds to File Suit**

This Court concludes that both the usury and RICO counts at issue were properly before the Bankruptcy Court. [**28] The original debtor was Swain. Swain could have maintained an action against Sheehan and Connell under usury and state RICO statutes; but, he

against Appellants as a bargaining tool for the settlement of the claims being made against him by the Trustee. *See* Trustee's Brief, Exhibit J; *see also* text *supra*.

After Swain made the assignment, the choice of whether or not to file suit belonged to the Trustee. *Title 11, section 541(a)(7) of the Bankruptcy Code* states that after the voluntary filing of a bankruptcy petition, which commences a case and creates an estate, all "property of the estate" includes any interest in property which the estate acquires thereinafter. *11 U.S.C § 541(a)(7)*. The right to bring suit is an assignable form of property recognized under Rhode Island law. *See R.I. Gen. Laws § 9-2-8 (1956)* (stating that the assignee of a "nonnegotiable chose in action" has the ability under Rhode Island law to bring suit in his or her own name, subject to all defenses raisable against the assignor); *New Bedford Inst. for Sav. v. Calcagni, 676 A.2d 318, 320 (R.I. 1996)* [**29] (reciting the "long settled" practice that the assignee of a nonnegotiable chose in [*239] action may bring suit in the assignor's shoes if the assignment is in writing); Black's Law Dictionary 241 (6th ed. 1990) (defining "chose in action" as a "right of bringing an action" or a "right of proceeding in a court of law to procure payment of a sum of money"). Therefore, once the right to sue was absolutely and irrevocably assigned to the Trustee, the right to sue on these claims became part of the Newport Creamery estate. *11 U.S.C. § 541(a)(7)*. This nullifies Appellants' argument that the Trustee cannot sue a third party. The Trustee has established that he has the right to sue Appellants on Newport Creamery's behalf.

Appellants also argue that the Trustee has no grounds for filing suit as Swain waived his right to a claim of usury. In support of this proposition, Appellants cite *Giorgio v. DeFusco*, wherein then Chief Judge Francis J. Boyle, referring to an Oklahoma case, stated: "In our opinion, however, waiver of a usury defense should be permitted when it is freely and knowingly made after reasoned reflection for the legitimate purpose of avoiding or settling [**30] litigation." *Boyajian v. Defusco (In re Giorgio), 81 B.R. 766, 770 (D.R.I. 1988)* (*citing Shoenfelt v. Donna Belle Loan and Investment Co., 1935 OK 579, 172 Okl. 346, 348, 45 P.2d 507, 509-510 (Okla. 1935)*; *Siegal v. Lechler, 130 Colo. 338, 342-343, 275 P.2d 949, 951 (Colo. 1954)*; *Gunn Plumbing, Inc. v. Dania Bank, 252 So.2d 1, 4 (Fla. 1971))*. Judge Boyle's statement, when taken in context, is inapplicable to the facts of this case. The quote was made in reference to the plaintiffs in that case, who had raised a claim of usury in a previous suit and had entered into a consent judgment with the defendants in the context of that case releasing any potential claim of usury against the defendants. After the plaintiffs defaulted on their payments and went into bankruptcy, they filed a new case, moving to vacate the consent judgment. *Giorgio, 81 B.R. at 767-70*. In *Giorgio*, Judge Boyle concluded that the usury claim was part of the consent agreement reached in the previous case and thus could not be reasserted. *Id. at 770*. Here, Swain settled with the Trustee but never settled the usury claim with Appellants. Instead [**31] he assigned it to the Trustee who can now assert it against Sheehan and Connell.

In any event, Appellants have failed to establish that Swain waived his claim of usury both knowingly and voluntarily. Waiver is the intentional and voluntary relinquishment of a known legal right. *Doyle v. Huntress, Inc., 301 F. Supp. 2d 135, 149 (D.R.I. 2004)*; *Harvard Pilgrim Health Care v. Thompson, 318 F. Supp. 2d 1, 11 (D.R.I. 2004)*. Here, Swain assigned his legal right to sue to the Trustee. There is not a shred of evidence that Swain intentionally or voluntarily gave up his right to sue Appellants. Appellants have failed to establish the required elements of a waiver and have failed to demonstrate how Judge Boyle's statement in *Giorgio*, which was taken out of context, has any applicability to this case. Therefore, this Court rejects Appellants' argument.

**B. Distancing Newport Creamery from Swain**

Now the Court turns to Appellants' argument that the Trustee is attempting to distance Swain from Newport Creamery. This argument is based on the notion that Swain is a collaborator in constructing this high interest loan arrangement, [**32] and thus, cannot benefit from the receipt of these funds and then claim to be a victim of usury. It is apparent to this Court that Appellants are arguing an *in pari delicto* defense without saying it in so many words. The *in pari delicto* doctrine [*240] is that a plaintiff, who has participated in the wrongdoing, may not recover damages resulting from the wrongdoing. Black's Law Dictionary 794 (7th ed. 1999). It is well established under Rhode Island law that when a plaintiff is *in pari delicto*, the law will not aid either party, but instead it leaves the parties where it finds them. *Sullivan v. Hergan, 17 R.I. 109, 110, 20 A. 232, 233 (1890)*. The

what the law says shall not be done. *Birkett v. Chatterton, 13 R.I. 299, 303 (1881)*.

However, the Rhode Island Supreme Court has also held that the action of the plaintiff must be directly prohibited by statute in order for the *in pari delicto* doctrine to apply. *Guay Bros. Inc. v. Gauvreau, 47 R.I. 400, 401-02, 133 A. 797, 798 (1926)* (where a landlord moved to eject a tenant who was illegally selling alcohol out of a [**33] garage, and the Court found that the landlord was not *in pari delicto* even though his employees, who were acting under his orders, had bought alcohol from the tenant, because the statute that was violated only made it illegal to sell alcohol out of the garage); *Grande v. Eagle Brewing Co., 44 R.I. 424, 428, 117 A. 640, 642 (1922)* (where there was an illegal contract for the sale of a liquor license and the buyer sued to recover the cost of the license, the Court held that the *in pari delicto* doctrine did not apply as it was only unlawful to sell a liquor license, not to buy one); *Birkett 13 R.I. at 301-03* (where a father was not allowed to recover money owed to his 11 year old son because of the *in pari delicto* doctrine, because the statute prohibited the employment of minors in manufacturing establishments). In the state usury and RICO statutes, there is no mention of the *in pari delicto* doctrine, nor is there mention of a similar defense. Notably as well, there are no other statutes in Rhode Island that bar the payment of an illegal interest rate. Here, the statutes in question only bar the lender from reserving, charging or taking [**34] illegal interest on a loan, *R.I. Gen. Laws § 6-26-2(a) (2000)*, or the collection of unlawful debt, *R.I. Gen. Laws § 7-15-2(a) (1979)*. In this case, Swain cannot be found to have participated in any wrongdoing in borrowing money at a usurious interest rate because his actions were not expressly prohibited by any statutes. Therefore, Swain could, in fact, have actually benefitted from the receipt of the loan money and still claim to be a victim under the state usury and RICO statutes.

**1. Usury Claim**

Even if Swain knew that the interest was high at the time he accepted the loan, Rhode Island usury law places the burden of charging a legal interest rate on the lender:

> *No person*, partnership, association, or corporation *loaning money to or negotiating the loan of money for another*.
>
> *charge, or take interest on a loan*, whether before or after maturity, at a rate which shall exceed. . .twenty-one percent (21%) per annum. . . .

*R.I. Gen. Laws § 6-26-2 (2000)* (emphasis added).

The statute explicitly states [**35] that all borrowers will be able to recover the amount involved, even if payment has already been made on the loan. *R.I. Gen. Laws § 6-26-4(a) (1995)*. In addition, under Rhode Island contract law there must be an offer, acceptance and consideration in order to have a legal contract. *Filippi v. Filippi, 818 A.2d 608, 623-24 (R.I. 2003)*. Usury is a contract claim under which there must be: (1) a contract entered into; and, (2) the reservation, charging or taking of excessive interest. *R.I. Gen. Laws § 6-26-2 (2000)*; *§ 6-26-4 (1995)*. Hence, [*241] there can never be a violation of the usury laws without either party knowing of and bargaining for, or, in other words, contracting for, the terms, including high interest. Despite mutual assent to the terms, Rhode Island statutes do not punish the borrower. Instead, the Rhode Island statutes provide a remedy even after part or all of the loan has been paid. Here, Swain cannot be found *in pari delicto* with Appellants because Swain never reserved, charged or took any interest; therefore, even though he knew about the terms, he never participated in any wrongdoing that was prohibited [**36] by statute.

**2. State RICO Claim**

The Trustee's RICO claim is derived from the usury claim. The RICO statute prohibits the collection of unlawful debt. *R.I. Gen. Laws § 7-15-2(a) (1979)*. As defined by Rhode Island law, "unlawful debt" is debt incurred or contracted for which is unenforceable under state law, in whole or in part, as to principal or interest, because of the law relating to usury. *R.I. Gen. Laws § 7-15-1(d) (1985)*. Again, Appellants argue that Swain knew what the terms of the contract were when he accepted them, and therefore, should not be allowed to benefit from the receipt of the funds and then claim to be a victim.

In 1996, while examining both the federal civil RICO statute, *18 U.S.C. § 1964(a)*, and the state RICO statute at issue, the First Circuit observed that the question of whether or not an "innocent party" requirement exists in order for standing to be established [illegible] circuit. *Roma Constr. Co. v. A Russo, 96 F.3d 566, 570 (1st Cir. 1996)*. Under the wording of the state RICO statute, [**37] the federal RICO statute, and pertinent legislative history, the Court could find no requirement that a plaintiff had to be an "innocent victim." *Id. at 570-74*. The Court, however, did not have to rule on this issue because the plaintiff did show nonculpability under all potentially applicable statutes. *Id. at 572* (assuming, without concluding, that civil RICO standing is limited to innocent parties); *see also id. at 570 n.2* (cautioning that in its analysis the Court did not intend to imply an *in pari delicto* defense was applicable to civil RICO claims). The Court did assume that where RICO statutes provide a civil remedy, claims should only be denied if statutes and case law prohibit recovery, not on general policy grounds. *Id. at 571*. Also, if RICO standing was limited to "innocent parties", the question of a party's innocence must be resolved via the incorporation of state law into federal law. *Id. at 572*.

Therefore, in order for the *in pari delicto* doctrine to apply to the RICO count, Swain would need to have been involved with the wrongdoing, which, under the state RICO statute, [**38] was the collection of unlawful debt. Like the plaintiff in the First Circuit case, Swain can show that he is nonculpable under all potential statutes. As noted previously, the Rhode Island usury statute places the burden of reserving, charging, or taking of a legal interest rate on the lender. The Rhode Island RICO statute alters this burden slightly, as it places the burden of the legal interest rate on the collector. The Rhode Island RICO law statute states:

> It is unlawful for any person who has knowingly *received any income* derived directly or indirectly. . .*through the collection of unlawful debt*, to directly or indirectly use or invest any part of that income, or the proceeds of that income in the acquisition of an interest in, or the establishment or operation of any enterprise.

[*242] *R.I. Gen. Laws 7-15-2(a) (1979)* (emphasis added).

The state RICO statute is clear that it is the collection of unlawful debt that is illegal, yet, it does not state that it is illegal to pay unlawful debt. Here, Swain cannot be [illegible] Swain did not collect any unlawful debt, and thus [**39] did not participate in any usurious wrongdoing.

Appellants' argument that the Trustee has no standing to file suit fails, as standing was created when the assignment was executed to the Trustee. Rhode Island usury and RICO laws are meant to protect victims of a usurious loan, as remedies are available to all borrowers. *R.I. Gen. Laws § 6-26-4(a) (1995)*. Whether the debtor had knowledge that the interest rate was excessive is irrelevant under state law, as the contract can be created and paid, yet recovery is still permitted. *Id.* This state burdens only the lender and the collector, both of whom are often the creators of the terms and conditions of the loan, to not violate state interest laws. *R.I. Gen. Laws § 6-26-2 (2000)*; *§ 7-15-2 (1979)*. Therefore, the Bankruptcy Judge was correct in concluding that the Trustee could recover the $ 150,000 paid by Swain with Newport Creamery funds to Sheehan and Connell and treble damages of $ 450,000 against them for violation of the state RICO statute.

**IV. The Bankruptcy Judge's Reasons for Denying Summary Judgment as to the Fraudulent Conveyance claim**

In their brief, [**40] Appellants cite a statement made by Judge Votolato when he denied the Trustee's motion for summary judgment on the fraudulent conveyance claim (Count III):

> But for summary judgment reasons, or

> for the basis for summary judgment, I think the Court needs and requires a very high comfort level to assess or to make a ruling on an issue at this juncture. I just don't have it in this case.

Transcript at 20.

Appellants argue that Judge Votolato's rulings granting summary judgment on the usury and state RICO claims, but denying summary judgment on the fraudulent conveyance claims are inconsistent and thus should be reversed. This is an argument made out of desperation.

Appellants have quoted Judge Votolato out of context. In the statement quoted above, Judge Votolato was discussing the evidence set forth to prove the insolvency of Newport Creamery with relation to the elements necessary to prove a fraudulent conveyance are not the same as for a RICO or usury claim. The Trustee had to show that when the conveyance of $ 150,000 was made to Sheehan and Connell that made Newport Creamery insolvent. [**41] The Bankruptcy Judge concluded that the Trustee had not made that showing. Clearly, the Trustee made a showing that the loan made and collected by Sheehan and Connell was in violation of the usury and civil RICO statutes. The Bankruptcy Judge's denial of the Motion for Summary Judgement on Count III, is therefore, irrelevant to his ruling on the other counts.

CONCLUSION

For the reasons expressed above, the Bankruptcy Court's entry of judgment against Sheehan and Connell, jointly and severally, in the amount of $ 150,000 for usury on Count I, and in the amount of $ 450,000 for state RICO violations on Count IV, is affirmed. Since the Trustee's claims asserted in Counts II and III of the Complaint have not been resolved, and the [*243] issues of pre-judgment interest and counsel fees on Counts I and IV remain outstanding, this matter must be remanded to the Bankruptcy Court for further proceedings so that a truly final judgment can be entered and an end result

It is so ordered.

Ronald R. Lagueux

Senior Judge

September 29, 2004

LEXSEE 896 A.2D 714

**James O. Opella v. Ilan I. Opella**

**No. 2004-380-Appeal.**

**SUPREME COURT OF RHODE ISLAND**

*896 A.2d 714; 2006 R.I. LEXIS 77*

**May 5, 2006, Filed**

**PRIOR HISTORY:** [**1] Appeal from Superior Court. Providence County. (PC 01-6000). Judge Stephen J. Fortunato.

**COUNSEL:** For Plaintiff: Dean G. Robinson, Esq.

For Defendant: Bruce R. Thibodeau, Esq.

**JUDGES:** Present: Williams, C.J., Goldberg, Flaherty, Suttell, and Robinson, JJ. JUSTICES: Williams, CJ., Goldberg, Flaherty, Suttell, and Robinson, JJ. WRITTEN BY: Justice Paul A. Suttell, for the Court.

**OPINION BY:** Suttell

**OPINION**

[*715] **Justice Suttell, for the Court.**The plaintiff, James O. Opella, appeals from a judgment in favor of his father, the defendant, Ilan I. Opella, in this dispute over money. [1] This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be decided summarily. After considering the written and oral submissions of the parties and examining the record, we are of the opinion that the issues raised in this appeal may be resolved without further briefing or argument. For the reasons set forth herein, we affirm the judgment of the Superior Court.

1 Both parties are residents of Texas. The defendant does not contest the *in rem* jurisdiction of the Superior Court over this action. *See Shaffer v. Heitner, 433 U.S. 186, 207-08, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977).*

[**2] **Facts and Procedural History**

This case has its genesis in various sums of money that defendant and his late wife, Margie Inez Opella,

1985 and 1994, he paid approximately $ 68,000 to plaintiff or to other persons on plaintiff's behalf. In a telephonic deposition, portions of which were read into the record, defendant testified that he, his wife, and plaintiff all considered the payments to be loans and that plaintiff had said that he would pay the money back. In addition, defendant and his wife kept receipts and summary lists of all payments to plaintiff that they considered to be loans. James Opella testified, however, that he never made any promises to pay back the money; rather, he considered the payments to be gifts.

In June 1985, plaintiff was incarcerated after a conviction for possession of a controlled substance, cocaine, with intent to deliver. He was released on bail from December 26, 1985, until January 1990, and was then again incarcerated, this time until April 1991. On December 30, 1985, while out on bail, plaintiff signed a promissory note for $ 16,000 payable to his father. The plaintiff explained that [**3] he signed the note at the insistence of his mother, just in case anything should happen to him, so that his parents could recover the money that they had paid to help him with his house.

[*716] On March 28, 1990, plaintiff signed a second promissory note for $ 100,000 payable to his parents. The plaintiff testified that this second note was his idea, to protect two properties that he owned. [2] This second note was secured by a mortgage, executed on the same date, encumbering two properties plaintiff owned, 408 Cranston Street and 81 Sycamore Street in Providence. Both the note and the mortgage specified a

rate of interest of 12 percent per annum. The plaintiff testified that he considered the documents to represent a "blanket lien" on the properties, rather than a "loan." He said that he trusted his parents and viewed the note as "nothing more than paperwork" that would protect them and the properties if he died. In contrast, defendant said that he understood the $ 100,000 promissory note to cover all payments that he and his wife had provided to plaintiff since 1985, plus any future advances. It is undisputed that plaintiff was incarcerated at the Adult Correctional Institutions when he [**4] executed this second promissory note and mortgage on March 28, 1990.

2 The plaintiff testified at trial that the idea to create the second note was his. In his written submission to this Court, however, he claims that he signed the note "reluctantly" and at defendant's [illegible]

On January 3, 1995, well after plaintiff's release from prison in 1991, defendant and his wife signed a partial release of the mortgage, thereby discharging the encumbrance on the Cranston Street property so that plaintiff could sell it. The release specifically stated that it would have no effect on his parents' right to collect on the Sycamore Street property. [3] A portion of the proceeds from the sale of the Cranston Street property was paid to plaintiff's parents. The plaintiff testified that he consented to this payment, which he characterized as "gratitude for all the help [he had] been given."

3 The partial release was introduced for identification, but was not made a full exhibit at trial. The plaintiff read the third paragraph of the partial release into the record as follows:

> "But this release shall not in any way affect or impair the right of said Margie Inez Opella and Ilan I. Opella to hold under the said mortgage deed as security for the sum remaining due thereof or to sell under the power of sale in said mortgage deed contained all the remainder of the premises therein conveyed and not hereby or heretofore releases or otherwise enforce the provision of said mortgage."

[**5] The plaintiff's mother died in 1998, bequeathing by will her entire estate, including her interest in the $ 100,000 note and mortgage, to defendant. In 2000, plaintiff entered into a purchase and sales agreement to sell the Sycamore Street property. The plaintiff retained Attorney George Landes to represent him in the sale. After discovering the existence of the mortgage lien on the property, Mr. Landes contacted Stanley Cramb, an attorney in Texas who was representing defendant, to discuss the matter.

On September 14, 2000, Mr. Landes wrote a letter to Mr. Cramb, notifying him that plaintiff was confident that the amount advanced to him by his parents was far less than $ 100,000, the amount appearing on the note and mortgage documents. The letter further stated that the [illegible] was serving a prison sentence, thus "in effect nullifying such conveyances" under Rhode Island statutory law. In a September 28, 2000 letter, Mr. Cramb responded that despite his belief that the Rhode Island law prohibiting prison inmates from conveying property did not apply, defendant had "decided to once again try to help his son." The letter went on to inform [**6] plaintiff's attorney that:

> [*717] "My client is willing to forgive the mortgage loan indebtedness and release his lien against your client's property in Rhode Island if your client will sign a general release releasing my client from any possible or potential liability as a result of your client's execution of the said mortgage loan documentation against his property. Please let me know if this proposal is acceptable to your client. If it is, please also send me the necessary documentation to release and discharge the mortgage lien against your client's property and to discharge the loan indebtedness. In turn, I will send to you a General Release of Liability to be signed by your client."

On October 11, 2000, Mr. Landes wrote back to Mr. Cramb, stating, "my client is in agreement with your client's proposal of September 28, 2000," and indicating that he was mailing a discharge of the mortgage for

defendant to sign.

The record reflects that further correspondence was exchanged between the attorneys, and that plaintiff signed a "Mutual Release Agreement" on November 21, 2000. Then, in a December 21, 2000 letter, defendant, through a newly secured Rhode Island attorney, Alfred [**7] Thibodeau, informed Mr. Landes that he was unwilling to execute the mutual release and was seeking recovery of the payments that he and his wife had made to plaintiff from 1985 to 1994.

On November 13, 2001, plaintiff filed a complaint in Superior Court, alleging that the note "lacked the consideration recited and the mortgage was improperly recorded" in the land evidence records, and that defendant's actions or inactions in failing or refusing to execute the release and mortgage discharge were

Street property. He also sought specific performance of the alleged agreement to settle. On December 14, 2001, defendant answered and filed a counterclaim alleging that plaintiff was indebted to him for the money paid to plaintiff or others on his behalf. The defendant averred that the $ 100,000 promissory note was valid for the repayment of sums advanced or to be advanced in the future, and that the mortgage secured by the Sycamore Street property was recorded properly on April 2, 1990. Each party also sought costs and attorney's fees.

After a nonjury trial, the trial justice found that the payments by defendant and his wife to plaintiff [**8] throughout the years "were loans and not gifts." In addition, he found that the promissory note, as well as the mortgage that plaintiff executed while in prison, were valid instruments. Finally, the trial justice found that the parties did not form a binding contract to settle because there "was never a meeting of the minds between the two."

Judgment was entered on November 10, 2004, which, *inter alia*, ordered plaintiff to repay defendant at a rate of 12 percent per annum "that amount ($ 32,000.00 or thereabouts) that was loaned to James Opella by Ilan and Margie Inez Opella prior to the execution of the promissory note, or March 28, 1990," and "that amount that was loaned * * * after the execution of the promissory note * * * without any interest accruing." The plaintiff also was held responsible "for all costs and attorney's fees incurred by Ilan Opella regarding this matter."

On appeal, plaintiff challenges the following rulings of the trial justice: (1) that plaintiff must repay all the funds that defendant and his late wife paid to him because they were loans, and not gifts; (2) that the $ 100,000 promissory note was valid; (3) that the mortgage securing said note was a [**9] valid security interest in the Sycamore Street property; and (4) that [*718] the parties had not entered into a valid contract to execute a mutual release for the discharge of the mortgage indebtedness.

**Standard of Review**

"In reviewing a trial justice's decision in a nonjury civil case, we will not disturb his or her factual findings 'unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *Bogosian v. Bederman, 823*

*Crime Laboratory Commission, 788 A.2d 1129, 1144 (R.I. 2002)).* We also "will not disturb determinations of credibility in a non jury trial unless the findings are clearly wrong or the [trial justice] misconceived or overlooked material evidence." *Id.* (quoting *Andreozzi v. Andreozzi, 813 A.2d 78, 82 (R.I. 2003)).* It is not this Court's task to weigh credibility; rather, "the task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." *Id.* (quoting *Walton v. Baird, 433 A.2d 963, 964 (R.I. 1981)).* [**10] "We must therefore consider all the facts, circumstances, and pleadings to determine whether the Superior Court justice's findings were clearly wrong and thereby constitute reversible error." *Forte Brothers, Inc. v. Ronald M. Ash & Associates, Inc., 612 A.2d 717, 721 (R.I. 1992).*

**Discussion**

The plaintiff's first argument on appeal is that the trial justice was clearly wrong in finding that the sums of money forwarded to plaintiff from his parents were loans, and not gifts. The evidence presented at trial conflicted concerning whether the payments provided to plaintiff were intended as loans or gifts. The plaintiff testified that the payments of money were gifts because his parents never indicated that any of the payments were loans and he never made any promises to repay them. According to defendant, however, all three individuals considered the advances to be loans.

The trial justice said that he was satisfied that the

sums defendant and his wife transferred to plaintiff "were loans and not gifts." Focusing on the two promissory notes plaintiff executed in favor of his parents as evidence that the payments were intended to be loans, he found the testimony [**11] of plaintiff "to be lacking in credibility or plausibility." The trial justice also considered the fact that defendant had kept meticulous records of the payments to plaintiff as further proof that they were not gifts.

In short, the trial justice found defendant's evidence to be more persuasive than plaintiff's evidence. This Court has upheld trial justices' determinations of fact in similar circumstances when the evidence presented at trial was contradictory. *See, e.g., Kobelecki v. Kobelecki, 706 A.2d 1322, 1323-24 (R.I. 1997)* (mem.); *Holding v. Holding, 82 R.I. 474, 475-76, 111 A.2d 476, 476-77 (1955)*. Affording these credibility determinations and

satisfied that the trial justice was not clearly wrong in finding that the payments that defendant and his wife provided to plaintiff were loans.

Next, plaintiff challenges the trial justice's ruling that the March 28, 1990 promissory note executed by plaintiff in favor of defendant and his wife was valid. He emphasizes that the evidence at trial indicated that the note had a face amount of $ 100,000, whereas defendant testified that only [**12] about $ 68,000 actually was [*719] "loaned" to plaintiff. [4] He argues that the difference of $ 32,000 between the note's face amount and the actual amount advanced "could only have constituted interest," meaning that the note contained a 32-percent rate of interest, which is prohibited by *G.L. 1956 § 6-26-2*. The plaintiff alleges that the note was usurious, and therefore null and void.

4 It should be noted that, in his deposition testimony admitted at trial, defendant said that the entire amount he actually had loaned to his son was approximately $ 68,000. The defendant later said, however, that the amount actually loaned to plaintiff up to the moment in time when the parties executed the $ 100,000 promissory note was approximately $ 32,000.

*Section 6-26-2(a)* prohibits loan interest rates that exceed 21 percent per annum. Any contract in which the yearly interest rate exceeds this maximum permissible rate is expressly declared void by *§ 6-26-4(a)*. The promissory note at issue in this case, however, clearly stated [**13] a rate of interest of 12 percent per annum on its face. The trial justice determined that the 12-percent interest attached only to the loans received by plaintiff before the note was executed, "$ 32,000.00 or thereabouts," less the partial release amount connected with the sale of the Cranston Street property. He also ruled that recovery of the funds paid to plaintiff after the note was executed would be without interest. The trial justice's decision in this regard was not clearly erroneous; nor did he overlook or misconceive material evidence.

The plaintiff also contends that the trial justice erred when he found that the mortgage securing the promissory note was valid. He argues that *§ 13-6-3* rendered the transaction void because plaintiff was incarcerated when the mortgage was executed and thus could not effectuate a conveyance of property absent Superior Court permission. *Section 13-6-3* provides that:

> "No person who shall be sentenced to imprisonment in the adult correctional institutions shall have any power, during his or her imprisonment, to make a will, or any conveyance of his or her property, or of any part of that property, except by permission of the superior [**14] court granted on petition for that power, and on the notice and terms, if any, that the court shall prescribe."

Applying equitable principles, the trial justice noted that it was plaintiff's idea to execute a mortgage and that after his release from prison he relied on it "as if it were a valid document" when he secured a partial release from his parents so that he could sell the Cranston Street property. It appears to us, however, that the issue of the mortgage's validity has become moot since the filing of this appeal. In his supplemental memorandum, defendant represents that the Sycamore Street property has been sold and that he "was paid pursuant to the Mortgage and the Superior Court's decision." Accordingly, he has signed and forwarded a discharge to the closing attorney. In light of the trial justice's ruling that the note itself was valid and the monies advanced were indeed loans, the validity of the mortgage *vel non* no longer has any relevance to this controversy. [5]

5 Even if this issue were not moot, we are satisfied that the trial justice did not err by

> applying equitable principles to preclude plaintiff from denying the validity of a mortgage that plaintiff admitted was his idea to execute. *See East Greenwich Institution for Savings v. Kenyon, 20 R.I. 110, 112-14, 37 A. 632, 633-34 (1897).*

[**15] Finally, plaintiff contends that the trial justice erred in finding that there was no contract between plaintiff and defendant [*720] to execute the mutual release and mortgage discharge. For parties to form an enforceable contract, there must be an offer and an acceptance. Each party must have and manifest an objective intent to be bound by the agreement. *Weaver v. American Power Conversion Corp., 863 A.2d 193, 198 (R.I. 2004).* For either an express or implied contract, "a litigant must prove mutual assent or a 'meeting of the minds between the parties.'" *Mills v. Rhode Island Hospital, 828 A.2d 526, 528 (R.I. 2003)* (mem.) (quoting

*Concrete Corp., 120 R.I. 360, 365, 387 A.2d 694, 697 (1978)).*

In the present case, the trial justice found that although there were negotiations between the parties' attorneys, there never was a meeting of the minds between the parties themselves. Crediting the testimony of Ilan Opella, the trial justice found the defendant to be an elderly gentleman who was undergoing a great deal of emotional turmoil and was confused. He further found that the defendant [**16] never manifested his assent to the settlement agreement, and thus there never was a meeting of the minds. Again, according the great deference to which the trial justice's credibility determinations and factual findings are entitled, we cannot say that he was clearly wrong.

**Conclusion**

For the reasons stated herein, we affirm the judgment of the Superior Court, to which court the record in this

LEXSEE 2006 U.S. DIST. LEXIS 25640

**ARMBRUST INTERNATIONAL, LTD. and ERWIN PEARL, INC., Plaintiffs, v. TRAVELERS CASUALTY and SURETY COMPANY OF AMERICA and ST. PAUL FIRE and MARINE INSURANCE COMPANY, Defendants.**

**CA 04-212 ML**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

***2006 U.S. Dist. LEXIS 25640***

**May 1, 2006, Decided**

**COUNSEL:** [*1] For Armbrust International, Ltd.,

Snow, Partridge, Snow & Hahn LLP, Providence, RI.

For Traveler's Casualty and Surety Company of America, Defendant: John J. Flanagan, John J. Flanagan, Attorney at Law, Warwick, RI; Mark E. Cohen, Robert J. Maselek, Jr., McCormack & Epstein, Boston, MA.

For St. Paul Fire and Marine Insurance Company, Defendant: Anthony R. Zelle, Zelle McDonough, P.C., Boston, MA; Stephen H. Burke, Ratcliffe Burke Harten & Elias LLP, Providence, RI.

**JUDGES:** Mary M. Lisi, United States District Judge.

**OPINION BY:** Mary M. Lisi

**OPINION**

***MEMORANDUM AND ORDER***

This matter is before the Court on Cross-Motions for Summary Judgment filed by Defendant Travelers Casualty and Surety Company of America ("Travelers") and Defendant St. Paul Fire and Marine Insurance Company ("St. Paul"), as well as a Motion for Partial Summary Judgment filed by Plaintiffs Armbrust International, Ltd. and Erwin Pearl, Inc. (collectively, "Plaintiffs"), all pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure.* Plaintiffs move for summary judgment on Count I, alleging breach of insurance [*2] contract and Count III, seeking a declaratory judgment of the rights and obligations of the parties. For the reasons

Judgment is granted, and those of Plaintiffs and Defendant St. Paul are denied.

I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* An issue is "genuine" if the pertinent evidence is such that a rational factfinder could render a verdict in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." *Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)* (citation omitted). Cross-motions for summary judgment "simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004)* [*3] (citation omitted).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. *Nat'l Amusements, 43 F.3d at 735.* Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but. . . must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).* The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Reich v.*

*John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)* (citation omitted).

In the instant case, the basic facts are not in dispute. Where there are no significant disagreements about the basic facts, a court may treat the parties as though they have submitted their dispute as a "case stated" and decide the case as a matter of law. *See EEOC v. Steamship Clerks Union, Local 1066,48 F.3d 594, 603 (1st Cir. 1995)* (*citing Federacion de Empleados del Tribunal Gen. de Justicia v. Torres, 747 F.2d 35, 36 (1st Cir. 1984)*).

Local Rule 12.1 [1] requires that the [*4] party who files a motion for summary judgment must also file a statement of "all material facts as to which he contends there is no genuine issue necessary to be litigated." D.R.I. Loc. R. 12.1(a)(1). The nonmoving party must submit a

contends there is a genuine issue necessary to be litigated." D.R.I. Loc. R. 12.1(a)(2). Plaintiffs submitted an extensive Statement of Material Facts Not in Dispute ("SMFND"). While Travelers and St. Paul do not dispute Plaintiffs' factual assertions, they do dispute the legal characterizations that are imbedded in many of Plaintiffs' fact statements. To the extent Plaintiffs have made legal arguments in their SMFND, these have been disregarded in the Court's determination.

1 The United States District Court for the District of Rhode Island adopted revised Local Roles on January 1, 2006. Pursuant to Rule 101(b) of the revised rules, these new roles "become effective on January 1, 2006 and shall apply to all cases then pending and thereafter filed." D.R.I. LR Gen 101(b). Because the parties' motions for summary judgment were all filed before the effective date of the revised rules, this Court applies the rule in force at the time of filing. Local Rule 12.1.

[*5] II. Facts

Between May 2000 and May 2003, Michelle Gardner, an employee of Plaintiffs, embezzled approximately $ 323,203 by preparing improper payroll checks for other employees, fraudulently endorsing those employees' names, and depositing or cashing the checks. (Pls.' SMFND PP55, 57.) Plaintiff discovered the fraudulent activity in May 2003 and terminated Ms. Gardner's employment on May 8, 2003. (Pls.' SMFND P56.) On May 29, 2003, Plaintiffs gave notice of the loss to St. Paul and Travelers, the two insurance carriers with whom they had contracted for employee dishonesty policies during the period in question. (Pls.' SMFND P57.)

In order to resolve the question of which policy or policies cover which portion or portions of Plaintiffs' loss, an accounting of the relevant policy coverage in place at the time of loss is necessary.

1. From October 20, 2001 to October 20, 2002, Plaintiffs were insured by St. Paul's Premier Property Protection Policy No. CK05700250 ("St. Paul policy 1"), which included as "Additional Coverage" protection against employee dishonesty, with a policy limit of $ 500,000 and a $ 5,000 deductible. (Pls.' SMFND P11; St. Paul's Rule 12.1 Statement in [*6] Support of Motion for Summary Judgment ("12.1 Stmt.") P1, 3, 6.) Relevant policy language indicates this policy covered "loss or damage to money, securities, and other covered business personal property that results directly from employee dishonesty." (St. Paul's 12.1 Stmt. P3.) "Employee dishonesty means only dishonest acts committed by an employee whether identified or not while acting alone or with other persons, with the intent to:

. Cause you a loss; and

. Obtain personal benefit; or

. Obtain financial benefit for any person or organization intended by the employee to receive that benefit." (St. Paul's 12.1 Stmt. P4.)

2. From October 20, 2002 to October 20, 2003, Plaintiffs were insured by St. Paul's Premier Property Protection Policy No. CK05700250 ("St. Paul policy 2"), which included as an "Additional Benefit"

protection against employee theft, with a policy limit of $ 25,000. (St. Paul's 12.1 Stmt. If 1, 5, 7.) The relevant policy section defines the coverage in these terms: "We'll pay for loss or damage to money, securities or other property resulting directly from theft by any of your employees. This can be money, securities or other property you [*7] own or that you're holding, whether or not you're liable for its loss." (St. Paul's 12.1 Start. P5.) "This protection applies only when there is evidence that the employee meant to cause you a loss. This evidence must also show that the employee intended that he or she or another person or organization would get some unearned financial benefit." (St. Paul's 12.1 Stmt. P5.)

3. From February 25, 2003 to March 12, 2004, Plaintiffs had employee dishonesty coverage under Travelers' Wrap Policy No. 103287494, which they added to other coverage already in place with Travelers under that policy. (Pls.' SMFND P48; Travelers' SMFND P5, 6.) The relevant policy language is as follows:

> The Company agrees to indemnify the Insured for: A. Employee Dishonesty. Direct loss of, and direct loss from damage to, Money, Securities and other property resulting from Employee Theft. . . . "Employee Theft" means the unlawful taking of Money, Securities and other property to the deprivation of an Insured by an Employee, whether identified or not, acting alone or in collusion with others.

(Pls.' SMFND Ex. Bat 1, 3.) In its Discovery section, the policy also placed the following limitations [*8] on recovery:

> This Coverage Part applies to loss which occurs during the Policy Period. Loss is covered under this Coverage Part only if discovered no later than 120 days following termination or cancellation of the Insuring Agreement or termination of this Coverage Part as to an Insured. . .

(Pls.' SMFND Ex. B at 6.) Another relevant portion of the Travelers policy is the Loss Sustained During Prior Insurance provision, which states:

> If the Insured or a predecessor in interest sustained loss during the period of any prior insurance that it or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, the Company will pay for it under this Coverage Part, provided:
>
> a. this Coverage Part became effective at the time of cancellation or termination of the prior insurance; and
>
> b. the loss would have been covered by this Coverage Part had it been in effect when the acts or events causing the loss were committed or occurred.

(Pls' SMFND Ex. B at 7.)

Plaintiffs contend that St. Paul policy 2 was not in place from October 20, 2002 to October 20, 2003, as detailed above, [*9] because negotiations concerning the terms of renewal of St. Paul policy 1 continued through February 2003 without a placement policy in place. Plaintiffs nonetheless concede that on March 6, 2003, Michael Brozost, Vice President and Legal Counsel of Erwin Pearl, "signed a premium summary acknowledging the premiums and coverages purchased effective October 20, 2002. The summary showed $ 25,000 of Employee Dishonesty coverage. . ."(Pls.' SMFND P47.) Although Plaintiffs have not submitted a copy of the "premium summary" labeled as "Deposition Exhibit 49," neither of the Defendants disputes the content of the letter as asserted by plaintiffs. Therefore, the Court accepts Plaintiffs' representation of the content of the letter, and finds its effect was to render St. Paul policy 2, with a coverage limit of $ 25,000 for employee theft, effective from October 20, 2002 to October 20, 2003.

A contract of insurance, like any other contract, requires a manifestation of mutual assent in the form of an offer by one party which is accepted by the other party. *John Hancock Mut Life Ins. Co. v. Dietlin, 97 R.I. 515, 199 A.2d 311, 313 (R.I. 1964)*. An application for insurance is ordinarily an offer [*10] which must be unconditionally accepted before an insurance contract comes into existence, *Id.* Brozost's signature on the summary operated as an acceptance of the terms St. Paul offered in its summary, and therefore, the insurance agreement between St. Paul and Plaintiffs came into existence upon his signing of the summary. *Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am., 345 F. Supp. 2d 214, 223 (D.R.I 2004)* (finding that signature of Chief Operating Officer on insurance company's proposal operated as acceptance of insurance contract offer). Because one of the terms of the offer delineated in the summary was that the policy be made effective October 20, 2002 to October 20, 2003, Brozost's acceptance of that offer rendered St. Paul policy 2 effective through those dates.

Plaintiffs further dispute the coverage dates detailed above by arguing they were not given proper notice of the reduction in coverage effected by St. Paul policy 2. Plaintiffs refer to Regulation 38, Section 5 of the Rhode Island Department of Business Regulation, Division of Insurance Regulation, which states in relevant part:

> An insurer shall provide to the first-named [*11] insured . . . written notice of premium increase, change in deductible, reduction in limits or coverage at least thirty (30) days prior to the expiration date of the policy. .. . If the insurer fails to provide such notice, the coverage provided to the named insured shall remain in effect until notice is provided or until the effective date of replacement coverage obtained by the named insured, whichever first occurs.

R.I.D.B.R. Ins. Reg. 38 *available at* http://www.dbr.state.ri.us/rules_regs/id_rules.html. Plaintiffs assert that St. Paul did not provide notice of the reduction in limits, and therefore, "the policy limit applicable to the St. Paul employee dishonesty coverage was $ 500,000 until Plaintiffs secured replacement coverage from Travelers." (Pls.' Mem. Supp. Summ. J. 9 n.2.) Plaintiffs' pleadings reveal that on September 19, 2002, just over 30 days before St. Paul policy 1 was to expire, St. Paul gave notice of a proposed premium increase of 30% or more but did not give notice regarding a change in policy limits for employee dishonesty. (Pls.' SMFND P17.) Negotiations then ensued concerning reducing the premium increase and one of the means by which Plaintiffs [*12] arrived at a reduced premium was to reduce employee dishonesty coverage to a limit of $ 25,000. (Pls.' SMFND P44.) Because Plaintiffs chose the reduced coverage and received a return of premium of $ 23,616 (Pls.' SMFND P53), Plaintiffs' argument that they were given no notice of the reduced coverage limit fails. Therefore, the effective dates of St. Paul policy 2, with a limit of $ 25,000 for employee theft, was October 20, 2002 to October 20, 2003.

Because Plaintiffs also assert an estoppel claim in an attempt to bar Travelers from denying coverage, the Court held a hearing on April 21, 2006 to establish exactly what was communicated between Travelers, the insurance brokers, and Plaintiffs during the negotiations to secure Plaintiffs employee dishonesty coverage. At oral argument, Plaintiffs' counsel conceded that Travelers made no representations to the insurance brokers or Plaintiffs to the effect that its coverage would be equivalent to that provided by St. Paul. Plaintiffs' counsel reiterated the claim that the insurance brokers "believed" that the coverage Travelers had offered Plaintiffs was essentially equivalent to the St. Paul coverage. (Pls.' SMFND P44.)

After being notified [*13] of Plaintiffs' loss, St. Paul took the position that there was coverage under policy 2 (covering 2002-2003) but not policy 1 (covering 2001-2002). (Pls.' SMFND P60.) St. Paul reasoned, pursuant to *CPC International. Inc. v. Northbrook Excess & Surplus Insurance Co., 668 A.2d 647, 650 (R.I 1995)*, that a claim for property damage is covered under the policy that is in effect when the damage manifests itself, is discovered, or in the exercise of reasonable diligence is discoverable. (Pls.' SMFND P60.) Because the loss was discovered during the 2002-2003 policy period, St. Paul explained, Plaintiffs could look only to that policy for coverage of the entire loss. St. Paul issued Plaintiffs a check for the policy limit of $ 25,000. St Paul claims it has fully discharged its obligation to Plaintiffs and moves for summary judgment of Plaintiffs' request for a declaration of the parties' rights and obligations.

In response to Plaintiffs' notification of loss. Travelers took the position that coverage under its policy only applies to loss which actually occurred during the policy period. (Pls.' SMFND P61.) Travelers disputes the applicability of the holding in *CPC International* [*14] discussed more fully beginning at p. 13 of this Older. Because the amount of money embezzled during the Travelers policy period of February 25, 2003 to March 12, 2004 was $ 1,144.08, significantly less than the $ 25,000 deductible, Travelers reasoned that it did not owe any funds to Plaintiffs. (Travelers' SMFND P3, 4.)

Plaintiffs seek partial summary judgment on Counts I and III of their Complaint. Count I charges Travelers with a breach of insurance contract. Count III requests the Court issue a declaratory judgment assigning the rights and obligations of Travelers and St Paul in this matter. St. Paul moves for summary judgment as to all of Plaintiffs' claims against it, arguing that it has fully discharged its obligations to Plaintiffs. Travelers moves for summary judgment as to all counts of Plaintiffs' Complaint, arguing that it has no duty to indemnify Plaintiffs for the losses incurred through the embezzlement of its employee.

III. Discussion

A federal court sitting in diversity applies the substantive law of the forum state, *Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*, including the choice of law rules. *Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4, 96 S. Ct. 167, 46 L. Ed. 2d 3 (1975)*. [*15] Where the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement. *Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991)* (*citing Moores v. Greenberg, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987)*). Here, all three parties agree that Rhode Island law should govern interpretation of the insurance policies. The Court will, therefore, apply Rhode Island law to the instant dispute.

Rhode Island courts "interpret insurance policy terms according to the same rules of construction governing contracts." *Town of Cumberland v. R.I. Interlocal Risk Mgmt. Trust, Inc., 860 A.2d 1210, 1215 (R.I. 2004)*. The courts "look at the four corners of a policy, viewing it in its entirety, affording its terms their plain, ordinary and usual meaning." *Id.* (*citing Casco Indem. Co. v. Gonsalves, 839 A.2d 546, 548 (R.I. 2004)*(internal quotation marks omitted)). The test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean. *Town of Cumberland, 860 A.2d at 1215* [*16] (*citing Pressman v. Aetna Cas. and Surety Co., 574 A.2d 757, 760 (R.I. 1990)*). When the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end, and the contract terms must be applied as written. *Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550, 551 (R.I. 1990)*. Whether coverage exists in any given case for a particular damage-causing event depends first and foremost upon the precise terms and conditions of the policy in question. *Textron, Inc. v. Liberty Mut. Ins. Co., 639 A.2d 1358, 1362 (R.I. 1994)*.

*A. The Travelers Policy*

Plaintiffs assert coverage by Travelers under two theories. The first is that under Rhode Island law, property loss "occurs" for purposes of triggering insurance coverage when the loss "manifests itself or is discovered or in the exercise of reasonable diligence is discoverable." *CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 668 A.2d 647, 650 (R.I. 1995)*. Because the Travelers policy was in effect when Plaintiffs discovered the loss caused by Ms. Gardner's three year-long embezzlement spree, Plaintiffs argue that that policy covers [*17] the entirety of the embezzlement loss. Plaintiffs' second argument is that the loss is covered under the Travelers "Prior Insurance" clause, whereby Travelers promised to cover losses occurring during another insurance carrier's coverage period subject

to certain restrictions.

In their moving papers, Plaintiffs also raise, without fully developing, an estoppel claim. Generally, arguments not fully developed are considered waived. *See United States v. Hughes, 211 F.3d 676, 684 n.6 (1st Cir. 2000).* However, in its opposition papers, Travelers attacks this claim, and Plaintiffs' Reply articulates the estoppel claim more completely. Essentially, Plaintiffs contend that Travelers is estopped from denying coverage for the employee dishonesty losses because the Preston Insurance Agency, Inc. ("Preston"), which Plaintiffs assert was acting as Travelers' agent, believed the Travelers policy was essentially equivalent to the St. Paul policy preceding it.

Under the doctrine of promissory estoppel, a promise which the promisor should reasonably expect to induce which does induce such action or forbearance is binding if injustice [*18] can be avoided only by enforcement of the promise. *Hinchey v. NYNEX Corp., 144 F.3d 134, 143 (1st Cir. 1998)*; *General Accident Ins. Co. of Am. v. American Nat'l Fireproofing, 716 A.2d 751, 755 (R.I. 1998).* In the context of insurance coverage the insured must show (1) that he was misled by the acts or statements of the insurer or its agent; (2) that he relied on those representations; (3) that such reliance was reasonable; and (4) that the insured suffered detriment or prejudice based on the reliance. *General Acc., 716 A.2d at 755* (citation and internal quotation marks omitted).

Preston, the insurance brokerage firm that arranged the insurance agreements between Plaintiffs and both St. Paul and Travelers, is an independent, or non-exclusive, insurance agent, with contracts to sell insurance policies for multiple insurance carriers. (Pls.' SMFND P7; Travelers' SMFND P13). Under Rhode Island law, independent insurance brokers can simultaneously be agents of the insureds and the insurers pursuant to the doctrine of dual agency. *Etheridge v. Atl. Mut. Ins. Co., 480 A.2d 1341, 1346 (R.I. 1984).* Dual agency does not make an [*19] insured and an insurance company both liable for all acts of the broker agent; rather, it divides responsibility for the conduct of the agent according to the nature of the broker's actions. *General Acc., 716 A.2d at 756-57.* An insurance agent who represents multiple insurance companies and has the freedom to choose the company with which he would place an insurance policy is an agent of the insured to the extent of distributing the risk and determining the appropriate amount of coverage to obtain from any of the companies. *Etheridge, 480 A.2d at 1346.* That same broker is the agent of the insurance company to the extent of issuing insurance certificates. *General Acc., 716 A.2d at 757.* Therefore, to the extent an issued certificate evince liability coverage, the insurance company is bound by its terms. *Id.*

The parties' statements of undisputed facts did not clearly assert the nature of representations made by Travelers or Preston during negotiations to secure Plaintiffs employee dishonesty coverage. The Court heard oral argument on April 21, 2006 to clarify the question of who said what to whom, and when. At the hearing, Plaintiffs' [*20] counsel conceded that there were no representations from Travelers to either Preston or Plaintiffs concerning the equivalence of coverage. Plaintiffs continued to assert only that Preston believed the coverages were essentially equivalent and that this belief binds Travelers and bars it from asserting that there is no coverage. Under Rhode Island law, however, Preston was acting as Plaintifffs' agent in seeking employee dishonesty coverage from both Travelers and St. Paul. Preston's beliefs concerning coverage and the representations Preston made to Plaintiff therefore do not bind Travelers. Without statements from Travelers, Plaintiffs' cannot show that they were misled by statements of the insurer, or that they relied on those statements, or any of the other requisite elements of an estoppel claim. Accordingly, Plaintiffs' have failed to establish a promissory estoppel claim.

Having declined Plaintiffs' invitation to bar Travelers from disclaiming coverage, the Court considers in turn Plaintiffs' two arguments countering Travelers' denial. Plaintiffs' first argument invokes *CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co., 668 A.2d 647 (R.I. 1995),* [*21] in which the Supreme Court of Rhode Island responded to a certified question from the First Circuit concerning what the trigger of coverage standard should be for determining at what point an "occurrence" causing property damage has taken place. The court answered the question by finding that "coverage under a general liability policy is triggered by an occurrence that takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence is discoverable." *Id. at 650.* The policy in question in *CPC International* was a comprehensive general liability ("CGL") policy in which the insurance company agreed

to indemnify the insured for damages to a third party flowing from personal injuries, property damage, or advertising liability arising out of an occurrence. *Id. at 649*. The policy specifically defined "property damage" as "loss of or direct damage to or destruction of tangible property (other than property owned by any insured) and which results in an Occurrence *during the policy period*." *Id. at 649*(emphasis added). The policy then defined "occurrence" to mean [*22] "an accident, event or happening including continuous or repeated exposure to conditions which results, *during the policy period*, in Personal Injury, Property Damage or Advertising Liability neither expected or intended from the standpoint of the Insured." *Id.* (emphasis added).

These coverage definitions indicate the policy at issue in *CPC International* was a third-party liability policy requiring that the loss-causing accident, happening, or event take place within the policy period and that the resulting property damage take place or manifest itself within the policy period. Cases interpreting *CPC International* have established that its definition of "occurrence" applies only to CGL policies that limit recovery in the same way. *See Employers Mut. Cas. Co. v. PIC Contractors, Inc., 24 F. Supp. 2d 212, 216 (D.R.I 1998)*(distinguishing *CPC International* because policy in question did not require occurrence to take place during the policy period, stating "the Rhode Island Supreme Court . . . applied the manifestation rule based upon particular and specific provisions contained in the defendant-insurer's general liability policy."); *Truk-Away of R.I., Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 309, 312 (R.I. 1999)* [*23] (applying *CPC International* to CGL policy that required an occurrence resulting in property damage that becomes apparent during the policy period); *Textron, Inc. v. Aetna Cas. and Sur. Co., 723 A.2d 1138, 1139 (R.I. 1999)* (applying *CPC International* because "it is undisputed that all policies at issue contain essentially the same trigger-of-coverage language, which is similar to the language in *CPC International* . . . ."); *Avco Corp. v. Aetna Cas. & Sur. Co., 679 A.2d 323, 328 (R.I. 1996)*(applying *CPC International* to CGL policy requiring occurrence to take place during policy period); *Ins. Co. of N. Am. v. Kayser-Roth Corp., 1999 R.I. Super. LEXIS 66, No. C.A. PC 92-5248, 1999 WL 813661 at *27 (R.I. Super. July 29, 1999)*(distinguishing *CPC International* because policy in question (did not require that the occurrence cause property damage during the policy period).

Because *CPC International* has been so narrowly construed, its definition of "occurrence" cannot be applied to the Travelers policy. The Travelers policy promises to reimburse Plaintiffs for "direct loss of, and direct loss from damage to. Money, Securities and other property [*24] resulting from Employee Theft," (Pls.' SMFND Ex. B at 1) language which defines at least this portion of the policy as an employee fidelity policy. Travelers itself names the policy a "first party fidelity" policy. (Travelers' Mem. Supp. Summ. J. 2.) Employee fidelity policies are defined by the coverage they provide, that is, indemnifying the insured for direct losses from dishonest acts of its employees. *See. e.g., Oriental Fin. Group v. Fed. Ins. Co., 309 F. Supp. 2d 216 (D.P.R. 2004)*(defining a fidelity bond as a contract whereby insurer agrees to indemnify insured against a loss arising from employee dishonesty). The policies cover injury to the insured, not a third party, a fact which significantly differentiates them from liability policies, which, as a rule, indemnify an insured against losses to a third party. *See, e.g., Vons Cos. v. Federal Ins. Co., 57 F. Supp. 2d 933, 943 n.12 (C.D. Cal. 1998)*(finding that employee dishonesty policies differ from liability policies in that they insure against loss to the insured from employee dishonesty and that simply because word "liability" is in employee dishonesty policy does not make it a liability [*25] policy). In fact, it is a distinguishing mark of employee dishonesty policies that they do not generally cover losses to third parties resulting from an employee's dishonest acts. *See. e.g., Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc., 346 F.3d 259, 263 (1st Cir. 2003)*(listing cases).

As a policy which concerns itself with direct injury to the insured, the Travelers fidelity policy differs substantially from the CGL policies bound by the *CPC International* line of cases. Moreover, while Plaintiffs argue that mere usage of the word "occurs" allows them to import case law defining the word "occurrence," the word "occurrence" in the CGL context refers to a particular set of circumstances, often specifically defined in the insurance agreement, which cannot be directly translated to the fidelity bond context. *See, e.g., Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 17 (1st Cir. 1982)*("An 'occurrence' is defined as 'an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury.' . . . It is clear from this language that each occurrence is made up of two components, [*26] the exposure and the resulting bodily injury; and it is the

resulting bodily injury, not the exposure, which must take place 'during the policy period.'"). Because the policy at issue here differs materially from the policy analyzed in *CPC International,* and does not use the language crucial to its construction, the Court finds that the definition of "occurrence" in that case does not apply here to the Travelers policy.

Without *CPC International* to define which losses are covered, the Court is left to the words of the Travelers policy themselves, and the way similar policies have been interpreted by other courts. The Travelers policy states "this Coverage Part applies to loss which occurs during the Policy Period. Loss is covered under this Coverage Part only if discovered no later than 120 days following termination or cancellation of the Insuring Agreement or termination of this Coverage Part as to an Insured. . ." Travelers argues that the "loss" referred to in this section occurs at the time of the employee's dishonest act, not when the loss is discovered." (Travelers' Mem. Supp. Summ. J. 6.) Nothing in the language of this section strictly necessitates that finding; [*27] however, courts have indeed interpreted loss in the fidelity bond context as "occurring" at the time of the employee's fraud. "Under a fidelity crime bond, loss means the deprivation or dispossession of money or property of the [insured] due to the dishonest, criminal or fraudulent acts of the insured's employees." *Fireman's Fund Ins. Co. v. Special Olympics Intern., Inc., 249 F. Supp. 2d 19, 27 (D. Mass. 2003)*(citation omitted) *aff'd on other grounds, 346 F.3d 259 (1st Cir. 2003)*; *See also, Fidelity Sav. and Loan Ass'n v. Republic Ins. Co, 513 F.2d 954, 956 (9th Cir. 1975)*(holding that loss within fidelity bond occurs at the time of the activity giving rise to the claim against the insured).

The Travelers coverage at issue here is therefore limited by the policy language to losses caused by dishonest acts of employees which actually took place during the policy period and which were discovered within 120 days of the end of the policy period. Because Plaintiffs' employee's fraudulent acts were discovered during the policy period. Plaintiffs are certainly within the discovery timing limit. Plaintiffs are also properly limited to [*28] recovering under this coverage section only those sums embezzled between February 25, 2003 (the policy start date) and March 12, 2004 (the policy end date). Those sums, Plaintiffs and Travelers agree, are well below the $ 25,000 retention of the Travelers policy.

Plaintiff attempt to overcome these limiting provisions by appealing to the Loss Sustained During Prior Insurance provision of the Travelers policy. In this section, Travelers promises that

> If the Insured or a predecessor in interest sustained loss during the period of any prior insurance that it or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, the Company will pay for it under this Coverage Part, provided:
>
> > a. this Coverage Part became effective at the time of cancellation or termination of the prior insurance; and
> >
> > b. the loss would have been covered by this Coverage Part had it been in effect when the acts or events causing the loss were committed or occurred.

(Travelers' SMFND P8.) To paraphrase this section, the loss Plaintiffs experienced during the period prior to February 25, 2003 (the Travelers policy start [*29] date) would be covered if all of the following were true:

> 1. The loss was sustained during the period the St. Paul policies were in place; and
>
> 2. The St. Paul policies in place would have covered the loss but the time to file a claim under those policies had expired; and
>
> 3. The Travelers policy became effective at the time of the termination or cancellation of St. Paul policy 2; and
>
> 4. The Travelers policy would have covered the loss if it had been in effect at the time of the embezzlement.

Of these four factors, only the first and fourth return answers in the affirmative. It is not clear to the Court that the time to file a claim under either St. Paul policy has expired; in fact, there has been no discussion as to what the time limits were for filing a claim under these policies. Furthermore, with respect to the third factor, St. Paul policy 2 (effective October 20, 2002 to October 20, 2003) overlaps the Travelers policy (effective February 25, 2003 to March 12, 2004). This overlap means that the Travelers policy did not become effective at the time of termination or cancellation of St Paul policy 2, as the third factor requires. Because the Travelers policy ran [*30] concurrently with St. Paul policy 2, and the language of this "Prior Insurance" provision clearly requires that the prior insurance terminate or cancel before the current policy becomes effective, Plaintiffs are not covered under the "Prior Insurance" provision.

Plaintiff contend that the St. Paul policy did in fact terminate at the time the Travelers policy became effective because its coverage limit for employee dishonesty changed from $ 500,000 to $ 25,000 on February 10, 2003. (Pls.' Mem. Supp. Smnm. J. 10.) Plaintiffs support this argument with the assertion that St. Paul issued an endorsement and a return of premium in the amount of $ 23,616 on April 18, 2003 reducing the employee dishonesty benefit limit to $ 25,000, and citing as the policy's effective date February 10, 2003. (Pls.' SMFND P52; Pls.' SMFND Ex. C.) However, as this Court has discussed above, the premium summary acknowledging the $ 25,000 employee dishonesty coverage signed by Michael Brozost, Erwin Pearl's Vice President and Legal Counsel, on March 6, 2003 operated as an acceptance of the new policy terms and rendered that coverage effective October 20, 2002. Therefore, St. Paul policy 2 was in place from October 20, 2002 to [*31] October 20, 2003, and had a $ 25,000 employee dishonesty limit

Even had the reduction in coverage occurred in February 2003, and not as part of the imposition of a new policy in October 2002, such a reduction would not amount to either a termination or a cancellation, as the third factor requires. In the insurance policy context, a termination is defined as the expiration of the policy by lapse under its own terms, and a cancellation is defined as an ending of the policy prior to the expiration of the policy period by act of one of the parties to the agreement. *State Farm Mut. Auto Ins. Co. v. White, 563 F.2d 971, 974 n.2 (9th Cir. 1977).* Because the overlap indicates there was neither termination nor cancellation of the St. Paul policy at the time the Travelers policy commenced, Plaintiffs cannot avail themselves of the "Prior Insurance" clause in this case.

*B. The St. Paul Policies*

In its response to Plaintiffs' notification of loss, St. Paul premised its coverage determination on the applicability of the *CPC International* doctrine. In its Memorandum of Law in Support of its Cross-Motion for Summary Judgment, St. Paul argues that because Plaintiffs [*32] adopt and advocate the law supporting St. Paul's determination, it is entitled to judgment as a matter of law. However, as the Court determined above, the rule of *CPC International* cannot be applied to the St. Paul policies. Both St. Paul policies include employee fidelity coverage, labeled first as "Additional Coverage" and then as an "Additional Benefit," that essentially promises to indemnify Plaintiffs for direct losses caused by employee theft in ways fundamentally similar to the Travelers coverage. While the employee dishonesty coverage in these two policies is included as an "additional" benefit to a broader property policy, the nature of the coverage promised by the fidelity bond portion of these broader policies does not change for being "additional." *See* 10A Lee R. Russ & Thomas F. Segalla *Couch on Insurance* § 148:1 (3d ed. 2005)("The concept of 'property insurance' now includes a broad spectrum of policies and coverages applicable to just about any type of property that exists in the modern world."). It is the terms of the contract for insurance that determine the nature of the coverage, not the label an insurance company attaches to the policy. *See, e.g.,* [*33] *Am. Legion Dep't of Mo. Inc. v. Hanover Ins. Co., 286 B.R. 729, 738-39 (E.D. Mo. 2002)*("The terms of the contract for insurance at issue in this matter establish that it provides for fidelity insurance.").

As explained above, fidelity bonds such as these do not fit into the narrow parameters of the *CPC International* holding. While Plaintiffs do not contest St. Paul's coverage determination, they ask that the Court deny without prejudice St. Paul's Motion for Summary Judgment, reserving the issue of St. Paul's liability for another day. St. Paul contends that without a dispute of its interpretation of the policy, there is no justiciable controversy and the claims against them should be dismissed as a matter of law. However, because the Court has found that the *CPC International* doctrine does not

apply to the St. Paul policies, the question of whether or not there is coverage under those policies remains open and has not been fully briefed by the parties. Therefore, the claim against St. Paul is not ripe for summary judgment.

IV. Conclusion

Because the Travelers policy covers only those losses actually incurred during the policy period, the *CPC International* [*34] doctrine does not apply to fidelity bonds such as the Travelers policy, and the "Prior Insurance" clause does not independently allow for recovery here, the Court finds that Travelers has no duty to indemnify Plaintiffs for losses incurred due to their employee's embezzlement outside of those losses already accounted for by Travelers. Therefore, Travelers' Motion for Summary Judgment as to all counts of Plaintiffs' Complaint is GRANTED.

As to St. Paul's Motion for Summary Judgment, the Court finds that the facts concerning the extent of St. Paul's coverage in light of the inapplicability of the *CPC International* definition of "occurrence" to St. Paul's policy remain to be fully developed. Therefore, the Court DENIES St. Paul's Motion for Summary Judgment.

Finally, for the reasons stated above, the Court DENIES Plaintiffs' Motion for Summary Judgment

SO ORDERED.

Mary M. Lisi

United States District Judge

May 1, 2006

Corpus Juris Secundum
Database updated December 2007

Contracts
by Paul M. Coltoff, J.D.; Sonja Larsen, J.D.; Carmela Pellegrino, J.D.

V. Agreement or Mutual Assent
A. Necessity and Essentials of Agreement in General

References

## § 37. Manifest and secret intention

### West's Key Number Digest

West's Key Number Digest, Contracts 16
An essential prerequisite to the creation of a contract is manifestation of mutual assent which must be gathered from the words or acts of the parties; and the secret intention [illegible]

Manifestation of mutual assent is an essential prerequisite to the creation of a contract.[FN73] In determining whether a contract exists, it is incumbent on the court to try to arrive at the intention of the parties,[FN74] which must be determined in light of existing circumstances.[FN75] The general rules governing the interpretation of contracts apply not only where there is an admitted contract under consideration, but also where the controversy is whether there is a contract.[FN76]

The apparent mutual assent, essential to the formation of a contract, must be gathered from the language employed by them,[FN77] or manifested by their words or acts,[FN78] and it may be manifested wholly or partly by written or spoken words or by other acts or conduct.[FN79] The undisclosed intention is immaterial in the absence of mistake, fraud, and the like,[FN80] and the law imputes to a person an intention corresponding to the reasonable meaning of his or her words and acts.[FN81] It judges of his or her intention by his or her outward expressions and excludes all questions with respect to his or her unexpressed intention.[FN82] Intent may be inferred from a party's acts and conduct even in the face of his or her expressed declarations to the contrary.[FN83]If his or her words or acts, judged by a reasonable standard, manifest an intention to agree with respect to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his or her mind on the subject,[FN84] since mental assent to the promises in a contract is not essential.[FN85]

On the other hand, neither party to a contract may assume that a contract exists if he or she knows that the other party does not intend what his or her words or actions may seem to express.[FN86]

Where neither party intends that a contract shall result by what is done, no valid contract results.[FN87] Where both parties actually intend that there shall be no contract and that intent is known and admitted, there is no occasion to consider the existence or nonexistence of any objective manifestation to the contrary.[FN88] So, none of the acts by a party may be interpreted as assent to a prior writing if both parties know and understand that such writing will not ripen into a contract until the happening of a condition precedent,[FN89] although the contract may come into existence on the happening of such condition if that was the manifested intention of the parties.[FN90]

### CUMULATIVE SUPPLEMENT

Under Wisconsin law, the parties' execution of an unambiguous written contract establishes an enforceable meeting of the minds as a matter of law regardless of the parties' actual intentions. Deputy v. Lehman Bros., Inc., 345 F.3d 494, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003).

**[END OF SUPPLEMENT]**

[FN73] U.S.—Hartman v. Lauchli, 194 F.2d 787 (8th Cir. 1952); In re Marcalus Mfg. Co., 120 F. Supp. 784 (D.N.J. 1954).
Conn.—Thames River Recycling, Inc. v. Gallo, 50 Conn. App. 767, 720 A.2d 242 (1998).
Md.—Eastover Stores, Inc. v. Minnix, 219 Md. 658, 150 A.2d 884 (1959).
N.J.—Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 95 A.2d 391 (1953).
Communication of intention, see § 38.
Necessity of mutual assent, generally, see § 35.

## Expression of assent

(1) Chief constituting element of contract is expression of assent by each party thereto, the one to the other, to matters comprehended therein.
Tex.—McAshan v. Cavitt, 227 S.W.2d 340 (Tex. Civ. App. El Paso 1949), judgment aff'd, 149 Tex. 147, 229 S.W.2d 1016 (1950).
(2) When persons seek by agreement to alter their legal relationship, there must to that end be a clear intent embodied in an unequivocal expression.
Tex.—Finley v. Hundley, 252 S.W.2d 958 (Tex. Civ. App. Dallas 1952).
(3) Expression of mutual assent to all essential terms is operation that completes contract without which contract cannot exist.
Minn.—Field-Martin Co. v. Fruen Mill. Co., 210 Minn. 388, 298 N.W. 574 (1941).
[FN74] Pa.—In re Kaufmann's Estate, 137 Pa. Super. 88, 8 A.2d 472 (1939).

[FN75] U.S.—Zehr v. Wardall, 134 F.2d 805 (C.C.A. 6th Cir. 1943).
Cal.—Beta Sigma Tau v. Shrine Civic Auditorium, 159 Cal. App. 2d 281, 323 P.2d 496 (2d Dist. 1958).
Or.—Klimek v. Perisich, 231 Or. 71, 371 P.2d 956 (1962).
S.D.—Federal Land Bank of Omaha v. Houck, 68 S.D. 449, 4 N.W.2d 213 (1942).

[FN76] Pa.—In re Kaufmann's Estate, 137 Pa. Super. 88, 8 A.2d 472 (1939).
General rules governing interpretation of admitted contracts, see §§ 302 et seq.

[FN77] Ala.—Air Conditioning Engineers v. Small, 259 Ala. 171, 65 So. 2d 698 (1953).
Cal.—Caron v. Andrew, 133 Cal. App. 2d 412, 284 P.2d 550 (3d Dist. 1955).
Fla.—Gendzier v. Bielecki, 97 So. 2d 604 (Fla. 1957).
Mo.—Campbell v. Snoddy, 215 Mo. App. 339, 249 S.W. 131 (1923).
Wash.—Gaasland Co. v. Hyak Lumber & Millwork, Inc., 42 Wash. 2d 705, 257 P.2d 784 (1953).

## Written contract

The existence vel non of a written contract depends on intention of parties to be ascertained by a consideration of the writing and the accompanying circumstances.

N.J.—Volk v. Atlantic Acceptance & Realty Co., 139 N.J. Eq. 171, 50 A.2d 488 (Ch.

[FN78] U.S.—Reich v. Vegex, Inc., 51 F. Supp. 99 (E.D. Pa. 1942), judgment aff'd, 137 F.2d 647 (C.C.A. 3d Cir. 1943).
Cal.—Caron v. Andrew, 133 Cal. App. 2d 412, 284 P.2d 550 (3d Dist. 1955).
N.Y.—Barry, Bette & Led Duke, Inc. v. State, 169 Misc. 2d 594, 645 N.Y.S.2d 713 (Ct. Cl. 1996).

[FN79] Ark.—Childs v. Adams, 322 Ark. 424, 909 S.W.2d 641, 58 A.L.R.5th 843 (1995).
Minn.—Roberge v. Cambridge Co-op. Creamery, 248 Minn. 184, 79 N.W.2d 142 (1956).
Ohio—McSweeney v. Jackson, 117 Ohio App. 3d 623, 691 N.E.2d 303 (4th Dist. Lawrence County 1996).

## Words not essential

(1) Although assent to agreement must be manifested in order to be legally effective, it need not be expressed in words.
U.S.—Restaurant Associates Industries, Inc. v. Anheuser-Busch, Inc., 397 F. Supp. 1213 (S.D.N.Y. 1975); Gomez v. Federal Stevedoring Co., 5 N.J. Super. 100, 68 A.2d 482 (App. Div. 1949).
(2) The meeting of minds necessary for the formation of a contract can be found from conduct and circumstances as well as by verbal expression.
Utah—Radley v. Smith, 6 Utah 2d 314, 313 P.2d 465 (1957).
(3) Assent to a contract need not be express, but may be implied from acts and circumstances.
U.S.—Paxson v. Commissioner of Internal Revenue, 144 F.2d 772, 44-2 U.S. Tax Cas. (CCH) ¶9457, 32 A.F.T.R. (P-H) ¶1273 (C.C.A. 3d Cir. 1944).
(4) Where a contract has been made to which a person must give his assent in order to be bound thereby, such person must act with reasonable promptness when confronted with the knowledge that a contract has been entered into without his consent but nevertheless with the intent to bind him; the conduct of a party who has not consented to a contract in the meaning of that term, as used in contract law, may nevertheless cause him to be bound by the contract under the rules of waiver, estoppel, and ratification.
Okla.—Blunt v. Blunt, 198 Okla. 138, 176 P.2d 471 (1947).
[FN80] U.S.—Bolander v. Godsil, 10 Alaska 19, 116 F.2d 437 (C.C.A. 9th Cir. 1940).
Cal.—Brant v. California Dairies, 4 Cal. 2d 128, 48 P.2d 13 (1935).
Mo.—Paul's Rod & Bearing, Ltd. v. Kelly, 847 S.W.2d 68 (Mo. Ct. App. W.D. 1991).
N.Y.—Mencher v. Weiss, 306 N.Y. 1, 114 N.E.2d 177, 32 L.R.R.M. (BNA) 2539, 24 Lab. Cas. (CCH) ¶67797 (1953).

## Uncertain manifestation of intent

(1) If manifestations of intention of either party are uncertain or ambiguous, and he has no reason to know that they may bear a different meaning to other party from that which he himself attaches to them, his manifestations are operative in formation of a contract only in event that other party attaches to them the same meaning.
U.S.—Julius Kayser & Co. v. Textron, Inc., 228 F.2d 783 (4th Cir. 1956).
(2) If both parties to contract know or have reason to know that manifestations of one of them are uncertain or ambiguous and parties attach different meanings to manifestations, such difference prevents uncertain or ambiguous manifestations from being operative as an offer or acceptance.
U.S.—Sorensen v. P. H. Thompson & Son, 248 Minn. 280, 79 N.W.2d 673 (1956).
(3) Purported offer of employment was held not such an offer as should have been ambiguous to offeror only and hence offeree's reasonable and good-faith belief

concerning such ambiguous offer did not bind offeror.

[FN81] U.S.—American Lumber & Manufacturing Co. v. Atlantic Mill & Lumber Co., 290 F. 632 (C.C.A. 3d Cir. 1923).
Ark.—Childs v. Adams, 322 Ark. 424, 909 S.W.2d 641, 58 A.L.R.5th 843 (1995).
Ga.—Southern Airways Co. v. De Kalb County, 102 Ga. App. 850, 118 S.E.2d 234 (1960).
Va.—Marefield Meadows, Inc. v. Lorenz, 245 Va. 255, 427 S.E.2d 363 (1993).

### Considered as whole

In determining existence of contract, court considers acts, conduct, and statements of parties as a whole, and should construe a transaction to constitute a contract if there was meeting of minds on essential elements on unequivocal terms, and one of parties acted thereon in good faith.
Okla.—Queen Anne Candy Co. v. Eagle, 184 Okla. 519, 88 P.2d 630 (1939).

### Implication of assent from words or acts

Words of parties necessary to express mutual assent include also what is necessarily to be implied from what they said, and, where mutual assent is expressed by acts, any

effective as such.
Tex.—Security Ins. Co. v. Davis, 45 S.W.2d 376 (Tex. Civ. App. Eastland 1931), writ granted, (May 16, 1932) and rev'd on other grounds, 67 S.W.2d 258 (Tex. Comm'n App. 1934).

### Mistaken understanding of intent

Where the owner of premises did not promise to pay for plastering done by plaintiff, who was employed by the contractor, the fact that plaintiff understood that the owner was to pay him would not obligate the owner, unless he had said or done something to justify such belief.
Vt.—Conti v. Johnson, 91 Vt. 467, 100 A. 874 (1917).

### Interpretation adopted by other party

(1) An offeror is bound in law, as well as ethics, by the interpretation of an offer that the offeror knew or had reason to know that the offeree had adopted.
U.S.—Church v. Bobbs-Merrill Co., 170 F. Supp. 32 (S.D. Ind. 1959), judgment aff'd, 272 F.2d 212, 123 U.S.P.Q. (BNA) 517 (7th Cir. 1959).
(2) Where plaintiff prepared two plans for construction of a building by plaintiff for defendant, and defendant reasonably interpreted plaintiff's written offer as referring to and incorporating the second plan rather than the first plan, defendant was not liable under the first plan but under the second one.
Minn.—Field-Martin Co. v. Fruen Mill. Co., 210 Minn. 388, 298 N.W. 574 (1941).
[FN82] U.S.—Allied Steel & Conveyors, Inc. v. Ford Motor Co., 277 F.2d 907 (6th Cir. 1960).

[FN83] Cal.—H. S. Crocker Co. v. McFaddin, 148 Cal. App. 2d 639, 307 P.2d 429 (2d Dist. 1957).

[FN84] U.S.—Allied Steel & Conveyors, Inc. v. Ford Motor Co., 277 F.2d 907 (6th Cir. 1960).
Cal.—C.I.T. Corp. v. Panac, 25 Cal. 2d 547, 154 P.2d 710, 160 A.L.R. 1285 (1944).
Fla.—Gendzier v. Bielecki, 97 So. 2d 604 (Fla. 1957).
N.J.—Leitner v. Braen, 51 N.J. Super. 31, 143 A.2d 256 (App. Div. 1958).
S.D.—Federal Land Bank of Omaha v. Houck, 68 S.D. 449, 4 N.W.2d 213 (1942).

[FN85] U.S.—Coltra v. U.S., 110 Ct. Cl. 217, 96 F. Supp. 618 (1951).
Md.—Ray v. William G. Eurice & Bros., 201 Md. 115, 93 A.2d 272 (1952).
Va.—Lucy v. Zehmer, 196 Va. 493, 84 S.E.2d 516 (1954).

### Subjective meeting of minds not essential

(1) A subjective meeting of the minds is not necessary for a binding, legally enforceable contract.
S.D.—Mitzel v. Hauck, 78 S.D. 543, 105 N.W.2d 378 (1960).
(2) The requisite mutual assent for the formation of a contract does not require a subjective mutual intent to agree on the same thing in the same sense but may be based on objective manifestations, whereby one party by his words or conduct or by both leads the other party reasonably to assume that he assents to, and accepts the terms of, the other's offer.
Minn.—Holt v. Swenson, 252 Minn. 510, 90 N.W.2d 724 (1958).
(3) Since test as to mutual assent is objective, the formation of a contract does not require the "meeting of the minds" of the parties.
U.S.—Canister Co. v. National Can Corp., 63 F. Supp. 361 (D. Del. 1945), appeal dismissed, 163 F.2d 683 (C.C.A. 3d Cir. 1947).
[FN86] Or.—Klimek v. Perisich, 231 Or. 71, 371 P.2d 956 (1962).

[FN87] U.S.—Nice Ball Bearing Co. v. Bearing Jobbers, Inc., 205 F.2d 841 (7th Cir. 1953); Louisville Trust Co. v. National Bank of Kentucky, 291 U.S. 665, 54 S. Ct. 440, 78 L. Ed. 1056 (1934).
Cal.—Laughlin v. Haberfelde, 72 Cal. App. 2d 780, 165 P.2d 544 (4th Dist. 1946).
Md.—Houston v. Monumental Radio, 158 Md. 292, 148 A. 536 (1930).

### Incomplete arrangement

The law does not regard an arrangement as completed which the parties thereto regard as incomplete.
Minn.—Linne v. Ronkainen, 228 Minn. 316, 37 N.W.2d 237 (1949).
[FN88] Minn.—Dusenka v. Dusenka, 221 Minn. 234, 21 N.W.2d 528 (1946).

[FN89] N.Y.—Application of Garrett Corp., 16 Misc. 2d 152, 182 N.Y.S.2d 979 (Sup. Ct. 1959), order aff'd, 9 A.D.2d 741, 192 N.Y.S.2d 655 (1st Dep't 1959), order aff'd, 8 N.Y.2d 819, 202 N.Y.S.2d 323, 168 N.E.2d 391 (1960).

[FN90] Utah—R.J. Daum Const. Co. v. Child, 122 Utah 194, 247 P.2d 817 (1952).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CJS CONTRACTS § 37

END OF DOCUMENT

LEXSEE 387 A.2D 694

**J. Koury Steel Erectors, Inc. of Massachusetts v. San-Vel Concrete Corporation**

**No. 76-418-Appeal.**

**Supreme Court of Rhode Island**

***120 R.I. 360*; *387 A.2d 694*; *1978 R.I. LEXIS 668***

**June 28, 1978**

**COUNSEL:** [***1] *Abedon & Visconti Ltd., Girard R. Visconti*, for plaintiff.

*Lovegreen*, for defendant.

**JUDGES:** Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

**OPINION BY:** BEVILACQUA

**OPINION**

[*361] [**695] This is an appeal from a judgment of the Superior Court finding that the plaintiff had failed to [*362] establish the essential elements of a valid and enforceable contract. The trial was conducted before a judge sitting without a jury. The plaintiff has now appealed to this court.

The controversy arises out of a construction project known as the "New Bedford Parking Garage." In April 1974, Douglas Cringan, the contract manager for defendant San-Vel Concrete Corporation (San-Vel), forwarded invitations to bid to various steel erectors including plaintiff J. Koury Steel Erectors, Inc. of Massachusetts. At that time, San-Vel was interested in bidding on a subcontract for the supply and erection of precast concrete components to be used in said project.

On April 12, 1974, John E. Koury, president of plaintiff corporation, telephoned a bid to San-Vel in the amount of $ 170,000. [**696] Four days later, on April 16, Cringan [***2] telephoned Mr. Koury and informed him that his bid was very low. Subsequently, plaintiff submitted a revised bid for the sum of $ 200,000 which was included by San-Vel in its bid to the general contractor Peabody Construction.

Mr. Koury testified that on April 16, 1974 Cringan

would be awarded the steel construction work. Cringan's version of the conversations contradicted the statements made by Mr. Koury. Cringan stated that he lacked the authority to award any contracts since such power was vested in Mr. Roy, president of San-Vel. A deposition taken from Mr. Roy corroborated his testimony. It is uncontroverted that sometime later, Cringan apprised Mr. Koury of a so-called "piece" change in the construction specifications and plaintiff reduced its revised bid to $ 190,000. On August 20, 1974, Cringan requested a meeting with plaintiff to discuss sequencing [1] the work and materials for the project. A sequencing meeting was held on September 13, 1974 at which time plaintiff requested that defendant perform some [*363] dry-packing and grouting. Cringan testified that the sequencing meeting with plaintiff was insignificant [***3] because he had conducted similar meetings with several other bidders.

1 The term sequencing describes the scheduling for delivery of materials to the job site and the determination of the work time for the job.

In a conversation with Cringan on September 19, 1974, Mr. Koury confirmed his bid of $ 190,000, and also confirmed that defendant would perform all the dry-packing and grouting work. The parties however did not agree upon a price for that work. Instead, Cringan told Mr. Koury that he would "get back" to him. Mr. Koury testified that he made several unsuccessful attempts to contact Cringan in order to discuss the progress of the negotiations. On October 14, 1974,

Cringan told Mr. Koury that he was no longer responsible for the sub-contracting and informed him that the contract had been awarded by Mr. Roy to General Gansett Steel Erectors Corporation for $ 177,500. Cringan denied accepting plaintiff's bid and avowed that his dealings with plaintiff typified ordinary negotiation sessions.

After reviewing [***4] all the evidence and drawing the reasonable inferences therefrom, the trial justice found the testimony of Mr. Koury to be incredible and unpersuasive. The plaintiff admits in its brief that Mr. Koury only "thought" or "felt" he had the job. The trial justice commented that a notation in Mr. Koury's handwriting addressed to Edward Prescott, an estimator for plaintiff, stating "Ed -- we've got the job 99% (sure)(*till we see contract*!)" belied Mr. Koury's statement that he was convinced that he had been awarded the contract. The trial justice did not believe Mr. Koury's explanation that he did not trust anyone until a written contract was actually signed. He did, however, believe the testimony of Mr. Cringan, defendant's witness, particularly noting Cringan's statement that he had never told Mr. Koury or Mr. Prescott that plaintiff would receive the job or that its bid would be accepted.

I

The plaintiff contends that the trial justice was clearly wrong, that he overlooked and misconceived material evidence [*364] presented by plaintiff and afforded undue weight to defendant's evidence. We find no merit in this argument. It is well settled that where parties have submitted [***5] their cause to a trial justice sitting without a jury, the findings of fact of the trial justice will be given great weight. *Kego Displays, Inc. v. Fournier, 119 R.I. 469, 379 A.2d 1098 (1977)*; *Flynn v. Burkhardt, 118 R.I. 69, 371 A.2d 1057 (1977)*, and will not be disturbed on appeal unless it can be shown that such findings are clearly wrong or that the trial justice misconceived or overlooked material evidence. *Rehab v. Lemenski, 115 R.I. 576, 350 A.2d 397 (1976)*; *Barattini v. McGovern, 110 R.I. 360, 292 A.2d 860 (1972)*. This same rule applies to inferences drawn by [**697] the trier of fact. *Coutanche v. Larivierre, 107 R.I. 1, 164* A.2d (1970).

In the instant case the testimony is in conflict. The trial justice specifically rejected the testimony of Mr. Koury and Mr. Prescott and accepted as truthful and reliable the testimony of Cringan and Mr. Roy. The plaintiff's argument on appeal is essentially that the testimony of its witnesses rather than that of defendant's should have been believed. That argument may be properly addressed to the factfinder at trial. However, it is inapropriate in appellate proceedings. *Fournier* [***6] *v. Ward, 111 R.I. 467, 306 A.2d 802 (1973)*; *Marstan Corp. v. Centreville Realty Co., 106 R.I. 36, 256 A.2d 26 (1969)*.

II

The plaintiff also alleges that the trial justice erred in failing to find that defendant had entered into an express or an implied contract with plaintiff during 1974. [2] We disagree. The distinction between an express or an implied contract is not based upon legal effect but upon the way in which [*365] mutual assent is manifested. 1 *Williston, Contracts* § 3 (3d ed. 1957). In an expressed contract the terms and conditions of the contract are assented to orally or in writing by the parties.

2 In its original complaint filed November 27, 1974, the plaintiff alleged that it had an oral or implied contract with the defendant on or about October 29, 1974. In the same complaint it claimed an oral or implied contract on or about September 19, 1974. Thereafter, in an amended complaint the plaintiff alleged that it had an oral or implied contract with the defendant on or about April 16, 1974. Finally, in its post-trial memorandum, the plaintiff contended that the oral or implied contract came into existence in May 1974.

[***7]

In *Bailey v. West, 105 R.I. 61, 249 A.2d 414 (1969)*, this court held that the elements of a contract "implied in fact" are as follows:

> "* * * A 'contract implied in fact,' * * * or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, as implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract.

"'It has been said that a contract implied in fact must contain all the elements of an expressed contract. So, such a contract is dependent on mutual agreement or consent, and on the intention of the parties; and a meeting of the minds is required. A contract implied in fact is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown. Such a contract does not arise out of an implied legal duty or obligation, but out of facts from which consent may be inferred; there must be a manifestation of assent arising wholly or in part from acts other [***8] than words, and a contract cannot be implied in fact where the facts are [illegible]

*249 A.2d at 416.*

To establish either an express or an implied contract, one must prove mutual agreement and intent to promise. In the instant case, the trial justice found that there was no mutual assest or meeting of the minds between the parties. He further found that defendant never intended to enter into an enforceable contract with plaintiff. An examination of the transcript reveals that these findings by the trial justice are [*366] supported by competent evidence. Therefore, they may not be disturbed by this court on review.

III

The final argument raised by plaintiff is based upon the doctrine of promissory estoppel. In the case of *East Providence Credit Union v. Geremia, 103 R.I. 597, 239 A.2d 725 (1968)*, this court, citing language in *Restatement of Contracts* § 90 (1932) defined the doctrine as follows:

> "'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial [**698] character on the part of the promisee and which does induce such action or forbearance is [***9] binding if injustice can be avoided only by enforcement of its promise.'" *103 R.I. at 601, 239 A.2d at 727.*

The plaintiff contends that the facts in the instant case lend themselves to the application of this doctrine. We disagree. We believe, for the reasons previously stated, that the trial justice was correct in finding that no promise was made by Cringan to Mr. Koury regarding acceptance of the plaintiff's bid. Therefore, in the circumstances of the case before us, the doctrine of promissory estoppel is inapposite.

The plaintiff's appeal is denied and dismissed, and the order appealed from is affirmed.

LEXSEE 768 F. SUPP. 943

**BANCO TOTTA E ACORES, Plaintiff, v. FLEET NATIONAL BANK, Defendant**

**C.A. No. 89-0220L**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

***768 F. Supp. 943*; *1991 U.S. Dist. LEXIS 9580***

**July 3, 1991, Decided**

**COUNSEL:** [**1] Eugene Scheiman, Esq., Thomas Fellig, Esq., Baer, Marks & Upham, New York, New [illegible] Rhode Island, for Plaintiff.

Richard F. Ziegler, Esq., Cleary, Gottlieb, Steen & Hamilton, New York, New York, Richard P. McMahon, Esq., McMahon & McMahon, Providence, Rhode Island, for Defendants.

**JUDGES:** Ronald R. Lagueux, United States District Judge.

**OPINION BY:** LAGUEUX

**OPINION**

[*944] MEMORANDUM AND ORDER

RONALD R. LAGUEUX, UNITED STATES DISTRICT JUDGE

This matter is before the Court on cross motions for summary judgment, and on defendant's motion to dismiss Count I of plaintiff's complaint based upon the pleadings, pursuant to *Fed.R.Civ.P. 12(c)*. The dispute concerns an $ 18 million commercial loan issued by Fleet National Bank ("Fleet") to Anthony Liuzzo ("Liuzzo"), a nursing home operator, in 1988. Plaintiff here, Banco Totta e Acores ("BTA"), participated in that loan in the amount of $ 2 million. Soon after the closing papers were signed, the relationship between Fleet and Liuzzo deteriorated, resulting in Fleet's accelerating the loan on October 27, 1989. The dispute between Fleet and Liuzzo was recently addressed by this Court in *Fleet National Bank v. Liuzzo, 766 F. Supp. 61 (D.R.I. 1991)*. In this suit against Fleet, BTA attempts to rescind its [**2] participation contract with Fleet or recover damages against Fleet for alleged misrepresentations by Fleet about the Liuzzo [*945] loan. Fleet, in turn, counterclaims that BTA violated the terms of the contract executed by the banks.

FACTUAL BACKGROUND

Building on a relationship started in 1986 when Fleet loaned Liuzzo $ 1 million, Fleet began negotiations with Liuzzo in 1987 concerning a larger, longer-term credit arrangement. In May 1988, BTA agreed to purchase a $ 2 million participation in the proposed loan. Several other banks enlisted as participants as well. On July 28, 1988, Fleet and Liuzzo entered into a revolving credit agreement, consolidating approximately $ 16 million in outstanding debt with $ 2 million in new credit.

Soon thereafter, Fleet became troubled about some aspects of Liuzzo's business operations, including a New York State grand jury investigation into Medicaid fraud at one of the nursing homes, which actually may have been underway at the time of the loan's closing. In the dispute between Fleet and Liuzzo, Fleet alleges, and Liuzzo vehemently denies, that Liuzzo knew of the investigation before the loan closed and failed to disclose what he knew to Fleet. This [**3] dispute led Fleet to attempt to terminate its contract with Liuzzo by urging him to seek financing elsewhere, and eventually, when Liuzzo failed to make a scheduled principal payment, to fully accelerate the loan. In the midst of that dispute, BTA filed suit against Fleet, alleging, among other things, that Fleet knew of the Medicaid fraud investigation and failed to disclose it to BTA. Alternatively, BTA charges that even if Fleet did not

know about the investigation when BTA agreed to participate in the loan, BTA justifiably relied on Fleet's assessments of Liuzzo's creditworthiness and suffered pecuniary loss as a result.

DISCUSSION

I. *BTA's complaint*

A. The counts

BTA's complaint has four counts. In the first count, BTA claims that Fleet breached its "duty of disclosure" by omitting to disclose material information. The duty of disclosure, BTA alleges, is established by policy guidelines for loan participation agreements promulgated by the federal Office of the Comptroller of the Currency. The second count is one for intentional misrepresentation.

wantonly breached its duty of due care and good faith by making [**4] material misrepresentations and omissions. [1] The fourth count alleges that Fleet has been unjustly enriched as a result of its refusal to refund to BTA the money BTA contributed to the Liuzzo loan. Counts 1, 2 and 3 refer to alleged material misrepresentations and omissions enumerated earlier in the complaint, including: 1) that Fleet knew that two of Liuzzo's nursing homes were being investigated for Medicaid fraud and that, consequently, Liuzzo was not a good credit risk, but failed to disclose this information to BTA; 2) that Liuzzo told Fleet officials about a Florida newspaper article on the Medicaid investigation, but Fleet failed to tell BTA about the article; 3) that Fleet knew of but failed to tell BTA about an ongoing financial audit of one nursing home being conducted by the State of New York's Department of Social Services; and, finally, 4) that Fleet failed to apprise BTA of the opinion letter provided by Liuzzo's attorney, which mentioned the audit.

1 The pertinent paragraphs of this count state in full:

76. Pursuant to the terms of the Participation Agreement, the Bank owed BTA a duty of due care and good faith in the exercise of the Bank's duties under the Participation Agreement and in connection with the RCA. [The revolving credit agreement between Fleet and Liuzzo].

77. The Bank willfully and wantonly breached its duty of due care and good faith by, among other things, making the material misrepresentations and omissions described above.

[**5] The four counts in BTA's complaint and the distinctions among them become somewhat blurred and redefined in BTA's motion and accompanying memoranda of law. The first count emerges as a claim for negligent misrepresentation wherein BTA [*946] asserts that Fleet failed to provide BTA with adequate information about Liuzzo, according to the standard set in the federal policy guidelines. In one of its memoranda of law, [2] BTA refers to the second count as one for "common law fraud or deceit" and the third count as "willful and wanton misconduct." BTA then addresses both counts with a single argument, delineating Fleet's alleged intentional misrepresentations. Though the third count, when outlined in the complaint, hints at a possible breach of contract, this theory has not been pursued by BTA in its subsequent memoranda. In the briefs the third count is treated as a tort claim, and is, for all intents and purposes, indistinguishable from count two, the deceit claim. The fourth count, originally for unjust enrichment, is transformed in the memoranda into a claim for rescission for innocent misrepresentation. [3]

2 "Banco Totta e Acores' Memorandum in Opposition to Fleet National Bank's Motion for Summary Judgment and for Judgment on the Pleadings".

[**6]

3 The doctrine of unjust enrichment or quasi contract is clearly inapplicable to this case. That equitable doctrine only applies where there is no contract between the parties and the law implies one to prevent the unjust enrichment of one party, and detriment to the other. *Hurdis Realty Inc. v. Town of North Providence, 121 R.I. 275, 397 A.2d 896 (1979)*. Here, there is a Participation Agreement that describes the legal duties of both parties. No implied obligations exist beyond the contract.

After careful review and analysis of BTA's pleadings and memoranda, the Court concludes that BTA has, in essence, attempted to state three causes of action under Rhode Island law: one for intentional misrepresentation, one for negligent misrepresentation, and one for innocent misrepresentation.

BTA has moved for partial summary judgment, seeking rescission, on the claim for innocent misrepresentation. Fleet has moved to dismiss the negligent misrepresentation claim with a motion for judgment on the pleadings, pursuant to *Fed.R.Civ.P. 12(c)*. Fleet seeks to dismiss the remaining claims through [**7] a summary judgment motion based on *Fed.R.Civ.P. 56*. Because the Court has reviewed the parties' Participation Agreement in considering BTA's negligent misrepresentation claim, the Court will treat Fleet's 12(c) motion as a motion for summary judgment, as permitted by the Federal Rules of Civil Procedure. [4]

4 *Fed.R.Civ.P. 12(c)* states:

> . . . If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in *Rule 56*, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by *Rule 56*.

B. Summary judgment

*Fed.R.Civ.P. 56(c)* provides the standard for ruling on a motion for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and [**8] that the moving party is entitled to a judgment as a matter of law.

Summary judgment may be granted even if some key facts are disputed, as long as those facts, and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the party opposing the motion, support judgment for the moving party. *Continental Casualty Co. v. Canadian Universal Insurance Co., 924 F.2d 370 (1st Cir. 1991)*.

C. The misrepresentation claims

An explication of these three misrepresentation claims under Rhode Island law is now in order. The tort of negligent misrepresentation has never been recognized by the Rhode Island Supreme Court. The Court addressed the claim in passing in *Ostalkiewicz v. Guardian Alarm, 520 A.2d 563 (R.I. 1987)*, where the plaintiff below had brought a claim for negligent misrepresentation, among other claims, and the trial judge (this writer) directed a verdict for the defendant. On appeal, the Supreme Court began ". . . assuming without [*947] deciding that a separate or distinct action might be brought for negligent misrepresentation," then went on to uphold the directed verdict based on the particular facts of the case.

[**9] In a federal case governed by Rhode Island law, *Rusch Factors, Inc. v. Levin, 284 F. Supp. 85 (D.R.I. 1968)*, Judge Pettine allowed an action to lie against an accountant for negligent preparation of financial statements. In describing the tort of negligent misrepresentation, the Court cited the tentative draft of the *Restatement (Second) of Torts § 552*:

> (1) One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. [5]

5 This language has been incorporated in the final version of the *Restatement (Second) of Torts § 552* (1977).

The tort of intentional misrepresentation, or, in common law parlance, deceit, is well established in Rhode Island [**10] law. It is required that plaintiff prove the following elements: 1) that defendant made a false representation; 2) that defendant intended thereby to deceive the plaintiff; 3) that defendant intended that plaintiff rely on the representation; 4) that plaintiff did rely on the misrepresentation; and 5) that plaintiff was injured as a result. *Cliftex Clothing Co., Inc. v. DiSanto,*

*88 R.I. 338, 344, 148 A.2d 273 (1959)*. In Rhode Island, a party who has been induced by fraud to enter into a contract has a choice of two remedies: he may affirm the contract and seek damages under the tort theory; or he may pursue a remedy under contract law, that is, to rescind the contract and recover what he has paid under it. *Halpert v. Rosenthal, 107 R.I. 406, 412, 267 A.2d 730 (1970)*.

In *Halpert*, the Rhode Island Supreme Court expanded the second category of suits, those seeking rescission of a contract based on fraud, to include suits where the plaintiff was induced to enter into the contract by an innocent misrepresentation. *Id. at 413*. In *Halpert*, a prospective home buyer backed out of a real estate agreement when he discovered that the house was infested [**11] by termites. The homeowner then sued the reluctant buyer on the contract. The buyer lodged a counterclaim, asserting that the homeowner had intentionally misrepresented that the house was termite-free during the preagreement negotiation. Though the buyer could produce no evidence to show that the homeowner intended to deceive the buyer with his misstatements, the trial judge denied the homeowner's motion for a directed verdict. The jury found for the would-be buyer and ordered the homeowner to return the downpayment. The Supreme Court affirmed:

> When he denied the plaintiff's motion, the trial justice indicated that a false, though innocent, misrepresentation of a fact made as though of one's knowledge may be the basis for rescission of a contract. While this issue is one of first impression in this state, it is clear that the trial judge's action finds support in the overwhelming weight of decisional and textual authority which has established the rule that where one induces another to enter into a contract by means of a material misrepresentation, the latter may rescind the contract. It does not matter if the representation was "innocent" or fraudulent.

*Id. at 412-413, 267 A.2d 730*. [**12] As with a claim for intentional misrepresentation, the plaintiff must show that he justifiably relied on defendant's misrepresentation, and was harmed thereby. *Id. at 415, 267 A.2d 730*.

A claim for innocent misrepresentation is restricted, however, because of the limitations inherent in the remedy of rescission. Rescission is appropriate only when both parties to the contract can be restored to [*948] the status they occupied prior to the contract, *Jakober v. Loew's Theatre, ect., 107 R.I. 104, 112, 265 A.2d 429 (1970)*, "provided no rights of third parties have intervened, and provided that any benefits received under it can be restored, so that the parties can be replaced in their original positions." *Turner v. Domestic Investment and Loan Corp., 119 R.I. 29, 33, 375 A.2d 956 (1977)*.

These restrictions on the applicability of rescission are fatal to BTA's claim for innocent misrepresentation. BTA loaned $ 2 million to Fleet; Fleet in turn loaned the money to Liuzzo. Liuzzo, of course, has defaulted on his payments. If the contract between BTA and Fleet was allowed to be rescinded now, Fleet would be forced to repay BTA its participation share, and Fleet would then [**13] only have a cause of action for that $ 2 million against Liuzzo. In short, there is no way that Fleet can be "restored to the status it occupied prior to the contract" with BTA. As a result, rescission is an inappropriate remedy here and BTA's claim for rescission for innocent misrepresentation (or for any other reason) must fail.

D. Justifiable reliance

As a matter of law, all three claims, for innocent, negligent and intentional misrepresentation, cannot survive for another, shared reason. Though the three causes of action differ in some respects, one element necessary to establish a prima facie case common to all three is that the plaintiff must have *justifiably relied* on the representation, mistaken or deceitful, made by the defendant. *Halpert v. Rosenthal, 107 R.I. 406, 413, 267 A.2d 730 (1970)* (innocent misrepresentation), *Rusch Factors, Inc. v. Levin, 284 F. Supp. 85, 91 (D.R.I. 1968)* (negligent misrepresentation), *LaFazia v. Howe, 575 A.2d 182 (R.I. 1990)* (intentional misrepresentation).

All three misrepresentation claims are controlled by a recent case from the Rhode Island Supreme Court, *LaFazia v. Howe, id.* In [**14] *LaFazia*, plaintiffs/sellers sued defendants/buyers for failing to make the final payment on a note for the purchase of a delicatessen. The buyers asserted a counterclaim, alleging that they had been induced to buy the operation by false and material misrepresentations made to them by the sellers concerning the delicatessen's past revenues. Before the sale, the buyers had examined the tax returns

of the business and expressed concern over the low profits, but they had been reassured by the sellers' verbal representations that in reality the business was much more profitable than indicated by the records. Consequently, the buyers agreed to the sale and signed a contract with the following disclaimers:

> 9. The Buyers rely on their own judgment as to the past, present or prospective volume of business or profits of the business of the Seller and does [sic] not rely on any representations of the Seller with respect to the same.
>
> 10. No representations or warranties have been made by the Seller, or anyone on its behalf, to the Buyers as to the condition of the assets which are the subject of this sale, and it is understood and agreed that said assets are sold 'as is' at the time of [**15] sale.

*575 A.2d at 183.* A standard merger clause was included as well. Distinguishing these clauses from other "general, nonspecific" disclaimer clauses, the Court upheld summary judgment for the sellers:

> It is fundamental to actions predicated on the theory of deceit that the party claiming deceit present evidence that shows that he or she was induced to act because of his or her reliance upon the alleged false representations. *East Providence Loan Co. v. Ernest, 103 R.I. 259, 263, 236 A.2d 639, 649 (1968).*
>
> . . . [Here] the merger and disclaimer clauses preclude defendants from asserting that plaintiffs made material misrepresentations regarding the profitability of the business. The clauses prevent defendants from successfully claiming reliance on prior representations.

*575 A.2d at 185.*

In the present case, BTA alleges that Fleet made the material misrepresentations described previously concerning the Medicaid investigation and the audit. In [*949] addition, BTA claims Fleet further misrepresented Liuzzo's creditworthiness by: 1) stating in the participation proposal and other written documents that Liuzzo was in compliance [**16] with all federal and state laws and regulations; 2) failing to respond honestly when BTA's credit officer remarked to Fleet's officers that they had found "an honest nursing home operator," [Palmer transcript, page 94]; and 3) providing BTA with a copy of the revolving credit agreement containing Liuzzo's own representations and warranties.

Following the negotiation and planning period (during which BTA claims these misrepresentations were made), BTA and Fleet both signed the Participation Agreement, which contained the following clause:

> 10. *Participant Representations and Warranties.* The Participant represents and warrants to the Bank that:
>
> (a) its execution and delivery of this Agreement has been duly authorized; the Participant has full power and authority to purchase the Participation; and the Participant's decision to purchase the Participation was based solely upon its own independent evaluation of the Loan, the Borrower's creditworthiness and the value and lien status of the Collateral, and all other matters relating thereto.

Participation Agreement, page 6. The impact of this clause is the same as *LaFazia's* specific disclaimer clause: it renders legally irrelevant [**17] all misrepresentations, innocently, negligently, or intentionally, made by Fleet to BTA before the Participation Agreement was signed. As in *LaFazia*, the Fleet/BTA disclaimer concerns the very matter about which BTA now claims it was defrauded, i.e., Liuzzo's creditworthiness. Having asserted in unambiguous contract language that it based its decision to participate in the loan "solely upon its own independent evaluation," BTA cannot now claim that it was relying upon Fleet's representations. Furthermore, the Court holds that if BTA did indeed rely on Fleet's representations, and not on its own appraisal, then that reliance was not justifiable in light of the contract between the parties.

Because the key element, justifiable reliance, cannot be established for any of BTA's three misrepresentation

claims, these counts in BTA's complaint fail to pass muster. The Court, therefore, grants Fleet's motion for summary judgment on BTA's entire complaint, and denies BTA's motion for partial summary judgment on its fourth count.

II. *Fleet's counterclaims*

Fleet has brought two counterclaims against BTA. The first is a breach of contract claim, which asserts that BTA violated Section [**18] 13.2 of the Participation Agreement, the "cooperation clause." The second claim is that BTA intentionally interfered with the contractual relationship between Fleet and Liuzzo by initiating litigation against Fleet in connection with the loan. BTA has moved for summary judgment on both counterclaims.

A. The breach of contract claim

Under the terms of the Participation Agreement, Fleet was obligated to notify BTA "as soon as [is] reasonably practical" after it acquired "Actual Knowledge of the occurrence of a material Event of Default or Default Condition." Section 13.1. "Default Condition" is defined in § 9.1(b) as an "event or condition which upon notice or passage of time or both could become an Event of Default." Section 13.2 provides that after notice is given as required by § 13.1, Fleet may pursue a course of action that it, "the Participant and the Other Participants shall agree upon." The paragraph continues:

> In the event that the Bank [Fleet], the Participant, and the Other Participants do not agree on the foregoing within five (5) days after Participant's receipt of notice of the occurrence of such an Event of Default, Default Condition, or proposed action or omission, [**19] the Bank shall take such action or actions, assert such rights, exercise such remedies and/or waive such Event(s) of Default or Default Condition(s) or refrain from taking such actions with respect thereto as the [*950] holders of a majority of the percentage interests in the Loan (including the Bank) shall deem appropriate in the circumstances, *and Participant will cooperate fully with Bank in connection therewith.*

Participation Agreement, page 7 (emphasis added).

Fleet asserts that it notified BTA of the Medicaid investigation on December 6, 1988. A series of meetings were then scheduled for the participant banks to discuss with Fleet the course of action to pursue. According to Fleet, BTA refused to participate in some of these meetings and instead, on February 6, 1989, demanded that the Participation Agreement be rescinded and that Fleet buy back BTA's portion of the loan. Moreover, BTA initiated an independent investigation with New York State authorities into Liuzzo's business operations, and, ultimately, filed this action against Fleet on April 7, 1989. BTA's refusal to attend meetings with the other participant banks, its investigation of Liuzzo, and its suit against Fleet, [**20] all, according to Fleet, represent breaches of the cooperation clause.

BTA responds with a number of arguments. First, BTA claims that the notice required under § 13.1 was not provided until February 21, 1989, when Fleet sent Liuzzo the first notice of default. Because BTA had already requested that Fleet rescind the loan by that date, BTA argues that its actions are not governed by the cooperation clause, which covers only actions taken five days after § 13.1 notification.

Second, BTA argues that Fleet suffered no injury as a result of BTA's failure to cooperate and, consequently, cannot sue for damages. BTA's third argument is that if the act of filing suit against Fleet is in itself a violation of the cooperation clause, then the clause works as a covenant or contract not to sue, and is "disfavored by the law."

As the Court has already indicated, BTA had no right to seek rescission of the Participation Agreement. BTA, by adopting a rescission stance, by necessity took an adversary position to Fleet and thus failed to cooperate with Fleet in its attempt to become disentangled with Liuzzo. Therefore, without engaging in a lengthy review of BTA's arguments and Fleet's counterarguments, [**21] it is clear that the Court *cannot* hold as a matter of law that BTA did not breach the Participation Agreement by its refusal to participate in the course of action agreed upon by Fleet and the other participants vis a vis Liuzzo. Consequently, the Court must deny BTA's motion for summary judgment on Fleet's first counterclaim.

B. The claim for intentional interference with contractual relationship

Fleet claims that BTA's independent inquiry into Liuzzo's operations and the initiation of litigation against Fleet in connection with the Liuzzo loan represent a wrongful interference with the contractual relationship between Fleet and Liuzzo. Through these actions, Fleet states in its answer, "BTA has jeopardized the likelihood that the borrower will perform in accordance with the terms of the Loan."

The necessary elements of the tort of interference with a contractual relationship are as follows: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom." *Smith Devel. Corp. v. Bilow Enterprises, 112 R.I. 203, 211, 308 A.2d 477 (1973).*

Although Fleet can readily show that [**22] a contract existed and that BTA knew of it, Fleet's evidence falls short of establishing the third and fourth prongs of the prima facie case. While BTA's decision to, as Fleet phrases it, "take sides with Liuzzo" may have fanned the flames of the Fleet/Liuzzo dispute, this effect was indirect at best. There is no evidence that BTA intended its actions to further disrupt the relationship between Fleet and Liuzzo; instead, it appears that BTA was simply trying to extricate itself from a deal that was going sour. As for Fleet's ability to show any damages resulting from BTA's actions, these are entirely speculative. [*951] Fleet's damages (whatever they turn out to be) were caused by Liuzzo's default. There is no evidence that BTA *caused* Liuzzo's default. In fact, the indications are that the Fleet/Liuzzo loan relationship was rapidly deteriorating at the time BTA took the actions complained of by Fleet.

Because of the failure of evidence necessary to establish the prima facie case for intentional interference with contractual relationship, the Court must grant BTA's motion for summary judgment on Fleet's second counterclaim. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* [**23]

*Conclusion*

The Court has granted summary judgment for Fleet on all four claims of BTA's complaint. Therefore, BTA's motion for summary judgment on its own fourth claim has been denied.

Fleet's counterclaim for breach of contract survives, as the Court has denied BTA's motion for summary judgment on this claim. However, the Court has granted BTA's motion for summary judgment on Fleet's second counterclaim for tortious interference with contractual relations.

Because of *Fed.R.Civ.P. 54(b)*, no judgments shall enter until the remaining issues in this lawsuit are resolved.

*It is so ordered.*