LEXSEE 1993 R.I. SUPER. LEXIS 56

**DANIEL E. MORAN, SR. AND BOSTON NURSES ASSOCIATION, INC. v. NORRELL HEALTH CARE, INC.**

**PC 89-4262**

**SUPERIOR COURT OF RHODE ISLAND, PROVIDENCE**

***1993 R.I. Super. LEXIS 56***

**September 15, 1993, Filed**

**DISPOSITION:** [*1] For the foregoing reasons, plaintiff's claims are denied.

**JUDGES:** GIBNEY, J.

**OPINION BY:** GIBNEY

**OPINION**

*GIBNEY, J.* Before the court is the complaint of plaintiffs, Daniel E. Moran Sr. and Boston Nurses Association, Inc., against Norrell Health Care, Inc., for business interference and defamation. This court takes jurisdiction pursuant to *G.L. 1956 (1985 Reenactment) § 8-2-14*.

*FACTS/TRAVEL*

The defendant, Norrell Health Care, Inc., is a Georgia corporation engaged in the health care/temporary help service business. Norrell provides temporary or part-time personnel for customers in the health care field.

In order to do business in certain prescribed areas, Norrell engages agents to market in, and provide temporary employees for, those areas. In 1986, Norrell entered into an agency agreement with A.G.D.L. Associates, Inc. Anthony DiLuglio, Sr. was the president of AGDL which became Norrell's agent for the Rhode Island area.

In early 1989, Norrell was interested in opening an office in Warren, Rhode Island. AGDL was thus authorized to hire a new employee who would look into the feasibility of opening an office in Warren. Although the new employee would work for AGDL, Norrell [*2] approval was required before the new employee could be hired.

Dan Moran, the plaintiff, brought impressive credentials to his interview for the AGDL/Norrell position. He was a registered nurse in both Massachusetts and Rhode Island with 13 years of experience in the nursing field in positions ranging from staff nurse to head nurse. When Moran was interviewed for the Norrell position in March of 1989, he was the Supervisor of Nurses at the Wayland Health Center.

In mid-March, plaintiff met with A.G.D.L.'s DiLuglio, a Norrell District Manager, Kathryn Dobbs, and a Norrell Regional Manager, Cheryl Camillo. Dobbs and Camillo gave DiLuglio Norrell's approval to hire Moran as nursing supervisor for Rhode Island and manager of the new Warren office.

On the witness stand, plaintiff claimed he was offered a position by AGDL but never responded to their offer. In his deposition however, Moran indicated that he accepted the position with reservations (plaintiff's deposition, p. 15, l. 23). Cheryl Camillo testified that she considered him the manager of the Warren office.

It is unclear whether plaintiff was hired as manager of the Warren office or Director of Nursing for A.G.D.L. or both. [*3] Indeed, it is unclear whether plaintiff actually ever heard the words, "you're hired." What is undisputed is that plaintiff did some marketing for AGDL/Norrell for which he received two consultant's fees from AGDL and, at one point, performed supplemental staffing shifts for which he was paid by Norrell. The evidence and testimony also show that

plaintiff, when his relationship with Norrell went sour, submitted a resignation letter to Norrell wherein he stated that he was, ". . . tenuring (sic) [his] resignation immediately with Norrell as a consultant." (Plaintiff's exhibit A)

Some time in May, 1989, a Norrell employee, Jane Lepcracci, contacted Norrell in Atlanta to report certain unspecified payment problems for overtime hours at AGDL. According to Cheryl Camillo, this report prompted an audit by Norrell of AGDL in mid-May. The audit resulted in a determination by Norrell that AGDL had diverted Norrell employees and Norrell clients to another health care service business called Per Diem which was run by Anthony DiLuglio, Jr. The specifics of that controversy are the subject of a different lawsuit and irrelevant to this dispute. At any rate, Norrell perceived A.G.D.L.'s actions [*4] as a violation of their agency [illegible] the audit. The testimony is conflicting on whether the atmosphere at the audit was merely tense or whether it actually erupted into a shouting match. Plaintiff claims he tendered his resignation on May 12th because of the unprofessional and acrimonious conduct of Norrell's representatives at the meeting. Regardless of what was said and at what volume it was said, Norrell and AGDL could not negotiate any kind of settlement so the agency agreement was terminated on May 23rd by Norrell.

On that very same day, May 23rd, plaintiff incorporated Boston Nurses Association (BNA) to compete in the business of providing temporary health care. Plaintiff arranged with Anthony DiLuglio to lease the Norrell/AGDL premises at 88 Pitman Street in Providence. As far as the testimony and evidence show, BNA existed for a very brief period of time. Plaintiffs introduced no credible evidence to show that BNA had any clientele or any commitments from prospective clientele.

Once again, there was conflicting testimony as to whether plaintiff took Norrell rolodexes and other trade secrets, or when plaintiff changed the [*5] phone number at the 88 Pitman Street address, and on when an awning with the Norrell insignia was painted over to remove the insignia. Whatever happened, Norrell sought and was granted a Temporary Restraining Order against AGDL Associates, Inc.; Per Diem Nursing Association, Inc.; Anthony DiLuglio, Sr. and Anthony DiLuglio, Jr. (Exhibit ___).

Upon being granted the TRO, Norrell wrote letters to various health care facilities around the state of Rhode Island informing them of the TRO and cautioning them against doing business with AGDL, Per Diem, the DiLuglios or any employee or agent of them. (Exhibit ___).

Norrell also sent letters to plaintiff and BNA stating that the TRO prevented Moran/BNA from soliciting business from any of the facilities listed on an exhibit attached to the TRO. Plaintiff, on advice from counsel, ceased doing business with those places and was effectively put out of business.

On July 24th, 1989, plaintiff and BNA received a clarification from Mr. Justice Needham in the form of an order saying that the May 25th TRO did not apply to plaintiff or BNA.

On August 7, 1989, plaintiff and BNA brought this cause of action against Norrell Health Care, Inc. alleging, [*6] in essence, tortious interference with a contractual relationship, interference with prospective contractual relations, and defamation. The defendant counterclaimed, alleging that Moran defamed defendant and utilized Norrell records to divert Norrell customers to BNA. This court denies defendant's counterclaim at the outset because of defendant's failure to establish any of the above allegations during the trial.

For the reasons set out below, this court also denies each of plaintiff's claims.

### *THE "INTERFERENCE" CLAIMS*

Rhode Island recognizes a cause of action for tortious interference with a contractual relationship. The elements of the tort are: 1) the existence of a contract, 2) the alleged wrongdoer's knowledge of the contract, 3) his intentional interference with the contract and 4) damages resulting therefrom. *Smith Development Corp. v. Bilow Enterprises, Inc., 112 R.I. 203, 308 A.2d 477, 482 (R.I. 1973).*

Plaintiff and BNA allege that Norrell interfered with the contractual relationship between plaintiff and various health care providers around Rhode Island when it sent letters informing the providers of the TRO. Unfortunately, plaintiffs were never [*7] able to satisfy the first element of the tort. In order to show an interference with a contractual relationship, the plaintiff

must prove the existence of a contract. Plaintiff presented no evidence that established the existence of a contract so the claim must fail.

The existence of something less than a contract does not preclude plaintiffs' claim of interference with prospective contractual relations. However, plaintiff needs more than a hope at some prospective contract to state such a claim.

In order to establish interference with prospective contractual relations, plaintiff must show the following elements: 1) the existence of a business relationship or expectancy; 2) knowledge by the interferee of the relationship or expectancy; 3) an intentional act of interference; 4) proof that the interference caused the harm sustained, and 5) damages to the plaintiff. *Mesolella v. City of Providence, 508 A.2d 661, 669 (R.I. 1986)*.

In *Mesolella*, the plaintiff complained that the defendant had amended a zoning ordinance to prevent him from building a low income housing project on his land. *Mesolella, 508 A.2d at 663*. In anticipation of the development, [*8] and prior to the amendment of the zoning ordinance, plaintiff had submitted an application to the Rhode Island Housing and Mortgage Financing Corporation (RIHMFC) for financing his project. The project was conditionally approved by RIHMFC. Additional federal financing was sought from, and granted by, the U.S. Department of Housing and Urban Development. *Id. at 664*.

The *Mesolella* court found that the plaintiff in that case did state a claim for tortious interference with prospective contractual relations. *Id. at 670*. In reference to the first element of the tort (existence of a business relationship or expectancy), the *Mesolella* court found that plaintiff's complaint, "alleged the expectancy of a relationship with RIHMFC in the construction of his project." *Id.* The conditional financing approval formed the basis of this expectancy. The importance of the likelihood of the expectancy for purposes of this tort is highlighted by the causation standard provided by the *Mesolella* court. The court set out two options for the standard: "Courts differ in the standards they set for proof of causation in this tort. Generally, they require proof [*9] either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." *Id. at 671*, citing annot., 5 A.L.R. 4th at 17.

In the case at bar, plaintiff was only able to point to a diary for a one week period purporting to record placement of certain BNA personnel in 1989 (plaintiff's exhibit 8). That is an insufficient attempt at establishing plaintiff's burden.

The *Mesolella* court relied on *Federal Auto Body Works, Inc. v. Aetna Casualty and Surety Co., 447 A.2d 377 (R.I. 1982)*, to establish the tort of interference with prospective contractual relations. The *Federal Auto Body* court made reference to the restatement in establishing the tort. *Id. 447 A.2d at 380, fn. 4* quoting *Restatement (Second) Torts § 766* B at 20 (1979). That court also referred to another Restatement passage when it said, "Even if one intentionally causes a third person to abstain from entering into a contractual relationship with another, such interference is not improper if one has a financial interest in the business of the third [*10] person and by the relation without employing wrongful means." *Id. at 380*.

Even if plaintiff were able to establish that he had a business expectancy with one of the health care providers, Norrell may well have been justified in sending the letters. As was mentioned though, this court finds nothing in the testimony and exhibits at trial which establish a business relationship of sufficient maturity to justify plaintiff's claim of the tort of interference with prospective contractual relations.

The plaintiff cited a California case as authority for the tort of interference with prospective economic advantage. *Pacific Gas and Electric v. Bear Stearns & Co., 50 Cal. 3d 1118, 791 P.2d 587, 270 Cal. Rptr. 1 (Cal. 1990)*. That tort is California's equivalent of Rhode Island's action for interference with prospective contractual relations. As the elements of the two torts are almost identical, this court need not review in detail the defects in plaintiffs' claim. Once again, plaintiff simply has not established enough of a business expectancy to state a claim for interference with prospective economic [*11] advantage.

The California Supreme Court elaborated on this need for a definite economic relationship between the plaintiff and a third party when it said, "as a matter of law, a threshold causation requirement exists for maintaining a cause of action for either tort; namely, proof that it is reasonably probable that the lost economic advantage would have been realized but for the

defendant's interference." *Youst v. Longo, 43 Cal. 3d 64, 233 Cal. Rptr. 294, 729 P.2d 728, 733 (1987).*

Plaintiff also pointed to Illinois' recognition of the tort of interference with prospective economic advantage arising out of a business relationship. *Thorne v. Elmore, 79 Ill. App. 3d 333, 34 Ill. Dec. 846, 398 N.E.2d 837.* Once again, the court required that there be some definite business expectancy. In Illinois, a plaintiff must have a, "reasonable expectancy of entering into a business relationship." *Id. 398 N.E.2d at 847.* No such reasonable expectancy was established by plaintiff at trial.

Plaintiff never established the existence of a business expectancy. therefore, regardless of what he calls the tort, plaintiff has not established liability on [*12] Norrell for the letters to the health care providers or for the letters to Moran and BNA under that line of authority.

*DEFAMATION*

Defamation requires proof of: 1) a false and defamatory statement concerning another; 2) an unprivileged publication to a third party; 3) fault amounting at least to negligence on the part of the publisher and 4) damages, unless the statement is actionable irrespective of special harm. *Healey v. New England Newspapers, Inc., 520 A.2d 147, 149 (R.I. 1987)*; *Lyons v. Rhode Island Public Employees Council 94, 516 A.2d 1339, 1342 (R.I. 1986).*

Traditionally, defamation was broken down into two separate actions: libel and slander. Libel dealt with written publication of defamatory material whereas slander dealt with an oral publication. The case before this court involves both written and oral statements. In recent years, the distinction between libel and slander has been minimized but an important distinction remains. Libel is actionable without proof of special damages whereas slander requires proof of special damages unless it is slanderous per se. *Laudati v. Stea, 44 R.I. 303, 117 A. 422 (1922).* [*13]

"A slander is slander per se if it charges a person with a crime involving moral turpitude or states that he is suffering from certain diseases, or prejudices him in his office, profession, or business, or may probably tend to do so." *Id.* Plaintiffs called, as one of their witnesses, John O'Donnell, who operated a Norrell agency in the Fall River area from 1987-1990 called Coastal Health Care Corp. O'Donnell testified that at a meeting in late 1989, Cheryl Camillo, Steve Vance and Kathryn Dobbs accused Dan Moran and BNA of illegalities. This forms the basis for plaintiffs' slander per se claim.

Plaintiffs also allege that in her September 10, 1992 deposition, Kathryn Dobbs admitted that she probably, "said that what David Moran was doing was illegal by using the Norrell time slips and the Norrell employees . . ." (Plaintiffs' exhibit no. 5, p. 33, l. 23-25).

Several problems emerge with respect to Dobbs' deposition and O'Donnell's testimony that hurt plaintiffs' reliance on them. First of all, the alleged statement made by Dobbs was in response to a hearsay statement made by Daniel Moran in his deposition:

p. 89 l. 21 Q. Kathryn Dobbs has admitted to saying exactly what? [*14]

> l. 22 A. What Daniel Moran and Boston Nurses Association was doing was illegal and conveyed that to people that went to the Norrell office.

When Moran was asked who Dobbs conveyed the message to, he identified three woman who never testified at the trial, and, as far as this court knows, never testified at any deposition. Thus, defendant has never had the opportunity to cross-examine these witnesses.

Later on in the deposition, Daniel Moran himself pointed out the danger of this allegation about Dobbs:

p. 91 l. 14 Q. To the best of your knowledge, do you know whether Cheryl Camillo made any of these alleged statements?

> A. It is just hearsay. I've been told by people, and they described who said it.

Plaintiffs failed to point out the following exchange that occurred later in Dobbs' deposition:

p. 34 l. 13 Q. The passage from Mr. Moran's deposition that I read to you, refers to an interview of you by "we", whoever he means as "we". Did that interview take place?

l. 16 A. I don't recall any interview.

l. 17 Q. Did you ever, and I'll quote from the passage, "admit," end quote, to saying what Mr. Moran attributes to you in his deposition? [*15]

l. 20 Mr. Marran: Objection, already asked and answered.

l. 22 By Mr. Prescott:

l. 23 Q. The answer is no?

l. 24 A. The answer is no.

Ms. Dobbs' deposition testimony is seemingly contradictory and, unfortunately, Mr. O'Donnell's testimony sheds no light on the issue. First, Mr. O'Donnell was unable to recall exactly who attended the

Indeed, Cheryl Camillo later denied on the witness stand that she attended the meeting with O'Donnell. Second, O'Donnell could not allege that plaintiff was accused of the commission of a specific crime, but merely that plaintiff was accused of an "illegality." Third, Mr. O'Donnell took the witness stand with a great deal of bias against Norrell. He testified that he and Norrell ended their agency relationship under less than amicable terms. He explained that he lost his life savings, "as a result of Norrell." He still believes that Norrell owes him money, although he cannot put a dollar value on it. The animus O'Donnell feels toward defendant was palpable.

For these reasons, this court does not find John O'Donnell to be a credible witness. This court is [*16] not convinced that Ms. Dobbs said that what plaintiff was doing was illegal at the 1989 meeting with O'Donnell. At most, Ms. Dobbs admitted to saying Moran was engaged in illegality. Plaintiff has presented no credible evidence to show that this potentially defamatory statement was published to a third person. Unprivileged publication to a third party is an essential element of any defamation claim. Plaintiff has not established this element.

Even if plaintiff could prove publication to O'Donnell, this court believes that Norrell was privileged to publish a suspicion of illegality to O'Donnell. John O'Donnell ran a Norrell agency. Since Norrell suspected that AGDL was diverting Norrell clients to Per Diem, they may have felt that O'Donnell deserved a warning to protect his (and Norrell's) business interests. The concept of qualified privilege allows a declarant to, "escape liability for a false and defamatory statement made about another if the occasion for the publication is such that the publisher, acting in good faith, correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or [*17] those of third persons, or certain interests of the public." *Ponticelli v. Mine Safety Appliance Co., 104 R.I. 549, 247 A.2d 303, 305-306 (R.I. 1968).* Norrell may have been speaking out to protect O'Donnell's, and hence Norrell's, interests. As was mentioned, however, O'Donnell's bias calls all of his testimony against Norrell into question. This court is not persuaded that a Norrell employee or executive slandered Moran or BNA at the meeting in question.

Cheryl Camillo, who countered plaintiff's version of events on several points, was found to be knowledgable,

persuasive.

Plaintiffs' libel claim arises out of certain letters sent to Norrell customers by Norrell notifying them of the TRO. It is unclear which customers received the letter. One letter, addressed to Briarcliff Health Care, was entered as an exhibit. (Plaintiff's exhibit II).

That letter informs the Norrell customer that the TRO prohibits AGDL Associates and its employees and agents as well as Per Diem and its employees and agency from soliciting Norrell customers. No where does the letter refer to Daniel Moran or BNA. Hence, this court finds [*18] that the letter did not libel Moran or BNA expressly or by innuendo.

Norrell also sent letters to plaintiff and BNA informing them that the TRO offered to them. Assuming, arguendo, such letters contained a false and defamatory statement and Norrell was negligent in sending same, plaintiff has failed to show the essential element of publication required for a libel claim. *Lonardo v. Quaranta, 205 A.2d 837, 99 R.I. 70.* (R.I. 1964).

***DAMAGES***

Defendant claims that a distinction exists between interruption of business and destruction of business for purposes of computing damages. Although there is no Rhode Island authority to support this distinction, this court agrees with defendant that lost profits is inappropriate to a damages determination in the instant

case.

As defendant concedes, lost profits is an acceptable element of damages in Rhode Island for business interruption. *Abbey Medical/Abbey Rents, Inc. v. Mignacca, 471 A.2d 189, 195 (R.I. 1984)*. However, recovery for loss of profits requires plaintiff to establish such loss with "reasonable certainty." *Smith Development Corp. v. Bilow Enterprises, 112 R.I. 203, 308 A.2d 477, 482 (R.I. 1973)*. [*19] Therefore, courts in other jurisdictions have either refused to allow recovery for lost profits for newly established businesses, *Deauville Corp. v. Federated Dept. Stores, Inc., 756 F.2d 1183* C.A. 5 (Tex. 1985), *Manniello v. Dea, 461 N.Y.S.2d 582, 92 A.D.2d 426*, N.Y.A.D. 3 Dept. 1983, or like Rhode Island, have required such lost profits to be shown with reasonable certainty. *Walgreen Arizona Drug Co. v. Levitt, 670 F.2d 860*, (A. Ariz. 1982), *Massey-Ferguson,*

App. 1 Dist. 1982, *Diesel Service, Inc. v. Accessory Sales, Inc., 210 Neb. 797, 317 N.W.2d 719 (Neb. 1982)*.

In the present controversy, plaintiffs attempted to show lost profits through the testimony of an expert, Louis Paolino. For reasons that will be explained below, this court finds Mr. Paolino's testimony to be unpersuasive.

First, BNA was a new business. Therefore, pursuant to the authority cited above, plaintiff needed to show with "reasonable certainty" what BNA's profits would have been. Mr. Paolino arrived at a net annual profit figure for BNA of $ 182,508.00.

Mr. Paolino's [*20] opinion was based on statistics from Lifetime Medical, a supplemental staffing business that he owns. Mr. Paolino used his knowledge of Lifetime Medical, a business that had existed for 14 years, along with an assumption that plaintiff would have accomplished 600 hours per week in sales, to arrive at his profit figure.

The problems inherent in Mr. Paolino's computations are obvious. First, he was forced to assume that plaintiff and BNA would operate as efficiently as Lifetime Medical and its experienced staff. Second, he provided no basis for a figure of 600 hours of sales per week.

Paolino further assumed that BNA's average bill rate (i.e. - the bill distribution between R.N.'s, L.P.N.'s and Nurses Assistants, all of whom are paid at different rates) would be identical to Lifetime's. He relied on scheduling sheets from plaintiff and computer summary sheets from AGDL to arrive at his profit figure. The scheduling sheets were unreliable, while the AGDL computer summary

clients.

The most glaring example of the speculative and unreliable nature of Mr. Paolino's testimony was his assertion that BNA would have operated well in the black [*21] in 1989 while Lifetime Medical, Paolino's own company and the basis of the comparison, sustained a significant loss. This court found Paolino's testimony speculative and unconvincing.

Generally speaking, Paolino's testimony was based upon inconclusive data, gross speculation and assumptions not in evidence. As a result of these defects, his testimony did not weather cross-examination.

For the foregoing reasons, plaintiff's claims are denied.

# Pike & Fischer

Communications Regulation
Call 1-800-255-8131
Email Customer Care

**STANLEY MARSH 3, TOM F. MARSH, MICHAEL C. MARSH, ESTELLE F. WATLINGTON, STANLEY MARSH 3 SPECIAL TRUST AND TOM F. MARSH SPECIAL TRUST, d/b/a MARSH MEDIA, EL PASO For Renewal of License of KVIA-TV, El Paso, Texas**

**41 RR 2d 1655, 67 FCC 2d 284, 1977 FCC LEXIS 1303**

HIDE DIGESTS

**[73.24(G), 73.24(R)(18)]**

... "personal" to a particular licensee and cannot be held over the heads of future assignees of a station's license. This position furthers the policy that citizen agreements should not strictly bind a licensee to fixed and unchangeable positions. Oral agreements have no force or effect before the Commission. **Marsh Media, El Paso, 41 RR 2d 1655** [1977].

**[73.24(R)(30)]**

An El Paso, Texas, TV station's public affairs programming for the Hispanic community did not raise a substantial question requiring a hearing. Besides segments of general public affairs programs, the station's half-hour Spanish-language program on Sundays will apparently constitute 29 minutes of the 95 minutes per week proposed for local public affairs. **Marsh Media, El Paso, 41 RR 2d 1655** [1977].

**[73.24(Y)(3)]**

Where a renewal applicant interviewed 211 community leaders of whom 69 were Hispanic, and at least 15 leaders were associated with various projects in the community's (El Paso, Tex.) barrio, no substantial question was raised with respect to the community leader survey. Whether any members of a committee composed of 11 Mexican-American organizations in the El Paso area were formally ascertained was not, standing alone, dispositive. The Commission requires only that leaders from every significant segment of the community be ascertained and leaves the selection of the particular individuals to be interviewed to the discretion of the licensee. **Marsh Media, El Paso, 41 RR 2d 1655** [1977].

**[73.24(Y)(4)]**

A licensee's general public survey constituted an adequate effort to ascertain the Hispanic community of El Paso, Tex. Of a total sample of 626 interviewees, 406 were chosen at random from the El Paso telephone directory. Of the random telephone interviewees, 181 were "Spanish". In addition 115 telephone interviews were specifically allocated to areas with relatively high minority population. And 105 further interviews were conducted personally in the same area. **Marsh Media, El Paso, 41 RR 2d 1655** [1977].

**(December 23, 1977)**

**FCC 77-810**

**File No. BRCT-435**

**Released: December 23, 1977**

Adopted: November 30, 1977

MEMORANDUM OPINION AND ORDER

**BY THE COMMISSION: COMMISSIONERS FERRIS, CHAIRMAN; AND BROWN CONCURRING AND ISSUING STATEMENTS.**

1. The Commission has before it the above-captioned application for renewal of license for Station KVIA-TV, El Paso, Texas, filed April 1, 1977 by Marsh Media, El Paso; a Petition to Deny Renewal filed by the Committee for the Development of Mass Communication; and an Opposition submitted by the licensee.

2. By way of background, in 1973 the Committee, an "umbrella" group comprised of 11 Mexican-American organizations in the El Paso area, reached an agreement with Walton Enterprises, Inc., then licensee of KELP-TV. [1] The agreement, which was filed with the Commission, spelled out various means by which Mexican-Americans were to participate in the station's operation and specifically stated that the station would air a Committee-produced program, Conoceme. However, the licensee reserved "the right to make changes and/or revisions which in its judgement (sic) would better reflect applicable FCC rules and policies." In 1976, Marsh Media assumed control of the station and, after several months, the new licensee cancelled the Committee's program and substituted a station-produced Spanish-language show, Por Que? Por Que! The Committee's Petition to Deny followed.

Standing

3. Marsh Media suggests the Committee lacks standing because its petition is "designed purely to cause injury" to Marsh Media and because the Committee's "overriding concern" is its entirely "private" ambition to force Marsh Media to accept the Committee's "unrepresentative programming and program censorship." However, the Committee alleges its members "reside and work within the area of dominant influence" of the licensee, represent a "substantial segment of the viewing audience" of the station and are motivated by what the Committee terms "concern for the public welfare and for the improvement of broadcast services in the El Paso area." Thus, the Committee has standing to file a petition to deny as "responsible spokesmen for representative groups having significant roots in the listening community." Office of Communication of the United Church of Christ v. FCC, 359 F.2d 994, 1005 (D.C. Cir. 1966).

Violation of Agreement

4. Initially, the Committee asserts that Marsh Media is subject to and has violated the agreement between the Committee and KVIA-TV's former licensee. The agreement was included as part of the station's 1974 renewal application, and petitioner says nothing in the official transfer of license to Marsh Media "abrogates explicity or otherwise" the terms of the accord. By affidavit of its executive director, David Morales, the Committee asserts that some of its members met with representatives of Marsh Media before the assignment and that one of Marsh's representatives indicated the new licensee would honor the agreement. [2]

5. Marsh Media counters that it is not subject to the Walton agreement, and it denies giving any indication to petitioner that the station would continue to honor the agreement. Further, Marsh says its assignment application explicitly stated that the new licensee was not a party to the agreement and would carry out the "constructive commitments" of the accord. (See Assignment Application, Exhibit Z).

6. The Commission has consistently held that agreements between licensees and the public remain in a sense "personal" to a particular licensee and cannot be held over the heads of future assignees of a station's license. That is, the parties to such an agreement have "no right or authority to make the provisions... binding on any future assignee" of a station's license. Letter to Frank Lloyd, Esq., 55 FCC 2d 800, 802 (1975). This position will also further the Commission's policy that citizen agreements should not strictly bind a licensee to fixed and unchangeable positions. Agreements Between Broadcast Licensees and the Public, 57 FCC 2d 42, 49-50 (1975). Further, Marsh is not bound by virtue of any oral agreement, understanding or misunderstanding since we have indicated that oral agreements will have no force or effect before the Commission. Id. at 51. The wisdom of that policy is forcefully demonstrated by the apparent differences of recollection concerning the meeting between Marsh and the Committee. [3] Finally, even if the licensee had assented to the agreement, the accord reserved the licensee's "right to make

changes and/or revisions." Not only does this clause appear to limit the enforceability of the ... Commission's often-stated policy that **ultimate responsibility for programming** decisions must remain in the hands of licensees. Agreements Between Broadcast Licensees and the Public, supra at 49. As the Commission has previously indicated, it cannot approve agreements "which contain 'fixed determinations, binding and unchangeable,' in areas where flexibility to serve the public interest is required." Id. at 49-50. Therefore, it does not appear that Marsh is bound by the agreement between the Committee and Walton, and even if the licensee were bound, the alleged violations of the agreement's terms seem to fall within the ambit of the licensee's specifically reserved discretion.

Ascertainment

7. The Committee next alleges that both the licensee's community leader survey and general public survey were inadequate. As to the leader survey, the Committee says the licensee engaged in "selective interviewing" resulting in the systematic exclusion of barrio leaders. [4] Additionally, petitioner claims that the time and location of the interviews discriminated against barrio leaders and that none of the Committee's leaders was interviewed. As regards the general public survey, the Committee again alleges "selective interviewing" which excluded persons living in El Paso's barrio. And petitioner asserts that the licensee's "over reliance" on a telephone survey "automatically biased" the survey against "lower economic echelon citizens."

8. It appears from the record that of the 211 community leaders ascertained by Marsh, 69 were Hispanic. More specifically, Marsh Media asserts that 15 leaders interviewed were "deeply involved in or ... associated with the barrio" and another five were involved with or associated with the Committee itself. For support the licensee offers affidavits of its interviewers as well as memoranda of certain interviews. [5] Also, the licensee maintains it took "particular care" to ascertain the views of El Paso's Hispanics.

9. Again the Committee's allegations alone do not raise a substantial and material question of fact. Petitioner must show by some supporting evidence that some significant portion of the community has been excluded from ascertainment. This the Committee has not done as regards either the licensee's community leader or general public survey. Storer Broadcasting Co., supra at 471.

10. The licensee ascertained at least 15 community leaders associated with various projects in El Paso's barrio. Whether any members of the Committee were formally ascertained is not -- standing alone -- dispositive. The Commission requires only that leaders from every significant segment of the community be ascertained and leaves the selection of the particular individuals to be interviewed to the discretion of the licensee. Id. [6] The Committee has failed to produce supporting evidence of any abuse of discretion and, thus, has raised no substantial and material question of fact as to Marsh Media's leader survey.

11. Similarly, the licensee's general public survey appears to constitute an adequate effort to ascertain El Paso's Hispanic community. The record reflects that out of a total sample of 626 interviewees, 406 were chosen at random from the El Paso telephone directory. Of these random telephone interviewees, 181 are listed as "Spanish." An additional 115 telephone interviews were specifically allocated to areas with relatively high minority populations. And 105 further interviews were conducted personally in the same area. Of the 220 personal and telephone interviews in "minority areas," 193 were with Hispanics. Thus, while the licensee relied primarily on telephone interviews, it appears that Marsh made a serious attempt to ascertain the interests and needs of the entire community. Given this and the fact that the Committee has produced no evidence of the systematic exclusion of persons in the barrio, no substantial and material question of fact has been raised. See Sarkes Tarzian, Inc., FCC 2d , 40 RR 2d 1711, 1714-15 (1977).

Programming

12. The Committee also offers a wide-ranging critique of KVIA-TV's past and proposed programming. Petitioner alleges that the station does not present public service programs of "reasonable relevance to Chicano or Black or women's needs, interests and aspirations." Further, the Committee says, "general interest" public service programming "ignores or gives short shrift to Chicano or other minority interests." Petitioner maintains that KVIA-TV portrays Chicanos as "querulous, complaining nitpickers without significant, legitimate problems or creative solutions" and treats Mexican-Americans with "Anglo-values" different from other Hispanics. The Committee characterizes KVIA-TV's Spanish language program Por

Case 1:06-cv-00431-ML-LDA Document 29-3 Filed 12/12/2007 Page 10 of 35


[illegible]

[illegible] "interest" programming is insufficient given the "desperate need" for "bilingual" programming.

13. In opposition, Marsh Media insists that any program changes were made in good faith and suggests the Committee seeks to convert the Commission into an arbiter of "good" programming. The licensee also maintains that particular programming decisions are peculiarly in its discretion and that the Committee has presented "no evidence which even remotely suggests that Marsh Media has abused its programming discretion."

14. None of the Committee's broad-brush programming complaints presents a substantial and material question of fact since the Committee has failed to show "through affidavits that the licensee failed to meet a substantial number of problems in its programming or that it refused in bad faith to meet a significant community problem." Columbia Broadcasting System, Inc., 46 FCC 2d 903, 910-11 (1974). Rather, the Committee merely has offered allegations of ultimate, conclusory facts regarding KVIA-TV's programming. See generally Sande Broadcasting Co., 58 FCC 2d 139, 143 (1976). Moreover, the record reflects a significant effort to present public affairs programming of particular interest to El Paso's Hispanic community, especially considering licensee's brief stewardship at KVIA-TV. [7]

15. Further, licensees are under no obligation to divide programming "so as to reflect the exact racial, ethnic, or religious composition" of their audiences. Columbia Broadcasting System, Inc., supra at 910; accord Chuck Stone v. FCC, 466 F.2d 316, 328, reh. denied, 466 F.2d 331 (D.C. Cir. 1972). As to the Committee's criticism of KVIA-TV [illegible] never insisted that "any one type of program must be followed to meet community problems, needs and interests." Newhouse Broadcasting Corp., 61 FCC 2d 528, 534 (1976). And the Commission has refused to become involved in the subjective determination of what is or is not a "good program." Columbia Broadcasting System, Inc., supra at 910. Therefore, the Committee's general criticisms of KVIA-TV's programming do not present a substantial and material question of fact to be resolved by evidentiary hearing. [8]

Employment Discrimination

16. Finally, the Committee alleges that the licensee engages in employment discrimination. Petitioner asserts that the "great disparity" between the number of minorities and women on KVIA-TV's staff and the number of minorities and women in the El Paso work force demonstrates that KVIA-TV's equal employment opportunity program is inadequate. As to recruitment, the Committee maintains that the licensee has "eschewed developing links with local groups or utilizing similar non-traditional recruitment avenues." [9]

17. In opposition Marsh Media asserts that the station's employment figures bring it well within the "zone of reasonableness." Also, the licensee alleges that it has "systematically maintained contact, for women and minority recruitment purposes" with a variety of organizations and agencies as well as two local colleges.

18. Because Marsh did not assume control of the station until after the pay period covered by the 1976 Annual Employment Report, only the 1977 Report indicates station employment under Marsh's stewardship. The Report -- in an area in which 59.1% of the work force is minority and 39.7% female -- reflects the following employment profile:

Total full-time employees 48
Women 12 (25%)
Minorities 20 (39.58%) [10]
Total in upper four category jobs 42
Women 7 (14.58%)
Minorities 15 (29.16%)

FERRIS

Case 1:06-cv-00431-ML-LDA Document 29-3 Filed 12/12/2007 Page 11 of 35


CONCURRING STATEMENT OF CHAIRMAN CHARLES D. FERRIS

Re: Application for Renewal of License of KVIA-TV, El Paso, Texas

I concur separately in this decision to state my views on our policy requiring a broadcast station to present programming that meets the particular needs of a substantial minority population in its service area. Here, of course, the "minority" portion of the community is in fact the majority: Mexican-Americans comprise approximately 56% of the SMSA workforce of El Paso, Texas.

The Court of Appeals has recently warned us that there is a "zone of reasonableness" by which we should test a station's programming to substantial minority groups as well as its equal employment opportunity efforts directed to them. In Alianza Federal de Mercedes v. FCC, 539 F.2d 732 (D.C. Cir., 1976), an Albuquerque, New Mexico, television station had spent, at most, 6% of its total public affairs program time dealing with problems of interest to its 40% Mexican-American community. The Court, while finding the programming issue inadequately presented to the Commission to allow judicial review, noted that had it reached the issue a renewal hearing might have been required.

The Commission has itself in the past used a quantitative test to judge a licensee's program service to its minority audience. The Commission held in Alabama Educational Television Commission, 50 FCC 2d 461, 472 (1975), that a licensee's failure to serve the needs and interests of a 30 percent minority community was "fundamentally irreconcilable with the obligations which the Communications Act places upon those who receive authorizations to use the air waves." In Radio Marion, 52 FCC 2d 1229, 1243 (1975), the Commission said that a licensee "with a Black population outnumbering the White population" [illegible] obligation in terms of service to the minority community." And in New Mexico Broadcasting, 54 FCC 2d 126, 143 (1975), the Commission designated for hearing the issue of whether another Albuquerque licensee had presented sufficient programming "of relevance to the Mexican-American community in its service area." Last year the Supreme Court specifically recognized that the Commission has an "obligation under the Communications Act of 1934... to insure that its licensees' programming fairly reflects the tastes and viewpoints of minority groups." NAACP v. FPC, 425 U.S. 664, 670 Footnote.7 (1976).

But while we have stated this obligation, we have never precisely defined its parameters. The Court in Alianza seemed to be proposing that the Commission follow a three-step procedure:

(1) Calculate the total public affairs programming presented by a licensee in a community with a significant minority population;

(2) Determine the percentage of its overall public affairs programming devoted specifically to the concerns of the minority population; and

(3) If we find a "gross disparity" (from 2 to 6% of the total in Alianza), designate the license for hearing to determine whether in fact such a disparity is consistent with the licensee's public trustee responsibilities.

This alone should not be the test. In this case, one-third of KVIA's weekly public affairs programming consists of a regularly scheduled bilingual program specifically addressing the Mexican-American community of El Paso, even if we do not look to individual programs in other public affairs series addressing Mexican-American concerns. This substantial percentage of total public affairs programming would clearly meet the Alianza test, as the Commission notes in its decision here.

I am concerned, however, that both we and the Court in Alianza may be too narrowly focusing our scrutiny. First, simply applying the Alianza test in a mechanical fashion would allow a licensee who did a minimal amount of total public affairs programming to do far less for its minority audience than one who did substantially more total public affairs programming in an attempt to fully meet its responsibility to inform its local electorate. The Court could not have meant such an irrational result.

Second, the timing of public affairs programming addressed to minority concerns is of critical importance. Here, KVIA scheduled Por Que? Por Que! at 10:30 Sunday morning -- traditionally a low television-viewing period -- while it airs some of its other public affairs programming in prime time. While this factor was not explicitly mentioned in Alianza, it is one we should be able to take into account. Finally, our review should

not focus exclusively on the "public affairs" programming a licensee chooses to air. Our statutory mandate [illegible] public service announcements and children's and other programming as well. Our concern with total program service dates at least from our 1946 Blue Book and was reaffirmed in our 1960 Report and Statement of Police re: En Banc Programming Inquiry 44 FCC 2303.

The Commission notes that petitioners here did make a general allegation that a 30 minute per week bilingual program is insufficient "given the 'desperate need' for 'bilingual' programming" in El Paso. But we have no evidence in the record on the extent to which Spanish is the primary or coequal language of the El Paso Mexican-American population, nor has the Commission developed any presumptions to guide us in this area.

The Commission should begin to assist licensees in bilingual communities by developing clearer guidelines as to when and to what degree bilingual service is necessary to meet our basic test of serving their communities' needs. Even if less than half of El Paso's Mexican-American citizens use Spanish as a primary or coequal language, that could still amount to one-quarter of KVIA's total audience. We require our licensees to ascertain and address community needs and interests. But how can they be addressed meaningfully if a substantial portion of the audience is not comfortable with the language being used? A trustee of the public surely has a fiduciary obligation to speak to those for whom he holds that trust in a language they can readily understand. Perhaps we should require this issue to be explored by a licensee in its ascertainment surveys, if the existence of a threshold percentage of Hispanic citizens in its service area would make such an inquiry potentially fruitful.

Broadcasters affected by such a policy may object that a majority of their audience will be disturbed by Spanish captioning or bilingual dialogue. One answer to their concerns may result from the Commission's approval a year ago for use of Line 21 of the television signal to carry closed captions for the deaf. Captioning for the Deaf, 63 FCC 2d 378 (1976). Closed captioning is a technique by which coded data signals are transmitted along with the regular video signal, enabling decoder-equipped television receivers to display visually the information contained in the aural segment of television programs. In that decision, we indicated that Line 21 uses other than deaf captioning might be permitted in the future. Id. at 388-89.

Closed captioning of Spanish subtitles might be used to meet the needs of KVIA's Hispanic audience and that of other similarly situated licensees. Alternatively, Spanish-language simulcasts of television progrmming could be arranged on a local radio broadcast station subcarrier frequency. Or perhaps a specialized cable radio channel could be developed for this purpose.

Public broadcasting has already taken the lead in initiating and applying the deaf-captioning system we approved last year. They may begin to pioneer in the use of Spanish-language captioning, or commercial broadcasters this time might take the lead in expanding this benefit to other unserved or underserved parts of the television viewing audience. The Commission's role should be supportive of innovative approaches to meet the special needs of the Hispanic community, as it has been for the deaf.

Such inquiries, however, are well beyond the scope of the instant case, since petitioners here have not alleged sufficient facts on the overall need for bilingual television service in El Paso to warrant a full hearing on KVIA's license renewal. This is particularly true in view of the Commission's qualified finding that KVIA's service to Mexican- Americans has been adequate "especially considering" the "brief stewardship" of its current licensee. Marsh Media acquired this station exactly a year before filing the renewal application in question. Combining these factors, I concur in the result reached, but I would expect to take a much harder look three years from now when this licensee has held a longer stewardship in the El Paso community.

Re: Application for Renewal of License of KVIA-TV, El Paso, Texas

If the Commission were examining the issue of licensee agreements with community groups as an original matter, I would attempt to convince my colleagues that when there is in existence a written agreement between a broadcast licensee and a community group, this agreement should remain in effect when the station license is transferred and thereafter bind the transferee unless there is a disavowal of the agreement by the transferee in the transfer application. Such a rule would be easy to administer, and it would place the burden on the new licensee (where I believe it belongs) to make clear its intentions with

respect to the pre-existing agreement

Having come to the Commission two years after the decision in National Association for Better Broadcasting, 55 FCC 2d 800 (1975), I would not at this point disturb that decision. I therefore agree that the Committee for the Development of Mass Communications cannot bind Marsh Media, the present station licensee, to a citizens' agreement made with Walton Enterprises, the former licensee. And Agreements Between Broadcast Licensees and the Public, 57 FCC 2d 42 (1973), makes it clear that the Commission "will give no consideration whatever" to oral understandings. It should be borne in mind, however, that these decisions do not leave community groups without a remedy. Such groups are free to raise the question of the continued vitality of the agreement (or the desirability of a new agreement) with the transferee in connection with the proposed transfer of the station license, a matter of which the community must be notified under our rules.

I am more disturbed by the programming questions which lurk beneath the surface of the parties' pleadings, but which are not directly addressed by either petitioner or the licensee and therefore are not addressed by the Commission. On my reading, petitioner's attack on the renewal of KVIA-TV focuses on (1) Marsh Media's disavowal of the citizens' agreement executed by its predecessor, (an action which Marsh Media had the right to take under our policy); (2) Marsh Media's failure to continue to air "Conoceme" (although that program has been replaced with another bilingual program); and (3) Marsh Media's alleged failure to address the needs and interests of the Mexican-American community in other public affairs programming. I agree that no material question is raised with respect to this licensee's public affairs programming since 30 of the 95 minutes of weekly public affairs programming aired by the station consist of a bilingual program specifically directed toward the Mexican-American community.

However, the Commission's precedents appear to me to say that the licensee's obligation to meet the needs and interests of the community it serves, including minority segments of that community, runs to the totality of the station's programming. Report and Statement of Policy Re: Commission En Banc Programming Inquiry, 44 FCC 2303 (1960); Evening Star Broadcasting Co., 27 FCC 2d 316 (1971). In the context of the totality of KVIA-TV's weekly programming, I seriously question whether a 30 minute program, particularly one that is aired at 10:30 on Sunday mornings, would satisfy the licensee's obligation to address the needs and interests of a Mexican-American community which in the El Paso service area according to the record comprises at least 56.9% of the work force. [1] Nor do the other programs cited in footnote 7 of the Commission's Opinion provide much comfort on this score; there is, for example, no indication in the record that either "Probe" or "Hotline to Politics" addresses identified needs and interests of Mexican-Americans in the El Paso area.

As the Court of Appeals for the District of Columbia Circuit noted in Chuck Stone v. FCC, 466 F.2d at 328, **Footnote** 44, community life includes a wide spectrum of activities and interests, including family life, cultural events, social interaction and education. These areas are often at least as important in everyday life as the "community problems" normally addressed in public affairs programs. Of course, a "gross disparity" in allocation of public affairs programming could in itself indicate a failure to minority citizens' needs and interests. Alianza Federal de Mercedes v. FCC, 539 F.2d 732 (1976) (dictum). But for me the question whether a broadcast licensee has met its responsibility to address the needs and interests of minority segments in the community generally must be answered against the backdrop of the station's full program offering, including, for example, children's and educational programming, editorials and public service announcements. [2]

I am unable to conclude that CDMC in its Petition to Deny clearly put in issue the totality of KVIA-TV's programming in addressing Mexican-American needs and interests. Therefore, Marsh Media was not required to respond except with respect to the discontinuance of "Conoceme" and the responsiveness of the station's other public affairs programs. On the narrow inquiry thus framed, I concur in the Commission's Opinion and Order.

**End Notes**

---

[1]. On February 24, 1976, the Commission approved the assignment of the station's license from Walton to Marsh Media, El Paso. Marsh took control of the station on April 8, 1976, and, shortly thereafter, the station's call sign was changed from KELP-TV to KVIA-TV.

2. The Morales affidavit states "... Walton Enterprises (KVIA-TV) would be honoring all aspects of the

honor the agreement, and we will so construe it.

3. The Committee also complains of Marsh Media's "bad faith" in failing to settle on a further written agreement with the Committee. However, mere failure to reach agreement does not indicate such "bad faith." Storer Broadcasting Co., 58 FCC 2d 468, 470 (1976). Indeed, licensees are under no obligation to enter into negotiations or agreements with citizens groups. Agreements Between Broadcast Licensees and the Public, supra at 480.

4. Both petitioner and licensee appear to use the word "barrio" to describe the "lower economic echelon" of El Paso's Mexican-American community.

5. This material indicates that several members of the Committee were contacted by KVIA. These included: Lalo DeAvila, Fredrico Soforo, Hector I. Reyes, and Daniel Anchondo.

6. Besides its apparent formal ascertainment of certain Committee members, the record also reflects a considerable effort on the part of Marsh Media to listen to the concerns of the Committee and to solicit the Committee's participation in KVIA's Por Que? Por Que!

7. In addition to its Spanish-language program, Por Que? Por Que!, KVIA-TV's Pro News Magazine, a weekday public affairs program, appears to have included discussions of crime, illegal aliens, youth involvement in business, bilingual employment opportunities, bilingual teaching, and "the alleged disparity in the educational system of and

these programs. Also, the record indicates that the station produces Probe, a segment of its evening newscasts devoted to answering viewer problems and complaints, and Hotline to Politics, a weekly interview program featuring what the station characterizes as a "wide variety" of political figures. We also note that this does not appear to be the situation suggested in Alianza Federal de Mercedes v. FCC, 539 F.2d 732 (D.C. Cir. 1976), where the court indicated that small amounts of programming for large minority communities -- in that case only 6 hours and 55 minutes per year of programming "responsive to minority community problems" to serve a 40 percent Hispanic population -- might "create a disparity so significant as to amount to a difference in kind rather than in degree." Id. at 738. As indicated above, the instant case appears to reflect an adequate effort on the part of KVIA-TV to produce programming responsive to the ascertained needs, interests and problems of El Paso's Hispanic community. Besides segments of general public affairs programs, the station's Spanish-language program Por Que? Por Que! will apparently constitute some 29 minutes of the 95 minutes per week proposed by KVIA-TV for local public affairs.

8. Petitioner proposes to devote 6.5 percent of its overall and 6.1 percent of its prime-time operating hours to local news, public affairs, and other non-entertainment programming. This, petitioner says, does not rise to what it characterizes the Commission's "guidelines for determining 'substantial' service." However, as the licensee notes, the Commission has refused to adopt quantitative standards to judge licensee performance in the context of regular renewal. KCOP Television, Inc., 59 FCC 2d 1321, 1330 (1976). Rather, such matters are left to the discretion of the licensee, and absent a showing of abuse of that discretion, no substantial and material question of fact is raised, particularly where the applicant proposes over 13 percent total total non-entertainment programming.

9. The Committee also alleges that KVIA-TV engages in a cosmetic promotion plan for minority employees in which the station upgrades "job titles without commensurate increase in salary or responsibilities." However, the Committee has failed to follow up the charge with any evidence of such a policy, and Marsh Media denies any such policy exists. Such a naked allegation presents no substantial and material question of fact. See generally Sande Broadcasting Co., supra at 143.

10. This figure includes one minority employee, a technician, who is Black. All other minority employees are listed as Spanish-surnamed Americans. 19. The Commission has consistently held that our equal employment rules and policies do not require a licensee's staff to reflect exactly the presence of minorities and females in the applicable work force. WHEC, Inc., 52 FCC 2d 1079, 1088 (1975). Rather, we require that minorities and females be represented within reasonable proximity to their presence in the work force. Here, the KVIA-TV staff -- both over all and in the upper four job categories -- reasonably reflects the minority and female population of the El Paso work force. See Newhouse Broadcasting Corp., 61 FCC 2d 528, 539 (1976); Chapman Television of Tuscaloosa, Inc., 61 FCC 2d 261, 267 (1976). 20. As to the licensee's affirmative action plan, the record indicates that KVIA-TV has maintained a number of contacts with minority and other organizations for the purpose of minority recruitment. Further, the station has recently supported a grant to train Mexican-American broadcasters at the University of Texas at El Paso and says that of 43 employees hired since it became licensee, 25 were minority workers. Therefore, since the licensee's affirmative action program seems adequate, see Newhouse Broadcasting Corp., supra at 539, and since the Committee has not gone beyond mere accusations of employment discrimination

Committee has not gone beyond mere accusations of employment discrimination, the Committee has failed to raise [illegible] question of fact and, thus, has failed to demonstrate that grant of KVIA-TV's renewal application would not serve the public interest. Further, on the basis of the record before us, we find that the licensee is qualified and that renewal of the license of KVIA-TV would serve the public interest, convenience and necessity. Accordingly, IT IS ORDERED, That the Petition to Deny filed by the Committee for the Development of Mass Communication on July 1, 1977, IS DENIED. IT IS FURTHER ORDERED, That the application of Marsh Media, El Paso for renewal of license for KVIA-TV, El Paso, Texas, IS GRANTED. FEDERAL COMMUNICATIONS COMMISSION, WILLIAM J. TRICARICO, Secretary.

Footnote. 'n' Text Omitted

1. The "minority" group in this case is actually the majority group in the KVIA-TV service area.

Footnote. 'n' Text Omitted

2. I recognize that licensees have full discretion to choose the means they will employ to address such needs and interests, and it is in furtherance of broadcaster discretion that the Commission has said it will "look to the licensee's programming on an over-all basis." Evening Star Broadcasting Co., 27 FCC 2d 316, 334 (1971). Considering programming on an overall basis, I merely wish to serve notice that the fact that a licensee broadcasts a minority-targeted program during "graveyard" viewing hours does not, in my judgment, necessarily end the inquiry.

© 2007, IOMA, Inc., Published by Pike & Fischer

or hinders another station serving substantially the same area from broadcasting the network's programs not taken by the former station, or which prevents or hinders another station serving a substantially different area from broadcasting any program of the network organization; but not prohibiting any contract between a station and a network organization pursuant to which the station is granted the first call in its primary service area upon the programs of the network organization. P. 200.

(3) A regulation declaring that no license shall be granted to a standard broadcast station having any contract, etc., with a network organization which provides for the affiliation of the station with the network organization for a period longer than two years. P. 201.

(4) A regulation providing that no license shall be granted to a standard broadcast station which options for [illegible] days' notice, or more time than a total of three hours within each of four segments of the broadcast day, as described in the regulation, and that such options may not be exclusive as against other network organizations and may not prevent or hinder the station from optioning or selling any or all of the time covered by the option, or other time, to other network organizations. P. 202.

(5) A regulation providing that no license shall be granted to a standard broadcast station having any contract, etc., with a network organization which (a), with respect to programs offered pursuant to an affiliation contract, prevents or hinders the station from rejecting or refusing network programs which the station reasonably believes to be unsatisfactory or unsuitable; or which (b), with respect to network programs so offered or already contracted for, prevents the station from rejecting or refusing any program which, in its opinion, is contrary to the public interest, or from substituting a program of outstanding local or national importance. P. 204.

(6) A regulation providing that no license shall be granted to a network organization, or to any person directly or indirectly controlled by or under common control with a network organization, for more than one standard broadcast station where one of the stations covers substantially the service area of the other station, or for any standard broadcast station in any locality where the existing standard broadcast stations are so few or of such unequal desirability (in terms of coverage, power, frequency, or other related matters) that competition would be substantially restrained by such licensing. P. 206.

(7) A regulation providing that no license shall be granted to a standard broadcast station having any contract, etc., with a network organization under which the station is prevented or hindered from, or penalized for, fixing or altering its rates for the sale of broadcast time for other than the network's programs. P. 208.

3. *Section 311* of the Federal Communications Act, by authorizing the Commission to withhold broadcasting station licenses from persons who have been convicted of violating the Antitrust Laws, does not imply that, in the absence of such conviction, conduct of the applicant amounting to such violation may not be considered by the Commission in determining whether the granting of his application would be contrary to the "public interest." P. 222.

4. The standard of "public interest" governing the exercise of the powers delegated to the Commission by the Act is not so vague and indefinite as to create an unconstitutional delegation of legislative authority. P. 225.

5. The Commission by announcing that it will refuse station licenses to persons who engage in specified network practices contrary to the public interest, convenience or necessity does not thereby deny to such persons the constitutional right of free speech. P. 226.

6. In a suit to enjoin the enforcement of regulations promulgated by the Federal Communications Commission, the District Court properly disposed of the case upon the pleadings and the record made before the Commission, without trial *de novo*. P. 227.

**COUNSEL:** Mr. John T. Cahill, with whom Messrs. A. L. Ashby, Harold S. Glendening, and John W. Nields were on the brief, for the National Broadcasting Co.; and Mr. E. Willoughby Middleton, with whom Mr. Thomas H. Middleton was on the brief, for the Stromberg-Carlson Telephone Manufacturing Co. (Mr. David M. Wood was on the Statement as to Jurisdiction, for the Woodmen of the World Life Insurance Society), -- appellants in No. 554. Mr. Charles E. Hughes, Jr., with whom Messrs. Allen S. Hubbard, Harold L. Smith, and John J. Burns were on the brief, for appellant in No. 555.

Solicitor General Fahy, with whom Messrs. Richard S. Salant, Charles R. Denny, Harry M. Plotkin, and Max

Goldman were on the brief, for the United States et al.; and Mr. Louis G. Caldwell, with whom Messrs. Leon Lauterstein and Percy H. Russell, Jr., were on the brief, for the Mutual Broadcasting System, Inc., -- appellees.

Briefs of amici curiae were filed by Mr. Isaac W. Digges on behalf of the Association of National Advertisers, Inc., and by Mr. George Link, Jr., on behalf of the American Association of Advertising Agencies, -- in support of appellants; and by Messrs. Homer S. Cummings, Morris L. Ernst and Benjamin S. Kirsh on behalf of the American Civil Liberties Union, -- in support of appellees.

**JUDGES:** Stone, Roberts, Reed, Frankfurter, Douglas, Murphy, Jackson; Black and Rutledge took no part in the consideration or decision of these cases

- - -

**OPINION**

[*193] [**999] [***1350] MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

In view of our dependence upon regulated private enterprise in discharging the far-reaching role which radio plays in our society, a somewhat detailed exposition of the history of the present controversy and the issues which it raises is appropriate.

These suits were brought on October 30, 1941, to enjoin the enforcement of the Chain Broadcasting Regulations promulgated by the Federal Communications Commission on May 2, 1941, and amended on October 11, 1941. We held last Term in *Columbia System v. United States, 316 U.S. 407*, and *National Broadcasting Co. v. United States, 316 U.S. 447*, that the suits could be maintained under *§ 402 (a)* of the Communications Act of 1934, 48 Stat. 1093, *47 U. S. C.* [***1351] *§ 402 (a)* (incorporating by reference the Urgent Deficiencies Act of October 22, 1913, 38 Stat. 219, *28 U. S. C. § 47*), and that the decrees of the District Court dismissing the suits for want of jurisdiction should therefore be reversed. On remand the District Court granted the Government's motions for summary judgment and dismissed the suits on the merits. *47 F.Supp. 940*. The cases are now here on appeal. *28 U. S. C. § 47*. Since they raise substantially the same issues and were argued together, we shall deal with both cases in a single opinion.

On March 18, 1938, the Commission undertook a comprehensive investigation to determine whether special regulations applicable to radio stations engaged in chain [*194] broadcasting [1] were required in the "public interest, convenience, or necessity." The Commission's order directed that inquiry be made, *inter alia*, in the following specific matters: the number of stations licensed to or affiliated with networks, and the amount of station time used or controlled by networks; the contractual rights and obligations of stations under their agreements with networks; the scope of network agreements containing exclusive affiliation provisions and restricting the network from affiliating with other stations in the same area; the rights and obligations of stations with respect to network advertisers; [**1000] the nature of the program service rendered by stations licensed to networks; the policies of networks with respect to character of programs, diversification, and accommodation to the particular requirements of the areas served by the affiliated stations; the extent to which affiliated stations exercise control over programs, advertising contracts, and related matters; the nature and extent of network program duplication by stations serving the same area; the extent to which particular networks have exclusive coverage in some areas; the competitive practices of stations engaged in chain broadcasting; the effect of chain broadcasting upon stations not licensed to or affiliated with networks; practices or agreements in restraint of trade, or in furtherance of monopoly, in connection with chain broadcasting; and the scope of concentration of control over stations, locally, regionally, or nationally, through contracts, common ownership, or other means.

1 Chain broadcasting is defined in § 3 (p) of the Communications Act of 1934 as the "simultaneous broadcasting of an identical program by two or more connected stations." In actual practice, programs are transmitted by wire, usually leased telephone lines, from their point of origination to each station in the network for simultaneous broadcast over the air.

On April 6, 1938, a committee of three Commissioners was designated to hold hearings and make recommendations [*195] to the full Commission. This committee held public hearings for 73 days over a period of six months, from November 14, 1938, to May 19, 1939. Order No. 37, announcing the investigation and specifying the particular matters which would be

explored at the hearings, was published in the Federal Register, 3 Fed. Reg. 637, and copies were sent to every station licensee and network organization. Notices of the hearings were also sent to these parties. Station licensees, national and regional networks, and transcription and recording companies were invited to appear and give evidence. Other persons who sought to appear were afforded an opportunity to testify. 96 witnesses were heard by the committee, 45 of whom were called by the national networks. The evidence covers 27 volumes, including over 8,000 pages of transcript and more than 700 exhibits. The testimony of the witnesses called by the national networks fills more than 6,000 pages, the equivalent of 46 hearing days.

The committee submitted a report [***1352] to the Commission on June 12, 1940, stating its findings and recommendations. Thereafter, briefs on behalf of the [illegible] the full Commission, and on November 28, 1940, the Commission issued proposed regulations which the parties were requested to consider in the oral arguments held on December 2 and 3, 1940. These proposed regulations dealt with the same matters as those covered by the regulations eventually adopted by the Commission. On January 2, 1941, each of the national networks filed a supplementary brief discussing at length the questions raised by the committee report and the proposed regulations.

On May 2, 1941, the Commission issued its Report on Chain Broadcasting, setting forth its findings and conclusions upon the matters explored in the investigation, together with an order adopting the Regulations here assailed. Two of the seven members of the Commission dissented [*196] from this action. The effective date of the Regulations was deferred for 90 days with respect to existing contracts and arrangements of network-operated stations, and subsequently the effective date was thrice again postponed. On August 14, 1941, the Mutual Broadcasting Company petitioned the Commission to amend two of the Regulations. In considering this petition the Commission invited interested parties to submit their views. Briefs were filed on behalf of all of the national networks, and oral argument was had before the Commission on September 12, 1941. And on October 11, 1941, the Commission (again with two members dissenting) issued a Supplemental Report, together with an order amending three Regulations. Simultaneously, the effective date of the Regulations was postponed until November 15, 1941, and provision was made for further postponements from time to time if necessary to permit the orderly adjustment of existing arrangements. Since October 30, 1941, when the present suits were filed, the enforcement of the Regulations has been stayed either voluntarily by the Commission or by order of court.

Such is the history of the Chain Broadcasting Regulations. We turn now to the Regulations themselves, illumined by the practices in the radio industry disclosed by the Commission's investigation. The Regulations, which the Commission characterized in its Report as "the expression of the general policy we will follow in exercising our licensing power," are addressed in terms to station licensees and applicants [**1001] for station licenses. They provide, in general, that no licenses shall be granted to stations or applicants having specified [illegible] at a particular practice found by the Commission to be detrimental to the "public interest," and we shall consider them *seriatim*. In doing so, however, we do not overlook the admonition of the Commission that the Regulations as well as the network practices [*197] at which they are aimed are interrelated: "In considering above the network practices which necessitate the regulations we are adopting, we have taken each practice singly, and have shown that even in isolation each warrants the regulation addressed to it. But the various practices we have considered do not operate in isolation; they form a compact bundle or pattern, and the effect of their joint impact upon licensees necessitates the regulations even more urgently than the effect of each taken singly." (Report, p. 75.)

The Commission found that at the end of 1938 there were 660 commercial stations in the United States, and that 341 of these were affiliated with national networks. 135 stations were affiliated exclusively with the National Broadcasting Company, Inc., known in the industry as NBC, which operated two national networks, the "Red" and the "Blue." NBC was also the licensee of 10 stations, [***1353] including 7 which operated on so-called clear channels with the maximum power available, 50 kilowatts; in addition, NBC operated 5 other stations, 4 of which had power of 50 kilowatts, under management contracts with their licensees. 102 stations were affiliated exclusively with the Columbia Broadcasting System, Inc., which was also the licensee of 8 stations, 7 of which were clear-channel stations operating with power of 50

kilowatts. 74 stations were under exclusive affiliation with the Mutual Broadcasting System, Inc. In addition, 25 stations were affiliated with both NBC and Mutual, and 5 with both CBS and Mutual. These figures, the Commission noted, did not accurately reflect the relative prominence of the three companies, since the stations affiliated with Mutual were, generally speaking, less desirable in frequency, power, and coverage. It pointed out that the stations affiliated with the national networks utilized more than 97% of the total night-time broadcasting power of all the [*198] stations in the country. NBC and CBS together controlled more than 85% of the total night-time wattage, and the broadcast business of the three national network companies amounted to almost half of the total business of all stations in the United States.

The Commission recognized that network [illegible] important part in the development of radio. "The growth and development of chain broadcasting," it stated, "found its impetus in the desire to give widespread coverage to programs which otherwise would not be heard beyond the reception area of a single station. Chain broadcasting makes possible a wider reception for expensive entertainment and cultural programs and also for programs of national or regional significance which would otherwise have coverage only in the locality of origin. Furthermore, the access to greatly enlarged audiences made possible by chain broadcasting has been a strong incentive to advertisers to finance the production of expensive programs. . . . But the fact that the chain broadcasting method brings benefits and advantages to both the listening public and to broadcast station licensees does not mean that the prevailing practices and policies of the networks and their outlets are sound in all respects, or that they should not be altered. The Commission's duty under the Communications Act of 1934 is not only to see that the public receives the advantages and benefits of chain broadcasting, but also, so far as its powers enable it, to see that practices which adversely affect the ability of licensees to operate in the public interest are eliminated." (Report, p. 4.)

The Commission found that eight network abuses were amenable to correction within the powers granted it by Congress:

*Regulation 3.101 -- Exclusive affiliation of station.* The Commission found that the network affiliation agreements of NBC and CBS customarily contained a provision which [*199] prevented the station from broadcasting the programs of any other network. The effect of this provision was to hinder the growth of new networks, to deprive the listening public in many areas of service to which they were entitled, and to prevent [**1002] station licensees from exercising their statutory duty of determining which programs would best serve the needs of their community. The Commission observed that in areas where all the stations were under exclusive contract to either NBC or CBS, the public was deprived of the opportunity to hear programs presented by Mutual. To take a case cited in the Report: In the fall of 1939 Mutual obtained the exclusive right to broadcast the World Series baseball games. It offered this program of outstanding national interest to stations throughout the country, including NBC and CBS affiliates in communities having [***1354] no other stations. CBS [illegible] clauses of their agreements with these stations, and as a result thousands of persons in many sections of the country were unable to hear the broadcasts of the games.

"Restraints having this effect," the Commission observed, "are to be condemned as contrary to the public interest irrespective of whether it be assumed that Mutual programs are of equal, superior, or inferior quality. The important consideration is that station licensees are denied freedom to choose the programs which they believe best suited to their needs; in this manner the duty of a station licensee to operate in the public interest is defeated. . . . Our conclusion is that the disadvantages resulting from these exclusive arrangements far outweigh any advantages. A licensee station does not operate in the public interest when it enters into exclusive arrangements which prevent it from giving the public the best service of which it is capable, and which, by closing the door of opportunity in the network field, adversely affects the program structure of the entire industry." (Report, pp. 52, 57.) Accordingly, [*200] the Commission adopted Regulation 3.101, providing as follows: "No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization under which the station is prevented or hindered from, or penalized for, broadcasting the programs of any other network organization."

*Regulation 3.102 -- Territorial exclusivity.* The Commission found another type of "exclusivity"

provision in network affiliation agreements whereby the network bound itself not to sell programs to any other station in the same area. The effect of this provision, designed to protect the affiliate from the competition of other stations serving the same territory, was to deprive the listening public of many programs that might otherwise be available. If an affiliated station rejected a network program, the "territorial exclusivity" clause of its affiliation agreement prevented the network from offering the program to other stations in the area. For example, Mutual presented a popular program, known as "The American Forum of the Air," in which prominent persons discussed topics of general interest. None of the Mutual stations in the Buffalo area decided to carry the program, and a Buffalo station not affiliated with Mutual attempted to obtain the program for its listeners. These efforts failed, however, on account of the "territorial exclusivity" provision in Mutual's agreements with its outlets. The result was that this program was not available to the people of Buffalo.

The Commission concluded that "It is not in the public interest for the listening audience in an area to be deprived of network programs not carried by one station where other stations in that area are ready and willing to broadcast the programs. It is as much against the public interest for a network affiliate to enter into a contractual arrangement which prevents another station from carrying [*201] a network program as it would be for it to drown out that program by electrical interference." (Report, p. 59.)

Recognizing that the "territorial exclusivity" clause was unobjectionable in so far as it sought to prevent duplication of programs in the same area, the Commission limited itself to the situations in which the clause impaired the ability of the licensee to broadcast available programs. Regulation 3.102, promulgated to remedy this particular evil, provides as follows: "No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which prevents or hinders another station serving substantially the same area from broadcasting the [***1355] network's programs not taken by the former station, or which prevents or [**1003] hinders another station serving a substantially different area from broadcasting any program of the network organization. This regulation shall not be construed to prohibit any contract, arrangement, or understanding between a station and a network organization pursuant to which the station is granted the first call in its primary service area upon the programs of the network organization."

*Regulation 3.103 -- Term of affiliation.* The standard NBC and CBS affiliation contracts bound the station for a period of five years, with the network having the exclusive right to terminate the contracts upon one year's notice. The Commission, relying upon § 307 (d) of the Communications Act of 1934, under which no license to operate a broadcast station can be granted for a longer term than three years, found the five-year affiliation term to be contrary to the policy of the Act: "Regardless of any changes that may occur in the economic, political, or social life of the Nation or of the community in which the station is located, CBS and NBC affiliates are bound by contract to continue broadcasting the network programs of only one network for 5 years. The licensee is so bound even though the policy and caliber of programs of the network may deteriorate greatly. The future necessities of the station and of the community are not considered. The station licensee is unable to follow his conception of the public interest until the end of the 5-year contract." (Report, p. 61.) The Commission concluded that under contracts binding the affiliates for five years, "stations become parties to arrangements which deprive the public of the improved service it might otherwise derive from competition in the network field; and that a station is not operating in the public interest when it so limits its freedom of action." (Report, p. 62.) Accordingly, the Commission adopted Regulation 3.103: "No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which provides, by original term, provisions for renewal, or otherwise for the affiliation of the station with the network organization for a period longer than two years: [2] *Provided*, That a contract, arrangement, or understanding for a period up to two years, may be entered into within 120 days prior to the commencement of such period."

2 Station licenses issued by the Commission normally last two years. Section 3.34 of the Commission's Rules and Regulations governing Standard and High-Frequency Broadcast Stations, as amended October 14, 1941.

*Regulation 3.104 -- Option time.* The Commission found that network affiliation contracts usually contained

so-called network optional time clauses. Under these provisions the network could upon 28 days' notice call upon its affiliates to carry a commercial program during any of the hours specified in the agreement as "network optional time." For CBS affiliates "network optional time" meant the entire broadcast day. For 29 outlets of NBC on the Pacific Coast, it also covered the entire broadcast day; for substantially all of the other NBC affiliates, [*203] it included 8 1/2 hours on weekdays and 8 hours on Sundays. Mutual's contracts with about half of its affiliates contained such a provision, giving the network optional time for 3 or 4 hours on weekdays and 6 hours on Sundays.

In the Commission's judgment these optional time provisions, in addition to imposing serious obstacles in the path of new networks, hindered stations in developing a local program service. The exercise by the networks of [illegible] regular scheduling of local programs [***1356] at desirable hours. The Commission found that "shifting a local commercial program may seriously interfere with the efforts of a [local] sponsor to build up a regular listening audience at a definite hour, and the long-term advertising contract becomes a highly dubious project. This hampers the efforts of the station to develop local commercial programs and affects adversely its ability to give the public good program service. . . . A station licensee must retain sufficient freedom of action to supply the program and advertising needs of the local community. Local program service is a vital part of community life. A station should be ready, able, and willing to serve the needs of the local community by broadcasting such outstanding local events as community concerts, civic meetings, local sports events, and other programs of local [**1004] consumer and social interest. We conclude that national network time options have restricted the freedom of station licensees and hampered their efforts to broadcast local commercial programs, the programs of other national networks, and national spot transcriptions. We believe that these considerations far outweigh any supposed advantages from 'stability' of network operations under time options. We find that the optioning of time by licensee stations has operated against the public interest." (Report, pp. 63, 65.)

The Commission undertook to preserve the advantages of option time, as a device for "stabilizing" the industry, [*204] without unduly impairing the ability of local stations to develop local program service. Regulation 3.104 called for the modification of the option-time provision in three respects: the minimum notice period for exercise of the option could not be less than 56 days; the number of hours which could be optioned was limited; and specific restrictions were placed upon exercise of the option to the disadvantage of other networks. The text of the Regulation follows: "No license shall be granted to a standard broadcast station which options for network programs any time subject to call on less than 56 days' notice, or more time than a total of three hours within each of four segments of the broadcast day, as herein described. The broadcast day is divided into 4 segments, as follows: 8:00 a. m. to 1:00 p.m.; 1:00 p.m. to 6:00 p.m.; 6:00 p.m. to 11:00 p.m.; 11:00 p.m. to 8:00 a.m. Such options may not be exclusive as against other network organizations and may not prevent or hinder the station from optioning or selling [illegible] by the option, or other time, to other network organizations."

*Regulation 3.105 -- Right to reject programs*. The Commission found that most network affiliation contracts contained a clause defining the right of the station to reject network commercial programs. The NBC contracts provided simply that the station "may reject a network program the broadcasting of which would not be in the public interest, convenience, and necessity." NBC required a licensee who rejected a program to "be able to support his contention that what he has done has been more in the public interest than had he carried on the network program." Similarly, the CBS contracts provided that if the station had "reasonable objection to any sponsored program or the product advertised thereon as not being in the public interest, the station may, on 4 weeks' prior notice thereof to Columbia, refuse to broadcast such program, [*205] unless during such notice period such reasonable objection of the station shall be satisfied."

While seeming in the abstract to be fair, these provisions, according to the Commission's finding, did not sufficiently protect the "public interest." As a practical matter, the licensee could not determine in advance whether the broadcasting of any particular network program would or would not be in the public [***1357] interest. "It is obvious that from such skeletal information [as the networks submitted to the stations prior to the broadcasts] the station cannot determine in advance whether the program is in the public interest, nor

can it ascertain whether or not parts of the program are in one way or another offensive. In practice, if not in theory, stations affiliated with networks have delegated to the networks a large part of their programming functions. In many instances, moreover, the network further delegates the actual production of programs to advertising agencies. These agencies are far more than mere brokers or intermediaries between the network and the advertiser. To an ever-increasing extent, these agencies actually exercise the function of program production. Thus it is frequently neither the station nor the network, but rather the advertising agency, which determines what broadcast programs shall contain. Under such circumstances, it is especially important that individual stations, if they are to operate in the public interest, should have the practical opportunity as well as the contractual right to reject network programs. . . .

to serve the public interest. The licensee has the duty of determining what programs shall be broadcast over his station's facilities, and cannot lawfully delegate this duty or transfer the control of his station directly to the network or indirectly to an advertising agency. He cannot lawfully bind himself to accept programs in every case [*206] where he cannot sustain [**1005] the burden of proof that he has a better program. The licensee is obliged to reserve to himself the final decision as to what programs will best serve the public interest. We conclude that a licensee is not fulfilling his obligations to operate in the public interest, and is not operating in accordance with the express requirements of the Communications Act, if he agrees to accept programs on any basis other than his own reasonable decision that the programs are satisfactory." (Report, pp. 39, 66.)

The Commission undertook in Regulation 3.105 to formulate the obligations of licensees with respect to supervision over programs: "No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which (a), with respect to programs offered pursuant to an affiliation contract, prevents or hinders the station from rejecting or refusing network programs which the station reasonably believes to be unsatisfactory or unsuitable; or which (b), with respect to network programs so offered or already contracted for, prevents the station from rejecting or refusing any program which, in its opinion, is contrary to the public interest, or from substituting a program of outstanding local or national importance."

*Regulation 3.106 -- Network ownership of stations.* The Commission found that NBC, in addition to its network operations, was the licensee of 10 stations, 2 each in New York, Chicago, Washington, and San Francisco, 1 in Denver, and 1 in Cleveland. CBS was the licensee of 8 stations, 1 in each of these cities: New York, Chicago, Washington, Boston, Minneapolis, St. Louis, Charlotte, and Los Angeles. These 18 stations owned by NBC and CBS, the Commission observed, were among the most powerful and desirable in the country, and were permanently inaccessible to competing networks. "Competition [*207] among networks for these facilities is nonexistent, as they are completely removed from the network-station market. It gives the network complete control over its policies. This 'bottling-up' of the best facilities has undoubtedly had a discouraging effect upon

[***1358] common ownership of network and station places the network in a position where its interest as the owner of certain stations may conflict with its interest as a network organization serving affiliated stations. In dealings with advertisers, the network represents its own stations in a proprietary capacity and the affiliated stations in something akin to an agency capacity. The danger is present that the network organization will give preference to its own stations at the expense of its affiliates." (Report, p. 67.)

The Commission stated that if the question had arisen as an original matter, it might well have concluded that the public interest required severance of the business of station ownership from that of network operation. But since substantial business interests have been formed on the basis of the Commission's continued tolerance of the situation, it was found inadvisable to take such a drastic step. The Commission concluded, however, that "the licensing of two stations in the same area to a single network organization is basically unsound and contrary to the public interest," and that it was also against the "public interest" for network organizations to own stations in areas where the available facilities were so few or of such unequal coverage that competition would thereby be substantially restricted. Recognizing that these considerations called for flexibility in their application to particular situations, the Commission provided that "networks will be given full opportunity, on proper application for new facilities or renewal of existing licenses, to call to our attention any reasons why

the principle should be modified or held inapplicable." (Report, p. 68.) [*208] Regulation 3.106 reads as follows: "No license shall be granted to a network organization, or to any person directly or indirectly controlled by or under common control with a network organization, for more than one standard broadcast station where one of the stations covers substantially the service area of the other station, or for any standard broadcast station in any locality where the existing standard broadcast stations are so few or of such unequal desirability (in terms of coverage, power, frequency, or other related matters) that competition would be substantially restrained by such licensing."

[**1006] *Regulation 3.107 -- Dual network operation.* This regulation provides that: "No license shall be issued to a standard broadcast station affiliated with a network organization which maintains more than

applicable if such networks are not operated simultaneously, or if there is no substantial overlap in the territory served by the group of stations comprising each such network." In its Supplemental Report of October 11, 1941, the Commission announced the indefinite suspension of this regulation. There is no occasion here to consider the validity of Regulation 3.107, since there is no immediate threat of its enforcement by the Commission.

*Regulation 3.108 -- Control by networks of station rates.* The Commission found that NBC's affiliation contracts contained a provision empowering the network to reduce the station's network rate, and thereby to reduce the compensation received by the station, if the station set a lower rate for non-network national advertising than the rate established by the contract for the network programs. Under this provision the station could not sell time to a national advertiser for less than it would cost the advertiser if he bought the time from NBC. In the words of NBC's vice-president, "This means simply that a national advertiser should pay the same price for the station [*209] whether he buys it through one source or another source. It means that we do not believe that our stations should go into [***1359] competition with ourselves." (Report, p. 73.)

The Commission concluded that "it is against the public interest for a station licensee to enter into a contract with a network which has the effect of decreasing its ability to compete for national business. We believe that the public interest will best be served and listeners supplied with the best programs if stations bargain freely with national advertisers." (Report, p. 75.) Accordingly, the Commission adopted Regulation 3.108, which provides as follows: "No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization under which the station is prevented or hindered from, or penalized for, fixing or altering its rates for the sale of broadcast time for other than the network's programs."

The appellants attack the validity of these Regulations along many fronts. They contend that the Commission went beyond the regulatory powers conferred upon it by the Communications Act of 1934; that even if the Commission were authorized by the Act to deal with the matters comprehended by the

Commission misconceived the scope of the Act, particularly *§ 313* which deals with the application of the anti-trust laws to the radio industry; that the Regulations are arbitrary and capricious; that if the Communications Act of 1934 were construed to authorize the promulgation of the Regulations, it would be an unconstitutional delegation of legislative power; and that, in any event, the Regulations abridge the appellants' right of free speech in violation of the *First Amendment*. We are thus called upon to determine whether Congress has authorized the Commission to exercise the [*210] power asserted by the Chain Broadcasting Regulations, and if it has, whether the Constitution forbids the exercise of such authority.

Federal regulation of radio [3] begins with the Wireless Ship Act of June 24, 1910, 36 Stat. 629, which forbade any steamer carrying or licensed to carry fifty or more persons to leave any American port unless equipped with efficient apparatus for radio communication, in charge of a skilled operator. The enforcement of this legislation was entrusted to the Secretary of Commerce and Labor, who was in charge of the administration of [**1007] the marine navigation laws. But it was not until 1912, when the United States ratified the first international radio treaty, 37 Stat. 1565, that the need for general regulation of radio communication became urgent. In order to fulfill our obligations under the treaty, Congress enacted the Radio Act of August 13, 1912, 37 Stat. 302. This statute forbade the operation of radio apparatus without a license from the Secretary of

Commerce and Labor; it also allocated certain frequencies for the use of the Government, and imposed restrictions upon the character of wave emissions, the transmission of distress signals, and the like.

3 The history of federal regulation of radio communication is summarized in Herring and Gross, Telecommunications (1936) 239-86; Administrative Procedure in Government Agencies, Monograph of the Attorney General's Committee on Administrative Procedure, Sen. Doc. No. 186, 76th Cong., 3d Sess., Part 3, dealing with the Federal Communications Commission, pp. 82-84; 1 Socolow, Law of Radio Broadcasting (1939) 38-61; Donovan, Origin and Development of Radio Law (1930).

The enforcement of the Radio Act of 1912 presented

of interference arose only rarely because there were more than enough frequencies for all the stations then in existence. The war accelerated the development of the art, however, and in 1921 the first standard [***1360] broadcast stations [*211] were established. They grew rapidly in number, and by 1923 there were several hundred such stations throughout the country. The Act of 1912 had not set aside any particular frequencies for the use of private broadcast stations; consequently, the Secretary of Commerce selected two frequencies, 750 and 833 kilocycles, and licensed all stations to operate upon one or the other of these channels. The number of stations increased so rapidly, however, and the situation became so chaotic, that the Secretary, upon the recommendation of the National Radio Conferences which met in Washington in 1923 and 1924, established a policy of assigning specified frequencies to particular stations. The entire radio spectrum was divided into numerous bands, each allocated to a particular kind of service. The frequencies ranging from 550 to 1500 kilocycles (96 channels in all, since the channels were separated from each other by 10 kilocycles) were assigned to the standard broadcast stations. But the problems created by the enormously rapid development of radio were far from solved. The increase in the number of channels was not enough to take care of the constantly growing number of stations. Since there were more stations than available frequencies, the Secretary of Commerce attempted to find room for everybody by limiting the power and hours of operation of stations in order that several stations might use the same channel. The number of stations multiplied so rapidly, however, that by November, 1925, there were almost 600 stations in the country, and there were 175 applications for new stations. Every channel in the standard broadcast band was, by that time, already occupied by at least one station, and many by several. The new stations could be accommodated only by extending the standard broadcast band, at the expense of the other types of services, or by imposing still greater limitations upon time and power. The National Radio Conference which met in November, 1925, [*212] opposed both of these methods and called upon Congress to remedy the situation through legislation.

The Secretary of Commerce was powerless to deal with the situation. It had been held that he could not deny a license to an otherwise legally qualified applicant on the ground that the proposed station would interfere

*Intercity Radio Co., 52 App. D. C. 339, 286 F. 1003*. And on April 16, 1926, an Illinois district court held that the Secretary had no power to impose restrictions as to frequency, power, and hours of operation, and that a station's use of a frequency not assigned to it was not a violation of the Radio Act of 1912. *United States v. Zenith Radio Corp., 12 F.2d 614*. This was followed on July 8, 1926, by an opinion of Acting Attorney General Donovan that the Secretary of Commerce had no power, under the Radio Act of 1912, to regulate the power, frequency or hours of operation of stations. 35 Ops. Atty. Gen. 126. The next day the Secretary of Commerce issued a statement abandoning all his efforts to regulate radio and urging that the stations undertake self-regulation.

But the plea of the Secretary went unheeded. From July, 1926, to February 23, 1927, when Congress enacted the Radio Act of 1927, 44 Stat. 1162, almost 200 new stations went on the air. These new stations used any frequencies they desired, regardless of the interference thereby caused to others. Existing stations changed to other frequencies and increased their power [**1008] and hours of operation at will. The result was confusion and chaos. With everybody on the air, nobody could be heard. The situation became so intolerable that the President in his message of December 7, 1926, appealed to Congress to enact a comprehensive radio law:

" [***1361] Due to the decisions of the courts, the authority of the department [of Commerce] under the law

of 1912 has broken down; many more stations have been operating [*213] than can be accommodated within the limited number of wave lengths available; further stations are in course of construction; many stations have departed from the scheme of allocations set down by the department, and the whole service of this most important public function has drifted into such chaos as seems likely, if not remedied, to destroy its great value. I most urgently recommend that this legislation should be speedily enacted." (H. Doc. 483, 69th Cong., 2d Sess., p. 10.)

The plight into which radio fell prior to 1927 was attributable to certain basic facts about radio as a means of communication -- its facilities are limited; they are not available to all who may wish to use them; the radio spectrum simply is not large enough to accommodate everybody. There is a fixed natural limitation upon the

with one another. [4] Regulation of radio was therefore as vital to its development as traffic control was to the development of the automobile. In enacting the Radio Act of 1927, the first comprehensive scheme of control over radio communication, Congress acted upon the knowledge that if the potentialities of radio were not to be wasted, regulation was essential.

4 See Morecroft, Principles of Radio Communication (3d ed. 1933) 355-402; Terman, Radio Engineering (2d ed. 1937) 593-645.

The Radio Act of 1927 created the Federal Radio Commission, composed of five members, and endowed the Commission with wide licensing and regulatory powers. We do not pause here to enumerate the scope of the Radio Act of 1927 and of the authority entrusted to the Radio Commission, for the basic provisions of that Act are incorporated in the Communications Act of 1934, 48 Stat. 1064, *47 U. S. C. § 151 et seq.*, the legislation immediately before us. As we noted in *Federal Communications Comm'n v. Pottsville Broadcasting Co., 309 U.S. 134, 137*, [*214] "In its essentials the Communications Act of 1934 [so far as its provisions relating to radio are concerned] derives from the Federal Radio Act of 1927. . . . By this Act Congress, in order to protect the national interest involved in the new and far-reaching science of broadcasting, formulated a unified and comprehensive regulatory system for the industry. The common factors in the administration of the various statutes by which Congress had supervised the different modes of communication led to the creation, in the Act of 1934, of the Communications Commission. But the objectives of the legislation have remained substantially unaltered since 1927."

Section 1 of the Communications Act states its "purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." Section 301 particularizes this general purpose with respect to radio: "It is the purpose of this Act, among other things, to maintain the control of the United States over all the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time,

license shall be construed to create any right, beyond the terms, conditions, and periods of the license." To that end a Commission [***1362] composed of seven members was created, with broad licensing and regulatory powers.

*Section 303* provides:

"Except as otherwise provided in this Act, the Commission from time to time, as public convenience, interest, or necessity requires, shall --

[**1009] (a) Classify radio stations;

[*215] (b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

. . . .

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this Act . . . ;

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

. . . .

(i) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

. . . .

(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act. . . ."

The criterion governing the exercise of the Commission's licensing power is the "public interest, convenience, or necessity." §§ 307 (a) (d), 309 (a), 310, 312. In addition, § 307 (b) directs the Commission that "In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."

[***LEdHR1] [1] The Act itself establishes that the Commission's powers are not limited to the engineering and technical aspects of regulation of radio communication. Yet we are asked to regard the Commission as a kind of traffic officer, policing the wave lengths to prevent stations from interfering with each other. But the Act does not restrict the Commission [*216] merely to supervision of the traffic. It puts upon the Commission the burden of determining the composition of that traffic. The facilities of radio are not large enough to accommodate all who wish to use them. Methods must be devised for choosing from among the many who apply. And since Congress itself could not do this, it committed the task to the Commission.

The Commission was, however, not left at large in performing this duty. The touchstone provided by Congress was the "public interest, convenience, or necessity," a criterion which "is as concrete as the complicated factors for judgment in such a field of delegated authority permit." *Federal Communications Comm'n v. Pottsville Broadcasting Co., 309 U.S. 134, 138*. "This criterion is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power. Compare *New York Central Securities Co.* v. *United States, 287 U.S. 12, 24*. The requirement is to be interpreted by its context, by the nature of radio transmission and reception, by the scope, character and quality of services . . ." *Federal Radio Comm'n v. Nelson Bros. Co., 289 U.S. 266, 285*.

The "public interest" to be served under the Communications Act is thus the interest of the listening public in "the larger and more effective use of radio." *§ 303 (g)*. [***1363] The facilities of radio are limited and therefore precious; they cannot be left to wasteful use without detriment to the public interest. "An important element of public interest and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts." *Federal Communications Comm'n v. Sanders Radio Station, 309 U.S. 470, 475*. The Commission's licensing function cannot be discharged, therefore, merely by finding that there are no technological objections to the granting of a license. If the criterion of "public interest" were limited to such matters, how could the Commission [*217] choose between two applicants for the same facilities, each of whom is financially and technically qualified to operate a station? Since the very inception of federal regulation by

rendered [**1010] have governed the application of the standard of "public interest, convenience, or necessity." See *Federal Communications Comm'n v. Pottsville Broadcasting Co., 309 U.S. 134, 138 n. 2*.

The avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States. To that end Congress endowed the Communications Commission with comprehensive powers to promote and realize the vast potentialities of radio. *Section 303 (g)* provides that the Commission shall "generally encourage the larger and more effective use of radio in the public interest"; subsection (i) gives the Commission specific "authority to make special regulations applicable to radio stations engaged in chain broadcasting"; and subsection (r) empowers it to adopt "such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act."

These provisions, individually and in the aggregate, preclude the notion that the Commission is empowered to deal only with technical and engineering impediments to the "larger and more effective use of radio in the public interest." We cannot find in the Act any such restriction of the Commission's authority. Suppose, for example, that a community can, because of physical limitations, be assigned only two stations. That community might be deprived of effective service in any one of several ways. More powerful stations in nearby cities might blanket out

the signals of the local stations so that they could not be heard at all. The stations might interfere with each other so that neither could be clearly heard. One station might dominate the other with the power of its signal. But [*218] the community could be deprived of good radio service in ways less crude. One man, financially and technically qualified, might apply for and obtain the licenses of both stations and present a single service over the two stations, thus wasting a frequency otherwise available to the area. The language of the Act does not withdraw such a situation from the licensing and regulatory powers of the Commission, and there is no evidence that Congress did not mean its broad language to carry the authority it expresses.

In essence, the Chain Broadcasting Regulations represent a particularization of the Commission's conception of the "public interest" sought to be

Communications Act of 1934. The basic consideration of policy underlying the Regulations is succinctly stated in its Report: "With the number of radio channels limited by natural factors, the public interest demands that those who are entrusted with the available channels shall make the fullest and most effective use of them. If a licensee enters into a [***1364] contract with a network organization which limits his ability to make the best use of the radio facility assigned him, he is not serving the public interest. . . . The net effect [of the practices disclosed by the investigation] has been that broadcasting service has been maintained at a level below that possible under a system of free competition. Having so found, we would be remiss in our statutory duty of encouraging 'the larger and more effective use of radio in the public interest' if we were to grant licenses to persons who persist in these practices." (Report, pp. 81, 82.)

We would be asserting our personal views regarding the effective utilization of radio were we to deny that the Commission was entitled to find that the large public aims of the Communications Act of 1934 comprehend the considerations which moved the Commission in promulgating the Chain Broadcasting Regulations. True enough, the [*219] Act does not explicitly say that the Commission shall have power to deal with network practices found inimical to the public interest. But Congress was acting in a field of regulation which was both new and dynamic. "Congress moved under the spur of a widespread fear that in the absence of governmental control the public interest might be subordinated to monopolistic domination in the broadcasting field." *Federal Communications Comm'n v. Pottsville Broadcasting Co., 309 U.S. 134, 137.* In the context of the developing problems to which it was directed, the Act gave the Commission not niggardly but expansive powers. It was given a comprehensive mandate to "encourage the larger and more effective use of radio in the public interest," if need be, by making "special regulations [**1011] applicable to radio stations engaged in chain broadcasting." *§ 303 (g) (i).*

Generalities unrelated to the living problems of radio communication of course cannot justify exercises of power by the Commission. Equally so, generalities empty of all concrete considerations of the actual bearing of regulations promulgated by the Commission to the subject-matter entrusted to it, cannot strike down exercises of power by the Commission. While Congress

regulate all phases of the radio industry, it did not frustrate the purposes for which the Communications Act of 1934 was brought into being by attempting an itemized catalogue of the specific manifestations of the general problems for the solution of which it was establishing a regulatory agency. That would have stereotyped the powers of the Commission to specific details in regulating a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding. And so Congress did what experience had taught it in similar attempts at regulation, even in fields where the subject-matter of regulation was far less fluid and dynamic than radio. The essence of that [*220] experience was to define broad areas for regulation and to establish standards for judgment adequately related in their application to the problems to be solved.

For the cramping construction of the Act pressed upon us, support cannot be found in its legislative history. The principal argument is that *§ 303 (i)*, empowering the Commission "to make special regulations applicable to radio stations engaged in chain broadcasting," intended to restrict the scope of the Commission's powers to the technical and engineering aspects of chain broadcasting. This provision comes from § 4 (h) of the Radio Act of 1927. It was introduced into the legislation as a Senate committee amendment to the House bill (H. R. 9971, 69th Cong., 1st Sess.) This amendment originally read as follows:

"(C) The commission, from time to time, as public

convenience, interest, or necessity requires, shall --

. . . .

[***1365] (j) When stations are connected by wire for chain broadcasting, determine the power each station shall use and the wave lengths to be used during the time stations are so connected and so operated, and make all other regulations necessary in the interest of equitable radio service to the listeners in the communities or areas affected by chain broadcasting."

The report of the Senate Committee on Interstate Commerce, which submitted this amendment, stated that under the bill the Commission was given "complete authority . . . to control chain broadcasting." Sen. Rep. No. 772, 69th Cong., 1st Sess., p. 3. The bill as thus amended was passed by the Senate, and then sent to conference. The bill that emerged from the conference committee, and which became the Radio Act of 1927, phrased the amendment in the general terms now contained in *§ 303 (i)* of the 1934 Act: the Commission was authorized "to make special regulations applicable to radio stations [*221] engaged in chain broadcasting." The conference reports do not give any explanation of this particular change in phrasing, but they do state that the jurisdiction conferred upon the Commission by the conference bill was substantially identical with that conferred by the bill passed by the Senate. See Sen. Doc. No. 200, 69th Cong., 2d Sess., p. 17; H. Rep. 1886, 69th Cong., 2d Sess., p. 17. We agree with the District Court that in view of this legislative history, *§ 303 (i)* cannot be construed as no broader than the first clause of the Senate amendment, which limited the Commission's authority to the technical and engineering phases of chain broadcasting. There is no basis for assuming that the conference intended to preserve the first clause, which was of limited scope, and abandon the second clause, which was of general scope, by agreeing upon a provision which was broader and more comprehensive than those it supplanted. 5

5 In the course of the Senate debates on the conference report upon the bill that became the Radio Act of 1927, Senator Dill, who was in charge of the bill, said: "While the commission would have the power under the general terms of the bill, the bill specifically sets out as one of the special powers of the commission the right to make specific regulations for governing chain broadcasting. As to creating a monopoly of radio in this country, let me say that this bill absolutely protects the public, so far as it can protect them, by giving the commission full power to refuse a license to anyone who it believes will not serve the public interest, convenience, or necessity. It specifically provides that any corporation guilty of monopoly shall not only not receive a license but that its license may be revoked; and if after a corporation has received its license for a period of three years it is then discovered and found to be guilty of monopoly, its license will be revoked. . . . In addition to that, the bill contains a provision that no license may be transferred from one owner to another without the written consent of the commission, and the commission, of course, having the power to protect against a monopoly, must give such protection. I wish to state further that the only way by which monopolies in the radio business can secure control of radio here, even for a limited period of time, will be by the commission becoming servile to them. Power must be lodged somewhere, and I myself am unwilling to assume in advance that the commission proposed to be created will be servile to the desires and demands of great corporations of this country." 68 Cong. Rec. 2881.

[*222] [***LEdHR2] [2]A totally different source of attack upon the Regulations is found in *§ 311* of the Act, which authorizes the Commission to withhold licenses from persons convicted of having violated the anti-trust [**1012] laws. Two contentions are made -- first, that this provision puts considerations relating to competition outside the Commission's concern before an applicant has been convicted of monopoly or other restraints of trade, and second, that, in any event, the [***1366] Commission misconceived the scope of its powers under *§ 311* in issuing the Regulations. Both of these contentions are unfounded. *Section 311* derives from § 13 of the Radio Act of 1927, which expressly commanded, rather than merely authorized, the Commission to refuse a license to any person judicially found guilty of having violated the anti-trust laws. The change in the 1934 Act was made, in the words of Senator Dill, the manager of the legislation in the Senate, because "it seemed fair to the committee to do that." 78 Cong. Rec. 8825. The Commission was thus permitted to exercise its judgment as to whether violation of the

anti-trust laws disqualified an applicant from operating a station in the "public interest." We agree with the District Court that "The necessary implication from this [amendment in 1934] was that the Commission might infer from the fact that the applicant had in the past tried to monopolize radio, or had engaged in unfair methods of competition, that the disposition so manifested would continue and that if it did it would make him an unfit licensee." *47 F.Supp. 940, 944.*

That the Commission may refuse to grant a license to persons adjudged guilty in a court of law of conduct in violation of the anti-trust laws certainly does not render [*223] irrelevant consideration by the Commission of the effect of such conduct upon the "public interest, convenience, or necessity." A licensee charged with practices in contravention of this standard cannot continue to hold his license merely because his conduct is

been proceeded against and convicted. By clarifying in *§ 311* the scope of the Commission's authority in dealing with persons convicted of violating the anti-trust laws, Congress can hardly be deemed to have limited the concept of "public interest" so as to exclude all considerations relating to monopoly and unreasonable restraints upon commerce. Nothing in the provisions or history of the Act lends support to the inference that the Commission was denied the power to refuse a license to a station not operating in the "public interest," merely because its misconduct happened to be an unconvicted violation of the anti-trust laws.

Alternatively, it is urged that the Regulations constitute an *ultra vires* attempt by the Commission to enforce the anti-trust laws, and that the enforcement of the anti-trust laws is the province not of the Commission but of the Attorney General and the courts. This contention misconceives the basis of the Commission's action. The Commission's Report indicates plainly enough that the Commission was not attempting to administer the anti-trust laws:

"The prohibitions of the Sherman Act apply to [**1013] broadcasting. This Commission, although not charged with the duty of enforcing that law, should administer its regulatory powers with respect to broadcasting in the light of the purposes which the Sherman Act was designed to achieve. . . . While many of the network practices raise serious questions under the antitrust laws, our jurisdiction does not depend on a showing that they do in fact constitute a violation of the antitrust laws. It is not our function [*224] to apply the antitrust laws as such. It is our duty, however, to refuse licenses or renewals to any person who engages or proposes to engage in practices which will prevent either himself or other licensees or both from making the fullest use of radio facilities. This is the standard of public interest, convenience or necessity which we must apply to all applications for licenses and renewals. . . . We do not predicate our jurisdiction to issue the regulations on the ground that the network practices violate the antitrust laws. We are issuing these regulations because we have found that the network practices prevent the maximum [***1367] utilization of radio facilities in the public interest." (Report, pp. 46, 83, 83 n. 3.)

We conclude, therefore, that the Communications Act of 1934 authorized the Commission to promulgate

investigation of chain broadcasting. There remains for consideration the claim that the Commission's exercise of such authority was unlawful.

[***LEdHR3] [3]The Regulations are assailed as "arbitrary and capricious." If this contention means that the Regulations are unwise, that they are not likely to succeed in accomplishing what the Commission intended, we can say only that the appellants have selected the wrong forum for such a plea. What was said in *Board of Trade v. United States, 314 U.S. 534, 548,* is relevant here: "We certainly have neither technical competence nor legal authority to pronounce upon the wisdom of the course taken by the Commission." Our duty is at an end when we find that the action of the Commission was based upon findings supported by evidence, and was made pursuant to authority granted by Congress. It is not for us to say that the "public interest" will be furthered or retarded by the Chain Broadcasting Regulations. The responsibility belongs to the Congress for the grant of valid legislative authority and to the Commission for its exercise.

[*225] [***LEdHR4] [4]It would be sheer dogmatism to say that the Commission made out no case for its allowable discretion in formulating these Regulations. Its long investigation disclosed the existences of practices which it regarded as contrary to the "public interest." The Commission knew that the

wisdom of any action it took would have to be tested by experience: "We are under no illusion that the regulations we are adopting will solve all questions of public interest with respect to the network system of program distribution. . . . The problems in the network field are interdependent, and the steps now taken may perhaps operate as a partial solution of problems not directly dealt with at this time. Such problems may be examined again at some future time after the regulations here adopted have been given a fair trial." (Report, p. 88.) The problems with which the Commission attempted to deal could not be solved at once and for all time by rigid rules-of-thumb. The Commission therefore did not bind itself inflexibly to the licensing policies expressed in the Regulations. In each case that comes before it the Commission must still exercise an ultimate judgment whether the grant of a license would serve the "public interest, convenience, or necessity." If time and changing circumstances reveal that the "public interest" is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations.

[***LEdHR5] [5]Since there is no basis for any claim that the Commission failed to observe procedural safeguards required by law, we reach the contention that the Regulations should be denied enforcement on constitutional grounds. Here, as in *New York Central Securities Corp.* v. *United States, 287 U.S. 12, 24-25*, the claim is made that the standard of "public interest" governing the exercise of the powers delegated to the Commission by Congress is so vague and indefinite that, if it be construed as comprehensively as [**1014] the [*226] words alone permit, the delegation of legislative authority is unconstitutional. But, as we held in that case, "It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary." *Ibid.* See *Federal* [***1368] *Radio Comm'n v. Nelson Bros. Co., 289 U.S. 266, 285*; *Federal Communications Comm'n v. Pottsville Broadcasting Co., 309 U.S. 134, 137-38*. Compare *Panama Refining Co.* v. *Ryan, 293 U.S. 388, 428*; *Intermountain Rate Cases, 234 U.S. 476, 486-89*; *United States v. Lowden, 308 U.S. 225*.

[***LEdHR6] [6]We come, finally, to an appeal to the *First Amendment*. The Regulations, even if valid in all other respects, must fall because they abridge, say the appellants, their right of free speech. If that be so, it would follow that every person whose application for a license to operate a station is denied by the Commission is thereby denied his constitutional right of free speech. Freedom of utterance is abridged to many who wish to use the limited facilities of radio. Unlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation. Because it cannot be used by all, some who wish to use it must be denied. But Congress did not authorize the Commission to choose among applicants upon the basis of their political, economic or social views, or upon any other capricious basis. If it did, or if the Commission by these Regulations proposed a choice among applicants upon some such basis, the issue before us would be wholly different. The question here is simply whether the Commission, by announcing that it will refuse licenses to persons who engage in specified network practices (a basis for choice which we hold is comprehended within the statutory criterion of [*227] "public interest"), is thereby denying such persons the constitutional right of free speech. The right of free speech does not include, however, the right to use the facilities of radio without a license. The licensing system established by Congress in the Communications Act of 1934 was a proper exercise of its power over commerce. The standard it provided for the licensing of stations was the "public interest, convenience, or necessity." Denial of a station license on that ground, if valid under the Act, is not a denial of free speech.

[***LEdHR7] [7]A procedural point calls for just a word. The District Court, by granting the Government's motion for summary judgment, disposed of the case upon the pleadings and upon the record made before the Commission. The court below correctly held that its inquiry was limited to review of the evidence before the Commission. Trial *de novo* of the matters heard by the Commission and dealt with in its Report would have been improper. See *Tagg Bros.* v. *United States, 280 U.S. 420*; *Acker v. United States, 298 U.S. 426*.

*Affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE RUTLEDGE took no part in the consideration or decision of these cases.

**DISSENT BY:** MURPHY

**DISSENT**

MR. JUSTICE MURPHY, dissenting:

I do not question the objectives of the proposed regulations, and it is not my desire by narrow statutory interpretation to weaken the authority of government agencies to deal efficiently with matters committed to their jurisdiction by the Congress. Statutes of this kind should be construed so that the agency concerned may be able to cope effectively with problems which the Congress intended to correct, or may otherwise perform the functions given to it. But we exceed our competence when we gratuitously bestow upon an agency power which the [*228] Congress has not granted. Since that is what the Court in substance does today, I dissent.

[***1369] In the present case we are dealing with a subject of extreme importance in the life of the nation. Although radio broadcasting, like the press, is generally conducted on a commercial basis, it is not an [**1015] ordinary business activity, like the selling of securities or the marketing of electrical power. In the dissemination of information and opinion, radio has assumed a position of commanding importance, rivalling the press and the pulpit. Owing to its physical characteristics radio, unlike the other methods of conveying information, must be regulated and rationed by the government. Otherwise there would be chaos, and radio's usefulness would be largely destroyed. But because of its vast potentialities as a medium of communication, discussion and propaganda, the character and extent of control that should be exercised over it by the government is a matter of deep and vital concern. Events in Europe show that radio may readily be a weapon of authority and misrepresentation, instead of a means of entertainment and enlightenment. It may even be an instrument of oppression. In pointing out these possibilities I do not mean to intimate in the slightest that they are imminent or probable in this country, but they do suggest that the construction of the instant statute should be approached with more than ordinary restraint and caution, to avoid an interpretation that is not clearly justified by the conditions that brought about its enactment, or that would give the Commission greater powers than the Congress intended to confer.

The Communications Act of 1934 does not in terms give the Commission power to regulate the contractual relations between the stations and the networks. *Columbia System v. United States, 316 U.S. 407, 416.* It is only as an incident of the power to grant or withhold licenses to individual stations under §§ 307, 308, 309 and 310 that this [*229] authority is claimed, [1] except as it may have been provided by subdivisions (g), (i) and (r) of *§ 303*, and by *§§ 311* and *313*. But nowhere in these sections, taken singly or collectively, is there to be found by reasonable construction or necessary inference, authority to regulate the broadcasting industry as such, or to control the complex operations of the national networks.

1 The regulations as first proposed were not connected with denial of applications for initial or renewal station licenses but provided instead that: "No licensee of a standard broadcast station shall enter into any contractual arrangement, express or implied, with a network organization," which contained any of the disapproved provisions. After a short time, however, the regulations were

licensing depend upon conformity with the regulations.

In providing for regulation of the radio, the Congress was under the necessity of vesting a considerable amount of discretionary authority in the Commission. The task of choosing between various claimants for the privilege of using the air waves is essentially an administrative one. Nevertheless, in specifying with some degree of particularity the kind of information to be included in an application for a license, the Congress has indicated what general conditions and considerations are to govern the granting and withholding of station licenses. Thus an applicant is required by § 308 (b) to submit information bearing upon his citizenship, character, and technical, financial and other qualifications to operate the proposed station, as well as data relating to the ownership and location of the proposed station, the power and frequencies desired, operating periods, intended use, and such other information as the Commission may require. Licenses, frequencies, hours of operation and power are to be fairly distributed among the several [***1370] States and communities to provide efficient service to each. § 307 (b). Explicit provision is made for dealing with applicants and licensees [*230] who are found guilty, or who are under the control of persons found guilty of violating the federal anti-trust laws. *§§ 311* and *313*. Subject to the limitations defined in the Act, the Commission is required to grant a station license to any applicant "if public convenience, interest, or necessity will be served thereby." § 307 (a). Nothing is said, in any

of these sections, about network contracts, affiliations, or business arrangements.

The power to control network contracts and affiliations by means of the Commission's licensing powers cannot be derived from implication out of the standard of "public convenience, interest or necessity." We have held that: "the Act does not essay to regulate the business of the licensee. [**1016] The Commission is given no supervisory control of the programs, of business management or of policy. In short, the broadcasting field is open to anyone, provided there be an available frequency over which he can broadcast without interference to others, if he shows his competency, the adequacy of his equipment, and financial ability to make good use of the assigned channel." *Federal Communications Comm'n v. Sanders Radio Station, 309 U.S. 470, 475.* The criterion of "public convenience,

to be "interpreted by its context, by the nature of radio transmission and reception, by the scope, character and quality of services, . . ." *Federal Radio Comm'n v. Nelson Bros. Co., 289 U.S. 266, 285.* Nothing in the context of which the standard is a part refers to network contracts. It is evident from the record that the Commission is making its determination of whether the public interest would be served by renewal of an existing license or licenses, not upon an examination of written applications presented to it, as required by §§ 308 and 309, but upon an investigation of the broadcasting industry as a whole, and general findings made in pursuance thereof which relate to the business methods of the network companies rather than [*231] the characteristics of the individual stations and the peculiar needs of the areas served by them. If it had been the intention of the Congress to invest the Commission with the responsibility, through its licensing authority, of exercising far-reaching control -- as exemplified by the proposed regulations -- over the business operations of chain broadcasting and radio networks as they were then or are now organized and established, it is not likely that the Congress would have left it to mere inference or implication from the test of "public convenience, interest or necessity," or that Congress would have neglected to include it among the considerations expressly made relevant to license applications by § 308 (b). The subject is one of such scope and importance as to warrant explicit mention. To construe the licensing sections (§§ 307, 308, 309, 310) as granting authority to require fundamental and revolutionary changes in the business methods of the broadcasting networks -- methods which have been in existence for several years and which have not been adjudged unlawful -- would inflate and distort their true meaning and extend them beyond the limited purposes which they were intended to serve.

It is quite possible, of course, that maximum utilization of the radio as an instrument of culture, entertainment, and the diffusion of ideas is inhibited by existing network arrangements. Some of the conditions imposed by the broadcasting chains are possibly not conducive to a freer use of radio facilities, however essential they may be to the maintenance of sustaining programs and [***1371] the operation of the chain broadcasting business as it is now conducted. But I am unable to agree that it is within the present authority of the Commission to prescribe the remedy for such conditions. It is evident that a correction of these

involve drastic changes in the business of radio broadcasting which the Congress has not [*232] clearly and definitely empowered the Commission to undertake.

If this were a case in which a station license had been withheld from an individual applicant or licensee because of special relations or commitments that would seriously compromise or limit his ability to provide adequate service to the listening public, I should be less inclined to make any objection. As an incident of its authority to determine the eligibility of an individual applicant in an isolated case, the Commission might possibly consider such factors. In the present case, however, the Commission has reversed the order of things. Its real objective is to regulate the business practices of the major networks, thus bringing within the range of its regulatory power the chain broadcasting industry as a whole. By means of these regulations and the enforcement program, the Commission would not only extend its authority over business activities which represent interests and investments of a very substantial character, which have not been put under its jurisdiction by the Act, but would greatly enlarge its control over an institution that has now become a rival of the press and pulpit as a purveyor of news and entertainment and a medium of [**1017] public discussion. To assume a function and responsibility of such wide reach and importance in the life of the nation, as a mere incident of its duty to pass on individual applications for permission to operate a radio station and use a specific wave length, is an assumption of authority to which I am not willing to lend my assent.

Again I do not question the need of regulation in this field, or the authority of the Congress to enact legislation that would vest in the Commission such power as it requires to deal with the problem, which it has defined and analyzed in its report with admirable lucidity. It is possible that the remedy indicated by the proposed regulations is the appropriate one, whatever its effect may be on [*233] the sustaining programs, advertising contracts, and other characteristics of chain broadcasting as it is now conducted in this country. I do not believe, however, that the Commission was justified in claiming the responsibility and authority it has assumed to exercise without a clear mandate from the Congress.

An examination of the history of this legislation convinces me that the Congress did not intend by anything in *§ 303*, or any other provision of the Act, to confer on the Commission the authority it has assumed to

is concerned primarily with technical matters, and the subjects of regulation authorized by most of its subdivisions are exceedingly specific -- so specific in fact that it is reasonable to infer that, if Congress had intended to cover the subject of network contracts and affiliations, it would not have left it to dubious implications from general clauses, lifted out of context, in subdivisions (g), (i) and (r). I am unable to agree that in authorizing the Commission in *§ 303 (g)* to study new uses for radio, provide for experimental use of frequencies, and "generally encourage the larger and more effective use of radio in the public interest," it was the intention or the purpose of the Congress to confer on the Commission the regulatory powers now being asserted. Manifestly that subdivision dealt with experimental and development work -- technical and scientific matters, and the construction [***1372] of its concluding clause should be accordingly limited to those considerations. Nothing in its legislative history suggests that it had any broader purpose.

It was clearly not the intention of the Congress by the enactment of *§ 303 (i)*, authorizing the Commission "to make special regulations applicable to radio stations engaged in chain broadcasting," to invest the Commission with the authority now claimed over network contracts. This section is a verbatim reenactment of § 4 (h) of the [*234] Radio Act of 1927, and had its origin in a Senate amendment to the bill which became that Act. In its original form it provided that the Commission, from time to time, as public convenience, interest, or necessity required, should:

"When stations are connected by wire for chain broadcasting, [the Commission should] determine the power each station shall use and the wave lengths to be used during the time stations are so connected and so operated, and make all other regulations necessary in the interest of equitable radio service to the listeners in the communities or areas affected by chain broadcasting."

It was evidently the purpose of this provision to remedy a situation that was described as follows by Senator Dill (who was in charge of the bill in the Senate) in questioning a witness at the hearings of the Senate Committee on Interstate Commerce:

". . . During the past few months there has grown up a system of chain broadcasting, extending over the

of the time -- many nights a month -- and the stations that are connected are of such widely varying meter lengths that the ordinary radio set that reaches out any distance is unable to get anything but that one program, and so, in effect, that one program monopolizes the air. I realize it is somewhat of a technical engineering problem, but it has seemed to many people, at least many who have written to me, that when stations are carrying on chain programs that they might be limited to the use of wave lengths adjoining or near enough to one another that they would not cover the entire dial. I do not know whether legislation ought to restrict that or whether it had better be done by regulations of the department. I want to [**1018] get your opinion as to the advisability in some way protecting people who want to hear some other program than the one being broadcasted by chain broadcast." (Report of Hearings Before [*235] Senate Committee on Interstate Commerce on S. 1 and S. 1754, 69th Cong., 1st Sess. (1926) p. 123.)

In other words, when the same program was simultaneously broadcast by chain stations, the weaker independent stations were drowned out because of the high power of the chain stations. With the receiving sets then commonly in use, listeners were unable to get any program except the chain program. It was essentially an interference problem. In addition to determining power and wave length for chain stations, it would have been the duty of the Commission, under the amendment, to make other regulations necessary for "equitable radio service to the listeners in the communities or areas affected by chain broadcasting." The last clause should

Case 1:06-cv-00431-ML-LDA Document 29-3 Filed 12/12/2007 Page 34 of 35



not be interpreted out of context and without relation to the problem at which the amendment was aimed. It is reasonably construed as simply authorizing the Commission to remedy other technical problems of interference involved in chain broadcasting in addition to power and wave length by requiring special types of equipment, controlling locations, etc. The statement in the Senate Committee Report that this provision gave the Commission "complete authority . . . to control chain broadcasting" (S. Rep. No. 772, 69th Cong., 1st Sess., p. 3) must be taken as meaning that the [***1373] provision gave complete authority with respect to the specific problem which the Senate intended to meet, a problem of technical interference.

While the form of the amendment was simplified in the Conference Committee so as to authorize the Commission "to make special regulations applicable to [illegible] Houses were assured in the report of the Conference Committee that "the jurisdiction conferred in this paragraph is substantially the same as the jurisdiction conferred upon the Commission by . . . the Senate amendment." (Sen. Doc. No. 200, 69th Cong., 2d Sess. , p. 17; H. Rep. No. 1886, [*236] 69th Cong., 2d Sess., p. 17). This is further borne out by a statement of Senator Dill in discussing the conference report on the Senate floor:

"What is happening to-day is that the National Broadcasting Co., which is a part of the great Radio Trust, to say the least, if not a monopoly, is hooking up stations in every community on their various wave lengths with high powered stations and sending one program out, and they are forcing the little stations off the board so that the people cannot hear anything except the one program.

"There is no power to-day in the hands of the Department of Commerce to stop that practice. The radio commission will have the power to regulate and prevent it and give the independents a chance." (68 Cong. Rec. 3031.)

*Section 303 (r)* is certainly no basis for inferring that the Commission is empowered to issue the challenged regulations. This subdivision is not an independent grant of power, but only an authorization to: "Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act." There is no provision in the Act for the control of network contractual arrangements by the Commission, and consequently *§ 303 (r)* is of no consequence here.

To the extent that existing network practices may have run counter to the anti-trust laws, the Congress has expressly provided the means of dealing with the problem. The enforcement of those laws has been committed to the courts and other law enforcement agencies. In addition to the usual penalties prescribed by statute for their violation, however, the Commission has been expressly authorized by *§ 311* to refuse a station license to any person [*237] "finally adjudged guilty by a Federal court" of attempting unlawfully to monopolize radio communication. Anyone under the control of such a person may also be refused a license. And whenever a court has ordered the revocation of an existing license, as expressly provided in *§ 313*, a new license may not be [illegible] person under his control. In my opinion these provisions (*§§ 311* and *313*) [**1019] clearly do not and were not intended to confer independent authority on the Commission to supervise network contracts or to enforce competition between radio networks by withholding licenses from stations, and do not justify the Commission in refusing a license to an applicant otherwise qualified, because of business arrangements that may constitute an unlawful restraint of trade, when the applicant has not been finally adjudged guilty of violating the anti-trust laws, and is not controlled by one so adjudged.

The conditions disclosed by the Commission's investigation, if they require correction, should be met, not by the invention of authority where none is available or by diverting existing powers out of their true channels and using them for purposes to which they were not addressed, but by invoking the aid of the Congress or the service of agencies that have been entrusted with the enforcement of the anti-trust laws. In other fields of regulation [***1374] the Congress has made clear its intentions. It has not left to mere inference and guess-work the existence of authority to order board changes and reforms in the national economy or the structure of business arrangements in the Public Utility Holding Company Act, 49 Stat. 803, the Securities Act of 1933, 48 Stat. 74, the Federal Power Act, 49 Stat. 838, and other measures of similar character. Indeed the Communications Act itself contains cogent internal evidence that Congress did not intend [*238] to grant power over network contractual arrangements to the

Commission. In § 215 (c) of Title II, dealing with common carriers by wire and radio, Congress provided:

"The Commission shall examine all contracts of common carriers subject to this Act which prevent the other party thereto from dealing with another common carrier subject to this Act, and shall report its findings to Congress, together with its recommendations as to whether additional legislation on this subject is desirable."

Congress had no difficulty here in expressing the possible desirability of regulating a type of contract roughly similar to the ones with which we are now concerned, and in reserving to itself the ultimate decision upon the matters of policy involved. Insofar as the Congress deemed it necessary in this legislation to safeguard radio broadcasting against arrangements that are offensive to the anti-trust laws or monopolistic in nature, it made specific provision in *§§ 311* and *313*. If the existing network contracts are deemed objectionable because of monopolistic or other features, and no remedy is presently available under these provisions, the proper course is to seek amendatory legislation from the Congress, not to fabricate authority by ingenious reasoning based upon provisions that have no true relation to the specific problem.

MR. JUSTICE ROBERTS agrees with these views.