UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC. | : | |
| *Plaintiff* | : | |
| VS. | : | C.A. No.: 06-431/ML |
| CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER | : | |
| *Defendants*. | : | |

**DEFENDANTS CARTER BROADCASTING CORPORATION AND FAITH CHRISTIAN CENTER'S LOCAL RULE CV 56 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Carter Broadcasting Corporation ("Carter") and Faith Christian Center ("Faith") submit the following Statement of Undisputed Facts pursuant to Local Rule of Civil Procedure 56 and in support of their Motion For Summary Judgment pursuant to rule 56 of the Federal Rules of Civil Procedure:

1. Carter is a New England based broadcasting group owned by Kenneth Carberry ("Carberry").

2. Faith is a non-profit church located in Seekonk, Massachusetts. New England Christian Media, Inc. is a corporation established by Faith that now owns and operates a radio station with the call numbers WSTL, which was formerly known as WRIB 1220 ("WRIB").

3. Carter owned and operated an AM radio station located in East Providence, Rhode Island, known as WRIB 1220 ("WRIB") until its sale on July 6, 2007 to Faith. (*See* November 28, 2007 Deposition of John Pierce, attached as Exhibit "A", pp. 88-89 and Seller's Residency Affidavit signed by Kenneth Carberry, attached as Exhibit **"**B **".**)

4. North American Catholic Educational Programming Foundation, Inc. ("NACEPF") is a corporation, headquartered at 2419 Hartford Avenue, Johnston, Rhode Island, which produces and broadcasts religious programs for television and radio. (*See* August 28, 2007 Deposition of John Primeau, attached as Exhibit "C", pp. 5-6.)

5. John Primeau ("Primeau") is the Chief Operations Executive Officer of NACEPF. (*See* Exhibit "C", p. 16.)

6. John Pierce ("Pierce") was employed by Carter as station manager of WRIB from 1986 until it closed on July 6, 2006. (Exhibit "A", p. 10.)

7. NACEPF began broadcasting its Roman Catholic educational programs on WRIB in 1994. Beginning in 1994, NACEPF paid for ten (10) half-hour slots of broadcasting time or two and a half (2 ½) hours a day of broadcasting time. (*See* Exhibit "C", p. 21.)

8. In 1994, WRIB charged NACEPF $20.00 per half hour for five (5) of the half hour slots and $25.00 per half hour for the other five (5) half-hour slots. (*See* Exhibit "C", p. 24.) Over time the price per half hour was increased to $28.00 per half hour. (*See* Exhibit "C", p. 24.)

9. From 1994 to 1999, NACEPF paid WRIB quarterly or semi-annually for its broadcasting time. (*See* Exhibit "C", p. 24.)

10. In 1999, Carter began negotiating with National Catholic Radio for the sale of WRIB as well as other radio stations owned by Carter. (*See* August 29, 2007 Deposition of Kenneth Carberry, attached as Exhibit "D", p. 21.)

11. When Primeau learned of the possible sale of WRIB, he requested that Pierce provide him with a one year contract to prevent the possibility of NACEPF's programs being taken off the air by the new owner. (*See* Exhibit "A", p. 33.)

12. Pierce refused to provide Primeau with a contract. (*See* Exhibit "A", p. 34.) Primeau returned to WRIB over the next several days requesting a contract from Pierce and each time Pierce refused. (*See* Exhibit "A", pp. 34, 64-65.)

13. The negotiations for the sale of WRIB to National Catholic Radio collapsed after approximately two years and the sale never took place. (*See* Exhibit "D", p. 21.)

14. As a result of the failed negotiations, Primeau became worried that if WRIB was sold in the future "everybody would be off the air or phased out." (*See* Exhibit "C", p. 25.)

15. As a result, Primeau changed his "**strategy**" and began paying WRIB in advance for the half hour slots NACEPF broadcast on WRIB[1]. (*See* Exhibit "C", p. 26, emphasis supplied.)

16. From June 7, 2001 until May 5, 2005, NACEPF would forward a check annually to WRIB paying in advance for the next year of broadcasting time. (*See* copies of checks and billing statements, attached as Exhibit "F".)

17. Pierce, who was responsible for billing clients and handling payments received, would deposit NACEPF's checks into a non-interest bearing checking account. (*See* Exhibit "A", pp. 19-20, 40.)

18. It was customary for Pierce to prepare monthly in-house bills regarding NACEPF's account with WRIB, which would reflect a credit balance, if any. (*See* Exhibit "A", 23, *see* also a copy of one of WRIB's monthly statements, attached as Exhibit "G".)

19. Pierce refrained from mailing the monthly bills he prepared to NACEPF because NACEPF would most often have a credit balance. (*See* Exhibit "A", pp. 26-27.)

---

[1] For a complete history of payments made by NACEPF to WRIB, please see WRIB's general ledger attached as Exhibit " E".

20. Pierce would send NACEPF a yearly invoice once NACEPF's credit balance had been depleted and it began owing WRIB for broadcasting time. (*See* Exhibit "A", pp. 23 – 27.)

21. In the summer of 2005, Faith and Carter began negotiating for the sale of WRIB to Faith. (*See* August 28, 2007 Deposition of David Marquard, attached as Exhibit "H", p. 14.)

22. On March 16, 2006, NACEPF forwarded a check to WRIB in the amount of $14,560.00, for payment in advance of NACEPF's half hour broadcasting slots for the entire year. (*See* Exhibit "C", p. 39.)

23. When NACEPF's check in the amount of $14,560.00 was forwarded to WRIB, NACEPF was aware that the owner of Carter was negotiating with Faith for the potential sale of the station to Faith. (*See* Exhibit "C", p. 41.)

24. Pierce refrained from depositing NACEPF's check in the amount of $14,560.00 because he believed the sale of WRIB to Faith to be imminent and planned on allowing NACEPF to broadcast its programs for free until the sale as a thank you to NACEPF for years of business. (*See* Exhibit "A", pp. 51-52, 56.)

25. Once the negotiations between Carter and Faith had continued for an additional eight weeks, the broadcasting time became too costly to simply give away. Therefore, Pierce deposited NACEPF's check for $14,560.00 on June 23, 2006. (*See* Exhibit "A", pp. 56-57.)

26. Pierce refrained from informing Primeau that WRIB was being sold to Faith because he was disturbed by Primeau's actions in 1999 by asking repeatedly for a contract that Pierce would not provide, and did not want Primeau to repeat his behavior when he heard of the sale of WRIB to Faith. (*See* Exhibit "A", pp 56-57.)

27. Once Primeau learned of the sale of WRIB to Faith, he sent a letter on July 6, 2006, by overnight carrier, to Kenneth Carberry and Kurt Carberry, with copies to Rev. David

Marquard and Rev. John Pfeffer, both employee of Faith. In his letter, Primeau stated that if the sale between Faith and Carter were executed, and he was not allowed to continue broadcasting through April 1, 2007, he would pursue claims for breach of contract against Carter and for tortious interference against Faith. (*See* Exhibit "C", p. 39.)

28. Carberry did not view the letter from Primeau until after the closing took place. (*See* Exhibit "D", p. 71.)

29. Aside from the letter of July 6, 2006, NACEPF had never asked Carter or WRIB to sign any documents indicating that NACEPF's programming would continue through April of 2007. (*See* Exhibit "C", p. 71.)

30. On July 7, 2006, the sale of WRIB from Carter to Faith[2] was finalized. (*See* Defendant Carter's Answers to Plaintiff's Interrogatories, attached as Exhibit "I", No. 14.)

31. On July 7, 2006, after the sale of WRIB to Faith closed, WRIB was closed and all of WRIB's customers' radio programs, including NACEPF's, were taken off the air. (*See* August 30, 2007 Deposition of Patricia Varner, attached as Exhibit "J", pp. 53, 86.)

32. Faith's decision to take the former programming off the air after its purchase of WRIB was made at the suggestion of its attorneys, based upon potential liability Faith could have been exposed to if programmers said or did anything in violation of FCC rules and regulations. (*See* Exhibit "H", p. 29.)

33. On July 7, 2006, a letter was sent from Carberry to Primeau with a check reimbursing NACEPF the amount of $11,760.00. (*See* Exhibit "D", pp. 51-52 and July 7, 2006 letter from Carberry to Primeau, attached as Exhibit "K"). The letter specified that the

[2] WRIB was technically purchased by New England Christian Media, Inc., a corporation established by Faith in 2006. (Depo. Marquard p. 8.)

$11,760.00 was reimbursement for the broadcasting slots that NACEPF paid in advance for and would not be allowed to use. (*See* Exhibit "C", pp. 51-52.)

34. Primeau has not cashed the refund check provided to him by Carter. (*See* Exhibit "C", p. 51.)

35. On September 18, 2006, NACEPF filed a complaint against both Carter and Faith. NACEPF alleges that Carter breached a contract with NACEPF that was formed when Carter accepted NACEPF's March 16, 2006, check in the amount of $14,560.00. (See NACEPF's Complaint, attached as Exhibit "L", ¶ 10.)

36. Primeau testified as follows at his deposition regarding the alleged contract between Carter and NACEPF and Primeau's payment in advance for broadcasting time:

> Q. "And did you have a discussion with Ken Carberry before you started giving him checks for lump sums of time about why it was you were giving him these checks in advance?
>
> **A. "In other words, whether or not I said to him, "Well, guess what? You know, starting now, seeing what's happened, I'm paying you in advance," I wouldn't know if I had that conversation.**
> **What I would have done is executed that by going right to the station personally and handing it to his gentleman there, Mr. Pierce, and saying – you know, If I give somebody a check for – I'll make this up, $14,806, I mean, that you know, didn't come out of the air…I'm telling him this is what it is. It's paid in advance. It goes from this date to this date, and you cashed the check, there's the deal.**

(*See* Exhibit "C", pp. 28-29, emphasis supplied.)

37. In its complaint, NACEPF further alleges that Faith tortiously interfered with the contract between it and Carter. (*See* Exhibit "L", ¶ 19.)

38. The following question and answer were exchanged at Primeau's deposition regarding Faith's alleged responsibilities to NACEPF after the sale of WRIB:

Q. Okay. And you knew at the time you gave them [Carter] that check for $14,560, that Carter couldn't guarantee that your programming would continue after a sale took place; correct?

**A. Absolutely not.**

Mr. Maglio: Okay.

**A. Quite the opposite. If I've created a contract, he has to assign the rights -- the rights have to be assigned, and anybody doing due diligence will see a credit for that amount. I mean, if any agent, be it Carter – I mean Faith Christian, or whatever does any due diligence, they're going to see that there is a credit for that amount of money…**

(*See* Exhibit "C", p.50.)

39. It was Carter's conclusion that NACEPF's decision to pay in advance for a year's worth of broadcasting time was simply its preferred method of bookkeeping. (*See* Exhibit "D", p. 34, *See* Exhibit "A", p. 64.)

40. Aside from the yearly check forwarded by NACEPF to WRIB, NACEPF provided no other documentation to either WRIB or Carter regarding NACEPF's broadcasting arrangement with WRIB. (*See* Exhibit "C", p. 37.)

Respectfully submitted,

CARTER BROADCASTING CORPORATION
and FAITH CHRISTIAN CENTER

By their Attorneys,

DAVID E. MAGLIO & ASSOCIATES, P.C.
/s/
David E. Maglio, Esq. (#3459)
The Owen Building
101 Dyer Street, Second Floor
Providence, Rhode Island 02903
(401) 831-5400
(401) 831-7979 (FAX)
dmaglio@magliolaw.com

**CERTIFICATION**

I hereby certify that an exact copy of the within document was filed by CM/ECF to the following individuals on the 12th day of December, 2007.

- Mark A. Pogue
  Edwards Angell Palmer & Dodge, LLP
  2800 Financial Plaza
  Providence, RI 02903
  mpogue@eapdlaw.com

/s/ David E. Maglio, Esq. (R.I. Reg. No. 3459)

h:\clients\carter\nacepf\pleadings\stmnt undisputed facts in supt msj