UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

NORTH AMERICAN CATHOLIC
EDUCATIONAL PROGRAMMING
FOUNDATION, INC.,
Plaintiff,

VS. C.A. NO. 06-431ML

CARTER BROADCASTING
CORPORATION and FAITH
CHRISTIAN CENTER,
Defendants.

DEPOSITION OF JOHN PIERCE, a witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on November 28, 2007, at 2:00 P.M.

APPEARANCES:

FOR THE PLAINTIFF:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK A. POGUE, ESQUIRE

FOR THE DEFENDANTS:
DAVID E. MAGLIO & ASSOCIATES, PC
BY: DAVID E. MAGLIO, ESQUIRE

ALSO PRESENT: KENNETH CARBERRY, JOHN PRIMEAU

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

copies of the monthly bills.

Q. Anything else?

A. Well, actually, I had actually saved for -- I don't even know why I saved them, but I had actually saved, like every year I would send John the master bill of what was due, and I would save those for maybe three or four years, and also there was an envelope that John had actually sent his last check. I know he stated that he dropped it off, and he always did, but his very last check, he actually sent, and I actually said to Ken, here's the envelope, and here's the date, and here's the arrow, pointing to the date, and, unfortunately, it's been misplaced. Ken actually, at first, I don't believe remembered it, but I know I gave it to him.

Q. You say this envelope from Mr. Primeau was in the folder?

A. Was in that folder, was in the NACEPF folder. There was actually an envelope stamped April something or other, but it was just to me from NACEPF, and that was actually -- it would show the date that he actually made his check.

Q. And why do you say that unfortunately that envelope cannot be located?

every 10 years they got a slight increase, but if it was $154 for an hour, or whatever, they knew what the amount was, and I would come in and basically there was an envelope stuck under my door. Why send a bill? But I kept a billing for them. Those sheets that are attached, I kept every month in case I just dropped dead or the station was sold or I got fired. Somebody could walk right in and open my drawer, and there would be this stack of bills that were sent, and there would be the bills that looked like they were being sent, but they really weren't.

Q. In the case of Voice of Italy and --

A. Now, in the case of John Primeau or NACEPF, he usually had a credit. So basically I still did the bills just as if I was sending them, but basically I just was saving myself the trouble of typing an envelope and licking a stamp, and I did not actually send them. But at the end of every year, I would send John -- John basically got one bill a year from me. There was only one time during the course of the year that I sent a bill to NACEPF, when he owed us money and not until.

Q. Let me back you up though. On these monthly bills, you say that you prepared bills for NACEPF

every month as if they were going to be sent?
A. As if they were going to be sent.
Q. But then you didn't actually send them?
A. I didn't actually send them.
Q. Are you saying that you nonetheless kept a copy of these bills?
A. Yes.
Q. And they were placed in the NACEPF file?
A. Yes.
Q. And that's the file that was given to Mr. --
A. That's the --
Q. Please wait until I'm finished. It's unnatural, I know, but the law is unnatural. So these bills that you prepared for NACEPF and never sent, were in the file that you gave to Mr. Carter?
A. Yes.
Q. That have not been found since?
A. Right.
Q. Now, you say that once a year you, in fact, did send something to NACEPF; is that right?
A. I did.
Q. What did you send? What is it that you sent once a year?
A. Once a year, John would generally pay -- over the last several years had been paying a year in

advance, so basically I didn't send a bill until he owed a month.

(MR. PRIMEAU TALKING TO MR. POGUE)

MR. POGUE: Just a second. I can't listen to you both. Could you read that back.

(ANSWER READ BACK)

Q. Maybe you can give me an example. My understanding is that John would pay you for a year's worth of airtime in advance?

A. Right.

Q. Every spring; is that right?

A. Generally.

Q. Generally every spring, so that he would give you a check that covered the airtime to be purchased by NACEPF for the spring of one year up until the spring of the following year, right?

A. Over the last few years, yes.

Q. Is that the practice he followed?

A. Yes.

Q. Now, you say that if there came a time where he owed you money, you would send him at the end of the year something?

A. Well, no. Let's say, for instance, if he paid me -- let's say, let's take 4/29/03, $14,496 he paid on that date. He would have gotten a bill

from me on April the 1st, because I did my billing on the first day of the month. I sent all my bills out on the 1st. So I would have waited until he owed say $1280 or $1360. It was $56 per hour, and when it came down to he actually owed a month, I would send a bill. The other bills would still be in my drawer, just not sent. They were just basically my own way of keeping track, and, like I said, if anything happened to me, somebody could come right in and take over and indeed send them if they wanted to. We had good enough relationship where, okay, I will see you once a year, and, you know, whenever you can bring it in, and I will send you a bill. So I only billed NACEPF for one month every year, and then John would send in a payment for a year.

Q. So, for example, NACEPF would purchase a year's worth of airtime in advance. Let's say that would purchase time through April 30, 2004?

A. Right.

Q. Then after a month had gone by, namely, May of 2004, and he owed you for a month, at that point you would send him a bill for one month?

A. I would send a bill. Yeah, I would let the credit expire and actually back out a month,

because there was no point in sending a bill for nothing or a bill with a credit balance. I had them. There was just no real purpose of sending them. There was no purpose of me sending a bill every month to the Armenian Radio Hour who paid $151.20 every Sunday with a check under my door. Why send a bill? In fact, if you were to look in the exhibits, you can see those bills. There is one bill, like, that somehow got pulled out of from somewhere, where you actually see a credit balance for NACEPF. That was a bill that was never sent. That was a bill that just stayed in my drawer. It stayed there. The bills that you see for The Voice of Italy, the Armenian Radio, those were never sent. In fact, they didn't even have an address on them. I didn't even know their address. Literally after 36 years, I wouldn't have even known where to send the Armenian Radio bill. I didn't know where he lived. He paid every week with a check under the door, so why send a bill.

Q. Now, Mr. Pierce, for what period of time did NACEPF pay with this large check that bought them a year's worth of airtime in advance? Beginning in what year did they adopt that practice?

so as to guarantee he would not be vulnerable to being thrown off the air?

MR. MAGLIO: Objection to the form of the question, but you can answer.

A. That's basically how it started. I mean, I can go into detail here that, you know, I almost hate to, but, as I said, on 3/5/99, John paid like six months in advance, which was his norm, $6,500. So when he had learned in August of '99 that this Fessio group was buying the station, John had literally come in to ask me to draw up a contract to try to save the program, and I explained to John then that, A, this is radio. Contracts basically, traditionally are worthless in a radio station, and the reason why, which I can remember explaining, was -- and I had to explain it again seven years later, that if he were to buy the radio station, and he wanted an all religious radio station, and he decided to buy WHJY, well, at HJY, every day at 9 A.M. they had a one-year contract with the Fox Lady, a strip club. Would that really be expected to be run for the next year simply because he had a contract on a station that was now religious? No. So at any rate, John had really, really come in and was asking me to

draw up a contract, and I said, John, the station sale is -- which at this time in 8/99, as far as we knew, the sale was like going to be happening in two weeks. It was extremely imminent. So I told him that in good conscience I could not draw up a contract. I refused flat out to do a contract because if I had done a contract, and, I mean, I'm not saying John, you know, to his credit, never said, well, let's back date a contract. This never happened. What he just said was, well, can we have a contract to offer me some protection? And I said, what's going to happen if they get to the closing and suddenly you come out of the woodwork with a contract that shows you're paid up until October of 2000, and all of a sudden Ken Carter is going to -- he may not be my boss anymore within 10 minutes from now, but he's going to throw me out a ten story window because what on earth was I doing giving a contract when a station sale was coming in two weeks. So basically at that time, and this is what had happened, was even though he still had a credit balance with us, John finally -- and he had actually come in for like three days in the course of a week asking for a contract, and I said no. So he came in, and he

A. Right.
Q. For the deposit of a check in that amount on 10/24/2000, right?
A. Yes.
Q. And then I see the next check in the packet for $13,050 matches up with an entry on your chart. The next check for $14,496 matches up with an entry on your chart on Exhibit 1. The next check for $14,856 matches up with an entry on your chart, and the last check in the packet of Exhibit 3 is a check for the amount of $14,560, and that matches up with the last entry on Plaintiff's 1, correct?
A. That's right.
Q. Now, the last check was dated, by NACEPF, March 16, 2006, but wasn't cashed for more than three months after that; do you see that?
A. Yes.
Q. Why didn't you cash it before then?
A. Well, three different reasons. John was probably the last to know that the station was going to be sold, and there was actually a reason for that. I had always expected that, you know, the shoe to drop, and him to come in and we would be going through it all over again. It would be

1999 again. It's Groundhog Day. So basically I put off as long as I possibly could telling John because of the problems that we had had in 1999 where he was perpetually asking me, or at least for three or four days, to do a contract, and I was afraid the same thing was going to happen. That was Reason 1. Reason 2 was that when I received that check, once again, and it's like an absolute instant replay of 1999. I was absolutely assuming the station was going to be closing within two weeks, and then it dragged on and on. So it was my thought, you know what, I'm not even going to tell Ken Carter about the check this time. I'm going to stick it in my drawer, and when they close this place once and for all, I'm just going to hand it back to John Primeau. If it dragged on for a month or five weeks, I felt I would be within my rights to do that because I did have a certain amount of managerial discretion there. And, you know, I was just going to make a managerial decision at the last minute that I wanted to give John the check back, and say, well, thank you for, you know, 10 or 15 years of business. You know, the people that came in here were, you know, terrific. I made a lot of friends

statement?

MR. POGUE: Yes.

MR. MAGLIO: Do you mind if we take a break right after that?

MR. CARTER: I don't need a break.

MR. POGUE: I don't need a break.

THE WITNESS: I don't.

MR. MAGLIO: Okay, we're all tough guys.

A. Just to reiterate. They were basically three reasons that I didn't deposit the check. One was I was hoping to be a friend and give it back without any hassle, but once it turned into like eight weeks or 10 weeks, at that point I had to do my fiduciary duty to the station. I could not in good conscience give away $3,000. I could give John $1,200, make an executive decision. I did that on the last day with the Italian show and the Spanish show. They owed a few bucks. You know what, I'll give you a head start. Carter Broadcasting just got $2 million dollars. They're not going to miss the $400. It's on me. Thank you very much for, you know, 46 years of broadcasting. So basically I would have liked to have just handed the check to John with no

hassles, and the ulterior motive was, I was holding the check because I knew what I had gone through in 1999, and I could see it coming again.

Q. Let go back over those reasons. I think I understand, but the first reason you mentioned -- and one thing you said in connection with the first reason was John Primeau and NACEPF was the last to know that the station was about to be sold; is that correct?

A. That's correct.

Q. And you deliberately kept NACEPF in the dark for that long because you were afraid that NACEPF or Mr. Primeau was going to complain about being taken off the air, right?

A. No, I just assumed that he was going to come in with another -- you know, just to aggravate me again. I mean, it was very disturbing in '99, the times that he came in asking for a contract, asking for a contract, asking for a contract, and I told him I couldn't do it. I was basically afraid we were going to go through that again. Faith Christian Center is about to buy it, so give me a contract.

Q. Did you ever tell Mr. Primeau that there was a sale in the offing?

Carter, d/b/a as WRIB, right?
A. Yes.
Q. By the way, what branch was that?
A. East Providence.
Q. And in return for the money that you were -- that you and Carter were depositing and then using from NACEPF, what was your understanding of what NACEPF was getting in exchange for the money?
A. I really had no understanding of anything other than he wanted to pay a year in advance. He didn't want to send a check every month. Why ask? Why look a gift horse in the mouth? Take the money and deposit it.
Q. Okay. Did you ever tell Mr. Primeau or anyone from NACEPF that we're treating this as a gift, and you're not getting anything in return for it?
A. In 1999 I did.
Q. What did you say about that?
A. That was basically when he was leaving me that check for the next year that I said I didn't want right now. I said, John, it's not a good idea to do this because we're going to have to give it all back to you, and we had a long discussion at the time that I said, you know, giving me the check does not make a contract. It's not a contract.

like left as a little island onto ourselves. We were basically on a cash in basis, and anything that went to Boston just simply wouldn't have shown up. It would have been, I would assume, revenue credited to WROL and not credited to me in Providence.
Q. What is WROL?
A. That was the Boston flagship station, and that's when that kind of selling would have happened, where it could have been placed on the Boston Christian station, in Providence, and Springfield all at the same time and get a package rate. That may have happened somewhere along the time of In Season and Out of Season, for instance. He was right out of Boston. He got a package deal for being on all the stations. But I actually remember that when ROL was sold, that income reverted back to us because there was no longer a

MR. POGUE: Could you mark that as the next exhibit, please.
(PLAINTIFF'S EXHIBIT 5 MARKED FOR IDENTIFICATION)
Q. Mr. Pierce, before we get to that next document I marked, I'm showing you Plaintiff's Exhibit 4 from the deposition of Mr. Carberry, and I could copy

Page 87

it if you need me to, but I would ask you to take a look at this document and tell me whether you've seen it before. This is a letter from Mr. Primeau of NACEPF dated July 6, 2006, the day before the closing of this sale, addressed to Mr. Carberry and a copy to Faith Christian Center. Have you seen that before?
A. I saw this last night for the first time, a copy of it in my blue book, and I didn't read it. The only thing I actually remember -- there just seemed to be thousands of pages there, but for some reason I can actually remember reading this, on Internet blogs they appeared. I just kind of thought to myself, that's odd. I don't even know what that is. So I have seen it. I haven't read it.
Q. Do you remember that on the eve of the closing Mr. Primeau sent a letter to Mr. Carberry with a copy to Faith Christian Center complaining about losing his airtime?
A. I was told about that, but I'm not sure if it was on the eve of the closing. If I can just correct this, and somebody might want to actually see when the closing was, but I was absolutely certain in my mind that the closing occurred on

7/6, not 7/5, so this would have been sent on the evening after the station had already closed.
Q. I think I covered that with Ken.
A. I'm almost certain the station closed on the 6th.
Q. The record speaks for itself. I covered it with Mr. Carter. How did you learn about this letter that Mr. Primeau sent challenging the closing? I know you saw it last night, but you said you thought you had heard about it earlier.
A. I think I probably actually heard it from John Primeau.
Q. By the way, I'm showing you Page 65 of Ken's deposition transcript. I said, "Did the closing occur on July 7, 2006?" Answer, "It did."
A. I believe it's the 6th.
Q. Were you present at the closing?
A. I wasn't present at the closing. I was present

closing was over two days. It actually was July 5th and 6th, I'm sure. On the 5th they made it right through the closing, but the bank was closed, and they couldn't transfer because they had done this via computer. They weren't sitting face to face. So that's when Patricia Varner

Page 89

called me and said, John, it's a done deal, and, unfortunately, we are shutting down, and I know that was 5th, and on the 6th is when the money actually transferred.
Q. Well, you have a disagreement with Mr. Carter then.
A. I believe the closing was on the 6th.
Q. You say that Mr. Primeau is the one that made you aware of his letter sent on July 6th?
A. Yeah. John was in touch with me, you know.
MR. MAGLIO: You can just say yes.
A. Yes.
MR. MAGLIO: That's it.
A. I believe that's where I heard about this.
Q. And how did he make you aware of this letter?
A. Well, I can remember John being very upset, and he had called me or e-mailed me, I'm really not sure which, that he had sent a letter registering the protest, because I'm positive it's not something that Mr. Carter told me or anybody else. I never saw that before until last night.
Q. What was Mr. Primeau upset about?
A. That the station had shut down, I believe. That's why I'm really honestly thinking that the closing was the 6th.