UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,
Plaintiff,

VS. C.A. NO. 06-431ML

CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER,
Defendants.

DEPOSITION OF JOHN PRIMEAU, in the above-entitled cause, taken on behalf of the Defendants, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of David E. Maglio & Associates, PC, 101 Dyer Street, Providence, Rhode Island, on August 28, 2007, at 10:00 a.m.

APPEARANCES:

For the Plaintiff:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK A. POGUE, ESQUIRE

For the Defendants:
DAVID E. MAGLIO & ASSOCIATES, PC
BY: DAVID E. MAGLIO, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

Christian Center?
A. Pursuant to the Complaint, as it's written.
Q. And is it your position that NACEPF -- and when I use NACEPF, just so the record is clear, I'm talking about the Plaintiff, North American Catholic Educational Programming Foundation, Inc.
A. Correct.
Q. Okay. Is it your position that NACEPF had a contract with Carter Broadcasting Corporation to air certain programs that NACEPF had produced?
A. Pursuant to the Complaint, as it's written, yes.
Q. Okay. What were the terms of that contract?
A. Pursuant to the Complaint, as it was outlined.
Q. Okay. Now, what is NACEPF?
A. NACEPF is an educational and religious organization.
Q. When was it started?
A. 1989.
Q. And is NACEPF a corporation?
A. Yes. Like I-N-C, Inc., after its name? Yes.
Q. Yes. And is it a 501(c)(3)? Is it a charitable corporation?
A. It is a charitable corporation, though, it receives no charity or government grants or

anything like that.
Q. And who are owners or stockholders?
A. It has no owners. It has no stockholders.
Q. Does it have any employees?
A. Yes.
Q. Currently, who are its employees?
THE WITNESS: In terms of number?
MR. MAGLIO: Yes. Well, the number will dictate whether I want all the names, but yes.
A. Okay. I need to count them because it changes. One, two -- I believe right now it has five.
Q. What are the names of those employees that currently work for NACEPF?
A. Myself, John Primeau, Tim Chodolka.
Q. How do you spell that?
A. I would have to look it up, but I think it's C-H-O-D-O-L-K-A. It's Polish. Alberta DiMuccio, Ann Primeau. She's 17, summer worker.
(OFF THE RECORD)
A. And Beatrice Medeiros.
Q. Is Ann your daughter?
A. Yes.
Q. Now, where is NACEPF headquartered?
A. 2419 Hartford Avenue, Johnston, Rhode Island,

its purpose was to lobby the Commission and so forth.

Also, as part of my lawsuit against Goldman Sachs, myself and two others of equal size put that deal together -- I should say we signed the deal Goldman Sachs put together, and that entity became a named entity within all those corporations.

Q. Okay. How about you, John Primeau, as opposed to NACEPF, are you an officer, director, shareholder, member of any corporations?

(NO VERBAL RESPONSE)

Q. No?

A. No.

Q. Any partnerships?

A. No.

Q. Okay. And what would you say is your occupation, currently?

A. I'm an employee of NACEPF. I'm the Chief Operations Executive Officer. Well, President, and I'm a director.

MR. MAGLIO: Just give me a moment before I change topics here.

(PAUSE)

Q. Actually, while I'm looking at this, let me ask

broadcasting any of its programs on WRIB which at the time was owned by Carter Broadcasting Corporation?
A. I will guess 1994.
Q. Okay. And I'm assuming that's somewhat of an educated guess. And what makes you say '94?
A. Best of my recollection at the moment.
Q. And did you make the decision to broadcast programming for NACEPF at WRIB?
A. Certainly.
Q. Was NACEPF broadcasting its programming on any other radio station before going to WRIB?
A. No.
Q. Did NACEPF after beginning its broadcasting of programs on WRIB at any time up until the time the station was sold to Faith Christian broadcast its programming anywhere else?
A. No.
Q. And then when -- I may have asked you this, but I'm just trying to get a chronology down. When did you start making available the audio screening on the web page?
A. As the web evolved, probably I would guess 2000, 2001.
MR. MAGLIO: Okay.

2 1/2 hours a day. So I believe that it was something like $20 per half-hour for 5 of them, and $25 per half-hour for the other 5, and maybe at one point, it went $25 for 5 half-hours, and maybe like $30 -- $28.50 or something like that for the next 5. But in all cases, I believe it was always under $30 per half-hour.
Q. All right. And when you first started buying time on WRIB, would you prepay for any of the time that you purchased?
A. No.
Q. Okay. How would you --
THE WITNESS: You're saying at the beginning?
MR. MAGLIO: Yes.
A. No.
Q. So how would you pay? Would you pay on a weekly basis? Would you be billed? Would you pay on a daily basis?
A. I probably would have paid him, maybe, quarterly.
Q. Quarterly?
A. And if I was behind, maybe I would pay him semiannually.
Q. And would you be billed?

A. Sometimes, or sometimes he would just tell the person bringing in the tapes, or he'd say it to me. I don't remember exactly. I didn't start prepaying until 2000 -- I believe around 2000.

Q. And why did you start prepaying?

A. Because Ken Carter was in the process of selling all his stations to the Fessio group which was -- I believe the name of it was Catholic Radio, and basically, was working with Monahan money (sic), and I believe they took like initially 12 of those Disney radio channels or something, and then they wanted to add to it. And Carter was serving notice that if the sale went through, we would be off the air. Everybody would be off the air or we'd be phased out. You know, he certainly would, you know, give you time to get off the air, but, in other words, that certainly was a scenario.

So when the deal fell through, I talked to him. He actually called me about, you know, this Fessio scenario. Fessio being the Jesuit priest from the University of San Francisco who, I believe, operates Ignatius Press who received the money from -- to go out and buy these, and as that deal was going through, he would -- I don't know

if you'd say he was consulting with me, but he was telling me his woes.

Q. And do you remember when that was -- when this deal was being put together and negotiated with this Fessio group?

A. I'm guessing, '99, 2000, could have been '98, '99, but it was significant because when the deal fell, I believe Ken Carter sued. I don't know if he got any damages. Because, you know, he was in the process of giving people, you know, get off the air in 30 days, that kind of thing, and he probably was suing for lost revenue or something or some contractual breach scenario.

And from that moment, I changed my strategy. I would calculate -- specifically in a calendar year, I would have a secretary go through Monday through Friday and count out each day that I would be on the air in a given period, perhaps April 1 to April 1, and I would count out, you know, how many programs -- let's say, it's 25 versus 28 or whatever it was, and I would specifically come up with the total amount, and prior to that, I'd give him a check.

Q. Prior --

A. So that, you know, he or Carter, whatever,

sale to a third party; is that right?
A. No, as I answered to you, I believe that at any time, his assets were for sale if, in fact, you know, he could make a killing or the price was right. I mean, but that would be true of whether it was -- at any time, someone could have called Ken Carter and said, "What's your price for your station in Boston versus Springfield versus Providence?" I mean, that man would deal at any time. If you met his price, something was for sale.
Q. Okay. And so let me try this a different way. After the Fessio deal fell through, at no time did Mr. Carberry tell you, look, John, Mr. Primeau, I'm not selling my stations. I've had enough of this, and, you know, I'm going to hang on to this until I die, or words to that effect?
A. No, he didn't say that. He had a corporation. Like any corporation, if he dropped dead, he would have a will and dispensation of his properties pursuant to what it was, and those assets would go to his children or whatever, you know, as his dispensation of property directed.
Q. And did you have a discussion with Ken Carberry before you started giving him checks for lump sums

of time about why it was you were giving him these checks in advance?
A. My discussions with him, as I remember them, dealt with Fessio and the aftermath and his losses, and during that time, I did pay. So whether or not I had said to him, "Hey, guess what, I'm going to start" --
(OFF THE RECORD)
A. In other words, whether or not I said to him, "Well, guess what? You know, starting now, seeing what's happened, I'm paying you in advance," I wouldn't know if I had that conversation.
What I would have done is executed that by going right to the station personally and handing it to his gentleman there, Mr. Pierce, and saying -- you know, if I give somebody a check for -- I'll make this up, $14,806, I mean, that, you know, didn't come out of the air. I didn't pick the number out. I didn't just say, "Here's $15,000, and, you know, just deduct it monthly as I owe you something." I'm telling him this is what it is. It's paid in advance. It goes from this date to this date, and you cashed the check, there's the deal.
Q. Okay. Did you have that type of a conversation

show that you, in writing, advised WRIB what the $14,496 was meant to cover?

A. No, just my verbal communication and delivery thereof.

Q. All right. If we can go over to the next document, N137. It's a check dated May 4, 2004, for $14,856. Did any written documentation accompany this check that would spell out what period of time and how much programming this check was meant to cover?

A. There would be no document, just my oral direct communication delivering it.

Q. Okay. And your best memory is you actually delivered this check to WRIB?

A. Yes.

Q. Now, the next page, it's N138.

A. Okay.

Q. Do you know what this is, this document? I'm trying to figure out where it fits in.

A. This is a check in the amount of $15,728, and the bookkeeper has written 5/2/05 to 4/30/06. So I presume she is paying -- well, it appears that there's a bill for $1,168. Maybe that's a price increase for something, and then she writes $14,560, and aggregates those two.

Q. Okay. And then if we could go to N139, which is a check dated March 16, 2006, for $14,560?
A. Yes, I can say with 100 percent certainty that I was there. Now, I don't know whether I was there on the 16th. I might have been there on the 17th or 18th, but I brought this check.
Q. Why does that stand out in your mind so vividly?
A. Because it was a yearly thing that I would do, and it's most recent. In other words, it's the one that -- my memory recalls recent events more than past events, and this is an event that -- you know, I was down there.
Q. All right. And in fact, this is the check that -- the last check you wrote for airtime before you received a reimbursement, if you will, for $11,760, from WRIB; correct?
A. I received back from them after notice that, you know, my intent -- or my suit was filed, excuse me. After they received my overnight letter stating that I would pursue breach against Carter and tortious interference from Faith if they executed this and did not provide me this time through April 1 of the following year, whatever my letter said to him was. So after that, the thing you're referring to showed up by

Q. Did WRIB, to your knowledge, have any -- strike that. Are there any facts known to you that would indicate that WRIB did not have the right -- the legal right to sell its station to Faith Christian Center?

MR. POGUE: I object to the extent that it calls for a legal conclusion because I think it's sort of wrapped up with legal implications, but you can answer as best you can.

A. From my understanding and speaking to Ken Carter through the years, he would sell if the price was right, and in this instance, it was, you know, ludicrously high, and he would definitely capitalize on the opportunity.

Q. Okay. Do you know when it was, by date, as specifically as possible, when you first heard any talk that Mr. Carberry was going to -- or was negotiating with Faith Christian Center for the sale of the station?

A. I believe in the spring of 2006, the concept of him selling it to a buyer was there, and I believe I might have went to some site where it said that Carter sells it for 1.9 million or something. That's a blog, and I believe when I delivered this check, I would have said, if I can recall it, to

'05, '06. In other words, whether or not it was Faith Christian, it could have been XYZ, this is how I paid.

Q. But you paid, in part, because you didn't want a new station owner, if there was one, to have the ability to cancel your programming; right?

A. I wanted performance through the time that they took the check and cashed it.

Q. Okay. And you knew at the time you gave them that check for $14,560, that Carter couldn't guarantee that your programming would continue after a sale took place; correct?

A. Absolutely not.

MR. MAGLIO: Okay.

A. Quite the opposite. If I've created a contract, he has to assign the rights -- the rights have to be assigned, and anybody doing due diligence will see a credit for that amount. I mean, if any agent, be it Carter -- I mean, Faith Christian or whatever does any due diligence, they're going to see that there's a credit for that amount of money, and any due diligence would raise the issue of, well, what's the implications of that credit. And he would have to honor that in the transfer.

Q. Okay. But you would agree with me that --
A. I only agree with my attorney.
MR. MAGLIO: That's right.
(OFF THE RECORD)
MR. MAGLIO: I'll mark this as the next exhibit, this set of documents as B, please.
(DEFENDANTS' EXHIBIT B MARKED FOR IDENTIFICATION)
Q. Let me show you what's been marked as Exhibit B, Mr. Primeau. Now, these are documents produced by your counsel, N140 through N143.
A. Okay.
Q. And you would agree with me, based on these documents, and based on your knowledge and experience in this transaction, that shortly after July 7, 2006, NACEPF received a check for $11,760 along with a cover letter of July 7, 2006; correct?
A. Yes, these are my copies that I sent my attorney, yes.
Q. Did you cash that check?
A. Absolutely not.
Q. You did not. Where is that check now?
A. I presume it's in some drawer in NACEPF.
Q. Do you know if the amount of that check is

accurate in terms of the computations for the amount of airtime actually used and not used?
A. No, I didn't -- in other words, I can see what he's doing. He's taking something from May, and he's taking something from June. He's taking something from July, probably through July 4 or whatever it is. He seems to be multiplying by an average of $56, and he aggregates it, and he sends it to me.
Q. Okay. And was $56 an hour, was that the price that you had agreed to pay for the time in question?
A. I don't know, but I would assume that could be the -- in other words, if I was paying 2 times, let's say, a $30 and $25, whatever it is, and it came to like $28.50 or $27.50, if you multiply it by 2, that could be $56. So it would be certainly in the ballpark, if not right on the money.
Q. You have no reason to believe that this math that Mr. Carberry's done here in terms of actual airtime used or not used is incorrect?
A. No.
MR. MAGLIO: Okay.
A. It would appear to be that he's giving me 23 days, which would be approximately right if you

present Carter Broadcasting with any document that you wanted them to sign that would indicate that the sale of the station was subject to your programming through April of 2007?

A. Just the letter I overnighted to them and faxed the evening before FedEx brought it to them.

Q. Were you ever told -- strike that. Were you told that you would be given an opportunity to address your listenership before Faith terminated your programs on its station?

A. I think -- I don't know. I would have assumed it, and I would have considered the opposite impossible.

(OFF THE RECORD)

MR. MAGLIO: The only thing I would ask, and I'll put it on the record and when the time comes, if it becomes an issue -- but I don't have a clear -- a completely clear understanding of what the nature and extent of the damages are. And I would just reserve my right -- and your lawyer may object to this -- that when the time comes, if I feel as though I need to ask you some additional questions about documentation that may be produced after today, that, at least, I want to reserve my right to either come to an agreement