UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NORTH AMERICAN CATHOLIC EDUCATIONAL
PROGRAMMING FOUNDATION, INC.,
Plaintiff,
VS. C.A. NO. 06-431ML
CARTER BROADCASTING CORPORATION
and FAITH CHRISTIAN CENTER,
Defendants.

DEPOSITION OF KENNETH CARBERRY, in the above-entitled cause, taken on behalf of the Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on August 29, 2007, at 9:30 a.m.

APPEARANCES:
For the Plaintiff:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK A. POGUE, ESQUIRE
For the Defendants:
LAW OFFICE OF DAVID MAGLIO & ASSOCIATES, PC
BY: DAVID E. MAGLIO, ESQUIRE

Also Present: John Primeau

ALLIED
court reporters, inc.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

115 Phenix Avenue
Cranston, RI 02920

Page 18

that have the name NACEPF on it?
A. I am not really directly, no, but I imagine that they have.
Q. Well, let me represent to you that we asked you to produce any document that has the name NACEPF on it, and that your company in response produced a total of one document. Does it sound right to you that for a client that was on the air for 10 years, Carter would just have a single document in its files that has the name NACEPF on it?
A. It does in a way, and that way is that our file room was flooded on two occasions, roof flooding, not earth flood.
Q. This is at the station in East Providence?
A. Correct.
Q. Okay. When were the floods?
A. And we lot a lot of our records there, but we do maintain some. We still maintain some. So to what extent that exists, I frankly don't know.
Q. Well, do you know how Carter went about looking for the documents we asked to be produced in the course --
A. Yes.
Q. Describe that for me, please.
A. John Pierce personally went through all the

Page 19

documents that were pertinent to the radio station, and not particularly this client, whatsoever, and forwarded whatever he could come across to the Boston office.
Q. Well, I thought Pierce doesn't work for Carter any longer?
A. That's at the time.
Q. Right. I'm talking about since you sold the station, there's been a lawsuit filed.
A. Correct.
Q. And in that lawsuit, we asked to Carter to produce any document with our name on it, and I'm asking you, do you know how Carter went about responding to that request?
A. Yes, we looked through our files to see what was forwarded to us by WRIB.
Q. All right. So as I understand it, at the time the station was sold, Pierce rounded up files?
A. That's correct.
Q. And forwarded them on to Boston?
A. That's correct.
Q. All right. And then when the request came in, you referred to the documents that Pierce had rounded up to see what was responsive to the request?
A. That's correct.

Page 20

Q. And who, in particular, undertook the task of reviewing what Pierce had supplied to see what was responsive to our request?
A. I believe -- I can't think of his name.
MR. MAGLIO: Barry Morin.
A. Barry Borin.
MR. MAGLIO: Morin.
A. Morin, I'm sorry, M-O-R-I-N.
Q. And did Mr. Morin mention to you that he could only find one piece of paper that had NACEPF's name on it?
A. No. To my knowledge, no.
Q. Is this the first you've heard that there was only one piece of paper produced?
A. Yes.
Q. But you're confident that because of the floods and other events that have occurred, that is all that Carter has in its possession at this point with reference to NACEPF?
A. I believe so.
Q. When were the floods; do you remember that?
A. Yes, I remember the last one. Let's see. 2003 or '04. The one prior to that was a long time ago.
Q. Now, did there come a time, Mr. Carberry, in the

Page 21

late 1990s when Carter Broadcasting negotiated for the sale of WRIB and perhaps other stations to a Father Fezzio or Catholic Radio Group, something like that?
A. Catholic Radio Network.
Q. Catholic Radio Network?
A. Yes, that's correct.
Q. When did those negotiations occur?
A. I believe in 1999 -- '98, '99.
Q. All right. And what was on the table at that point? Was it just RIB or was there other stations as well?
A. No, it was all of the Carter stations with the exception of WCRN. So there were six stations involved.
Q. Okay. So this was a fairly major transaction that was in the works at one time?
A. Yes, it was.
Q. And what ultimately happened to that transaction?
A. The deal fell through.
Q. How long a period of time were you engaged in the negotiating with National Catholic Radio?
A. At least two years, perhaps more.
Q. Did the deal, at one point, appear so imminent that you or agents of Carter Broadcasting notified

and Pierce always wondered why NACEPF paid in advance for airtime?
A. Yes.
Q. I thought you told me a moment ago, you don't recall any conversation with Pierce about the practice of NACEPF of buying a year's worth of airtime in advance?
A. The conversation would -- a July or August check would come in, and in conversation, John would say, "Oh, I have got the Primeau check in." "Boy, that's nice." But I could never -- and I've been in this business a long time, 50 years. I've had hundreds of clients, hundreds. I had big clients. Jimmy Swaggart was my -- I was his agent. I was agent for 10 big programs. Nobody ever did that with the exeption of those two programs I mentioned in the '70s and '60s, so it was a different method of paying. And I always just believed that it was perhaps a way of Mr. Primeau's bookkeeping, having nothing whatsoever to do with my radio station.
Q. Did either you or Pierce ever tell Primeau, "John, it's nice that you're giving us the free use of your money in advance, but you're not getting any rights in return for paying that money"?



A. No.
Q. Don't you think Mr. Primeau was under the impression that he was getting something in return for paying a year's worth -- buying a year's worth of airtime in advance?
MR. MAGLIO: I object to the form of the question. Go ahead.
A. I believe he believed that he was getting what he was paying for, and we gave him what he was paying for. That was it. If we played 260 programs a year for him, then he was paid -- he was charged and paid for those 260 programs. If, indeed, one program didn't go, the transmitter was knocked off, we would owe it to him, saying, "Those programs didn't go." It was just -- it was all a business decision by Mr. Primeau having -- and never encouraged, never required, never requested by the radio station.
Q. But nor did you ever inform NACEPF there was no guarantee or no obligation on the part of RIB to broadcast the stations for which NACEPF -- broadcast the programs, excuse me, for which NACEPF was paying?
MR. MAGLIO: I object to the form.
Q. True?



MR. MAGLIO: Go ahead.
THE WITNESS: Again, did you say did we inform him?
Q. Did you ever tell Mr. Primeau or anyone at NACEPF that although it had paid for a year's worth of shows in advance, there was no guarantee or no obligation on the part of RIB to air those shows?
MR. MAGLIO: Object to the form.
A. No, no.
Q. Why not?
A. There was an assumption certainly on our part that Mr. Primeau was well aware of -- being in the broadcast business that he is in was well aware of the FCC rules and regulations and who's in command, whose in charge. The licensee is always in charge.
Q. Was every other client at RIB billed in arrears? In other words, billed only after their programs had aired?
A. All clients were billed after their programs were aired.
Q. Whether or not they paid first?
A. Yes.
Q. Are you able to cite to the specific FCC rule or regulation that gives the licensee the absolute



discretion on what context to broadcast?
A. No, I cannot.
Q. Isn't the intent of that FCC rule to control objectionable content that's broadcast on the stations?
A. Not necessarily.
Q. What other purpose does the rule server other than that?
A. It serves many purposes.
Q. Such as what?
A. Any purpose the licensee determines.
Q. Did you ever have any concern about the content of the program that NACEPF was providing?
THE WITNESS: Concern regarding FCC rules, regulations?
Q. Do you ever have any concern whether it was or was not in the public interest?
A. No, I did not.
Q. Did you ever have any concern that the content of the NACEPF programming was objectionable in some way?
A. In some way, yes.
Q. In what way did you find it objectionable?
A. The station would occasionally receive telephone calls regarding their views on abortion

faxed and sent by Federal Express, and that it was faxed on the afternoon of July 6. That will be testimony from NACEPF, but it's my problem to account for the dates.

THE WITNESS: I'm glad -- if I may, I'm glad you said it was also sent by Federal Express. It's my belief, my recollection, that's why I believe it came by mail, and as a matter of fact, I did, indeed, see the Federal Express letter. I don't ever recall seeing the faxed one. I'm not saying it didn't exist. I'm not saying I did not see it. I recall the Federal Express letter, and I did see the Federal Express letter which didn't arrive -- now, part of that, I think, you have an indication as to when the FedEx -- I think you just showed me.

MR. POGUE: The last page of Exhibit 4 is the sender's receipt.

THE WITNESS: Sure. Okay. Let's see here. We have --

MR. MAGLIO: Let me just say one thing. You guys have a nice rapport. It's important to have just question and answer, and anything you say even while you're thinking is being taken down. So I want to get back to



questions and answers. And I do the same thing. Do not think out loud, please.

MR. POGUE: He's a guy who likes to get to the bottom of things, so I appreciate that.

MR. MAGLIO: I'm just concerned about the record.

(OFF THE RECORD)

Q. Let me go back to my question. When did you see Exhibit 4 for the first time in any fashion? I know you said after the closing, but when after the closing?

A. I believe it was the following day, probably the 8th -- if, indeed, the closing was the 7th. I believe it was the following day on the 8th. If not, on the 7th. It could very well have been on the 7th, as well.

Q. What did you do when you received the letter? Did you read it?

A. I did.

Q. What was your reaction to it?

THE WITNESS: You want to go line by line?

Q. No, first give me your overall reaction to it, and if you need to review it, I know it's got quite a bit of content to it.



A. It does.

Q. If you want to review it first, that's fine. Why don't we take a minute to let you look at it.

(OFF THE RECORD)

Q. Do you have a chance to look the letter over?

A. I did.

Q. What was your overall reaction when you looked at it on --

A. I was disappointed.

Q. Why?

A. That NACEPF took this tact, because I always thought our association was a good association.

Q. What is disappointing to you about the tact?

A. I was disappointed that NACEPF decided that we had done something wrong, and we're being reprimanded for it, and I just didn't think that was nice, and I was sorry that NACEPF did not have a place to go. I was sorry because I tried my best to have a place for their programs. I personally contacted people, radio station owners.

Q. All right. I want to get into that in a moment, and I appreciate that.

A. Sure.

Q. If you look at the last sentence in the first paragraph.



A. Yes.

Q. It says, "Likewise, this year NACEPF prepaid WRIB an entire yearly fee for the programming through April 30, 2007 per our canceled check." Do you see that?

THE WITNESS: What paragraph are you on? I'm sorry.

MR. POGUE: I'm sorry. It's the first paragraph, and the last sentence.

A. Okay.

Q. "Likewise, this year NACEPF prepaid WRIB an entire yearly fee for our programming through April 30, 2007, per our canceled check." Do you agree with that statement?

A. I do.

Q. And after reading this letter and being disappointed at the tact that NACEPF took in it, did you contact anybody, your lawyers, or Faith, or anyone else with your reaction to the letter?

A. No, certainly not immediately, no.

Q. Now, whose is Kurt Carberry, is that your son?

A. My son, yes.

Q. Did you talk about the letter with Kurt?

A. Only to the extent, I believe, that we received it, and it was our duty to certainly at that time