UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,
Plaintiff,

VS. C.A. NO. 06-431ML

CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER,
Defendants.

DEPOSITION OF DAVID MARQUARD, in the above-entitled cause, taken on behalf of the Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on August 29, 2007, at 2:00 p.m.

APPEARANCES:

For the Plaintiff:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK A. POGUE, ESQUIRE

For the Defendant:
DAVID E. MAGLIO & ASSOCIATES, PC
BY: DAVID E. MAGLIO, ESQUIRE

Also Present: John Primeau



ALLIED court reporters, inc.
115 Phenix Avenue
Cranston, RI 02920
401-946-5500
1-888-44DEPOS (443-3767)
TDD: 944-0677
FAX: 401-946-9228
E-MAIL: ACR115@aol.com
www.CARTproviders.com
www.AlliedCourtReporters.com ALLIED COURT REPORTERS, INC. (401)946-5500 or (888)443-3767

A. We heard about it through a broker.
Q. Do you remember when that came to your attention or Faith's attention?
A. I believe it was the summer of '05.
Q. And the deal closed, we've established in this case, on July 7, 2006; is that correct?
A. I believe that is correct.
Q. So the negotiating process and the paperwork process took about a year to complete; is that fair to say?
A. I would say that is correct.
Q. And what lawyers represented Faith in connection with the transaction?
A. There was, I believe, representation from Seder & Chandler in Worcester, Massachusetts. And beyond that, I'm not quite sure.
Q. Which principals or officers at Faith were most involved in the negotiating process?
A. I would say probably myself.
Q. Anybody else?
A. No.
Q. And who at Carter Broadcasting did you deal with most often in connection with the deal?
A. Primarily Mr. Carter. I believe possibly his son, I think.



Q. Is that Kurt? We saw that name earlier.
A. I don't remember, simply because there was another party between us.
Q. Over the course of the year leading up to the closing in July of 2006, did you ever have any face-to-face meetings with Mr. Carter?
A. We may have had a couple, maybe three, tops, I would think.
Q. Any phone calls with each other over the course of the --
THE WITNESS: Personally between him and myself?
MR. POGUE: Yes.
Q. At any point during the negotiations --
A. No, I mean, not that I recollect when I say that.
Q. I understand. At any point leading up to the day of the closing, did either you or Mr. Carter mention my client, which I'll refer to by shorthand as NACEPF, the North American Catholic Educational Programming Foundation?
THE WITNESS: Could you repeat that question?
Q. At any point in your conversations with any representative from Carter Broadcasting did the



name NACEPF come up?
A. Not that I recollect. I think the first time I remember anything would be through an E-mail that I received from that group, basically threatening a lawsuit, as I recollect.
Q. Do you remember approximately when you received the E-mail?
A. I could not tell you. I know it was -- I think sometime before the closing.
Q. Before the closing?
A. But beyond that, I couldn't really be too specific. I think it was closer to the closing.
MR. POGUE: I think I can show that to you.
(PLAINTIFF'S EXHIBIT 1 MARKED FOR IDENTIFICATION)
Q. David, I'm showing you a document that we've marked as an exhibit to this deposition as Marquard Deposition Exhibit Number 1, and I'll represent to you that the first page is a screen shot of the computer that John Primeau, the President of NACEPF, maintains reflecting the transmission of an E-mail on July 6 at 6:02 p.m., and then the second page is this letter. Is the letter that you're looking at the second page of



Exhibit 1 -- is that the letter that you remember receiving from NACEPF?
THE WITNESS: You're referring to this?
MR. POGUE: The second page, yes, this letter.
A. I believe that it is.
MR. POGUE: Okay.
A. I don't know. I couldn't tell you exactly for sure, but I believe it looks like what we received.
Q. Back on the first page, do you see that the "To" line has the designation dmfcc@cox.net?
A. Yes.
Q. Is that your E-mail address?
A. That is correct.
Q. And then down below, there's a cc to jpfeffer?
A. Yes.
Q. Who's that?
A. That is the associate pastor or executive pastor of Faith Christian Center.
Q. Okay. Is that the correct E-mail address for Pastor Pfeffer?
A. I believe so.
Q. And the "Sent" line of the E-mail reflects it was

of different times.
Q. So Carter Broadcasting was willing to let its employee John Pierce school you on how to get this off the ground?
A. He really did not school us in that area. He was there. We spoke with him, and you know, kind of gleaned, you know, some things about the operations of the station, but I would not, in any way, say that he schooled us in order to get this off the ground.
Q. Well, I didn't mean to be critical. I'm just trying to -- what were some of the issues that you discussed with Pierce? Let me put the question to you that way.
A. He was there more I think -- we were looking to see if we could make some kind of an transition with him as an employee.
Q. Did you offer employment to Mr. Pierce?
A. I believe we did. I think, though, if my recollection is correct, he was not interested in any long-term employment. I believe he was looking to end his relationship, and I don't know if he was retiring or doing whatever he was going to do, but for a period of time there, it appeared that he would stay on for a month or two to help



in the transition, but if I'm correct, I believe that did not transpire.
Q. Okay. Well, let's focus on those aspects of these meetings that you had in which you addressed the fate or the handling of the clients of WRIB. Can you recall what was said along those lines?
A. I can say at one point something that we were considering was giving them a 30-day notice, and that was brought up I know at one meeting that John was at. But it was brought up more as a matter of discussion than it was, you know, as an absolute. This is what we're going to do.
As time transpired, I believe with communications with our attorneys, they advised that it would be best if we just ended, you know, the broadcasting at that point, and then come up down the road.
Q. Why is it that you were entertaining the idea of giving these clients 30-days' notice?
A. Well, because we were looking to try to make it smooth and try to give them an opportunity to, if they needed to, possible sign off in some way. You know, give them an opportunity to make whatever adjustments they possibly could make.
Q. In other words, when you say 30-days' notice,



you're talking about you would notify them that they had 30 days left to broadcast, and then they would be taken off the air?
A. Correct.
Q. That would have given them an opportunity to bid their listeners good-bye and --
A. That was basically --
(OFF THE RECORD)
Q. Would have given them a chance to say good-bye to their listeners; right?
A. That is correct.
Q. And you started to say that was one of the main reasons why you were thinking of doing that?
A. That would be one of the reasons why we were thinking of doing that, yes.
Q. And another reason would have been to give them time to find another place to go, another station to use; is that right?
A. If that was possible, I guess, you know, my thought was just basically -- and, primarily, I think it was myself that came up with that, and it was a matter of discussion more than it was a matter of just, you know, this is what we're going to do. It was brought out as a possibility just to try to make it a smooth transition as opposed



to being abrupt.
Q. Right. And you say ultimately, your lawyers told you not to do that, that that would not be a good idea?
A. That was the advice that we were given.
Q. And you told the newspaper reporter -- and I can show it to you if you need to see it, but what the lawyers were saying was that they felt Faith, as the owner of the radio station, might be held liability or responsible for something that was said in this 30-day period by any of the broadcasters; right?
A. Yes, but, also, I don't believe everything you read in the newspaper.
Q. Well, correct my statement?
A. The answer is yes, that was -- the concept was that we were concerned that -- or the lawyers were concerned that something may be said that would -- basically, you know, we're now owners of the station, we could be held liable by the FCC.
Q. But wasn't all of the programming on WRIB prerecorded?
A. I don't believe so. I believe -- especially with the Spanish side of things, I believe that that was live -- I think it was anyway -- from

Word Index