UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC. | : | |
| *Plaintiff* | : | |
| VS. | : | C.A. 06-431ML |
| CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER | : | |
| *Defendants*. | : | |

**PLAINTIFF NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.'S OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to F. R. Civ. P. 56, plaintiff North American Catholic Educational Programming Foundation Inc. hereby objects to defendants' motion for summary judgment.

In support of this objection, the Court is respectfully referred to the accompanying memorandum, affidavit and exhibits.

NORTH AMERICAN CATHOLIC
EDUCATIONAL PROGRAMMING
FOUNDATION, INC.

By Its Attorneys,

/s/ Mark A. Pogue

Mark A. Pogue #3441
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
Tel. 401-274-9200
Telecopy 401-276-6611

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of January, 2008, a copy of the foregoing Objection Of North American Catholic Educational Programming Foundation, Inc. To Defendants' Motion For Summary Judgment by ECF to the following counsel of record:

David E. Maglio, Esq.
The Owen Building
101 Dyer Street, Second Floor
Providence, RI 02903

/s/ Mark A. Pogue

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC. | : | |
| *Plaintiff* | : | |
| VS. | : | C.A. 06-431ML |
| CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER | : | |
| *Defendants.* | : | |

**MEMORANDUM IN SUPPORT OF OBJECTION OF NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC. TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF") submits this memorandum in support of its objection to the motion for summary judgment (the "Motion") of defendants Carter Broadcasting Corporation ("Carter") and Faith Christian Center ("Faith"). As shown below, the Motion should be denied because there are genuine issues of material fact in this case.

## Factual Background

NACEPF is a Rhode Island corporation with a place of business in Johnston, Rhode Island. Affidavit of John Primeau ("Primeau Aff."), ¶ 2. NACEPF is an independent lay organization engaged in telecommunications, including producing and broadcasting religious and educational programming for television and radio. Id. John Primeau ("Primeau") is the president of NACEPF. Id., ¶ 1.

Carter formerly owned and operated an AM radio station located in East Providence, Rhode Island known as WRIB.[1] NACEPF paid to have Carter broadcast NACEPF-produced programming on WRIB beginning in the mid-1990's. Def. St., ¶ 7. Beginning in 1999, and perhaps earlier,[2] NACEPF began purchasing airtime from WRIB in advance, rather than paying in arrears on a monthly basis.

According to Pierce, in 1999 Primeau asked him to provide NACEPF with a one-year broadcasting contract, and Pierce refused. Def. St., ¶¶ 11-12. NACEPF disputes this. According to NACEPF, Primeau asked that WRIB provide NACEPF with a written broadcasting contract, and Pierce said he could not do this. Primeau Aff., ¶ 4.

After Pierce said that he could not provide NACEPF with a written contract, Primeau gave him a check drawn on NACEPF's account. Primeau Aff., ¶ 4. Primeau told Pierce that the check was to purchase a year's worth of broadcast time on WRIB, at the rates then in effect. Id. Primeau told Pierce that, by accepting NACEPF's check, Carter could confirm this purchase, and NACEPF would thereby gain the security of a full year of airtime. Id. Pierce acknowledged that NACEPF was offering the check to purchase a full year of airtime, and took the check. Id.

After Primeau left, Pierce called Ken Carberry ("Carberry"), the owner of Carter, and "explained the situation." Pl. St., Exh. A, p. 36. Pierce told Carberry that Primeau had left him with a check for a year of airtime and was "asking for a contract." Id. Carberry was trying to sell WRIB at the time, but was having "a lot of problems" with his buyer. Id. Carberry instructed Pierce to deposit NACEPF's check. Id. Pierce deposited NACEPF's check into the

[1] Defendants Carter Broadcasting Corporation And Faith Christian Center's Local Rule CV 56 Statement Of Undisputed Facts In Support Of Their Motion For Summary Judgment ("Def. St."), ¶ 3.

[2] According to John Pierce ("Pierce"), the former station manager at WRIB, NACEPF began purchasing future blocks of airtime in 1996. Deposition of John Pierce (Exhibit A to Plaintiff North American Catholic Educational Programming Foundation, Inc., Local Rule CV 56 Statement ("Pl. St.")), p. 30.

Carter checking account maintained for WRIB, where the funds were co-mingled with other monies owned by WRIB and Carter. Id., p. 37.

For each of the years 2000 through 2005, NACEPF purchased airtime on WRIB by paying the entire fee in advance. Primeau Aff., ¶ 10. Primeau would personally deliver each check to Pierce, and would show how the amount being paid was calculated. Id. NACEPF usually purchased a year of airtime at a time. Id. Pierce would acknowledge each year that NACEPF was purchasing airtime in advance, and would cash NACEPF's check for the purchase. Id.

During the period 2000-2005, WRIB never sent NACEPF any monthly bills. Primeau Aff., ¶ 8. It did not send NACEPF any yearly invoices, either. Id., ¶ 9.

In March 2006, Primeau delivered to WRIB a check in the amount of $14,560. Primeau Aff., ¶ 11. This was by now a yearly ritual. Id. Pierce understood that this was NACEPF's check to purchase a year of airtime, and that he could confirm the purchase by cashing the check. Id. As in years past, Pierce acknowledged that NACEPF was purchasing a year of airtime, and cashed the check. Id.

In the summer of 2005, Carter began negotiating for the sale of WRIB to defendant Faith. Def. St., ¶ 21. Carberry, concerned that the broadcasters on WRIB would become upset at the prospect of being taken off the air by the new owner, told Pierce to keep the impending sale "under his hat." Pl. St., Exh. A, p. 62. Pierce took this instruction to heart – particularly with respect to NACEPF. Afraid that Primeau would point out that NACEPF had a contract with WRIB, Pierce deliberately kept NACEPF in the dark about the impending sale "as long as I possibly could." Id, p. 52. In fact, Pierce did not tell NACEPF about the sale until a week or less before it closed. Id., pp. 59-60.

When NACEPF finally learned of the impending sale, on July 6, 2006, it sent a letter by fax and Federal Express to Carter (with a copy emailed to Faith) asserting that it had time remaining on its one-year broadcasting contract on WRIB. Pl. St., Exh. B. On July 7, 2006, Carter nonetheless sold WRIB to Faith. Deposition of Kenneth Carberry (Pl. St., Exh. C), p. 65. Faith proceeded to dismiss all of the WRIB broadcasters, including NACEPF. Def. St., ¶ 31.

In this action, NACEPF alleges that Carter breached its broadcast contract with NACEPF. In addition, NACEPF alleges that Faith tortiously interfered with the NACEPF-Carter contract.

## Defendants' Motion

Defendants advance three arguments in support of their summary judgment motion. First, they assert that there was no contract between NACEPF and Carter. Def. Mem., p. 4. Second, they contend that "As no contract was in place between NACEPF and Carter it is impossible as a matter of law, for Faith to have tortiously interfered with it." Id., p. 5. Third, they allege that, even if a contract existed between NACEPF and Carter, either Carter or Faith could terminate it at their discretion. Id., p. 5.

## ARGUMENT

The central question raised by the defendants' motion is whether a broadcast contract existed between NACEPF and Carter. Carter has already admitted that such a contract existed. In any event, this is a jury question, and it would not be appropriate for the Court to take that question from the jury. Finally, defendants' misread the FCC jurisprudence they cite and, in any event, it does not support their position. For these and the other reasons given below, the Motion should be denied.

## I. The Motion Should Be Denied Because Carter Has Already Admitted That NACEPF Had A Contract To Broadcast On WRIB

At their depositions, representatives of Carter admitted that NACEPF purchased a year of airtime on WRIB spanning the period May 2006-April 2007. These admissions alone are sufficient to defeat the Motion.

Carberry, the president of Carter, was asked whether he agreed with NACEPF's assertion (contained in Pl. St., Exh. B) that NACEPF had purchased programming on WRIB through April 30, 2007:

> Q: "Likewise, this year NACEPF prepaid WRIB an entire yearly fee for our programming through April 30, 2007, per our cancelled check." Do you agree with that statement?
>
> A: I do.

Pl. St., Exh. C, p. 73. Throughout his deposition, Carberry made similar admissions. He acknowledged that NACEPF purchased airtime on WRIB a year in advance:

> Q: Was it all right from Carter's standpoint that NACEPF paid for a year's worth of airtime in advance?
>
> A. Yes.
>
> * * *
>
> Q. What did Pierce do with the funds that NACEPF paid on an annual basis to buy a year's worth of airtime in advance?
>
> A. He would just generally deposit it right into the local bank. At the time, as I said, I think it was Fleet, in the WRIB account.

Id. at 25-26.

Pierce, WRIB's station manager, made similar admissions. For example, he acknowledged that NACEPF purchased airtime on WRIB for the period from the Spring of 2006 to the Spring of 2007:

Q: And, finally, on June 23, 2006, you deposited a NACEPF check in the amount of $14,560, right?

A: That's correct.

Q: And that check was for the purchase of airtime from the spring of '06 to the spring of '07?

A: That's correct.

Pl., St., Exh. A, p. 42.

A purchase is a contract. One party agrees to buy, and the other to sell, at an agreed-upon price. Here, both Carberry and Pierce admit that NACEPF purchased airtime on WRIB for the period May 2006 – April 2007. Carter has therefore admitted that there was a contract. The Motion should be denied on this basis alone.

## II. The Motion Should Be Denied Because Whether A Contract Existed Is A Question For The Jury

Even if Carter has not already admitted that a contract existed, the Motion should be denied because under Rhode Island law, whether a contract exists is ordinarily a question of fact to be resolved by the factfinder.[3] Marshall Contractors, Inc. v. Brown Univ., 692 A.2d 665, 670 (R.I. 1997) ("[T]he resolution of a dispute concerning if an when contract negotiations materialize into a mutual understanding and resulting binding contract is ordinarily a question of fact for the factfinder."); Bina v. Providence College, 39 F.3d 21, 27 (1st Cir. 1994) (applying Rhode Island law); Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1,7 (1st Cir. 1994) (applying Rhode Island law) ("We have consistently held that, so long as the evidence does not point unerringly in a single direction but is capable of supporting conflicting inferences, the

[3] Although not explicitly discussed in their brief, Faith and Carter assume that Rhode Island law applies to this issue. See Def. Mem. at 5. NACEPF agrees with this position. NACEPF is a Rhode Island entity; Primeau's discussions with Pierce about purchasing airtime occurred at WRIB in Rhode Island; and WRIB deposited NACEPF's checks into a Rhode Island bank account. These contacts confirm that Rhode Island law applies.

question of whether a contact has been formed between two parties is a question of fact to be determined by the factfinder.").[4]

The Motion should be denied for the simple reason that whether a contract existed is for a jury to decide, not the Court.

### III. This Is Not An Extraordinary Case That Would Justify Taking The Contract Question From The Jury

In Marshall Contractors, supra, the Rhode Island Supreme Court stated that whether a contract exists is "ordinarily" a question for the jury. This suggests that in certain extraordinary cases, where the evidence overwhelmingly favors one side or the other, the court is justified in ruling as a matter of law that a contract did or did not exist.

This case certainly does not justify such judicial intervention. If anything, as shown below, the evidence strongly supports NACEPF's position that a contract did exist.

#### A. A Unilateral Contract Was Formed When Carter Cashed NACEPF's Check And Performed The Requested Services

It is basic that an offer to contract can be accepted by an act of performance. In re Newport Plaza Assocs., L.P. v. Durfee Attleboro Bank, 985 F.2d 640, 645 (1st Cir. 1993) ("It is a basic tenet of contract law that an offerer may, as a condition of the offer's acceptance, call for an act, a forbearance, or a return promise from the offeree in exchange for the offeror's promise or performance."); Judd Realty, Inc. v. Tedesco, 400 A.2d 952, 956 (R.I. 1979) ("Under classic contract theory, an offer may invite a return promise, an act of performance or forbearance."). As the Restatement (Second) of Contracts states:

[4] Note that the foregoing decisions were non-jury cases in which the judge served as the factfinder. Where, as here, a jury trial has been demanded, whether a contract exists should be resolved by the jury. Persian Cultural Found. Of Rhode Island, Inc., v. Napolitano, No. PC/00-0163, 2006 WL 2623292 * 9 (R.I. Super. Sept. 12, 2006) (question whether contract was formed "should be resolved by a jury.").

> Where an offer invites an offeree to accept by rendering a performance, no notification is necessary to make such an acceptance effective unless the offer requests such a notification.

Restatement (Second) of Contracts, § 54(1).

Here, it is undisputed that for the year 2006-07 (as well as most of the years from 2000-06), NACEPF sought to purchase a full year of airtime on WRIB. It is also undisputed that, for each of those years, NACEPF presented WRIB with a check to pay for that airtime. NACEPF contends that, for each of those years, (including 2006-07), it indicated that WRIB could confirm the purchase by cashing the check, and that Carter did so and then performed the requested services. Primeau Aff., ¶¶ 4, 10, 11.

If these facts do not demonstrate conclusively that a contract was made between NACEPF and Carter for the 2006-07 broadcast year, at a minimum they show that there is a disputed issue of fact concerning that issue. NACEPF is entitled to have a jury resolve that question.

**B. By Exercising Dominion Over NACEPF's Funds, Carter Accepted NACEPF's Offer And Formed A Contract**

That a contract was formed is also shown by the fact that Carter asserted control over NACEPF's property. It is well-settled that an offeree's exercise of dominion over offered property can constitute acceptance of a contract offer. As a leading authority provides: "An offeree who does any act inconsistent with the offeror's ownership of offered property is bound in accordance with the offered terms unless they are manifestly unreasonable." Restatement (Second) of Contracts, § 69(2); see also Corbin on Contracts, § 3.17, at 401 (2007).

Autographic Register Co. v. Philip Hano Co., 198 F.2d 208 (1st Cir. 1952), illustrates this point. There, the defendant sent the plaintiff a check for royalties, specifying that the money was "an undertaking to repay" the plaintiff. Id. at 211. The plaintiff cashed the check and retained

the proceeds without any communication to the defendant. Id. The First Circuit found that the plaintiff's actions in cashing the check and retaining the proceeds constituted an acceptance of the defendant's offer to repay the amount provided. The court stated:

> It is elementary that an offer may be accepted by performing or refraining from performing a specified act as well as by an affirmative answer… Where the offeree exercises dominion over things which are offered to him, such exercise of dominion in the absence of other circumstances showing a contrary intention is acceptance.

Id. at 212 (citation omitted).[5]

Here, NACEPF tendered a check to Carter and explained that the purpose of the check was to purchase a year of airtime on WRIB. Carter exercised dominion over the funds offered by NACEPF by cashing the check and depositing the funds in its bank account. By doing so, Carter accepted NACEPF offer to purchase the airtime, and thereby made a contract.

## IV. The FCC Opinion Relied On By Defendants Does Not Apply To This Case

Defendants argue that even if a contract between NACEPF and Carter were formed, it could be terminated at their discretion. Defendants cite to an opinion issued by the Federal Communications Commission (the "FCC"), In re Marsh Media, El Paso, 67 F.C.C. 2d 284 (F.C.C. Nov. 30, 1977), for the proposition that "an FCC licensee has total discretion to terminate programming as it sees fit," with the result that "at either Carter or Faith's discretion,

---

[5] Consistent with the First Circuit's holding in Automatic Register Co., many other courts have held that the act of depositing a check will function as acceptance of an offer. See, e.g., Rockwood Mfg. Corp. v. AMP, Inc., 806 F.2d 142, 145 (7th Cir. 1986) (listing cases where act of cashing a check was found to be acceptance); Crouch v. Marrs, 430 P.2d 204, 209 (Kan. 1967) ("The endorsing and depositing a check constitutes an acceptance of the offer to buy which accompanies it because the act itself indicates acceptance."); Warrior Constructors, Inc. v. The Small Bus. Inv. Co. of Houston, 536 S.W.2d 382, 386 (Tex.Civ.App. 1976) ("It is universally recognized that a binding contract may be formed by a retention of or exercise of dominion over the thing offered…The cashing of appellant's checks by appellee was such an exercise of dominion over the funds as to constitute an acceptance of the conditions on which they were offered, notwithstanding any previous attempt to repudiate those conditions."); Stark v. McCaw, 506 P.2d 863, 865 (Wash.App.1973) (cashing check held to be acceptance of contract offer).

any agreements they had with any broadcasters could have terminated if it was determined that the programs would not best serve the public interest." Def. Mem. at 5, 7.

In Marsh Media, an entity known as the Committee for the Development of Mass Communication (the "Committee"), "an 'umbrella' group comprised of 11 Mexican-American organizations in the El Paso area," had made an agreement with Walton, the previous licensee of a television station, that "spelled out various means by which Mexican-Americans were to participate in the station's operation," including an agreement to broadcast certain programming produced by the Committee. Marsh Media at 284. The agreement at issue in Marsh Media was not a commercial agreement for purchase of air time -- such as the NACEPF -- Carter agreement -- but was recognized by the FCC as a "citizen agreement" intended to allow the licensee to demonstrate compliance with FCC regulatory obligations. Id. at 285.[6]

When Marsh Media subsequently assumed control of the station, it ceased broadcasting the Committee's program. Marsh Media, at 285. The Committee argued to the FCC that Marsh Media, the new licensee, was bound by the citizen agreement between the Committee and Walton, the prior licensee, to broadcast the Committee's program. Id. The FCC held that Marsh Media was not bound by the Committee's citizen agreement with Walton. Id. at 286. It based its ruling on "the Commission's policy that *citizen agreements* should not strictly bind a licensee to fixed and unchangeable positions." Id. (emphasis added). The FCC also noted that because Walton had "specifically reserved discretion" in the original agreement to cancel the Committee's programming, the enforceability of the citizen agreement was limited. Id. at 286.

[6] The FCC defines a "citizen agreement" as a "written agreement between a broadcast . . . licensee and one or more citizens or citizen groups, entered for primarily noncommercial purposes[,] . . . includ[ing] those agreements that deal with goals or proposed practices directly or indirectly affecting station operations in the public interest, in areas such as . . . programming and employment." 47 C.F.R. § 73.3526(e)(3), note to paragraph (e)(3). The FCC's definition of "citizen agreement" specifically excludes "common commercial agreements." Id. In short, a citizen agreement - - designed to permit a broadcast licensee to demonstrate compliance with regulatory obligations - - is fundamentally different from a commercial agreement, like NACEPF's agreement to purchase broadcast time on WRIB.

Once the facts of Marsh Media are accurately presented, it is apparent that defendants have misread the decision in two ways. First, defendants suggest that the decision applies to commercial contracts, as opposed to citizen agreements. This is wrong. The decision plainly relates only to citizen agreements. In fact, the FCC "has a long-standing policy of refusing to adjudicate contract law questions for which a forum exists in the state courts." Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control, WC Docket 05-75, Memorandum Opinion and Order, 20 FCC Rcd. 18433, ¶ 108, n.327 (2005). See also, e.g., S.A. Dawson D/B/A Dawson Associate, Assignment of Licenses for 900 MHz Specialized Mobile Radio Station WNVE296 at Bithlo City, Florida, File No. 9512R106102, Memorandum Opinion and Order, 17 FCC Rcd. 472, ¶ 7 (2002) (finding that contractual matters between parties are ordinarily addressed by courts rather than the Commission).

Second, Marsh Media held that a subsequent licensee (Marsh Media) is not bound by a citizen agreement made with a prior licensee (Walton). But that holding has no relevance to the claims asserted by NACEPF here. In this case, NACEPF does not seek to have WRIB's new licensee, Faith, honor the broadcast agreement NACEPF made with the prior licensee, Carter. Instead, NACEPF has sued Carter for breaching the broadcast contract it made, and has sued Faith for tortiously interfering with that contract. Those causes of action are perfectly sound. Marsh Media does not hold (as defendants appear to argue) that an FCC licensee can never make an enforceable contract with a broadcaster. To the contrary, Marsh Media merely states that citizen agreements (a type of agreement not at issue here) are "personal to a particular licensee." Id. at 285.

In short, no FCC rule or decision supports the view that a party to a commercial contract is immune from liability if it breaches the contract. Marsh Media certainly does not so hold.[7]

Defendants' reliance on National Broadcasting Co. v. United States, 319 U.S. 190, 193-94 (1943), Def. Mem. at 6, is similarly inapposite. In that case, the Court reviewed "Chain Broadcasting Regulations" that the FCC adopted in 1941 after conducting "a comprehensive investigation to determine whether special regulations applicable to radio stations engaged in chain broadcasting were required." Id. at 193. In its report on chain broadcasting, as defendants correctly note, the FCC stated that "The licensee is obliged to reserve to himself the final decision as to what programs will best serve the public interest." Def. Mem. at 6. This comment, however, was made in the context of the FCC's concurrent statement that "It is the station, not the network, which is licensed to serve the public interest." National Broadcasting, 319 U.S. at 205.

In other words, in National Broadcasting, the Court upheld individual stations' programming rights vis-à-vis control by a network. The opinion did not address stations' rights with respect to commercial contracts made with third parties -- such as the NACEPF -- Carter contract -- and it certainly cannot be interpreted to mean that licensees can unilaterally abrogate commercial contracts for air time without consequences.

[7] Defendants also argue that Marsh Media is significant because the FCC deemed inadmissible the Committee's evidence that the subsequent licensee had orally promised to broadcast its program. Marsh Media at 285. Of course, that point is not controlling here. In court, oral evidence is perfectly admissible to prove a contract.

## Conclusion

For the foregoing reasons, the Motion should be denied.

NORTH AMERICAN CATHOLIC
EDUCATIONAL PROGRAMMING
FOUNDATION, INC.

By Its Attorneys,

/s/ Mark A. Pogue
Mark A. Pogue #3441
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
Tel. 401-274-9200
Telecopy 401-276-6611

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January, 2008, a copy of the foregoing Memorandum In Support Of Objection Of North American Catholic Educational Programming Foundation, Inc. To Defendants' Motion For Summary Judgment by ECF to the following counsel of record:

David E. Maglio, Esq.
The Owen Building
101 Dyer Street, Second Floor
Providence, RI 02903

/s/ Mark A. Pogue