UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NORTH AMERICAN CATHOLIC
EDUCATIONAL PROGRAMMING
FOUNDATION, INC.,
Plaintiff,
VS. C.A. NO. 06-431ML
CARTER BROADCASTING
CORPORATION and FAITH
CHRISTIAN CENTER,
Defendants.

COURT ORIGINAL

DEPOSITION OF JOHN PIERCE, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on November 28, 2007, at 2:00 P.M.

APPEARANCES:

FOR THE PLAINTIFF:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK A. POGUE, ESQUIRE

FOR THE DEFENDANTS:
DAVID E. MAGLIO & ASSOCIATES, PC
BY: DAVID E. MAGLIO, ESQUIRE

ALSO PRESENT: KENNETH CARBERRY, JOHN PRIMEAU

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

PLAINTIFF'S EXHIBIT
A

started paying $6,000 plus. I'm not totally completely sure what that represents, because I don't have the logs, and I don't have the original billing sheets. What it seemed to me is that the payments were fairly well spaced, 1, 10. Looking at those payments that I did have, these little ones of $400, $1075, $1360, there's a gap where probably he owed some here. This $6,000 could have been owed. This is pure speculation.

MR. POGUE: Yes.

A. From 10/96 to 3/5/99, he was paying, what I just seem to remember, and this is only from my own memory now, is that he was paying like six months in advance, not a year. Now, in -- you'll see the payment. What's fairly relevant here as to when he started paying the year, on March 5, 1999, John paid $6,500, which I'm assuming, you know, and perhaps they can procure some sort of information of how long they were on, that it's payment for six months, because they seemed to have been on for an hour for quite a long time. I just don't have their records, unfortunately. So then if you look, on 8/9/99 there was a payment of $13,100, which was only five months later, and this is something I almost

that year. But at that particular time in 1999, I can just remember, you know, generally being upset every day, like, oh, no, John is here again; he wanted a contract. I said, John, think about it. If I suddenly write a contract to you dated 8/8/99, and the station closes on 8/18/99, what is that going to make me look like? You know, I'm doomed. I can't possibly in good conscience give you that contract. So John felt that by writing a check a year in advance was his contract.

Q. What did you do with the check that he wrote on --

A. I took that check --

Q. Let me finish. What did you do with the check that he wrote on August 9, 1999, for $13,100?

A. I called Ken Carter up and explained the situation. And I said, Ken, I have a little problem here in that John Primeau has been asking for a contract because he knows Fessio is going to deep six the program, along with everybody else. And basically Ken said to me, well, nothing is for sure, you know. We're having a lot of problems with these people. I think he had already given them an extension. And he said, look, we can always give it back to him; just deposit it. He said, does he owe us anything? And I said, well,

no, he's actually got a credit balance. So he said, well, you know, he just left it? Yeah. Okay. So I just deposited it, and I gave him a further credit.

Q. You deposited it in what account?

A. In the WRIB account, and I deposited that on August the 9th, 1999.

Q. And the WRIB account was at what bank?

A. It's always been at Bank of America or variations thereof, Fleet.

Q. And was the account in the name of Carter or in the name of WRIB?

A. I think it was Carter Broadcasting, d/b/a WRIB, or vice versa.

Q. Was the NACEPF check that you deposited on August 9, 1999, put into the general account that WRIB and Carter maintained at the Bank of America branch, or was there some special escrow or segregated account that you put it into?

A. No, it just went into our general account.

Q. So NACEPF's funds got co-mingled with the payments of all the other clients of the station?

A. True.

Q. And then the station would draw down upon those co-mingled funds to pay its bills and other

the amount of $15,728, correct?
A. Yes.
Q. And that was for the purchase of airtime on WRIB from the spring of '05 to the spring of '06?
A. Correct.
Q. And, finally, on June 23, 2006, you deposited a NACEPF check in the amount of $14,560, right?
A. That's correct.
Q. And that check was for the purchase of airtime from the spring of '06 to the spring of '07?
A. That's correct.
Q. There's a reference or a note underneath the columns of information you have here that says, CFR deal collapsed in January 2000; is that what it says?
A. That's right.
Q. And then the next line says, NACEPF paid on 8/9/99 when the --
A. He already had a credit balance.
Q. I see, and what does the last line say?
A. I had gotten that information of the deal, because I hadn't spoken with Mr. Carter, I did this on my own, and I had found this on line, because I could not remember exactly when the deal had collapsed, so I went to Northeast Radio Watch

1999 again. It's Groundhog Day. So basically I put off as long as I possibly could telling John because of the problems that we had had in 1999 where he was perpetually asking me, or at least for three or four days, to do a contract, and I was afraid the same thing was going to happen. That was Reason 1. Reason 2 was that when I received that check, once again, and it's like an absolute instant replay of 1999, I was absolutely assuming the station was going to be closing within two weeks, and then it dragged on and on. So it was my thought, you know what, I'm not even going to tell Ken Carter about the check this time. I'm going to stick it in my drawer, and when they close this place once and for all, I'm just going to hand it back to John Primeau. If it dragged on for a month or five weeks, I felt I would be within my rights to do that because I did have a certain amount of managerial discretion there. And, you know, I was just going to make a managerial decision at the last minute that I wanted to give John the check back, and say, well, thank you for, you know, 10 or 15 years of business. You know, the people that came in here were, you know, terrific. I made a lot of friends

The Voice of Prophecy, 7th Day Adventist Church, you could forget about. If you didn't adhere to Bill Blount, the owner's straight and narrow way of thinking, you weren't going there, and there wasn't one program on our station that he would have accepted, which I always thought was totally illegal. I always told people, you know, go over there; tell them I have a Catholic program, I want to do it, and then see if he can get away with it, because how can you turn this down, but he did. So basically we lost nobody, but Boston was devastated in 1999. So basically it was common sense, let's keep it under our hats as long as possible in case something goes wrong.

Q. Just to summarize that, Mr. Carter told you to keep under your hat -- to keep from the clients of WRIB the fact of the impending sale for as long as possible; is that fair to say?

A. Basically he said, keep it under your hat, it's going to leak out, as it always does. There is going to be something in the paper. You know, there are different blogs on the Internet that just leak this out, but as long as possible would be a good idea, simply because we don't want defections. If it had leaked out, you know, it

programmer or client of the station, except for the Portuguese group, knew before NACEPF about the impending sale; is that right?
A. Yes.
Q. And, I'm sorry, I think I asked you this a moment ago, did you ever sit down with Primeau or contact Mr. Primeau and tell him about the impending sale?
A. I believe I relayed the information to John through Alberta DiMuccio, who came in with the tapes, and I said, Alberta, I have bad news for you. I mean, it came to a point where I personally felt bad that things were, you know, about to end, but through all my understanding that everybody was going to have 30 days' notice, but suddenly as it got down to the nitty gritty, I was suddenly hearing maybe not, probably not, definitely not. So at that point I just wanted to do the right thing, and when Alberta came in with next week's tapes, I said, Alberta, I hate to say this, and I said, and John is going to go ballistic, but there's probably not going to be a next week's program.
Q. So you told Alberta about the impending sale a scant one week before the sale was set to close; is that right?

A. Or less.
Q. Or less than a week, okay. What instructions did Mr. Carter tell you, give to you about letting the clients of WRIB know about the impending sale?
MR. MAGLIO: Objection to the form of the question.
MR. POGUE: What's wrong with the question?
MR. MAGLIO: It assumes that he gave him instructions.
Q. Did Mr. Carter tell you anything about when or how to tell the clients of the station about the sale?
A. In a way. At the very first -- I was the first to know. Ken very graciously had called me when he had met with these people the first time and it looked like it was going to happen. He called me to tell me that, you know, John, it's about time. And basically it was, you remember what happened before in Boston? It would probably be a good idea to just keep this under our hat for awhile because things can go wrong, and they certainly do go wrong, and it was proven that they go wrong with Catholic Family Radio, and where the Catholic Family Radio deal never hurt WRIB, not even a penny, because nobody had a place to go in 1999.