UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,
Plaintiff,

VS. C.A. NO. 06-431ML

CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER,
Defendants.

DEPOSITION OF KENNETH CARBERRY, in the above-entitled cause, taken on behalf of the Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on August 29, 2007, at 9:30 a.m.

APPEARANCES:

For the Plaintiff:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK A. POGUE, ESQUIRE

For the Defendants:
LAW OFFICE OF DAVID MAGLIO & ASSOCIATES, PC
BY: DAVID E. MAGLIO, ESQUIRE

Also Present: John Primeau

COURT ORIGINAL

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

PLAINTIFF'S EXHIBIT
C

year's worth of airtime --
A. Absolutely.
MR. POGUE: You have to wait for me to finish the question.
THE WITNESS: Sorry.
Q. Was it all right from Carter's standpoint that NACEPF paid for a year's worth of airtime in advance?
A. Yes, it was.
Q. Because after all, by doing that, Carter would have the use of NACEPF's money for a year in advance; isn't that correct?
A. That's correct.
Q. Did Carter Broadcasting pay interest to NACEPF for the funds that NACEPF paid for the year's worth of airtime in advance?
A. No, it did not.
Q. Did you ever have any discussion with anyone from NACEPF about doing that?
A. No.
Q. Okay. What did Pierce do with the funds that NACEPF paid on an annual basis to buy a year's worth of airtime in advance?
A. He would just generally deposit it right into the local bank. At the time, as I said, I think

it was Fleet, in the WRIB account.
Q. So there was no special escrowing procedure followed with regard to the NACEPF funds paying for the airtime; is that correct?
A. No, no.
Q. Did you have any understanding of why it is that Mr. Primeau began to buy a year's worth of airtime in advance?
A. None whatsoever.
Q. Were you curious as to why he did that?
A. No, I was not.
Q. Did any other clients of RIB pay for a year's worth of airtime in advance?
A. No, they did not.
Q. Did any other client on any of the other Carter stations ever do that?
A. Many years ago, yes.
Q. What were the circumstances surrounding that incident?
A. There were two clients of -- and I'm talking, you know, '70s, '80s, even 60s, two clients who did that on a regular basis, and since then, I was not aware of any. It's a misconception, if I may add. It's a misconception that religious stations are paid in advance by many clients. That's just

Q. How did the closing with Faith occur physically? Was there a group of people around a table, or was it done sort of remotely? How did that happen?

A. It was done remotely. There was no gathering around a table, no.

Q. And did the closing occur on July 7, 2006?

A. It did.

Q. Before the closing had occurred, did you see a letter sent to both Carter and to Faith from John Primeau of NACEPF asserting a right to continue broadcasting on RIB into 2007?

A. I'm not -- I don't believe it was before. Was it before or just after?

MR. POGUE: Let's use a document. I'm going to show you a document to help with the discussion.

(PLAINTIFF'S EXHIBIT 4 MARKED FOR IDENTIFICATION)

Q. All right. I'm showing you a document marked as Deposition Exhibit 4. You have a copy already, David?

MR. MAGLIO: I do, thank you. Yes.

Q. Okay. Do you see, Mr. Carter, that this is a letter on NACEPF letterhead?

A. I do.

A. Yes.
Q. It says, "Likewise, this year NACEPF prepaid WRIB an entire yearly fee for the programming through April 30, 2007 per our canceled check." Do you see that?
THE WITNESS: What paragraph are you on? I'm sorry.
MR. POGUE: I'm sorry. It's the first paragraph, and the last sentence.
A. Okay.
Q. "Likewise, this year NACEPF prepaid WRIB an entire yearly fee for our programming through April 30, 2007, per our canceled check." Do you agree with that statement?
A. I do.
Q. And after reading this letter and being disappointed at the tact that NACEPF took in it, did you contact anybody, your lawyers, or Faith, or anyone else with your reaction to the letter?
A. No, certainly not immediately, no.
Q. Now, whose is Kurt Carberry, is that your son?
A. My son, yes.
Q. Did you talk about the letter with Kurt?
A. Only to the extent, I believe, that we received it, and it was our duty to certainly at that time