UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NORTH AMERICAN CATHOLIC
EDUCATIONAL PROGRAMMING
FOUNDATION, INC.,
Plaintiff,
VS. C.A. NO. 06-431ML
CARTER BROADCASTING
CORPORATION and FAITH
CHRISTIAN CENTER,
Defendants.

DEPOSITION OF JOHN PIERCE, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on November 28, 2007, at 2:00 P.M.

APPEARANCES:

FOR THE PLAINTIFF:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK A. POGUE, ESQUIRE

FOR THE DEFENDANTS:
DAVID E. MAGLIO & ASSOCIATES, PC
BY: DAVID E. MAGLIO, ESQUIRE

ALSO PRESENT: KENNETH CARBERRY, JOHN PRIMEAU

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

Page 30

started paying $6,000 plus. I'm not totally completely sure what that represents, because I don't have the logs, and I don't have the original billing sheets. What it seemed to me is that the payments were fairly well spaced, 1, 10. Looking at those payments that I did have, these little ones of $400, $1075, $1360, there's a gap where probably he owed some here. This $6,000 could have been owed. This is pure speculation.
MR. POGUE: Yes.
A. From 10/96 to 3/5/99, he was paying, what I just seem to remember, and this is only from my own memory now, is that he was paying like six months in advance, not a year. Now, in -- you'll see the payment. What's fairly relevant here as to when he started paying the year, on March 5, 1999, John paid $6,500, which I'm assuming, you know, and perhaps they can procure some sort of information of how long they were on, that it's payment for six months, because they seemed to have been on for an hour for quite a long time. I just don't have their records, unfortunately. So then if you look, on 8/9/99 there was a payment of $13,100, which was only five months later, and this is something I almost

Page 31

hate to go into because this is where, you know, the main problem starts.
Q. What is the main problem?
A. The main problem, okay, is that in 1999 Catholic Family Radio was trying to buy the radio station. They had a contract to purchase the radio station, and John got wind of it, whether I told him or whether he read it. Actually, there was a huge article in the paper, now that I think about it. I mean, that spread out in the Providence Journal, and it was Lynch or somebody talking about their vision and what they were going to do, and basically they spelled it out in black and white that everybody was gone from our radio station, and it was a catastrophe. For me personally, I was putting out fires left and right, oh, my God. Even our Catholics weren't safe, which I didn't realize until John Primeau told me about it. I figured, you know, you're Catholic; why is a Catholic going to throw you off? But, apparently, this Father Fessio was some sort of radical, you know, I don't know what, but where John may have been, and people like Father Randall on our station were more charismatic.
Q. Just so I understand, you're saying that the

Page 32

programmers or clients of WRIB were in a panic at the prospect that a new owner --
A. Right.
MR. MAGLIO: Let him finish.
Q. The programmers or clients of WRIB were in a panic at the prospect that a new owner would throw them off WRIB; is that right?
A. That's correct.
Q. Are you saying that this was public knowledge among the clients of WRIB because of the widespread publicity?
A. It was extremely public because there was a gigantic article in the paper, and I can remember Ken Carter going absolutely ape, because in Boston the same thing happened where he had a catastrophe there and lost business. It was lost revenue.
Q. Are you saying that once Mr. Primeau went through this -- I understand that the sale to CFR did not go through?
A. That's correct.
Q. But Mr. Primeau remembered the experience and remembered the feeling of having been at risk for being thrown off the air?
A. Right.
Q. So he began to pay in annual airtime installments

Page 33

so as to guarantee he would not be vulnerable to being thrown off the air?
MR. MAGLIO: Objection to the form of the question, but you can answer.
A. That's basically how it started. I mean, I can go into detail here that, you know, I almost hate to, but, as I said, on 3/5/99, John paid like six months in advance, which was his norm, $6,500. So when he had learned in August of '99 that this Fessio group was buying the station, John had literally come in to ask me to draw up a contract to try to save the program, and I explained to John then that, A, this is radio. Contracts basically, traditionally are worthless in a radio station, and the reason why, which I can remember explaining, was -- and I had to explain it again seven years later, that if he were to buy the radio station, and he wanted an all religious radio station, and he decided to buy WHJY, well, at HJY, every day at 9 A.M. they had a one-year contract with the Fox Lady, a strip club. Would that really be expected to be run for the next year simply because he had a contract on a station that was now religious? No. So at any rate, John had really, really come in and was asking me to

Page 34

draw up a contract, and I said, John, the station sale is -- which at this time in 8/99, as far as we knew, the sale was like going to be happening in two weeks. It was extremely imminent. So I told him that in good conscience I could not draw up a contract. I refused flat out to do a contract because if I had done a contract, and, I mean, I'm not saying John, you know, to his credit, never said, well, let's back date a contract. This never happened. What he just said was, well, can we have a contract to offer me some protection? And I said, what's going to happen if they get to the closing and suddenly you come out of the woodwork with a contract that shows you're paid up until October of 2000, and all of a sudden Ken Carter is going to -- he may not be my boss anymore within 10 minutes from now, but he's going to throw me out a ten story window because what on earth was I doing giving a contract when a station sale was coming in two weeks. So basically at that time, and this is what had happened, was even though he still had a credit balance with us, John finally -- and he had actually come in for like three days in the course of a week asking for a contract, and I said no. So he came in, and he

Page 35

sat down. John's usual manner was to just breeze in the radio station, sit at my desk, and open his checkbook once a year, and this is what he would do, or six months. And he said, all right, here's what I'm going to do, and he wrote a check for $13,100, and he ripped it out, and he put it on my desk, and I told him I didn't want it. I said, John, you know, this isn't a contract. And he said, well, it's better than nothing. You know, we'll worry about it later, and the check was just left on my desk. So John left. I told Ken Carter about it, and back then -- this is almost like an instant replay. Ken basically back then said -- I said, you know, what am I supposed to do with this check for $13,500? He already had a credit of a month or two, which you can see because John's next payment wasn't until 1/2 -- I'm sorry, 8/9/99, he paid $13,100, and then over a year later, 14 months later, he came in and paid $6,500, but that wasn't even for a year. He had, once again, reverted to paying six months. And then on 6/12/01 he paid a year, and then on 1/2/02 he only paid six months, and some of that was to catch up. So it wasn't like the year was forever. It's only been since '02 that he has been paying

Page 36

that year. But at that particular time in 1999, I can just remember, you know, generally being upset every day, like, oh, no, John is here again; he wanted a contract. I said, John, think about it. If I suddenly write a contract to you dated 8/8/99, and the station closes on 8/18/99, what is that going to make me look like? You know, I'm doomed. I can't possibly in good conscience give you that contract. So John felt that by writing a check a year in advance was his contract.

Q. What did you do with the check that he wrote on --

A. I took that check --

Q. Let me finish. What did you do with the check that he wrote on August 9, 1999, for $13,100?

A. I called Ken Carter up and explained the situation. And I said, Ken, I have a little problem here in that John Primeau has been asking for a contract because he knows Fessio is going to deep six the program, along with everybody else. And basically Ken said to me, well, nothing is for sure, you know. We're having a lot of problems with these people. I think he had already given them an extension. And he said, look, we can always give it back to him; just deposit it. He said, does he owe us anything? And I said, well,

Page 37

no, he's actually got a credit balance. So he said, well, you know, he just left it? Yeah. Okay. So I just deposited it, and I gave him a further credit.

Q. You deposited it in what account?

A. In the WRIB account, and I deposited that on August the 9th, 1999.

Q. And the WRIB account was at what bank?

A. It's always been at Bank of America or variations thereof, Fleet.

Q. And was the account in the name of Carter or in the name of WRIB?

A. I think it was Carter Broadcasting, d/b/a WRIB, or vice versa.

Q. Was the NACEPF check that you deposited on August 9, 1999, put into the general account that WRIB and Carter maintained at the Bank of America branch, or was there some special escrow or segregated account that you put it into?

A. No, it just went into our general account.

Q. So NACEPF's funds got co-mingled with the payments of all the other clients of the station?

A. True.

Q. And then the station would draw down upon those co-mingled funds to pay its bills and other