UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,
Plaintiff,
VS. C.A. NO. 06-431ML
CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER,
Defendants.

DEPOSITION OF JOHN PRIMEAU, in the above-entitled cause, taken on behalf of the Defendants, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of David E. Maglio & Associates, PC, 101 Dyer Street, Providence, Rhode Island, on August 28, 2007, at 10:00 a.m.

APPEARANCES:
For the Plaintiff:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK A. POGUE, ESQUIRE
For the Defendants:
DAVID E. MAGLIO & ASSOCIATES, PC
BY: DAVID E. MAGLIO, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

if you'd say he was consulting with me, but he was telling me his woes.
Q. And do you remember when that was -- when this deal was being put together and negotiated with this Fessio group?
A. I'm guessing, '99, 2000, could have been '98, '99, but it was significant because when the deal fell, I believe Ken Carter sued. I don't know if he got any damages. Because, you know, he was in the process of giving people, you know, get off the air in 30 days, that kind of thing, and he probably was suing for lost revenue or something or some contractual breach scenario.
And from that moment, I changed my strategy. I would calculate -- specifically in a calendar year, I would have a secretary go through Monday through Friday and count out each day that I would be on the air in a given period, perhaps April 1 to April 1, and I would count out, you know, how many programs -- let's say, it's 25 versus 28 or whatever it was, and I would specifically come up with the total amount, and prior to that, I'd give him a check.
Q. Prior --
A. So that, you know, he or Carter, whatever,



would know that I bought -- from my point of view when he cashed the check, he had bought my services -- I mean, I had paid for my services. So if this was to reoccur, I would still have the time that it expired.
Q. And after the Fessio deal -- I'm referring to it correctly, so the record is clear?
A. Well, some people might call it Catholic Radio. I call it Fessio because he was the top of the food chain in terms of administrating it.
Q. So after the Fessio deal to sell certain of Mr. Carberry's stations --
A. Buy.
Q. Buy, excuse me. Fell through, you were aware that Mr. Carberry still had an interest in selling the stations; is that right?
A. Well, yes and no. Yes, insofar as he got a price. No, in the sense that Ken Carter, you know, he wants to buy something for nothing and sell it on retirement. And from my point of view, anything is for sale if the price is right such as RIB, which sold for a ridiculous price.
Q. But my question is you were aware after the Fessio deal fell through that Mr. Carberry was still actively shopping the stations including RIB for



sale to a third party; is that right?
A. No, as I answered to you, I believe that at any time, his assets were for sale if, in fact, you know, he could make a killing or the price was right. I mean, but that would be true of whether it was -- at any time, someone could have called Ken Carter and said, "What's your price for your station in Boston versus Springfield versus Providence?" I mean, that man would deal at any time. If you met his price, something was for sale.
Q. Okay. And so let me try this a different way. After the Fessio deal fell through, at no time did Mr. Carberry tell you, look, John, Mr. Primeau, I'm not selling my stations. I've had enough of this, and, you know, I'm going to hang on to this until I die, or words to that effect?
A. No, he didn't say that. He had a corporation. Like any corporation, if he dropped dead, he would have a will and dispensation of his properties pursuant to what it was, and those assets would go to his children or whatever, you know, as his dispensation of property directed.
Q. And did you have a discussion with Ken Carberry before you started giving him checks for lump sums



of time about why it was you were giving him these checks in advance?
A. My discussions with him, as I remember them, dealt with Fessio and the aftermath and his losses, and during that time, I did pay. So whether or not I had said to him, "Hey, guess what, I'm going to start" --
(OFF THE RECORD)
A. In other words, whether or not I said to him, "Well, guess what? You know, starting now, seeing what's happened, I'm paying you in advance," I wouldn't know if I had that conversation.
What I would have done is executed that by going right to the station personally and handing it to his gentleman there, Mr. Pierce, and saying -- you know, if I give somebody a check for -- I'll make this up, $14,806, I mean, that, you know, didn't come out of the air. I didn't pick the number out. I didn't just say, "Here's $15,000, and, you know, just deduct it monthly as I owe you something." I'm telling him this is what it is. It's paid in advance. It goes from this date to this date, and you cashed the check, there's the deal.
Q. Okay. Did you have that type of a conversation

Page 38

Q. All right. And I don't -- obviously, you're seeing the same thing I'm seeing. I don't see a copy of the actual check. Do you know if that exists?
A. I don't know if the canceled check exists -- well, during this time, I had a tax attorney who lost his leg and became incapacitated, and he had all the documents of NACEPF as the tax attorney, and I still don't have them back. Therefore, what I had to do with my next tax attorney was to go to the bank, and, you know, get all these statements, you know, get everything. And what she may be doing is absent that one, she's using bank statements, and -- you see this is a part of the check that she would retain.
MR. MAGLIO: Right.
A. So she's showing what she retained, and of course, she would have verified that -- like, for instance, before she picked out this, she could have been going through statements, the bookkeeper, and she's looking for 14646. So this is a stack of things; right? She sees 14646, and she pops it out and printed it, because to this day, we still haven't received our original things back from that tax attorney.

Page 39

Q. Okay. And then if we could go to N139, which is a check dated March 16, 2006, for $14,560?
A. Yes, I can say with 100 percent certainty that I was there. Now, I don't know whether I was there on the 16th. I might have been there on the 17th or 18th, but I brought this check.
Q. Why does that stand out in your mind so vividly?
A. Because it was a yearly thing that I would do, and it's most recent. In other words, it's the one that -- my memory recalls recent events more than past events, and this is an event that -- you know, I was down there.
Q. All right. And in fact, this is the check that -- the last check you wrote for airtime before you received a reimbursement, if you will, for $11,760, from WRIB; correct?
A. I received back from them after notice that, you know, my intent -- or my suit was filed, excuse me. After they received my overnight letter stating that I would pursue breach against Carter and tortious interference from Faith if they executed this and did not provide me this time through April 1 of the following year, whatever my letter said to him was. So after that, the thing you're referring to showed up by

Page 40

Federal Express, I believe.
Q. All right. What is your understanding of Faith Christian Center's religious denomination? Are they Evangelical Christians? What are they?
A. Well, I would say they're Pentecostal, and they are -- like any fundamentalists, any fundamentalists in terms of either being -- fundamentalists -- Baptists or Evangelicals or Pentecostals. They're all usually independent, and their churches are started -- you know, they usually start with a storefront, and they work on tiding members, and as they get more prosperous by tiding members, they build a church, and it extends. In other words, they're all -- not like a Catholic church where the church is there.
MR. MAGLIO: I understand.
A. And then a pastor is assigned. These people would have had to on their own with their own initiative and entrepreneur skills build it from scratch usually, and they're excellent businessmen.
Q. Am I correct that you are not taking the position that WRIB did not have the right to sell its station to Faith Christian Center, are you?
A. I only take the position of the Complaint.

Page 41

Q. Did WRIB, to your knowledge, have any -- strike that. Are there any facts known to you that would indicate that WRIB did not have the right -- the legal right to sell its station to Faith Christian Center?
MR. POGUE: I object to the extent that it calls for a legal conclusion because I think it's sort of wrapped up with legal implications, but you can answer as best you can.
A. From my understanding and speaking to Ken Carter through the years, he would sell if the price was right, and in this instance, it was, you know, ludicrously high, and he would definitely capitalize on the opportunity.
Q. Okay. Do you know when it was, by date, as specifically as possible, when you first heard any talk that Mr. Carberry was going to -- or was negotiating with Faith Christian Center for the sale of the station?
A. I believe in the spring of 2006, the concept of him selling it to a buyer was there, and I believe I might have went to some site where it said that Carter sells it for 1.9 million or something. That's a blog, and I believe when I delivered this check, I would have said, if I can recall it, to