LEXSEE 765 A.2D 1212

**Margerty K. Lerner, et al v. Michael A. Ursillo et al.**

**DOCKET NO. 99-460-Appeal.**

**SUPREME COURT OF RHODE ISLAND**

***765 A.2d 1212*; *2001 R.I. LEXIS 40***

**February 7, 2001, Opinion Filed**

**SUBSEQUENT HISTORY:** [**1] As Corrected March 13, 2001.

**PRIOR HISTORY:** Appeal from Superior Court. Providence County. Thompson, J. (PC 97-4126).

**COUNSEL:** Samuel D. Zurier, Julius C. Michaelson, Jeffrey S. Michaelson For Plaintiff.

Robert Corrente, Charles D. Blackman For Defendant.

**JUDGES:** JUSTICES: Weisberger, C. J., Lederberg, Bourcier, Flanders, Goldberg, JJ., Concurring. WRITTEN BY: BOURCIER, J.

**OPINION BY:** BOURCIER

**OPINION**

[*1213] **Bourcier, Justice**. At issue in this case is the will of Florence Cooper (Florence), the deceased widow of the late Myer Cooper (Myer). The plaintiffs [1] allege that Florence made a binding oral agreement with Myer concerning the disposition of her entire estate in the event that Myer should predecease her, and they contend that she breached this purported agreement after his death. They appeal from the entry of summary judgment in favor of the defendants, [2] and assert that the Superior Court trial justice erred in finding the alleged agreement both void as against public policy, and as having been revoked by the subsequent wills executed by Myer and Florence. **Facts/Procedural History**

1 The plaintiffs in this case are: Margery K. Lerner, Phillip M. Lerner, Steven A. Lerner, Benjamin A. Salter, Elliot A. Salter, and Lester H. Salter both in his personal capacity and in his capacity as the Administrator of the Estate of Bertha Salter.

[**2]

2 The defendants are: Michael A. Ursillo, in his capacity as agent for the Administrators of the Estate of Florence Cooper and/or in his capacity as Administrator of the Estate of Florence Cooper, and Arthur Weigner and Sandra Brown, in their capacities as Co-Administrators of the Estate of Florence Cooper. The plaintiffs did not assert any individual cause of action against Michael Ursillo other than as in his capacity as agent for the administratrix.

In 1976, Myer and Florence, a childless couple who had been married for twenty-six years, engaged attorney Lester Salter (Lester), Myer's great-nephew and one of the plaintiffs in this matter, to draft their wills. On May 24, 1976, they each executed individual wills prepared for them by Lester. Both wills provided that Lester would be the executor. [3]

3 For purposes of this decision, it is not necessary to detail every provision or bequest contained in each will; instead, we will outline the provisions that are pertinent to this appeal.

[**3] Assuming Florence survived him, Myer's will provided that the remainder of his adjusted gross estate would be divided between two testamentary trusts; namely, "Trust A" (or the marital trust), [4] and "Trust B." Florence would receive the net [*1214] income from Trust A and such portions of principal as the trustees might deem necessary for her support. The trustees, in

their discretion, also could make necessary payments to Florence from Trust B, but only at "such time as Trust A has been exhausted." In addition to her right to receive its net income and any necessary corpus, or remainder, Florence was given an unrestricted power of appointment over Trust A's assets in order to qualify Trust A as a marital trust for Federal Estate Tax purposes. Upon Florence's death, and after certain specific bequests provided by Myer's will had been distributed, the balance of Trust B then would be divided into eighteen parts and distributed to named beneficiaries, most of whom were Myer's nieces and nephews. Lester was to receive one of those parts. With respect to Trust A, in the event that Florence failed to exercise her power of appointment over that trust, its remaining principal, if any, would be [**4] added to Trust B, divided into its eighteen parts and distributed as provided above.

4 A marital trust, so-called, is a type of trust that must meet certain statutory criteria before an estate can qualify for a tax deduction known as the "marital deduction." The marital trust must provide to the surviving spouse: (a) the net trust income for his or her life; and, (b) an exclusive, unrestricted general power of appointment over the interest, including the power to appoint in favor his or her own estate. *26 U.S.C. § 2056(b)(5).*

Florence, however, then concurrently exercised her unrestricted power of appointment in her will by providing for her niece, the defendant Sandra Brown (Sandra), and her nephew, the defendant Arthur Weigner (Arthur), to each receive one-half of the balance, if any, remaining in Trust A. Similarly, Myer also had provided in his will that in the event that he survived Florence, then upon his subsequent death, the assets that originally would have been transferred [**5] into Trust A, the marital trust, instead, would be distributed outright to Sandra and Arthur.

On June 7, 1976, two weeks after signing the first set of wills, Lester prepared and presented a new set of wills for Myer and Florence to execute. [5] The new wills expressly revoked all previous wills and codicils. Myer's new will, in addition to providing Florence with the entire net income from Trust A, also provided her with the entire net income from Trust B. Florence's new will provided that upon her death, [6] her entire estate, including the balance, if any, of Trust A, would pour over into Trust B, and that Trust B would be distributed according to Myer's will. Myer's will directed the trustees to distribute one-half of Trust B's principal to Sandra and Arthur, and the other half to his own nieces and nephews.

5 For purposes of this opinion, we will assume that Myer and Florence had not executed any wills prior to May 24, 1976.

6 Considering that Florence survived Myer, we will not refer to those terms of the wills that are contingent on Myer's surviving Florence.

[**6] Lester and the other plaintiffs now contend that on or before June 7, 1976, Florence induced Myer into providing her with the unrestricted income from Trust B by expressly promising him that she would not exercise her power of appointment over Trust A, and by promising Myer that she would leave her entire estate to Trust B. Lester maintains that, without such an agreement, Myer never would have given the extra income from Trust B to Florence, to whom he had been married for only twenty-six years. However, Florence's purported agreement never was memorialized, and Lester, who would gain to benefit from such agreement, is the only person who now claims to be a witness to the recondite agreement.

On May 31, 1977, Myer decided to execute a third will; once again, it was prepared by Lester. This will served to modify Myer's earlier list of designated beneficiaries and increased Lester's individual share from one part to three parts. On the same day, Lester prepared other documents by means of which Florence republished her will. The resulting third set of wills, drafted by Lester and executed by Myer and Florence, provided to expressly revoke all of their previous wills and codicils.

[**7] One year later, Lester again drafted and presented yet a fourth will to Myer. Myer [*1215] executed that will on June 23, 1978. Apart from some minor changes by Myer concerning his designated beneficiaries, his fourth will contained a new provision that stated:

> "If my wife survives me and does not leave her entire estate and all property over which she has power of appointment (after payment of debts, expenses and taxes) to said Trust B, then the entire remaining principal and undistributed

income of Trust B shall be divided [among Myer's designated beneficiaries]." [7] On the same day, namely, June 23, 1978, Lester prepared a codicil to Florence's will for Florence to execute. The codicil incorporated Myer's fourth will into her own will by reference. Once again, Myer's new will expressly revoked all previous wills and codicils Almost four months later, on October 5, 1978, Myer died. His fourth and final will was duly admitted to probate without objection. As the executor of Myer's will, Lester prepared and filed a federal estate tax return on behalf of Myer's estate. In that return, Lester categorized Trust A, the marital trust, as a bequest to Myer's surviving spouse, Florence, [**8] and he claimed the related tax deduction (the marital deduction) on behalf of the estate. In claiming that marital deduction, Lester was required to answer the following question contained on the federal estate tax return:

> "According to information and belief of such person or persons [filing the return], has any person other than the surviving spouse asserted (or is any such assertion contemplated) a right to any property interest listed on this schedule ***?"

"Under penalties of perjury," Lester answered "no" in responding to that question. The marital deduction subsequently was approved by the Internal Revenue Service, in part, based on Lester's answer to the above question. Some six years following Myer's death, Florence executed a new will on November 16, 1984. In her new will, Florence once again elected to exercise her unrestricted power of appointment over Trust A. This time she directed that her entire estate, including the principal from Trust A, be distributed to her niece and nephew, Sandra and Arthur. Nearly twelve years later, in October 1996, Florence died. Thereafter, her will of November 16, 1984, duly was admitted to probate.

7 Lester's respective share remained unchanged from the previous will.

[**9] Upon learning that Florence had exercised her unrestricted power of appointment over Trust A, the trustees proceeded to distribute the remainder of Trust B to Myer's designated beneficiaries as specified in his June 23, 1978 fourth will. Myer's beneficiaries did not contest the probating of Florence's will. Some, however, including Lester, decided to file claims against Florence's estate claiming to be contract creditors. In those claims, they asserted that by failing to pour over her entire estate into Trust B, Florence had breached her oral agreement with Myer and that such breach had deprived them of their rightful share of her estate. [8] Sandra and Arthur, as co-administrators of Florence's will, [9] timely disallowed the claims and the claimants duly filed their probate appeal in the Superior Court.

8 In their depositions, the other plaintiffs reveal that their only awareness and knowledge of the circumstances surrounding the alleged agreement derive exclusively from Lester's account of the matter, and they acknowledge that Lester is the only witness to this alleged agreement.

9 In her will Florence named an executor and an alternate executor; however, it appears that both either were unwilling or unable to serve.

[**10] In an amended complaint, the plaintiffs alleged that Florence had breached the cryptic oral agreement recalled only by Lester, and that her estate should be [*1216] promissorily estopped from benefiting from that breach. The plaintiffs asked the Superior Court to impose either a resulting trust or a constructive trust upon the disputed assets.

In response to the plaintiffs' claims, the defendant co-administrators filed a motion for summary judgment, advancing several grounds in support thereof. As undergird for their motion, they asserted that there was insufficient evidence to prove and establish the existence of the alleged oral contract, and that assuming one had been entered into, it later had been rescinded by Myer's and Florence's subsequent wills. The co-administrators also asserted that any such oral agreement was unenforceable both under the statute of frauds and for its flagrant violation of federal tax policy. In support of their motion, they urged that before the Superior Court could create and impose a resulting trust, the court first had to find that an express trust had failed in whole or part. They asserted that there were insufficient facts from which the court could establish [**11] the existence of any such

express trust. In addition, they averred that equitable remedies should not be available to the plaintiffs because any attempt to prove their case necessarily would require the disclosure of confidential attorney-client communications that Myer and Florence made to each other while being represented by Lester.

After a hearing on the motion in the Superior Court, the trial justice granted the defendants' motion for summary judgment. Without specifically finding that Myer and Florence had made the alleged oral agreement on or before July 7, 1976, the trial justice, nonetheless, found that if one had existed, it had been rescinded by the subsequent wills executed by Myer and Florence, and that it would be unenforceable as a matter of law because it violated Internal Revenue Code provisions concerning the marital trust deduction.

We have before us the plaintiffs' appeal from the Superior Court's entry of summary judgment in favor of the defendants. Additional facts will be supplied as needed. **Analysis**

"Summary judgment is an extreme remedy that should be applied cautiously." *Sjogren v. Metropolitan Property and Casualty Insurance Co., 703 A.2d 608, 610 (R. I. 1997)* [**12] (citing *Rotelli v. Catanzaro, 686 A.2d 91, 93 (R. I. 1996))*. "When reviewing a summary judgment, we do so on a de novo basis, applying the same legal criteria as the trial court." *Kiley v. Patterson, 760 A.2d 1253, 1255 (R. I. 2000)*. "Summary judgment is appropriate if upon 'examination of all the pleadings, affidavits, admissions, answers to interrogatories, and other materials viewed in the light most favorable to the party opposing the motion reveals no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *Cain v. Johnson, 755 A.2d 156, 164 (R. I. 2000)* (quoting *Sullivan v. Town of Coventry, 707 A.2d 257, 259 (R. I. 1998))*. "[I] n reviewing these materials, the motion justice should draw all reasonable inferences in favor of the nonmoving party and must refrain from weighing the evidence or passing upon issues of credibility." *Hendrick v. Hendrick, 755 A.2d 784, 789 (R. I. 2000)* (quoting *Superior Boiler Works, Inc. v. R.J. Sanders, Inc., 711 A.2d 628, 631 (R. I. 1998))*. We have stated repeatedly, however, that "a litigant opposing a motion for summary [**13] judgment has the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions, or mere legal opinions." *Kiley, 760 A.2d at 1255* (quoting *Manning Auto Parts, Inc. v. Souza, 591 A.2d 34, 35 (R. I. 1991))*. In addition, this Court may exercise "its prerogative to affirm a determination of a trial justice 'on grounds different from those enunciated in his or her decision.'" *Ogden v. Rath, 755 A.2d 795, 798 (R. I. 2000)* (per curiam) (quoting *State v. Pena Lora, 746 A.2d 113, 118 (R. I. 2000)* and [*1217] citing *Doe v. Gelineau, 732 A.2d 43, 45 (R. I. 1999))*; see also *Ahlburn v. Clark, 728 A.2d 449 (R. I. 1999)*. "In addition, the determination of whether a contract exists is a question of law that this Court reviews de novo." *Nonnenmacher v. City of Warwick, 722 A.2d 1199, 1202 (R. I. 1999)*. **The Existence of the Contract**

Our resolution of this appeal turns on whether Myer and Florence ever entered into a binding oral agreement. Absent our ability to conclude the existence of that contract, [**14] the plaintiffs' appeal must fail. The plaintiffs assert in support of their appeal that there is clear and convincing evidence of its existence on the record. That "clear and convincing evidence," they contend, consists of: (a) the existence of a series of mutual wills; (b) a large disparity between the couple's personal wealth; (c) a June 2, 1976 memorandum authored by Lester in which he outlines his understanding of the couple's testamentary objectives; and, (d) Florence's concealment of her 1984 will from Myer's beneficiaries. We address each of those contentions. **(a) The Mutual Wills**

The plaintiffs contend that the existence of a series of mutual wills constitutes evidence of a joint estate plan and a mutual desire to equally divide their joint property upon the death of the survivor. Similar assertions have been rejected by this Court in the past. See *Lorette v. Gorodetsky, 621 A.2d 186, 187 (R. I. 1993)* (mem.); *Williams v. Rhode Island Hospital Trust Co., 88 R.I. 23, 38-39, 143 A.2d 324, 333 (1958)*. The plaintiffs attempt to distinguish this case from Williams by contrasting the procedural postures of the cases. They note that Williams was decided [**15] after a full trial on the merits and then infer that cases involving mutual wills may never be dismissed at the summary judgment stage of a trial. We disagree.

As we have stated previously, "[t] he law is clear in Rhode Island that a party seeking to prove the existence of an irrevocable will contract must do so by clear and convincing evidence." *Gorodetsky, 621 A.2d 186 at 187*

(citing *Williams, 88 R.I. 23 at 36-37, 143 A.2d at 332*). Furthermore, "'the mere presence of joint or mutual wills does not raise any presumption that they were executed pursuant to a contract. '"Id. Indeed, the existence of "'discussions and ***understandings between persons of close affinities, especially between husbands and wives [about the execution of mutual wills], are not unusual and the fact that they have taken place is no indication that there has been any thought of a binding contract. '" *Williams, 88 R.I. at 39, 143 A.2d at 333*.

Although the plaintiffs concede that "a single set of reciprocal wills do [sic] not, in and of themselves [sic], constitute clear and convincing evidence of a contract to make a will," they contend that this case is different because [**16] "there were a series of four reciprocal wills, the first two of which were two weeks apart" that contained "intricate, parallel sets of changes." Thus, the plaintiffs essentially are asserting that although one set of mutual wills, standing alone, is not evidence of an agreement, more than one set constitutes clear and convincing evidence of a contract to make a will. We fail to see the distinction attempted by that pyramiding of inferences. It is not uncommon for married couples to change their wills as their circumstances change; consequently, the mere existence of more than one set of mutual wills still "'does not raise any presumption that they were executed in pursuance of a contract' " *Williams, 88 R.I. at 38-39, 143 A.2d at 333*, much less does that fact constitute clear and convincing evidence of a binding oral agreement to follow a specific estate plan.

**(b) The Wealth Disparity**

The plaintiffs next contend that in 1976, Myer's personal wealth amounted to $ 533,800, while Florence's personal wealth [*1218] amounted to only $ 12,000. They proffer in their appellate brief that this monetary disparity raises a persuasive inference that Myer, in his various wills, [**17] only provided income to Florence, his wife of twenty six years, "based on Florence's commitment not to ***steal from [Myer's] beloved relatives in order to enrich her own loved ones." That rather obtuse allegation, disguised as an "inference," essentially accuses Florence of having been a gold digger and a thief for over twenty six years. Such unsupported allegations and conclusions border on being simple balderdash and fall far short of the requisite positive evidence needed to avoid the grant of a motion for summary judgment in favor of the moving parties. **(c) The Memorandum**

The plaintiffs place great emphasis on a June 2, 1976 memorandum written by Lester to Samuel Gereboff, an accountant friend of Myer, in which Lester relates in part:

"After a conference with [Florence] and [Myer] on May 16, I understood their objective to be the ultimate disposition of Mike's estate as though each owned one-half outright during their lifetime, each half to be distributed to the beneficiaries they respectively designate." They contend that this memorandum contains clear and convincing evidence of the existence of the purported agreement between Florence and Myer. We view that [**18] assertion as lacking any probative merit and, as did the trial justice, we are unable to note any reference whatsoever in the memorandum to any mutual agreement between Myer and Florence, much less an intent to mutually be bound in perpetuity by the same. **(d) Concealment of the 1984 Will**

Finally, the plaintiffs propose that Florence deliberately concealed the existence of her final will from Lester. [10] They then make a quantum leap and contend that from this concealment, a fact-finder could reasonably infer that "she knew she had betrayed her husband and his family, and she understood that her new Will violated a promise that she had made to her husband (and upon which he relied) in consideration for his agreement to provide Florence with more income." This argument might have ostensible merit if the determination of the existence of the oral agreement was a question of fact; however, its determination was a question of law for the trial justice. See *Nonnenmacher, 722 A.2d at 1202*. Only after a judicial finding that the contract existed would the question of its breach become a question of fact for a jury to decide. See *Ricard v. John Hancock Mutual Life Insurance Co., 113 R.I. 528, 535, 324 A.2d 671, 675 (1974)*. [**19] Recognizing that a "'motion justice should draw all reasonable inferences in favor of the nonmoving party' " *Hendrick, 755 A.2d at 789* (emphasis added), we are of the opinion that the trial justice did not err by failing to recognize as reasonable this pyramiding of inferences proffered by the plaintiffs to establish the existence of the alleged oral agreement.

10 Florence allegedly told Arthur not to tell Lester that she had executed a new will in 1984.

We conclude here that the plaintiffs failed to produce the requisite clear and convincing evidence necessary to

establish the existence of the oral agreement between Florence and Myer. The trial justice did not err in granting the defendants' motion for summary judgment, albeit on different grounds than those considered by us on appeal. In view of the plaintiffs' failure to prove by clear and convincing evidence the existence of the oral agreement, we need not concern ourselves with the remaining issues raised by the plaintiffs in this appeal.

[**20] [*1219] For the foregoing reasons, the plaintiffs' appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of the case are remanded to the Superior Court.

**CONFIDENTIAL SETTLEMENT AGREEMENT**

This **CONFIDENTIAL SETTLEMENT AGREEMENT** ("Agreement") is entered into by and between R&D Equipment, Inc., a RI corporation whose principal place of business is ____________________ ("R&D"), Luis A. Torrado and Lisa A. Torrado, husband and wife, who reside in Exeter, RI (collectively "Torrado") and Quality Design Nor'easter Swimming Pools, Inc. d/b/a Quality Design Nor'easter Pools, a ____ corporation whose principal place of business is Nashua, NH ("Quality Design").

**WHEREAS,** Torrado entered into an agreement with Quality Design for the installation of a pool; and

**WHEREAS,** R&D performed certain services at the Torrado residence related to the installation of the pool; and

**WHEREAS,** the contract between the Torrado and Quality Design was never completed. Torrado did not pay the full contract amount and Quality Design did not complete performance under the terms of the contract; and

**WHEREAS,** R&D was never fully paid by Torrado or Quality Design for the work that R&D performed at the Torrado residence; and

**WHEREAS,** Torrado hired other contractors to complete the work necessary for the installation of the swimming pool and related equipment and landscaping; and

**WHEREAS,** R&D filed a civil action against Torrado and Torrado responded by filing a counter claim against R&D and by filing a cross claim against Quality Design. Said action is known as R & D EQUIPMENT VS. LUIS TORRADO ET AL, Sixth Division District Court, C.A. NO. 01-3330; and

**WHEREAS,** in order to avoid the further expense and time of litigation, the parties hereto desire and undertake to settle, compromise, resolve, release and extinguish any and all disputes, controversies and claims they may have with or against each other as set forth in the above referenced district court action, and specifically excluding any claims that may arise in the future as to warranty for work performed.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

(a) Quality Pools shall pay R&D the sum of $3,800.

(b) Quality Pools shall pay Torrado the sum of $2,500.

(c) Each party hereto shall, upon receipt of payment as set forth above, sign a dismissal stipulation dismissing the pending court action, WITH PREJUDICE. Each party shall bear its own costs and expenses incurred, including attorney fees, related to this action.

Each party, on behalf of herself/himself/itself and her/his/its shareholders, officers, directors, agents, employees, representatives, principals, servants, attorneys, administrators, executors, heirs, successors, assigns, and insurers of each of them, separately and collectively, hereby releases and forever discharges the other parties hereto, of and from any and all claims, debts, liens, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, obligations, damages or liabilities whatsoever, both in law and in equity, which each party has against the other related to the contract and the pending District Court action, except Warranty claims.

The provisions of this Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit or other proceeding that may be instituted, prosecuted, or attempted in violation of this release provision.

The parties hereto make the following representations and warranties to each other, which representations and warranties shall be relied upon by each other party:

(a) __No Prior Assignment__. They have not assigned or transferred (in whole or in part, including but not limited to any assignment or transfer by subrogation or by operation of law) to any other person, corporation or other entity, any of the claims, rights, demands, damages, liabilities or causes of action which they have agreed to release hereby.

(b) __Authority__. They are authorized to enter into this Agreement, and that each person executing this Agreement in a representative capacity on behalf of any of the parties has the authority to do so and that following their execution hereof the Agreement will remain binding and enforceable upon the parties.

(c) __Confidentiality.__ The Parties hereto agree that they will not reveal, convey, comment upon, or otherwise disclose any of the terms of provisions of this Agreement except to their spouses, attorneys, translators, tax accountants or other professionals. The Parties further agree that they will not initiate any discussions relating to the fact that this has been settled, but should any inquiry be made they shall respond to any such inquires only by stating that the matter was resolved by agreement and that they cannot speak further about it.

(d) __Advice of Counsel__. Except as set forth in this Agreement, the parties have not relied upon or been induced by any representation, statement, promise or disclosure of the other party or their attorneys, representatives, employees, officers, insurers or agents, but have relied upon their own knowledge and judgment and upon the advice and representations of their counsel in entering into this Agreement; they have read and fully know and understand the terms of this Agreement; and they are fully advised as to the legal effect thereof.

(e) **Execution of this Agreement.** The parties acknowledge that they are competent to, and do, fully understand the provisions of this Agreement; they are entering into this Agreement knowingly and voluntarily; and they have been afforded a full and reasonable opportunity to read and consider the terms of this Agreement.

In the event that litigation is necessary to enforce this Agreement, or for breach thereof, the prevailing party shall be entitled to recover their costs and reasonable attorneys' fees.

This Agreement shall be construed and enforced according to the laws of the State of Rhode Island without regard to principles of conflicts of law. Any court action or other proceeding brought by either party which is based on or derived from this Agreement shall be brought in a location within Kent County. The parties hereby consent and agree to submit to the jurisdiction of the State of Rhode Island in the event litigation becomes necessary to enforce this Agreement or for breach thereof.

This Agreement shall not be subject to any mistake of fact and there is absolutely no agreement or reservation which is not clearly expressed herein. The terms of this Agreement may be waived, modified, amended or otherwise changed only in a writing signed by all parties hereto. The failure of any party at any time to require the performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective agents, representatives, attorneys, insurers, parents, subsidiaries, successors, assigns, and affiliates.

This Agreement together with the Stipulation of Dismissal attached hereto constitutes the entire agreement between the parties with respect to the subject matter hereto. This Agreement together with the Stipulation of Dismissal constitutes the complete, full and final expression of the terms of the parties' agreement with respect to the subject matter hereto. The undersigned acknowledge and agree that all prior and contemporaneous representations, negotiations and agreements regarding the subject matter hereto are superseded.

This Agreement may be signed in separate counterparts, with each copy having the full force and effect of an original. If any provision of this Agreement be held ineffective, invalid or contrary to public policy or any law, the validity of the remainder of this Agreement shall not be affected thereby. The Headings of the Sections of this Agreement are for convenience of reference only and do not form a part hereof and in no way modify, interpret or construe the intentions of the parties. Each party has cooperated in, and in any construction to be made of this Agreement shall be deemed to have cooperated in, the drafting and preparation of this Agreement. This Agreement shall not be strictly construed against either party.

Dated as of this 17th day of January, 2008.

Witness

Lisa A. Torrado

Witness

Luis A. Torrado

R&D Equipment, Inc.

Witness

By:
Its: ______________

Quality Design Nor'easter
Swimming Pools, Inc.

Witness

By: John C. Raitt
Its: President