UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC. | : | |
| *Plaintiff* | : | |
| VS. | : | C.A. No.: 06-431/ML |
| CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER | : | |
| *Defendants*. | : | |

**CARTER BROADCASTING CORPORATION'S and FAITH CHRISTIAN CENTER'S PRETRIAL MEMORANDUM**

**Introduction**

This is an action for breach of contract and tortious interference brought by the plaintiff, North American Catholic Educational Programming Foundation, Inc. ("NACEPF"), alleging that it entered into a contract with the defendant, Carter Broadcasting Corporation ("Carter"), whereby Carter was to provide NACEPF with one years worth of broadcasting time that would survive a sale of the radio station, WRIB, to a third party. NACEPF also alleges that defendant, Faith Christian Center ("Faith"), tortiously interfered with the alleged contract.

**I. DEFENDANT'S EXPECTED EVIDENCE**

**Carter and NACEPF Never Entered into a Contract That Survived the Sale of WRIB to Faith Christian Center.**

The evidence will show that no contract was formed between Carter and NACEPF and that NACEPF's payment in advance for broadcasting time was nothing more than a devious attempt to circumvent Carter's decision that it would not enter into a

contract with NACEPF. In 1994, NACEPF began broadcasting its Roman Catholic educational programs on the AM radio station owned by Carter known as WRIB 1220 ("WRIB"). From 1994 to 1999, NACEPF paid WRIB quarterly or semi-annually for its broadcasting time. John Pierce ("Pierce") who was employed by Carter as the station manager of WRIB from 1986 until the station closed on July 6, 2006, will testify regarding Carter's business relationship with NACEPF.

Upon learning of the potential sale of WRIB in 1999, John Primeau ("Primeau"), NACEPF's Chief Operations Executive Officer, asked Pierce provide him with a one year contract to prevent the possibility of NACEPF's programs being cancelled if the station was sold to a new owner who did not want to carry his programs. Pierce will testify that he did not provide Primeau with a written contract. Primeau, undeterred, returned to WRIB over the next several days repeatedly requesting that Pierce provide him with a written contract. On each occasion, Pierce refused to provide Primeau and NACEPF with a written contract, informing Primeau of what he already knew, that if Carter sold WRIB it would not be on the condition that the new owner carry WRIB's programs. Instead, NACEPF began making payments that equaled one year's worth of broadcasting time in a unilateral attempt to take advantage of Carter and to create a contract where none existed.

Carter's owner and President, Kenneth Carberry ("Carberry") a/k/a Ken Carter, and Pierce will both testify that from June 7, 2001 until May 5, 2005, NACEPF would forward a check annually to WRIB in an amount equal to one year's worth of broadcasting time. Given their course of dealing, and Carberry's experience in the radio industry, Carberry will testify that he thought nothing of NACEPF's yearly payments and

never acknowledged that they would contractually bind Carter. No documentation ever accompanied NACEPF's annual payments and no documentation was ever provided to Carter that would evidence the existence of a one year, non-cancellable contract or the parties' intentions to create one. It was Carberry and Pierce's understanding that NACEPF's payment for large blocks of broadcasting time was simply NACEPF's preferred method of payment and bookkeeping.

NACEPF's funds were deposited annually in WRIB's non-interest bearing checking account with the understanding by both Pierce and Carberry that, if the station were to be sold, the remaining credit balance would be refunded to NACEPF. Primeau will admit that he was aware from 1999 until the time that WRIB was sold, that WRIB was continuously for sale. Pierce, who performed all of Carter's bookkeeping, carried NACEPF's credit balance forward on monthly in-house invoices and in WRIB's general ledger.

On March 16, 2006, NACEPF forwarded a check to WRIB in the amount of $14,560.00, for which NACEPF alleges it intended to receive 520 half-hour programs from May 1, 2006 to April 30, 3007. Pierce, aware that WRIB's sale was imminent, did not deposit NACEPF's check until June 23, 2006. Carter and Pierce refrained from telling Primeau about the potential sale of WRIB to Faith precisely because it was only a "potential" sale. If Carter informed his clients that he was selling WRIB to Protestant church before the sale took place, he would run the risk that his clients might leave the station. If the sale of WRIB were then to fall through, Carter could have lost some or all of his its clients and substantial revenue.

In any event, the potential sale of WRIB to Faith and the details of the transaction were available to the public on the Federal Communications Commission ("FCC") website and in the FCC's public inspection file. On November 25, 2005, the FCC granted and placed on its website, Carter's Application for Consent to Assignment of Broadcast Station Construction Permit or License ("Application") along with a copy of the Asset Purchase Agreement by and Between Faith and Carter. Additionally, on November 30, 2005, the FCC filed public notice of Carter's Application in its Daily Digest Vol. 24 No. 232. Finally, as required by FCC rules, Carter publicized the filing of its Application on the radio and in print.

The evidence will show that the sale of WRIB to Faith closed on July 6, 2006. On July 6, 2006, Primeau forwarded, by overnight carrier, to representatives of both Carter and Faith a letter, stating that NACEPF had prepaid WRIB an entire yearly fee for programming through April 30, 2007 and threatened litigation should the WRIB signal "go dark". On July 7, 2006, the day after the sale of WRIB to Faith closed, WRIB shut its doors and all of WRIB's customers' radio programs, including NACEPF's, were taken off the air. On July 7, 2006, Carberry forwarded to NACEPF a check in the amount of $11,760.00, reimbursing NACEPF for the broadcasting time that it would not be allowed to use. NACEPF has never cashed this reimbursement check.

**Faith Did Not Tortiously Interfere With a Contract Between Carter and NACEPF**

The evidence will show that Faith did not tortiously interfere with an alleged contract between Carter and NACEPF because there was no contract between Carter and NACEPF. Assuming, *arquendo*, that a contract did exist, Rev. David Marquard ("Marquard"), President and Pastor of Faith, will testify that Faith's decision to take the

former programming off the air after its purchase of WRIB was made based on the advice of its attorneys, as Faith would have been exposed to potential liability if WRIB's programmers said or did anything in violation of FCC rules and regulations. This problem was compounded by the fact that many of the WRIB programs were in different languages. Faith did not arbitrarily pick and chose the programs that would be removed from the air; rather, Faith removed all of the former programming. Faith was not aware of the existence of an alleged contract between Carter and NACEPF and did not intentionally interfere with any alleged contract. Carberry will also testify that Carter informed Faith that there were no clients with contracts that would extend beyond the closing date of the sale of WRIB. Faith had every right to rely on Carter's representations and to format the programming on the station it purchased.

**Damages**

Finally, the evidence will show that even if there was a one year contract between Carter and NACEPF, NACEPF has no damages. On July 7, 2006, Carter reimbursed NACEPF with a check in the amount of $11,760.00 for the unused portion of the funds. Any further damages claimed by NACEPF are speculative and were incurred as a result of NACEPF's failure to mitigate its damages.

NACEPF did not begin broadcasting it programs again until April 2, 2007, approximately eighteen days before the alleged contract with Carter was to expire. despite the availability of broadcasting slots on other radio stations at reasonable prices. NACEPF currently broadcasts its programming on WARL 1320, in Attleboro, Massachusetts. NACEPF's expert, Steven Apel, of Artam Research, is claiming that NACEPF is owed $38,993.91, which represents the amount of fees NACEPF would have

to pay to WARL for the unused 42 weeks of the WRIB contract to reach the same listeners it would have reached at WRIB. The evidence will show that not only is this figure speculative but is wholly irrelevant as well.

The evidence will show that NACEPF did not elicit any type of contribution from its listening audience and it would in fact return contributions that were sent to WRIB. Therefore, a decrease in listening audience would have no monetary impact on NACEPF. NACEPF has claimed to have undertaken a vast advertising campaign in an attempt to rebuild its listening audience. These advertising costs are irrelevant for the same reason expressed above and are nothing more than NACEPF's attempt to have Carter foot the bill for an expensive advertising campaign. Additionally, NACEPF failed to utilize the best advertisement of all, an indication on its website that its programming could now be listened to on WARL.

## MEMORANDUM OF SUPPORTING LAW

### NACEPF and Carter Did Not Enter Into a Binding One Year Contract

Under Rhode Island contract law, in order to have a legal contract there must be an offer, acceptance and consideration. *Sheehan v. Richardson*, 315 B.R. 226, 240 (D.R.I. 2004), *citing Filippi v. Filippi*, 818 A.2d 608, 623-24 (R.I. 2003). To establish that either an express or an implied contract exists, "a litigant must prove mutual assent or a 'meeting of the minds between the parties.'" *Opella v. Opella*, 896 A.2d 714, 720 (R.I. 2006), citing *Mills v. Rhode Island Hospital*, 828 A.2d 526 (R.I. 2003). Corbin on Contracts states that, "A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think they have made a contract; they must have

expressed their intentions in a manner that is capable of understanding." 1 Corbin on Contracts, § 95 at 394.

Further, a contract requires a manifestation of mutual assent in the form of an offer by one party which is accepted by the other party. *Armbrust Int'l, Ltd. v. Travelers Casualty and Surety Co. of America*, 2006 U.S. Dist. LEXIS 25640, (D.R.I. 2006). A manifestation of mutual assent to an exchange requires that each party either make a promise or begin to render performance. *See* Restatement of Contracts Second, §18. Undisclosed intentions are immaterial unless fraud or mistake are alleged and "neither party to a contract may assume that a contract exists if he or she knows that the other party does not intend what his or her words or actions may seem to express." *17 C.J.S. Contracts § 37.*

Even a contract implied in fact must contain all of the elements of an express contract. *J.Koury Steel Erectors, Inc. of Massachusetts v. San-Vel Concrete Corp.*, 387 A.2d 694,697 (R.I. 1978), quoting *Bailey v. West*, 249 A.2d 414 (R.I. 1969). Therefore, a contract implied in fact, "is dependent on mutual agreement or consent, and on the intention of the parties; and meeting of the minds is required." *Id.* Further a contract implied in fact cannot exist "unless a contract status is shown." *Id.* Finally, a contract cannot be implied in fact "where the facts are inconsistent with its existence". *Id.*

An offer for a unilateral contract requires an act on the part of the offeree to make a binding contract. *Judd Realty, Inc. v.* Tedesco, 400 A.2d 952, 955 (R.I. 1979), citing 1 Williston, *Contracts* § 65 at 213-213 (3d ed. 1957). This act is consideration for the promise contained in the offer and doing it with *intent* to accept without more will create a contract. *Id* at 955-956, emphasis supplied. Additionally, only the fulfillment of the

performance will create a contract and establish the rights and duties of the parties. *B&D Appraisals v. Gaudette Machinery Movers, Inc.,*733 F.Supp.505, 508 (D.R.I. 1990), citing Calamari & Perillo, *The Law of Contracts* §§ 2-28, 4-15 (2d ed. 1977).

**<u>Depositing NACEPF's Check Did Not Form a Contract Between NACEPF and Carter</u>**

Courts have rejected the notion that the retention or cashing of a check necessarily constitutes acceptance of an offer. *See Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1187-88 (5th Cir.1981) (concluding that cashing of check, without notice of such act or other notice of acceptance, does not constitute acceptance); Hermes v. William F. Meyer Co., 65 Ill.App.3d 745, 22 Ill. Dec. 451, 382 N.E.2d 841, 846-47 (1978) (stating that facts did not support conclusion that retention of check indicated assent). Additionally, only in the **absence** of a showing of a contrary intention, is the exercise of dominion over things offered, an acceptance. *Autographic Register Co. v. Philip Hano Co.*, 198 F.2d 208 (1st Cir. 1952), emphasis supplied.

**<u>Faith Did Not Tortiously Interfere With a Contract Between Carter and NACEPF</u>**

The elements of the tort of interference with a contractual relationship are well-established under Rhode Island law. To prevail under this theory, a plaintiff must prove: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional interference with the contract, and (4) that plaintiff suffered damages as a result of the defendant's interference. *Banco Totta e Acores v. Fleet Nat'l Bank*, 768 F. Supp. 943, 950 (D.R.I. 1991). Therefore, in order to show an interference with a contractual relationship, the plaintiff must prove the existence of a contract. *Moran v. Worrell Health Care, Inc.* 1993 R.I. Super. Lexis 56. Additionally, the plaintiff

must show that the defendant acted with legal malice and intent to harm without justification. *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252 (1st Cir. 1997).

**The Plaintiff failed to exercise reasonable diligence to mitigate its damages**

Under Rhode Island law, a plaintiff claiming injury from a breach of contract "has a duty to exercise reasonable diligence and ordinary care in attempting to minimize damages." *Tomaino v. Concord Oil of Newport, Inc.*, 709 A.2d 1016, 1026 (R.I. 1998). Damages which the plaintiff, might have avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered either as not having been caused by the defendant's wrong or as not being chargeable against the defendant." *24 Williston on Contracts § 64:27* Mitigation of Damages; see also Restatement (Second) of Contracts *§* 350(1). The purpose behind "mitigating damages" is to prevent a party from sitting idly by and allowing further damages to accumulate, which is exactly what NACEPF has done.

**The Plaintiff's damages are speculative and cannot be proven with a reasonable degree of certainty**

It is well settled that the amount of damages sustained in a breach of contract must be proven with a reasonable degree of certainty. *Guzman v. Jan-Pro Cleaning Systems, Inc.*, 839 A.2d 504, 507 (R.I. 2003). Further, the plaintiff "must establish reasonably precise figures and cannot rely upon speculation." *Id*, citing *Marketing Design Source, Inc. v. Pranda North America Inc.*, 799 A.2d 267, 273 (R.I. 2002).

**R.I.G.L. § 9-1-4 Statute of Frauds would apply to the alleged contract between NACEPF and Carter**

R.I.G.L. § 9-1-4 states in relevant part, "No action shall be brought: (1) Whereby to charge any person upon any agreement which is not to be performed within the space

of one year from the making thereof; unless the promise or agreement upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him thereunto lawfully authorized." *R.I.G.L. § 9-1-4.* The time within which a contract is to be performed begins from the time of the making of the contract and not from the time when actual services are to begin. *Kass v. Ronnie Jewelry, Inc.*, 118 R.I. 100, 103 (R.I. 1977).

**LENGTH OF TRIAL**

It is anticipated that this trial will last two to three (2-3) full days, with the plaintiff being allotted one full day and both defendants being allotted one full day each to present their respective cases.

Respectfully submitted,

CARTER BROADCASTING
CORPORATION and FAITH
CHRISTIAN CENTER

By their Attorneys,

DAVID E. MAGLIO & ASSOCIATES,
P.C.

/s/ David E. Maglio, Esq.
David E. Maglio, #3459
101 Dyer Street, Second Floor
Providence, Rhode Island 02903
Tel: (401) 831-5400
Fax: (401) 831-7979
dmaglio@magliolaw.com

**CERTIFICATION**

I hereby certify that an exact copy of the within document was filed by CM/ECF to the following individuals on the 10th day of March, 2008.

- Mark A. Pogue
  Edwards Angell Palmer & Dodge, LLP
  2800 Financial Plaza
  Providence, RI 02903
  mpogue@eapdlaw.com

/s/ David E. Maglio, Esq. (R.I. Reg. No. 3459)

h:\clients\carter\nacepf\pleadings\pretrial memo