UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC. | : | |
| *Plaintiff* | : | |
| VS. | : | C.A. 06-431ML |
| CARTER BROADCASTING CORPORATION and FAITH CHRISTIAN CENTER | : | |
| *Defendants*. | : | |

**PLAINTIFF NORTH AMERICAN CATHOLIC**
**EDUCATIONAL FOUNDATION, INC.'S PRE-TRIAL MEMORANDUM**

In accordance with this Court's Order dated December 6, 2006, plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF") herewith submits its pretrial memorandum.

**I. What NACEPF Expects To Prove**

NACEPF expects to prove that, in early 2006, it made a contract with the defendant Carter Broadcasting Corporation ("Carter") whereby Carter agreed to broadcast 520 half-hour programs produced by NACEPF on radio station WRIB. The manner in which this contract was formed followed the course of dealing of the parties beginning in at least 1999. Pursuant to that course of dealing, NACEPF's president John Primeau delivered a check for a year's worth of programming to WRIB's station manager, John Pierce. Primeau told Pierce what the check was for; explained how he calculated the amount of the check; and indicated that Carter could confirm the arrangement by cashing the check. Carter then cashed the check. The parties followed essentially this routine every year between 1999 and 2006.

After Carter cashed NACEPF's check for the 2006-07 broadcast year, Carter reached agreement to sell WRIB to Faith Christian Center ("Faith"), the co-defendant in this case. Pierce, Carter's station manager, knew that Faith intended to dismiss all of WRIB's programmers once it acquired the station. He also knew that, once Primeau learned of the impending sale, Primeau would complain that NACEPF had contractual rights to broadcast for the rest of the year it had paid for. For that reason, Pierce waited until the last minute to inform Primeau of the impending sale.

When Primeau learned of the sale, he immediately protested. In July 2006 he sent a letter by email, fax and Federal Express to both Carter and Faith which complained that he still had time left on the year of broadcasting he had paid for. Although Carter and Faith received Primeau's letter before their transaction closed, they nonetheless went through with it. After Faith acquired WRIB, it immediately dismissed all of its programmers, including NACEPF, from the airwaves.

At the time Faith blocked NACEPF from the station, WRIB had only broadcast 100 of the 520 half-hour shows that NACEPF had paid to broadcast. NACEPF attempted to find another radio outlet for its programming, but it was difficult to find a local radio station that would broadcast half-hour shows. Finally, in April 2007, NACEPF located another station (WARL) that agreed to broadcast half-hour shows. WARL, however, not only charged significantly more than WRIB had charged NACEPF; it only reaches about half as many listeners as WRIB did. Thus, although NACEPF had found another radio outlet, it was paying more to reach fewer people. NACEPF will establish through expert testimony that it will cost NACEPF an extra $39,000 to reach the same numbers of

listeners through WARL over the remaining 420 programs as it would have paid using WRIB as its broadcast outlet.

Moreover, NACEPF will present evidence that it had to undertake a significant advertising campaign to alert its long-time listener base that it had switched from WRIB to WARL. NACEPF will seek to recover these advertising expenses as well.

## II. Memorandum Of Law

Set forth below is a discussion of certain legal issues which are relevant to this case.

### A. Contract Formation

It is basic that, to create a binding contract, there must be an offer and acceptance. Armbrust International, Ltd. v. Travelers Casualty And Surety Company Of America, 2006 WL 1207659 at *3 (D.R.I. 2006) (Lisi, J.). There are several ways in which an offer can be accepted to form a contract.

#### 1. Implied-In-Fact Contracts

Assent to an offer need not be expressed in writing or in a formal document in order to create a binding contract. Rather, assent can be shown through the actions and communications of the parties. When acceptance happens in this manner, an implied-in-fact contract is formed.

> This is commonly referred to as an implied-in-fact contract. It is a form of express contract wherein the elements of the contract are found in and determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document. The difference between an express contract and an implied-in-fact contract is simply the manner in which the parties express their mutual assent.

Marshall Contractors, Inc. v. Brown University, 692 A.2d 665, 669 (R.I. 1997) (citations omitted). See also Anthony A. Nunes, Inc. v. American Automobile Assoc., 1995 WL 941459 at * 3 (R.I. Super. 1995) ("Contracts which result from words are described as 'express contracts,' while contracts that result from conduct are described as 'implied in fact contracts.' The distinction has no legal consequences.")

The history of dealings between two parties can create an implied-in-fact contract. School Committee Of The City Of Providence v. Board Of Regents For Education, 308 A.2d 788, 790 (R.I. 1973) (intention to contract "can be gleaned from the prior dealings between the parties or from any other surrounding facts or circumstances which might shed any light on the question."); Buzzmarketing, LLC v. The Upper Deck Company, LLC, 2004 WL 966241 at * 4 (E.D. Pa. 2004) ("past dealings between companies commonly form the basis for implied-in-fact contracts."); Dr. Franklin Perkins School v. Freeman, 741 F.2d 1503, 1515 (7th Cir. 1984) ("[A]n implied-in-fact contract is… established when a promisor's assent to the contract is manifested in conduct or surrounding circumstances such as a course of dealings[.]"); CME Tours, Inc. v. Hahnemann University, 1986 WL 10121 at * 2 (E.D. Pa. 1986) ("course of dealings and conduct of both parties [may] clearly establish the existence of an implied-in-fact contract."); Carter v. Katz, et al., 120 Misc.2d 1009, 1011 (Supr.Ct. NY 1983) ("past dealings would be sufficient to support an implied-in-fact contract").

**2. Offers Which Invite Acceptance Through Performance**

One particular type of implied-in-fact contract occurs where the offer invites acceptance by performance, and the offeree performs accordingly. In this situation, a

contract is formed even if the offeree does not verbally notify the offeror of its acceptance:

> Where an offer invites an offeree to accept by rendering a performance, no notification is necessary to make such an acceptance effective unless the offer requests such a notification.

Restatement (Second) of Contracts, § 54(1). Accord, Autographic Register Co. v. Philip Hano Co., 198 F.2d 208, 212 ("It is elementary that an offer may be accepted by performing or refraining from performing a specified act as well as by an affirmative answer.").

**3. Acceptance Manifested Through Exercise Of Dominion Over Offeror's Property**

Another way in which assent can be expressed is through exercising dominion over the offeror's property in accordance with the offer's terms. "An offeree who does any act inconsistent with the offeror's ownership of offered property is bound in accordance with the offered terms unless they are manifestly unreasonable." Restatement (Second) of Contracts, § 69(2); see also Corbin on Contracts, §3.17, at 401 (2007).

**B. The Standard Used To Determine If Assent Has Been Given**

Regardless whether an express or an implied-in-fact contract is at issue, an objective, external standard is used to determine whether assent has been given. "Under Rhode Island's law of contracts, we look to the parties' words and actions to determine whether they have manifested the objective intent to promise or be bound." Bourque v. FDIC, 42 F.3d 704, 708 (1st Cir. 1994) (emphasis in original; footnote omitted). Accord, Smith v. Boyd, 553 A.2d 131, 133 (R.I. 1989) ("In general, it is a party's objective intent that will be considered as creating either an offer or acceptance. That is, this court shall

look to an external interpretation of the party's or parties' intent as manifested by action.").

Because an external, objective standard is used to gauge whether a party has assented to a contract, a party cannot defeat the formation of a contract by claiming that it harbored a private, subjective belief that it had not agreed to the contract:

> Expressions of inward, subjective intent that conflict with outward evidence or with the other party's intent do not preclude contract formation. A party cannot … escape a contract by proving its own intent.

Anton v. SBC Global Services, Inc., 2006 WL 2827421 at * 8 (E.D. Mich. 2006) (citations omitted).

**C. Contract Damages**

The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as god a position as it would have been in had the parties fully performed the contract. Riley v. St. Germain, 723 A.2d 1120, 1122 (R.I. 1999). The measure of such damages is the additional cost the injured party incurs when it "covers" by procuring substitute services because of the other party's breach. As one court stated:

> If the seller breaches a contract for services, the buyer's remedy for cover equals the difference between the cost of the substitute services and the contract price plus other losses.

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001).

For example, in Riley v. St. Germain, the buyer broke its contract to purchase the seller's house. The seller "covered" by selling to another buyer – but at a much lower

price. The Rhode Island Supreme Court held that the seller's damages equaled the difference between the original sale price and the lower cover price, plus various incidental expenses incurred by the seller. 723 A.2d at 1122-23.

Here, NACEPF will present evidence of the cost to place it in as good a position as it would have been in had Carter fully performed the broadcasting contract . In particular, NACEPF will demonstrate that it incurred additional expenses to "cover" – that is, to procure substitute broadcast services to reach an equivalent number of listeners for an equivalent number of shows – after Carter breached the contract.

**D. Intentional Interference With Contract**

To prove the tort of intentional interference with contract, a plaintiff must prove the following: (i) the existence of a contract; (ii) the defendant's knowledge of the contract; (iii) the defendant's intentional interference; and (iv) damages resulting therefrom. Belliveau Building Corp. v. O'Coin, 763 A.2d 622, 627 (R.I. 2000).

## III. Probable Length Of Trial

Two to three days.

NORTH AMERICAN CATHOLIC
EDUCATIONAL PROGRAMMING
FOUNDATION, INC.

By Its Attorneys,

/s/ Mark A. Pogue
Mark A. Pogue #3441
EDWARDS ANGELL PALMER &
DODGE LLP
2800 Financial Plaza
Providence, RI 02903
Tel. 401-274-9200
Telecopy 401-276-6611

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of March, 2008, a copy of the foregoing Plaintiff North American Catholic Educational Programming Foundation, Inc.'s Pre-Trial Memorandum by ECF to the following counsel of record:

David E. Maglio, Esq.
The Owen Building
101 Dyer Street, Second Floor
Providence, RI 02903

/s/ Mark A. Pogue